# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STEPHEN J. and LINDA L. ROGERS, Husband and Wife, | ) | |
| DONALD E. and JUDITH DURAN, Husband and Wife, | ) | |
| DENISE RIZZO, a married woman in her individual behalf. | ) | |
| DWIGHT and CAROLYN AUSTIN, Husband and Wife, | ) | No. 07-273L |
| KATHY BECKER, | ) | |
| ANNE EDWARDS, | ) | |
| EDWARD and JANICE FATICA, Husband and Wife, | ) | |
| OWEN and LAURA HARNEY, Husband and Wife, | ) | |
| JAN and KARIN HEITMANN, Husband and Wife, | ) | |
| KENNETH and M. LaORA MILES, Husband and Wife | ) | |
| MISSION ESTATE HOMEOWNERS' ASSOCIATION | ) | |
| SUE WETZEL STITT, | ) | |
| EGBERT and BARBARA VON PAPEN, Husband and Wife, | ) | |
| For Themselves and As Representatives of a Class of Similarly Situated Persons, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |

THE UNITED STATES OF AMERICA, )
)
Defendant. )

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### SUMMARY OF THIS CASE

The Plaintiffs are citizens of the United States and of the State of Florida. The Plaintiffs' are the fee owners of property in Sarasota County, Florida. In 1910 the Seaboard Air Line Railway acquired an easement for the operation of a railroad across an approximately 12 mile long corridor from Sarasota to Venice, Florida. This railroad right-of-way was used for, among other purposes, the operation of trains used by the Ringling Brothers Circus.

This railroad easement was granted for the operation of a railroad and not for any other purpose. Under the terms of the relevant easement instruments and under Florida law, once the successor to the Seaboard Air Line Railway (which is now the Seminole Gulf Railway, L.P. ("SGLR")) ceased operating a railroad across the right-of-way, the railroad easement was abandoned and the Plaintiffs' as fee owners regained their right to the exclusive use and physical possession of their property.

Section 8 (d) of the 1983 amendments to the National Trails System Act, 16 U.S.C. §1247(d) ("Trails Act"), provides the issuance of a Notice of Interim Trail Use ("NITU") by the Surface Transportation Board (STB) forestalls the Plaintiff property owners "reversionary"[1] property rights and allows the Plaintiffs' property to be transferred to a trail user notwithstanding whatever "reversionary" interest the Plaintiff's have to their property under Florida law.

The STB issued a NITU affecting this abandoned railroad right-of-way on April 2, 2004. Pursuant to the Trails Act and this NITU, Sarasota County (and/or the Trust for Public Land) entered into negotiations with SGLR and CSX Transportation, Inc, (CSX)

[1] Plaintiff's use the term "reversionary" because such term was used in the generic sense by the Federal Circuit in *Barclay* and *Renewal Body Works*. Technically this is not a "reversion" of the property. Rather the Plaintiff's and their predecessors in title always held fee title to the property. Their fee title had been burdened by an easement for operation of a railroad. Upon the railroad's abandonment of this easement, their fee became "unburdened" by this easement to the extent that "reversionary _ " is used in this pleading it is used in the generic sense.

for acquisition of an easement for a public access recreational trail to be located across the abandoned railroad corridor. Under the terms of the original railroad easement and under Florida law, SGLR and CSX did not own or possess any right to grant Sarasota County or the Trust for Public Land an easement across the Plaintiff's land.

The appropriation of a new easement for an interim public recreational trail and the creation of a new easement for a future railroad corridor across the Plaintiffs' property is a taking of the Plaintiffs' property for which the Fifth Amendment to the U.S. Constitution requires that the United States pay "just compensation" to the Plaintiff property owners.

This action is the claim by these United States citizens brought pursuant to the Fifth Amendment and the Tucker Act 28 U.S.C. § 1491 (a)(1) seeking "just compensation" for the value of their property taken from them by the federal government through operation of the Trails Act. The "just compensation" they seek includes compensation for the delay between the date their property was taken (or made subject to the Trails Act) and when the federal government ultimately pays them compensation.

They also seek the government to pay their attorney fees and expenses incurred in bringing this action pursuant to the Declarations of Taking Act 42 U.S.C. § 4654 (c).

## COMPLAINT

### JURISDICTION

1. This court has jurisdiction pursuant to 28 U.S.C. §1491(a)(1) ("Tucker Act"), in that this action presents a claim against the United States which is founded upon the Constitution and Statutes of the United States.

### STATUTES AND CONSTITUTIONAL PROVISIONS

2. Plaintiffs' claim is governed by the following statute and constitutional provision:

(a) The Fifth Amendment to the United States Constitution which provides, "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

(b) National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act")

(c) The Tucker Act, 28 U.S.C. § 1491(a)("Tucker Act") which provides in relevant part, "The United States Court of Federal Claims shall have jurisdiction to render judgment on any claim against the United States founded upon the Constitution."

(d) The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654 (c)(2000) provides that just compensation includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding.

**Statement of Facts Applicable To All Counts.**

3. In 1910 the Seaboard Air Line Railway acquired an easement for the operation of a railroad line between the City of Sarasota and Venice, Florida.

4. The majority of this easement was acquired by the Seaboard Air Line Railway across property owned by members of the Palmer Family, specifically, Potter Palmer, Jr., and his wife Pauline Palmer and from Adrian C. Honore.

5. The easement granted to the Seaboard Air Line Railway specifically provided that the easement was for the purpose of operating a railroad and provided that, "This conveyance is made upon the express condition, however, that if the Seaboard Airline Railway shall not construct upon said land and commence the operation thereon with (sic) one year of the date hereof of a line of railroad, or, **if at any time thereafter the said Seaboard Air Line Railway shall abandon said line for railroad purposes then the above described pieces and parcels of land shall *ipso facto* revert to and again become the property of the undersigned, his heirs, administrators and assigns.**" (A complete copy of these easement instruments are attached as "Exhibit A" and are incorporated herein by this reference.)

6. Other easements by which the Seaboard Air Line Railway acquired the right to use the property across which the railroad was constructed contained similar provisions limiting the use of the property by the railroad to an easement for the purpose of operating a railroad.

7. On December 15, 2003, Seminole Gulf Railway, L.P. (SGLR), filed with the Surface Transportation Board a petition under 49 U.S.C. 10502 for exemption from the provisions of 49 U.S.C. 10903 to abandon an approximately 12.43-mile portion of its

Venice Branch between milepost SW 892 outside the city limits of the City of Sarasota, and milepost 904.4 near the City of Venice, in Sarasota County, FL. The line includes a "wye" and stub at approximately milepost SW 904.2 and side tracks.

8. According to SGLR, no railroad traffic has moved over this railroad corridor since March, 2002 and, "there is little likelihood of traffic returning to the [rail] line."

9. The SGLR (and CSX) are the successors and assigns of the Seaboard Air Line Railway.

10. On April 2, 2004 the STB issued a NITU for this abandoned railroad corridor. (A copy of the NITU is attached as Exhibit "B").

11. Pursuant to this NITU, the SGLR and CSX granted The Trust for Public Land an option to acquire the rail line for conversion to a trail.

12. The Trust for Public Land agreed to work with Sarasota County to convert the rail line into a public access recreational trail.

13. The negotiating period for reaching a Trail Use Agreement between the SGLR and Sarasota County or the Trust for Public Land was extended by the STB.

14. On January 13, 2005 a Quit Claim Deed was recorded between CSX Transportation, Inc. (the entity from which SGLR leased the abandoned right-of-way) and The Trust for Public Land. This deed was executed pursuant to a Trail Use Agreement that Plaintiff's believe was reached in December 2004. (A complete copy of this Quit Claim Deed is attached as "Exhibit C".)

15. This Quit Claim Deed affects more than 155 acres of property in Sarasota County, Florida including that property owned by the Plaintiffs.

16. This Quit Claim Deed was expressly executed and entered into by the Trust for Public Land and CSX in reliance upon the STB's issuance of the NITU and the provisions of the Trails Act.

17. The Trust for Public Land is a national, nonprofit, land conservation organization. The Trust for Public Land is not a railroad and is not authorized by any state or by the federal Surface Transportation Board to operate a railroad.

18. Sarasota County, Florida, a municipal entity, is not authorized by the state of Florida (or by any other state) or by the federal Surface Transportation Board to operate a railroad.

19. The SGLR (and/or Sarasota County) has removed the rails and ties from the abandoned right-of-way.

20. The National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act") provide, "in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."

21. But for operation of the Trails Act the Plaintiffs would have the exclusive right to physical ownership, possession and use of their property free of any easement for recreational trail use or future railroad use.

22. The United States Supreme Court in *Preseault v. United States* (*Preseault I*), 494 U.S. 1 (1990) held that Congress possessed the constitutional authority to enact the Trails Act and to take the Plaintiffs' property for conversion to a public-access

recreational trail and preservation of a railroad easement for a possible future railroad corridor.

23. However, the Supreme Court in *Preseault I* and the Federal Circuit sitting *en banc* in *Preseault v. United States*, (*Preseault II*), 100 F.3d 1525 (Fed. Cir. 1996) held that the Fifth Amendment to the United States Constitution requires the United States to pay the property owners for the value of that property taken by operation of Section 8(d) of the Trails Act. To wit, Justice O'Connor wrote in *Preseault I*, "[the Trails Act] provides that interim trail use 'shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.' This language gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests. By deeming interim trail use to be like discontinuance rather than abandonment, Congress prevents property interests from reverting under state law." *Preseault I* at 8.

24. The U.S. Court of Appeals for the Federal Circuit in *Preseault II*, held "We conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government. *** In the case before us there was a similar physical entry upon the private lands of the [property owners], acting under the Federal Government's authority pursuant to the ICC's [now STB's] Order. That it was for a valued public use is not the issue. We have here a straightforward taking of

private property for a public use for which just compensation must be paid." *Preseault II* at 1551.

25. The property over which the abandoned SGLR right-of-way is located is valuable property.

26. Creating a public access recreational trail across the Plaintiffs' property and appropriating a new easement for possible future railroad use has taken from the Plaintiffs not just the value of the land physically appropriated for this trail corridor (which varies in width between 100 and 200 feet) but has also greatly diminished the value of the Plaintiffs' property adjoining this trail corridor.

27. The value of the property taken from the Plaintiffs' (both that physically appropriated for a public trail and that diminished value of the Plaintiffs adjoining property) is very substantial.

28. The Federal Circuit in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004) and *Barclay v. United States*, 443 F.3d 1368 (2006) held that this claim for compensation has arisen upon the date that the Surface Transportation Board issued the NITU. Specifically, Judge Dyk of the Federal Circuit wrote, "[t]he taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. Abandonment is suspended and the reversionary interest is blocked 'when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)' of the Trails Act. We concluded that '[t]he issuance of the NITU is the only government action in the rail banking process

that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way.' Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU." *Barclay v. United States*, 443 F.3d 1368 (2006) (Judge Dyk cited his own prior decision in *Caldwell v. United States* as authority.)

29. The United States Constitution requires the federal government to pay "just compensation" to all those property owners' holding fee title to property that was subject to the NITU.

**THE PARTIES**

**Steve and Linda Rogers**

30. Plaintiffs Stephen and Linda Rogers ("Rogers") are husband and wife. The Rogers are residents and citizens of the State of Florida and the United States of America.

31. The Rogers acquired their home in Sarasota County, Florida on July 25, 2003. (A copy of the Warranty Deed by which the Rogers acquired their home is attached as "Exhibit D".)

32. The Rogers' property includes the fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**Donald and Judith Duran**

33. Plaintiffs Donald E. and Judith A. Duran ("Duran") are husband and wife. The Durans are residents and citizens of the State of Florida and the United States of America.

34. The Durans acquired their home in Sarasota County, Florida on August 1, 2000. (A copy of the Warranty Deed by which the Durans acquired their home is attached as "Exhibit E".)

35. The Durans' property includes the fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**Denise Rizzo**

36. Plaintiff Denise Rizzo, a married woman is a resident and citizen of the State of Florida and the United States of America.

37. Denise Rizzo acquired her home in Sarasota County, Florida on November 6, 2001. (A copy of the Warranty Deed by which Denise Rizzo acquired her home is attached as "Exhibit F".) Denise Rizzo lived in this property with her husband Frank Rizzo until such time as she sold the property on March 30, 2005.

38. Denise Rizzo's property includes fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**Dwight and Carolyn Austin**

39. Plaintiffs Dwight and Carolyn Austin ("Austin") are husband and wife. The Austins are residents and citizens of the State of Florida and the United States of America.

40. The Austins acquired their home in Sarasota County, Florida on September 30, 2002. (A copy of the Warranty Deed by which the Austins acquired their home is attached as "Exhibit G".)

41. The Austins' property includes the fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**Kathy Becker**

42. Plaintiff Kathy Becker is a resident and citizen of the State of Florida and the United States of America.

43. Kathy Becker acquired her home in Sarasota County, Florida on December 12, 2003. (A copy of the Warranty Deed by which Kathy Becker acquired her home is attached as "Exhibit H".)

44. Kathy Becker's property includes the fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**Anne Edwards**

45. Plaintiff Anne Edwards is a citizen of the United States of America.

46. Anne Edwards was fee owner of the property in Sarasota County, Florida described in the attached deed, "Exhibit I", on April 2, 2004. Anne Edwards subsequently sold that property to James and Patricia Dossett on August 24, 2005. (A copy of the Warranty Deed by which Anne Edwards sold her home is attached as "Exhibit I".)

47. Anne Edwards' property includes the fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**Edward and Janice Fatica**

48. Plaintiffs Edward and Janice Fatica ("Fatica") are husband and wife. The Faticas are residents and citizens of the State of Florida and the United States of America.

49. The Faticas acquired their home in Sarasota County, Florida on February 4, 2000. (A copy of the Warranty Deed by which the Faticas acquired their home is attached as "Exhibit J".)

50. The Faticas' property includes the fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**Owen and Laura Harney**

51. Plaintiffs Owen and Laura Harney ("Harney") are husband and wife. The Harneys are residents and citizens of the State of Florida and the United States of America.

52. The Harneys acquired their home in Sarasota County, Florida on July 9, 1999. (A copy of the Warranty Deed by which the Harneys acquired their home is attached as "Exhibit K".)

53. The Harneys' property includes the fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**Jan and Karin Heitmann**

54. Plaintiffs Jan and Karin Heitmann ("Heitmann") are husband and wife. The Heitmanns are residents and citizens of the State of Florida and the United States of America.

55. The Heitmanns acquired their home in Sarasota County, Florida on January 15, 2002. (A copy of the Warranty Deed by which the Heitmann acquired their home is attached as "Exhibit L".)

56. The Heitmanns' property includes the fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**Kenneth and M. LaOra Miles**

57. Plaintiffs Kenneth and M. LaOra Miles ("Miles") are husband and wife. The Miles are residents and citizens of the State of Florida and the United States of America.

58. The Miles acquired their home in Sarasota County, Florida on October 17, 2003. (A copy of the Warranty Deed by which the Miles acquired their home is attached as "Exhibit M".)

59. The Miles' property includes the fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**Mission Estate Homeowners' Association**

60. Plaintiff Mission Estate Homeowners' Association ("Mission Estate") is an association organized and in Good Standing in the State of Florida and a citizen of the United States of America.

61. Mission Estate owns property in Sarasota County, Florida.

62. Mission Estate's property includes the fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**Sue Wetzel Stitt**

63. Plaintiff Sue Wetzel Stitt is a resident and citizen of the State of Florida and the United States of America.

64. Sue Wetzel Stitt was fee owner of the property in Sarasota County, Florida on April 2, 2004. Sue Wetzel Stitt subsequently conveyed that property to Sue Wetzel Stitt, Trustee of the Sue Wetzel Stitt Revocable Trust on April 9, 2007 . (A copy of the Warranty Deed by which Sue Wetzel Stitt conveyed property to Trust is attached as "Exhibit N".)

65. Sue Wetzel Stitt's property includes the fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**Egbert and Barbara Von Papen**

66. Plaintiffs Egbert and Barbara Von Papen ("Von Papen") are husband and wife. The Von Papens are residents and citizens of the State of Florida and the United States of America.

67. The Von Papens acquired their home in Sarasota County, Florida on December 11, 2001. (A copy of the Warranty Deed by which the Von Papens acquired their home is attached as "Exhibit O".)

68. The Von Papens' property includes the fee title to all that property to the centerline of the abandoned SGLR right-of-way that is now subject to the easement for an interim public access trail and possible future railroad reactivation.

**The United States of America**

69. The Defendant is the United States of America.

**The Named Plaintiffs Seek To Represent Other Similarly Situated Sarasota County, Florida Property Owners**

70. The Plaintiffs bring this action in their individual capacity as property owners whose land has been taken by the federal government and also as a class action as representative parties on behalf of themselves and all other similarly situated landowners who own property in Sarasota County, Florida subject to the NITU.

71. According to the Federal Circuit, those property owners entitled to bring a claim for "just compensation" are those that owned property on the "date of taking" which is the April 2, 2004 date when the STB issued the NITU. The named Plaintiffs' held title to their property on April 2, 2004 and the members of the representative class they seek to represent are those other property owners that also held title to property subject to the NITU and Trails Act on April 2, 2004.

72. To the best of Plaintiffs' information and belief, there are more than one hundred other landowners along the approximately 12.5 mile length and more than 180 acre abandoned right-of-way described in the NITU who hold fee title to property for

which their state law "reversionary" property rights were forestalled and whose property is now subject to an easement for a public access recreational trail and possible future railroad use by reason of the NITU and Trails Act.

73. There are questions of law and fact common to the class; Plaintiffs' claims are typical of the claims of the class; and Plaintiffs will fairly and adequately protect the interests of the class.

## THE TRAILS ACT IS A TAKING OF THE PLAINTIFFS' PROPERTY BY THE FEDERAL GOVERNMENT

74. Part of the property owned in fee by each of the Plaintiffs was formerly subject to an easement for railway purposes. This railroad easement provided that the Seaboard Air Line Railway and its successor railroads could use the designated portion of the Plaintiffs' land for the purpose of operating an active railroad.

75. The easement did not provide the Seaboard Air Line Railway, or any other person or entity, the right to use the Plaintiff's property for a public access recreational trail.

76. It is long-settled Florida law that a grant of property to a railroad for a right-of-way is not a grant of fee title but only an easement for use of the property to operate a railroad. "'A right of way for a railroad is only an easement though it be conveyed by deed...' " *Van Ness v. Royal Phosphate Co.*, 60 Fla. 284, 53 So. 381 (Fla. 1910) (citing, *Brown v. Young*, 67 Iowa 625, 29 N.W. 941.)

77. Should the railroad abandon operation of a railroad over the property upon which the right-of-way easement has been granted, the property "reverts" to the fee owner and the fee owner's property is unencumbered by any easement for current or

future railroad use. See, *Seaboard Airline Ry. V. Southern Inv. Co.* 53 Fla. 832, 44 So. 351 (Fla. 1907) and *Canal Authority of Florida v. Mainer*, 440 So. 2d 1304 (Fla. App, 1983).

78. The railroad easement was expressly limited to use of the property as and for a right-of-way for the purpose of operating an active railroad and provided that, "if at any time thereafter the said Seaboard Air Line Railway shall abandon said line for railroad purposes then the above described pieces and parcels of land shall *ipso facto* revert to and again become the property of the undersigned, his heirs, administrators and assigns."

79. Under the terms of the relevant easement and under Florida law, when the SGLR railroad abandoned operation of a railroad over the Plaintiffs' property, the easement was abandoned and the Plaintiffs' regained the right to use and possess their property free of any easement.

80. The Trails Act allows the conversion of abandoned railroad rights-of-way for use as interim public access recreational trails and preserves the right-of-way for possible future reactivation as a railroad. The Trails Act further provides that such conversion to trail use "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes" 16 U.S.C § 1247 (d).

81. The Plaintiffs property had never – at any time – been subject to an easement allowing the public to use the Plaintiff's property for a recreational trail.

82. The Plaintiffs' property has never been subject to a general right of the public to cross or make use of the Plaintiffs' property for any purpose.

83. Any easement for operation of a railroad across the Plaintiffs' property had been abandoned and the Plaintiffs' enjoyed under Florida law the right to use and occupy their property free of any present or future easement for operation of a railroad across their land.

84. The federal government, through operation of the Trails Act and issuance of the NITU has: (a) forestalled or taken from the Plaintiffs' their state law "reversionary" right to their property; (b) appropriated an easement across the Plaintiffs' property for an interim public access recreational trail, and (c) appropriated an easement for a potential future railroad right-of-way across the Plaintiff's property and has taken from the Plaintiffs' the rights they enjoy under the Florida Constitution and Florida law to the exclusive use and physical occupation of their land.

85. Pursuant to the decision of the Federal Circuit in *Caldwell v. United States,* 391 F.3d 1226 (Fed. Cir. 2004) and *Barclay v. United States,* 443 F.3d 1368 (Fed. Cir. 2006), this taking of the Plaintiffs' property occurred when the STB issued the NITU on April 2, 2004.

86. According to the Federal Circuit, the date upon which the value of the property taken from each Plaintiff is to be established is the date of the NITU which is April 2, 2004.

87. The United States has neither instituted any condemnation proceeding against Plaintiffs or the other class members, nor paid, nor offered to pay, the Plaintiffs' for the property it has taken from them.

## SPECIFIC CLAIM FOR RELIEF

## COUNT ONE

### A Claim For "Just Compensation" For The Permanent Physical Taking Of The Plaintiffs And Similarly Situated Land Owners Whose Property Is Subject To The NITU

88. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraph 87 of this complaint.

89. The United States of America is a Republic and the actions and laws of the federal government are subject to the Constitution of the United States.

90. The Fifth Amendment to the Constitution of the United States, "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

91. The Fifth Amendment prohibits the United States from taking private property from a citizen without paying that citizen "just compensation".

92. The Fifth Amendment requirement of paying "just compensation" to a property owner from whom the government takes property includes the obligation of the government to pay the property owner: (a) the fair market value for the property taken as of the date it was appropriated by the federal government – this fair market value includes not only the value of the land actually physically confiscated but also any "severance damages" or loss in value to the property owner's entire parcel caused by the government's taking, (b) payment of an additional amount of delay damages necessary to compensate the property owner for the government's delay in paying the property owner "just compensation.

93. According to the Federal Circuit, the "date of taking" upon which the government's obligation to pay delay damages begins to run is the date of the NITU which, in this case, is April 2, 2004.

94. The Tucker Act, 28 U.S.C. § 1491(a)(1) which provides in relevant part, "The United States Court of Federal Claims shall have jurisdiction to render judgment on any claim against the United States founded upon the Constitution."

95. The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654 (c) provides that just compensation includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

96. The actions of the United States have resulted in the taking of Plaintiffs' and the class members' property, by reason of the direct physical taking of Plaintiffs' and the class members' property and by reason of the damage to Plaintiffs' and class members' remaining adjacent property which has suffered a loss of privacy and other severance damages as a result of the proximity of the public on the adjoining trail. The remaining property is also less valuable by reason of being divided into a smaller parcel by reason of the easement for trail use and adjoining an easement for possible future railroad use.

## SPECIFIC RELIEF REQUESTED

Plaintiffs respectfully request a judgment in favor of Plaintiffs:

1. Certifying that this action may be maintained as a class action;

2. Awarding Plaintiffs' the full fair market value of the property taken by the government on the date it was taken (including any "severance damages" suffered by the

Plaintiff in loss of value to the Plaintiffs' remaining property not actually physically taken but affected by the taking);

3. Compensation for the delay between the date of the government's taking of the Plaintiffs' property (which is the date of the original NITU according to the Federal Circuit's opinion in *Caldwell v. United States,* 319 F.3d 1226 (Fed. Cir. 2004)) and the actual date when the government finally pays "just compensation" to the Plaintiffs';

4. Paying the Plaintiffs' costs and attorneys' fees incurred pursuant to The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654 (c)(2000) which provides that just compensation includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

5. Such further relief as this Court may deem just and proper.

Respectfully submitted,

LATHROP & GAGE, L.C.

Date: June 26, 2007

By: ______________________

Mark F. Hearne, II
The Equitable Building
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
Telephone: (314) 613-2500
Facsimile: (314) 613-2550

Franklin Square, Suite 1050 East
1300 Eye Street, NW
Washington, D.C. 20005
Telephone: (202) 962-0032
Facsimile: (202) 962-0357

Attorney for Plaintiffs