**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| STEPHEN J. and LINDA L. ROGERS, et al.<br><br>For Themselves and As Representatives of a Class of Similarly Situated Persons,<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 07-273L |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO CERTIFY CLASS ACTION**

## I. SUMMARY OF MOTION

The twenty-one Plaintiffs[1] ("Plaintiffs"), own fee title to real estate located in Sarasota County, Florida. The Plaintiff's property was once traversed by the Venice Line of the Seminole Gulf Railway (the "Right-of-Way"). This now abandoned railroad line was an approximately 12 mile long stretch of railroad constructed by the Seaboard Air Line Railway for, among other purposes, the operation of trains used by the Ringling Brothers Circus. The easements which gave the railroad the right to use the property for a right-of-way were initially acquired in 1910 by the Seaboard Air Line Railway. The 12 mile long, mostly 100 foot wide, right-of-way occupied approximately 155 acres of land and was created by essentially twenty different

[1] Carolyn Austin, Dewight Austin, Kathy Becker, Donald E. Duran, Judith Duran, Anne Edwards, Edward Fatica, Janice Fatica, Lauren Harney, Owen Harney, Jan Heitmann, Karin Heitmann, Kenneth Miles, M. LaOra Miles, Mission Estate Homeowners' Association, Denise Rizzo, Linda L. Rogers, Stephen J. Rogers, Sue Wetzel Stitt, Barbara Von Papen, Egbert Von Papen

conveyances from more than twelve different original fee owners (or owner entities). There are now more than 100 fee owners that are successors in title to these original fee owners.

The easements granting the right to construct and operate a railroad on this property were limited to use of the property for the operation of a railroad, but did not include the right to use the property for a public access trail. Further, under the terms of the conveyances and Florida law, the easement was extinguished when use of the property for railroad service was abandoned. The conveyance instruments specifically provided that the easement was for the purpose of operating a railroad and that, "This conveyance is made upon the express condition, however, that if the Seaboard Air Line Railway shall not construct upon said land and commence the operation thereon with (sic) one year of the date hereof of a line of railroad, or, **if at any time thereafter the said Seaboard Air Line Railway shall abandon said line for railroad purposes then the above described pieces and parcels of land shall *ipso facto* revert to and again become the property of the undersigned, his heirs, administrators and assigns."**

Under established Florida law, SGLR's right to use Plaintiffs' (and similarly situated land owner's) property ceased when SGLR abandoned use of the property as a railroad. Moreover, even if SGLR had not abandoned the property, SGLR's right to use the property for a railroad never included the right to use the property for a public access recreational trail. The conversion of the railroad right of way to trail use that occurs by reason of the Trails Act has, therefore, taken Plaintiffs' and the potential class members' rights to their property—rights to which they are otherwise entitled under Florida law. *Van Ness v. Royal Phosphate Co.* 60 Flap 284, 53 So. 381 (Fla. 1910) (citing, *Right-of-Way v. Young*, 67 Iowa 625, 29 N.W. 941).

The last railroad traffic to use the Right-of-Way was in March 2002 when a load of plywood was shipped on the rail line. The Seminole Gulf Railway, L.P. ("SGLR") determined to abandon this rail line and on December 15, 2003 SGLR filed with the Surface Transportation Board ("STB") a petition to abandon the Venice Branch between milepost SW 892 near the City of Sarasota and milepost 904.4 near the City of Venice[2]. On April 2, 2004, the STB issued a Notice of Interim Trail Use ("NITU") pursuant to 16 U.S.C. 1247(d) ("Trails Act").

The NITU applied to the entire length of the Right-of-Way. On January 12, 2003 Pursuant to the NITU, SGLR and CSX Transportation, Inc. (the entity from which SGLR leased the Right-of-Way) executed a Quit Claim Deed conveying all interest they held in the Right-of-Way to The Trust for Public Land. The Trust for Public Land is a public charity and is not a railroad nor is the Trust for Public land authorized to operate a railroad.

This conversion of the abandoned railroad right of way to a public access recreational trail occurred under express authority of the Trails Act. Under Florida law and the express terms of the original easements the Plaintiff's interest in their land would have been free and clear of any easement for any public access, trail use or future reactivation of an easement for railroad use. However, by reason of the Trails Act and decision of the STB, fee title to all that more than 155 acres of land underlying the Right-of-Way is now encumbered by and subject to an easement for a public access recreational trail and possible future use for operation of a railroad.

Plaintiffs seek compensation for the taking of their property which, but for operation of the Trails Act, would be theirs to enjoy free of any easement for public trail use and free of any possible future railroad use. Plaintiffs' claim for an uncompensated taking of their land is

[2] SGLR's petition to abandon railroad service over this Right-of-Way was filed under 49 U.S.C. §10502 for an exempt abandonment pursuant to 49 U.S.C. §10903.

brought against the United States Government under the Tucker Act[3] and the Fifth Amendment to the United States Constitution because the taking of their property occurred by reason of the federal Trails Act. See, *Preseault v. United States* 494 U.S. 1 (1990) and *Preseault v. United States* 100 F. 3d 1525 (Fed. Cir. 1996). The Trails Act has operated to effect a physical taking of the Plaintiff's property because it requires the landowner to submit to the actual physical occupation of their land.

Plaintiffs also seek to certify this claim as a class action with themselves as representative parties for that class of similarly situated individuals or entities that held fee title to any land in Sarasota County, Florida which is now encumbered by the easements created by reason of the Trails Act and the April 2, 2004 NITU[4].

Because common questions of fact and law are shared by all property owners whose land is subject to this NITU, certification as a class action under Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC") serves the interests of justice, judicial economy, and efficiency. Certification of this matter as a class action also satisfies each of the specific criteria established by the U.S. Court of Claims in its benchmark decision, *Quinault Allottee Association and Individual Allottees v. United States*, 453 F.2d 1272 (Cl. Ct. 1972).

Class certification has been granted in the similar Trails Act cases such as *Miller v. U.S.* (No. 03-2489); *Hubbert v. U.S.* (No. 99-396L); *Illig v. U.S.* (No. 98-934L); *Moore v. U. S.* (No.

[3] 28 U.S.C. § 1491(a)(1)

[4] *Birdbay* Executive Golf Course v. United States (Case # 1:07-CV-426) is a case brought by owners of large tracks of property subject to this same NITU and Trails Act. The *Birdbay* Plaintiff's have not sought class certification of their action. A statement of an indirectly related case under rule 40.2 (b) RCFC has been filed in this case on July 6, 2007. *Birdbay* Plaintiff's and the Plaintiff's in this action have common counsel and it is likely that interest of judicial efficiency would be served by consolidating *Birdbay* and this case for briefing and decision on common legal issues. However, the Property in *Birday* are unique large tracks that would not be suitable to the type of class valuation appraisal adopted in the other Trails Act class certified cases of Moore, Illig, and Miller.

93-134L); and, *Glosemeyer v. U.S.* (93-126L). Certification of Tucker Act takings claims brought by landowners whose property was taken by operation of the Trails Act as opt-in class actions pursuant to Rule 23 of the RCFC has proven to be a substantially more cost-effective means to manage Trails Act taking claims, especially when many of the claims are by individual residential property owners and owners of small parcels.

Finally, the Uniform Relocation Assistance and Real Property Acquisition Policy Act of 1970, 42 U.S. C. § 4654 (c) (2000) requires the federal government to pay the legal fees and expenses of those property owners entitled to compensation for the taking of their property. The management of these claims as an opt-in class action pursuant to Rule 23 RCFC will very substantially reduce the costs and attorney fees paid by the federal government and provide for quicker more efficient resolution of these claims.

## II. STATEMENT OF QUESTION INVOLVED

Does Rule 23 RCFC allow for opt-in class certification of the claims by more than 100 owners of property in the same county who each have a similar Tucker Act claim under the Fifth Amendment for the federal government's taking of their property when the federal Trails Act imposed an easement for recreational trail use and future railroad reactivation upon their property and when each landowners' claim arose by reason of the same NITU issued by the Surface Transportation Board?

## III. THIS CASE SHOULD BE CERTIFIED AS AN WHY OPT-IN CLASS ACTION.

### A. THIS COURT HAS AUTHORITY TO CERTIFY A CLASS ACTION

Rule 23 of the Rules of United States Court of Federal Claims ("RCFC 23") gives this Court the authority to certify class actions. The rule states that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether [a class action] is to be so maintained."[5] In *Quinault Allottee Association and Individual Allottees v. United States*, the United States Court of Claims explained that "there is nothing in the type of jurisdiction we have ... to deprive us of this modern aid to speedier and less repetitious litigation." 453 F.2d 1272, 1274 (Cl. Ct. 1972).

### B. THIS ACTION FITS SQUARELY WITHIN THE COURT OF FEDERAL CLAIMS' GENERAL REQUIREMENTS FOR A PROPERLY CERTIFIED CLASS ACTION.

The Court of Federal Claims' revised Rule 23, in the main, adopts the criteria for certifying and maintaining a class action set forth in *Quinault*, the seminal case on class certification, which sets out various criteria to consider in deciding whether to certify a class. *Testwuide v. United States*, 56 Fed. Cl. 755, 761 (Fed. Cl. 2003). This Court must generally

[5] RCFC 23(c)(1).

consider the seven criteria set forth in *Quinault*.[6] *Favreau, II v. United States*, 48 Fed. Cl. 774, 776-777 (Fed. Cl. 2000). Additionally, the court should ask whether certification "would serve the interests of justice by addressing possible statute of limitations problems or other concerns." *Id.*

### 1. *This Case meets the criteria set forth in Quinault.*

The Court of Federal Claims has articulated the requirement that a class action case meet the seven *Quinault* criteria discussed below. *Favreau, II,* 48 Fed. Cl. at 776-777. "The *Quinault* test, however, is conjunctive; that is, failure to satisfy any one of the *Quinault* requirements is fatal to a motion for class certification." *Testwuide,* 56 Fed. Cl. at 761 (citing *Banner v. United States*, 38 Fed. Cl. 700, 703 (Fed. Cl. 1997)).

This present case completely satisfies all of the *Quinault* criteria: (i) the class size is expected to represent more than 100 class members, a large but manageable class; (ii) the common questions of law focus upon whether the government took plaintiffs' private property for public purpose under the Trails Act and the Fifth Amendment of the United States Constitution. This question must be answered for all potential class members under common legal issues of Florida and federal law; (iii) the factual questions will not override the common legal issues in that while no single parcel of real estate is precisely the same, property value differences are readily distinguished and determined by professional real estate appraisers[7]; (iv) the claims of the named Plaintiffs are typical of class members since the burden of the taking fell on all fee owners on the common date of taking; (v) the government's actions affected all

---

[6] The *Quinault* opinion set out an eighth factor—whether individual suits would create a risk for inconsistent adjudications. Given the Federal Circuit's appellate jurisdiction over Tucker Act and "little Tucker Act" decisions, the eighth factor is not applicable here. See *Christian, II v. United States*, 46 Fed. Cl. 793, 816 (2000) (*citing Berkley v. United States*, 45 Fed. Cl. 224, 234 (1999).

[7] The Department of Justice and counsel for property owners have adopted a cost-efficient method for establishing the value of each individual parcel of property taken in other class action Trails Act taking cases and it is anticipated that a similar method could be adopted in this case.

plaintiffs simultaneously, thereby acting on grounds applicable to the whole class; (vi) based on reasonable estimations of Plaintiffs' counsel, damages for many of the fee owners will likely be of such limited amount (relative to the cost of presenting their claim) that separately litigating each fee owner's claim is would be extremely inefficient and costly; and (vii) similarly situated persons are suing under identical statutes and are represented by competent counsel with experience in takings cases, thus, the named Plaintiffs will adequately protect the interests of the class.

**2. *Certification would serve the interests of justice.***

Certification in this case would serve the interests of justice. The class size, litigation efficiencies realized , and proposed "opt in" class are all attributes justifying class certification.

The proposed class represents more than 100 potential individual cases against the United States Government seeking compensation resulting from the taking of property that occurred when the slightly more than 12 mile long railroad right of way was converted to a public trail with possibility of future railroad use: Certification of a class action is the most efficient way to proceed. Instead of having more than 100 different cases, with multiple counsel and experts assigned to different trial judges, there will be one Plaintiffs' counsel working with common experts before one judge. Additional efficiencies are gained through the use of common title research and a unified approach to the appraisal of property values. There will be only one action to resolve the common factual and legal questions. The most substantial benefit of class certification is enjoyed by the Government since class certification provides an efficient method for the class members to present their claims and for the Government to answer those claims and resolve legitimate claims in a cost-efficient manner with limited attorney fees and expenses.

Federal law provides that where the plaintiff is successful in its action, the Government is required to pay the plaintiff's attorneys' fees and costs.[8] The attorneys' fees, costs, expert witness and appraisal fees for more than 100 separate actions, would greatly exceed the expense for one combined class action. The certification of this case as a class action, therefore, benefits the Government by reducing the potential amount of the Government's liability for Plaintiffs' attorney's fees and other costs.

The Plaintiffs propose an "opt-in" class which is the only type of class action that this Court will certify.[9] Certification of an "opt in" class means that potential members will not be included unless they take affirmative steps to join the suit after receiving notice. Plaintiffs and their counsel bear the burden (and the initial expense) of notifying the potential class members. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). The Court of Federal Claims has indicated its disfavor of "opt-out" classes in which potential class members are automatically included unless they take action to remove themselves as participants in the suit. *Armitage v. United States*, 18 Cl. Ct. 310, 312 (Cl. Ct. 1989); *Quinault*, 453 F.2d at 1276-1277.

For the foregoing reasons, the interests of justice are served because the interests of judicial economy and efficiency are served. Consequently, certification of the class is warranted.

## C. THIS ACTION SATISFIES EACH OF THE SPECIFIC *QUINAULT* CRITERIA FOR CERTIFICATION OF A CLASS ACTION.

The Court of Federal Claims Rule 23 (RCFC 23) is largely modeled on the comparable Federal Rule of Civil Procedure 23. In the main, the court's rule adopts the criteria for certifying and maintaining a class action as set forth in *Quinault*. Plaintiffs note that this action satisfies all

[8] *See* 28 U.S.C. § 2412.

[9] *See* Rules Committee Note to RCFC 23: "Additionally, unlike the federal rule, the court's rule contemplates only opt-in class certifications, not opt-out classes. The latter were viewed as inappropriate here because of the need for specificity in money judgments against the United States, and the fact that the court's injunctive powers—the typical focus of an opt-out class—are more limited than those of a district court."

of the *Quinault* criteria required to be considered in determining whether certification of a particular class action is appropriate. 453 F.2d at 1276. The eight criteria are as follows:

> (i) [the members must] constitute a large but manageable class, (ii) there is a question of law common to the whole class, (iii) this common legal issue is a predominant one, overriding any separate factual issues affecting individual class members, (iv) the claims of the present plaintiffs are typical of the claims of the class, (v) the Government has acted on grounds generally applicable to the whole class, (vi) the claims [of the class members] are so small that it is doubtful that they would be pursued other than through this case, (vii) the current plaintiffs will fairly and adequately protect the interests of the class without conflict of interest, and (viii) the prosecution of individual actions by members of the class, some in district courts and some in this court, would create a risk of inconsistent or varying adjudications. *Id.*

Despite the foregoing, the *Quinault* court declined to articulate a general rule of standards for certifying class actions and suggested proceeding on a case by case basis. *Glosemeyer*, 45 Fed. Cl. at 230 citing *Quinault*. Additionally, the eighth criterion concerning inconsistent adjudications no longer applies in takings cases.[10] *Moore*, 41 Fed. Cl. at 400.

The decision in *Quinault* stands as the "seminal case in this court regarding class certification." *Testwuide,* 56 Fed. Cl. at 761.[11] Plaintiffs meet all of the *Quinault* criteria and thus, their Motion to Certify a Class should be granted. We consider each criterion *seriatim* below.

### 1. ***The Proposed Members Constitute a Large But Manageable Class.***

The court is given "wide discretion to determine on a case by case basis if the numerosity requirement is met." *Favreau, II*, 48 Fed. Cl. at 777; *Taylor v. United States*, 41 Fed. Cl. 440, 445 (Fed. Cl. 1998).

---

[10] This is so because the Court of Appeals for the Federal Circuit "now hears appeals from both the district courts and this court in cases seeking compensation for a taking." *Moore v. United States*, 41 Fed. Cl. 394, 400. *See* 28 U.S.C. § 1295 (1994).

[11] *See also Favreau, II v. United States*, 48 Fed. Cl. 774, 776.

"In deciding whether a proposed class is manageable, the court considers whether the members are readily identifiable and reachable." *Id.*

**a) Plaintiffs' proposed class satisfies the "large" size criterion.**

There is no definite rule as to how large a class must be to qualify for certification, but prior cases in this Court have implied that a proposed class size of fifty members or less was too small. *Saunooke v. United States*, 8 Cl. Ct. 327, 333 (Cl. Ct. 1985). The present proposed class size which exceeds one hundred or more members is considerable and based upon a sound estimate of an ascertainable number of class members. *See Evans v. United States Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) (showing of precise numbers is not required, but mere allegations of numerosity are inadequate) and *Waller v. International Harvester Co.*, 98 F.R.D. 560, 563 (N.D.Ill. 1983) (numerosity requirement not satisfied where class size is purely speculative). Since the proposed class will be made up of those fee landowners who own parcels of property along the Venice Branch on the April 2, 2006 NITU date, prospective class members can be identified by a search of the records of the Sarasota County Tax Assessor and Recorder of Deeds. The Plaintiff estimates that there are significantly more than 100 individuals or entities who own fee parcels along the Venice Branch. Some individuals may own more than one parcel.

**b) The proposed class is also manageable as required by the *Quinault* criteria.**

The Court has required that the class be manageable. By "manageable," the Court "considers whether the members are identifiable and reachable." *Favreau, II*, 48 Fed. Cl. at 777. And in *Hannon v. United States*, the court concluded that plaintiffs met the manageability prong because "[p]laintiffs' counsel has assured that each of the ... plaintiffs could be reached in order to be notified of the pending suit... ." *Hannon v. United States*, 31 Fed. Cl. 98, 103 (Fed. Cl. 1994). This notification could easily be achieved for the proposed class in this case. As

mentioned above, the entire class in this case is ascertainable through a search of the records of the Sarasota County Tax Assessor and the Recorder of Deeds. The search can retrieve the names and addresses of all those individuals or entities shown to be fee owners of property along the Venice Branch on the April 2, 2004 NITU date. Plaintiff's counsel has already undertaken the initial research to identify the number and identity of potential class members.

In prior class certified Trails Act cases this Court required that notice of the lawsuit shall be sent by first class mail to all fee owners of the land who held title on the date of taking and published in the local community newspaper and other community publications. This publication is calculated to reach a broad circulation of the community and local landowners. A similar class notification procedure was agreed to by Plaintiff's counsel and Justice Department and ordered by this Court in *Illig v. United States* and *Miller v. United States*. The Plaintiff's anticipate a similar procedure in this case.

The great body of facts common to each landowner's claim further enhances the manageability of this proposed class. As stated, all of the proposed class members own land along the same 12 mile stretch of land in the same county with a common Recorder of Deeds which maintains title and land records for all parcels. But the pivotal issue determining manageability concerns the ownership of the land when SGLR's predecessor, the Seaboard Air Line Railway, first built the railroad along the property. This common derivation of ownership of the land factually unites the current landowners and creates a class in which most class members share common factual and legal title issues. *Hannon*, 31 Fed. Cl. at 101-103 (factual similarities made class more manageable). The railroad right-of-way was established, in large part, by a about twenty common conveyances. The proposed class is not overly large and is manageable. The first prong of *Quinault* is satisfied.

### 2. *The Claims of All Potential Class Members Turn On Legal Issues Common to the Entire Proposed Class.*

*Quinault's* second criterion requires that there exist common questions of law for the entire class. The principal legal issue in this case is whether the conversion of the approximate 12 mile stretch of land once used as a railroad and conveyed to The Trust for Public Land for use as a public use trail under the Trails Act, constitutes a taking under the Fifth Amendment of the United States Constitution. Two specific legal questions flow from this overarching question: (1) what interest in the property did the railroad hold under Florida law and the conveyances that created the easement? (2) Did operation of Trails Act take the owners' right to use and occupy their property? Both queries are answered by two events common to all fee owners. The first question is answered by the terms of the easement under which the railroad acquired the right to use the property when the Venice Branch was built in the early 1900s. Whatever right CSX and SGLR had to use the fee owners' property in 2004 is determined by the interest acquired by the Seaboard Air Line Railway from the twenty or so original fee owners in 1910.

The second question concerns the legal effect of the events in and around 2004 when SGLR abandoned and conveyed its interest in the property to The Trust for Public Land, pursuant the Trails Act and the STB's issuance of a NITU. See, Caldwell v. U.S. 391 F.3d 1226 (2004), Barclay v. U.S. 443 F. 3d 1368 (2006). These central questions of law and fact are common to all members of the proposed class.

The property interests for which potential class members seek compensation are defined by Florida property law.[12] The Fifth Amendment to the Constitution of the United States requires the payment of "just compensation" for taking of private property for public use.

[12] Justice O'Connor in *Presault v. Interstate Commerce Commission*, 494 U.S. 1 (1990) wrote: "As the [majority opinion] acknowledges, state law creates and defines the scope of the reversionary or other real property interests affected by the ICC's actions. In determining whether a taking has occurred, [we make] reference to state

The common question of Florida law is whether under the terms of the conveyance documents that created the easement, the SGLR railroad (or CSX) held a right to use the property for a public access hiking and biking trail.

The interest acquired by the railroad in 1910 when the Right-of-Way was constructed was expressly limited to a right to use the property for the operation of a railroad. The landowners retained fee title. For this reason, all landowners are united by a common legal issue because, even if the railroad held the greatest possible interest in the property short of actual fee ownership, the railroad did not, under Florida law or under the terms of the conveyances, acquire the right, nor have the ability to grant or convey an easement for a public access recreation trail. This single legal issues is common to all members.

In *Preseault v. United States*, 100 F.3d at 1550 the Federal Circuit held that when an abandoned railroad right of way is converted by operation of the Trails Act into a public use trail the action was a taking of the "reversionary" property owners interest in the property. Therefore, both the state and federal issues are common to the entire proposed class and the second prong of the *Quinault* criteria is satisfied.

**3. *The Common Legal Questions Predominate and Override Any Separate Factual Issues Affecting the Individual Members.***

As noted *supra*, the legal issues necessary to resolve these questions are identical for all class members. Furthermore, these issues of Florida real property law and the Trails Act dominate this case and override separate factual issues.

---

law…to determine whether a railroad right of way lapsed upon the conversion to trail use." [citations omitted]. 494 U.S. at 20.

When applying a state's statute, this Court is bound to accept the construction placed on the statute by the state's highest court. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Medical Protective Co. v. Bell*, 912 F.2d 244, 245 (8th Cir. 1990), *cert. denied*, 498 U.S. 1090, 111 S.Ct. 970, 112 L.Ed.2d 1056 (1991).

**a) The proposed class members share common factual issues of title and, where these factual issues are unique, they are not significant.**

Because the original grantors of the land were common and limited in number, there are few factual differences among class members. For instance, the descriptions of the property contained in original deeds would be similar for much of the proposed class members and the property interests in question lie along the same 12.5-mile stretch of land. Regardless of the nature of the conveyance to the railroad, as long as the railroad did not hold actual fee title, Florida law provides the same legal answer: the railroad's interest is only an easement and this easement is extinguished when operation of the railroad over the property is abandoned. The subsequent conveyances (from the original property owners who held title when the railroad was built in the 1900's up to the present fee owners) would concern essentially irrelevant factual differences between class members. The chain of title for many of the property owners would trace back to a common original fee owner who granted the railroad easement. However, as long as each class member can establish his or her own fee ownership, these *mesne* transactions would not be at issue in a resolution of the Government's liability for the taking.

**b) Despite having claims of differing monetary amounts, the potential class members share common factual issues to establish such property valuation.**

The primary factual difference among the proposed class of fee owners concerns the extent of damages that each class member is entitled to recover for the value of his or her portion of the Venice Branch. Because each parcel is unique in size, this amount will necessarily vary among the class members.

Once the liability phase has been completed, the determination of damages for separate plaintiffs does not prevent class certification. This court has held that class action status should not be ruled out if liability has been established "and quantification of the amount of each

plaintiff's damages remains the sole issue… ." *Hannon*, 31 Fed. Cl. at 103. The holding is directly on point in this case because the precise dollar amount of each class member's recovery will differ depending on the size of the taking and the severance damages. The *Hannon* court explained further that differing facts concerning damages did not prevent class certification because "[i]n all likelihood, such damages could be computed mechanically." *Id.* Such a mechanical determination of damages could be applied to this case, as discussed in *Hannon*. Using the property valuation approach agreed to by the Justice Department and Plaintiff's counsel in other Trails Act cases that use a formula to assist in determining efficiently and fairly the amount of compensation for each class member based upon the location of the property and the amount of acreage affected. The character of much of the property is similar, with more of the potential class members having a claim for property in residential neighborhoods many of these properties share factors common to the appraisal of the value of each property.

While discussing the possibility of allowing joinder of 1,218 plaintiffs, for example, the court in *Abel v. United States*, 18 Cl. Ct. 477 (Cl. Ct. 1989), remarked that it "has never expressed any concern nor had any difficulty dealing with cases involving hundreds of party plaintiffs… ." 18 Cl. Ct. at 479 (quoting *O'Hanlon v. United States*, 7 Cl. Ct. 204, 206-207 (Cl. Ct. **2004)).** By this statement, the court implicitly recognized that the determination of damages for the various class members should not render a class action unworkable. Thus, the differing damages between the class members is, in a sense, expected and does not override the common legal issues.

Because there are few factual differences in each class member's case and because the differences that exist go to facts which do not prevent class certification, the common legal

issues predominate and override those insignificant differences. Plaintiffs, therefore, have satisfied the third prong of the *Quinault* criteria.

Further, in other takings cases under the Trails Act, in which Plaintiffs' counsel represented the property owners (*Illig v. United States* and *Miller v. United States*) efficient methods to value each class members' property was developed by agreement between Plaintiff's counsel and the Justice Department. The parties selected representative parcels for certain general classes and agreed to use the designated parcels as a proxy to establish a value that could be applied to other like parcels (e.g., similar sized residential parcels in the same neighborhood). This meant that not every parcel needed to be separately appraised. This was a substantial savings of time and money. Plaintiff's counsel believes that a similar valuation approach would be appropriate in.

#### 4. *The Claims of the Named Plaintiffs Are Typical of the Claims of the Class.*

*Quinault* requires that the claims of the named Plaintiffs be typical of the claims of the potential class. This criterion is satisfied by the common factual and legal issues noted *supra*.

The Court of Federal Claims has not provided extensive guidance concerning what factors contribute to the analysis of this criterion. In *Hannon*, however, the court held that because the named Plaintiffs had causes of action under the same statutes as the class members, this criterion was satisfied. 31 Fed. Cl. at 104. *Hannon* also applies in this case where all of the named Plaintiffs and the class members are bringing claims premised upon a common legal theory of recovery under Florida real property law and by operation of the Trails Act which worked a taking of their property.

Further, this Trails Act operated by the STB's issuance of a single NITU that applied equally to all claims. The factual similarities between the named Plaintiffs and the proposed class

members also indicate that this criterion is satisfied. Each of these Plaintiffs, named and unnamed, owns fee simple title to land along right of way in issue. As a group, the named Plaintiffs represent one geographic area. In other words, the named Plaintiffs mirror the entire class factually. In this case, consequently, where factual similarities abound, and the named Plaintiffs are bringing a cause of action premised on the same legal theory, the criterion of typicality—that the named Plaintiffs' claims be typical of the claims of the potential class—is satisfied.

**5. *The Government Has Acted on Grounds Applicable to the Whole Class; When the Government Allowed the Abandoned Rail Line to Be Given to the Private Trail Group, it Took the Property of Each Class Member Simultaneously and in the Same Manner.***

The enactment of the Trails Act by Congress and its specific application to the particular real estate underlying the Venice Branch, was triggered on April 2, 2004 when the STB issued the NITU and the property has conveyed pursuant to this NITU to The Trust for Public Land. This Government action is applicable to and had a common effect upon the entire class.

According to *Armitage*, the key to this criterion is that the Government action cannot "implicate matters unique" to an individual plaintiff in the liability phase. 18 Cl. Ct. at 313. *Hannon* concluded that this criterion was met when the Government action had the same general impact upon the class. 31 Fed. Cl. at 103. This case, in the same way, meets the standards set out in both of these decisions. The property interest of each class member in the railroad right of way was taken without any compensation. The STB's action in issuing the NITU and converting the railway into a public use trail has affected each potential class member in the same manner. Each class member has been denied the right to enjoy his or her own property and use of the property has been confiscated for benefit of the general public as a recreational trail.

**6. *Some of The Class Members' Claims are Fairly Small, Creating Doubt that Individual Claims Would be Pursued if Certification Denied.***

There is doubt that some individual claims would be pursued if certification is denied because some of the potential class members' claims and respective amounts in controversy are fairly small relative to the cost necessary to individually present these claims. According to *Armitage*, the application of this criterion may be framed as follows: "Is a class action the only viable way for most putative class members to bring their claim?" 18 Cl. Ct. at 313.

Many of the class members own small parcels of land that are traversed by the right of way in issue. Their claims involve land encumbered by the Trail easement a few hundred feet (or less) in length. Because the area of these smaller parcels is small, the attorney's fee and other costs of bringing the action for the individual claim would greatly exceed the value of the claim. In *Hannon* in which the court concluded that claims under one thousand dollars ($1,000) each were insufficient to encourage individual litigation. 31 Cl. Ct. at 103-104. *See also, Armitage*, 18 Cl. Ct. at 313 (estimate that the average claim of $500 to $1000 probably justifies class action). It is not feasible for many of these landowners to separately initiate litigation against the United States Government. Litigation costs would easily exceed the amount of individual owner's damages and, therefore, it is doubtful that class members would pursue their individual claims. Consequently, a class action is the only vehicle by which many class members (especially the residential property owners) will be able to bring their respective claims.

**7. *The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class Without a Conflict of Interest.***

The named Plaintiffs will fairly and adequately protect the interests of the class. In order to satisfy this criterion, a plaintiff must demonstrate that the counsel for the class is adequate and that the named Plaintiffs do not have any conflicts of interest with class members. According to

*Quinault*, "counsel must be qualified, experienced, and generally able to conduct the proposed litigation" in order for this criterion to be satisfied. 453 F.2d at 1276 (*quoting Eisen*, 391 F.2d at 562). Additionally, there must be no significant conflicts between the named Plaintiffs and the potential class members. *Saunooke*, 8 Cl. Ct. at 333.

i) *The Plaintiff's Are Represented by Experienced Counsel*

The named Plaintiffs are represented by experienced and highly skilled counsel who meets the standard set by *Quinault*. The Plaintiff's counsel, Thor Hearne, is a partner with the law firm of Lathrop & Gage L.C. and has more than twenty years of experience in real estate, land use regulation, and related federal and state litigation. Further, Mr. Hearne has extensive experience practicing before this Court representing property owners in Trails Act taking cases. Mr. Hearne has represented (or is currently representing) property owners in the Trails Act taking cases, *Illig v. U.S.*, *Miller v. U.S.*, *The Town of Grantwood Village v. U.S.*, *Ladd v. U.S.*, *Birdbay Executive Golf Course v. U.S.* Two of these cases, *Miller* and *Illig* were ones certified as class actions in the U.S. Court of Claims and each included claims by approximately 100 landowners. Lathrop & Gage L.C. is a law firm of approximately 250 attorneys, many with extensive real estate experience, especially experience with the unique issues of real estate law related to railroad land title. Lathrop and Gage maintains an office in Washington, D.C. just blocks from the U.S. Court of Claims and routinely handles cases in both the U.S. Court of Claims and The Court of Appeals for the Federal Circuit.

ii) *These Potential Class Members Have No Conflict of Interest*

None of the named Plaintiffs has a conflict of interest concerning this matter. In *Saunooke*, the court held that this factor was not satisfied when the named Plaintiffs sought to

litigate legal issues peculiar to only themselves, with no consideration to potential issues that could be raised by other members of the proposed class. 8 Cl. Ct. at 333.

The Supreme Court's denial of class certification in *Amchem Products, Inc. v. Windsor* is instructive as to what constitutes a conflict between class representatives and the class members. 117 S.Ct. 2231 (1997). In that case, the Court held that representatives must possess the same interest and suffer the same injury as the class members. *Id.* at 2250-2251, quoting *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) quoting *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 216 (1974). The conflict in *Amchem Products* existed because class members already suffering from asbestos diseases had an interest in seeking the maximum immediate payments, thereby diminishing funds available to class members who were exposed to asbestos but who had not yet suffered any malady, and might not for years or even decades. *Id.* at 2251.

All damage that could possibly be done to each class member in this case has already occurred; no further damages could happen to one member thereby creating a separate cause of action for that class member, as was the case in *Amchem Products*. Each named Plaintiff here seeks the same objective as the other class members—to recover "just compensation" the appropriate award for property taken from them by the U.S. Government.

Because the named Plaintiffs are represented by skilled counsel and do not have any conflicts of interest with prospective class members, the seventh *Quinault* criterion is satisfied.

### 8. ***Class Certification is the Most Efficient Way to Proceed in this Case, and as such, Serves the Interests of Justice.***

The number of potential plaintiffs in this case will likely exceed 100 similarly situated fee owners along the Venice Branch in Sarasota County, Florida. The judicial efficiency of avoiding

a scenario where hundreds of individuals either seek to join a lawsuit or initiate their own suits weighs heavy in favor class certification.

The plaintiffs are taking advantage of the opt-in procedure for determining the composition of the class which comports with this court's limited equitable jurisdiction. *Favreau, II*, 48 Fed. Cl. at 780. For these reasons, Plaintiffs assert that the interests of justice will be greatly served in this case.

### 9. *Class Certification has been granted in other Trails Act cases by this Court.*

Numerous other class action suits involving takings claims under the Fifth Amendment related to the Trails Act have been certified in this Court. *See*, *Miller v. U.S.* (No. 03-2489); *Hubbert v. U.S.* (No. 99-396L); *Illig v. U.S.* (No. 98-934L); *Moore v. U. S.* (No. 93-134L); and, *Glosemeyer v. U.S.* (93-126L). In *Moore*, this Court discussed class certification and granted plaintiffs' request thereof notwithstanding the presumption that "class actions are generally disfavored in [the Court of Federal Claims]." 41 Fed. Cl. at 397. Similarly in *Miller* and *Illig*.

## V. CONCLUSION

In *Quinault*, this Court stated that "[t]here is no reason why this court cannot use [class action lawsuits] if [they are] appropriate." *Quinault*, 453 F.2d at 1274. As this Memorandum demonstrates, Plaintiffs' case is particularly suited to class action certification: (1) judicial economy and efficiency warrant it and the interests of justice would be served by it; (2) the complete satisfaction of the *Quinault* criteria all but mandate that class certification be granted; and, (3) the common issue of Florida real property law and the factual events and transactions by which the railroad's interest in the property is defined predominate and override any individual factual issues.

For all of the foregoing reasons, RCFC 23 warrants that this case be certified as a class action.

Respectfully submitted,

LATHROP & GAGE L.C.

Date: August 21, 2007

By______________________

Mark F. Hearne, II
J. Robert Sears
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
(314) 613-2500
(314) 613-2550 (fax)

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 21st day of Aug, 2007, a true and correct copy of the foregoing document was sent by Federal Express, overnight delivery, postage prepaid, to the following counsel of record:

Mark F. (Thor) Hearne II