2

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2007064694 2 PGS
2007 APR 20 01:36 PM
KAREN E. RUSHING
CLERK OF THE CIRCUIT COURT
SARASOTA COUNTY,FLORIDA
TFERNANDEZ Receipt#911520

Doc Stamp-Deed: 0.70

2007064694

This Document Prepared by:
MSC Title, Inc.
40 North Osprey Avenue
Sarasota, Florida 34236
Donita Stitt

RETURN TO:
SUE W. STITT
2422 Sonoma Drive West
Nokomis, FL 34275

Parcel ID Number: 0163-09-0034

# TRUSTEE'S DEED

THIS INDENTURE, made April 9, 2007, by and between SUE W. STITT, an unremarried widow, hereinafter referred to as Grantor, whose mailing address is 2422 Sonoma Drive West, Nokomis, FL 34275 and SUE WETZEL STITT, Trustee of the SUE WETZEL STITT REVOCABLE TRUST Dated July 11th, 1996, hereinafter referred to as Grantee, whose post office address is 2422 Sonoma Drive West, Nokomis, FL 34275.

(Wherever used the terms "Grantor" and "Grantee" shall include singular and plural, heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporation, wherever the context so admits or requires.)

**WITNESSETH**

Grantor, in consideration of the sum of Ten Dollars ($10.00) and other good and valuable considerations, receipt of which is hereby acknowledged, does hereby grant, bargain, sell and convey to Trustee, his successors and assigns, all Grantor's interest in and to the following described real property lying and being situated in Sarasota County, Florida to wit:

Lot 59, MISSION ESTATES, UNIT ONE, as per Plat thereof recorded in Plat Book 39, Page 6 of the Public Records of Sarasota County, Florida.

TOGETHER WITH all appurtenances, privileges, rights, interest, dower, reversions, remainders and easements thereunto appertaining:
TO HAVE AND TO HOLD said real estate with the following powers and for the following uses and purposes, to wit:

1. The Trustee is vested with full rights of ownership over the above described real estate and Trustee is specifically granted and given the power and authority:
   (a) To protect and conserve said real estate and improvements located thereon and to pay the taxes assessed thereon;
   (b) To sell said real estate, for cash or credit, at public or private sale, to exchange said real estate for other property and to grant options to sell said property, and to determine the price and terms of sales, exchange and options;
   (c) To execute leases and subleases for terms as long as 20 years, to subdivide or improve said real estate and tear down or alter improvements, to grant easements, give consent and make contracts relating to said real estate or its use and to release or dedicated any interest in said real estate;
   (d) To borrower money and to mortgage, pledge or encumber any or all of the said real estate to secure payment thereof;
   (e) To manage, control and operate said real estate, to collect the rents, issues and profits, to pay all expenses thereby incurred, and in addition, to manage and operate any business that may now or hereafter be operated and maintained on said real estate, and in general, to exercise any powers authorized by the provisions of Chapter 737, Florida Statutes, 1988;
   (f) The Trustee's liability hereunder, under the Trust Agreement or by operation of law to any persons firm or corporation is limited to the trust assets and the Trustee shall not become individually or personally obligated in any manner related thereto;
2. The Trustee shall hold said real estate and make distributions of said real estate of the proceeds derived therefrom in accordance with the terms and conditions of that certain Trust Agreement dated July 11th, 1996.
3. No purchaser, grantee, mortgagee, lessee, assignee or any other person dealing with the Trustee need see to the application of any proceeds of any sales, lease, mortgage or pledge, but the receipt of the Trustee shall be a complete discharge and acquittance therefor. Any and all persons, including but not limited to grantees, mortgagees, lessees, transferee and assigns dealing with said Trustee need not inquire into the identification or status of any beneficiary under this deed or any collateral instrument nor inquire into or ascertain the authority of such Trustee to act in and exercise the powers granted by this deed or of adequacy or disposition of any consideration paid to the Trustee nor inquire into the provis[ions] of said unrecorded Trust Agreement and any amendments thereto collateral hereto.

EXHIBIT
T

4. This conveyance is made in conformance with the provisions of Sections 689.071, Florida Statutes.

5. By its acceptance of this conveyance, the Trustee covenants and agrees to do and perform the duties, acts and requirements upon it binding.
6. Each and every power hereinabove set forth may be exercised by any Trustee. Any instrument executed by any Trustee or any act taken by any Trustee shall be binding upon the trust and all of the Trustees as fully and completely as if all Trustees had executed the said instrument or taken said action.
7. The Successor Trustee is Grantee's
The Successor Trustee shall have all of the title, powers and discretion herein given to the Trustee, without any act of conveyance or transfer. A certificate signed by any Trustee or any Successor Trustee under this instrument and acknowledged by him/her before a notary public shall be conclusive evidence upon all persons and for all purposes of the facts stated in the certificate representing the terms of this instrument and the identity of the Trustees who from time to time are serving under it.

**NOTE TO PROPERTY APPRAISER: The Grantee confirms that under the terms of the Trust referred to above, the Grantee has not less than a beneficial interest for life and is entitled to a homestead tax exemption pursuant to the provisions of Florida Statute 196.041(2).**

**In Witness whereof**, the Grantor has signed and sealed this deed the date above written.

Signed, sealed and delivered in the presence of:

Barbara Harmon
Witness Signature

Sue W. Stitt
SUE W. STITT
Address: 2422 Sonoma Drive West, Nokomis, FL 34275

Barbara Harmon
Witness Name Printed

Witness Signature

Jennifer Lynn Tello
Witness Name Printed

State of: Florida
County of: Sarasota

The foregoing instrument was acknowledged before me 9 day of April, 2007 by Sue W. Stitt, who is/are personally known to me or who did produce FLA DL as identification.

NOTARY PUBLIC

Sheryl Strall
Printed-Name of Notary
My Commission Expires: 12/12/09

SHERYL A. STRALL
MY COMMISSION # DD 498895
EXPIRES: December 12, 2009
Bonded Thru Notary Public Underwriters

1.00
5.00
413.00

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2001180901 1 PG
2001 DEC 13 09:59 AM
KAREN E. RUSHING
CLERK OF CIRCUIT COURT
SARASOTA COUNTY,FLORIDA
ADEPALO Receipt#114967
Doc Stamp-Deed: 413.00

2001180901

Prepared by and return to
**ROBERT J. DeBOER**
**Attorney at Law**
**KANETSKY, MOORE & DEBOER, P.A.**
**227 Nokomis Avenue South**
**Venice, FL 34285**

File Number **11209.78B**
Will Call No **180**

Parcel Identification No **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**

[Space Above This Line For Recording Data]

# Warranty Deed

(STATUTORY FORM - SECTION 689 02, F S )

11209.78 180

RETURN TO KANETSKY MOORE & DeBOER, P.A.

**This Indenture** made this 11th day of **December, 2001** between **CAITHNESS CONSTRUCTION, INC., a Florida corporation,** whose post office address is **8373 Pondview Lane, Englewood, FL 34224** of the County of **Charlotte**, State of **Florida**, grantor*, and **EGBERT VON PAPEN and BARBARA VON PAPEN, husband and wife,** whose post office address is **6017 Chaparral Avenue, Sarasota, FL 34243** of the County of **Sarasota**, State of **Florida**, grantee*,

**Witnesseth**, that said grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10 00) and other good and valuable considerations to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in **Sarasota County Florida**, to-wit

**Lot 56, MISSION ESTATES, UNIT ONE, as per Plat thereof recorded in Plat Book 39, Page 6, of the Public Records of Sarasota County, Florida.**

**Subject to restrictions, reservations, easements of record, zoning, applicable governmental regulations and taxes beginning with the current year.**

and said grantor does hereby fully warrant the title to said land, and will defend the same against lawful claims of all persons whomsoever

* "Grantor" and "Grantee" are used for singular or plural, as context requires

**In Witness Whereof**, grantor has hereunto set grantor's hand and seal the day and year first above written

Signed, sealed and delivered in our presence

Witness Name: R. J. DeBoer
Witness Name: NANCY A. NOWORYTA

_______________ (Seal)
JAN HEITMANN

_______________ (Seal)
KARIN HEITMANN

State of Florida
County of Sarasota

The foregoing instrument was acknowledged before me this 10th day of December, 2001 by JAN HEITMANN and KARIN HEITMANN, husband and wife, who [ ] are personally known or [X] have produced a driver's license as identification.

Printed Name:
Notary Public
My Commission Expires

NOTARY PUBLIC STATE OF FLORIDA Robert J. DeBoer Comm # CC 980480 Comm Exp. Nov 7, 2004

EXHIBIT U

DoubleTimes

34297 SERVICE DATE - JANUARY 2, 2004

DO

FR-4915-00-P

DEPARTMENT OF TRANSPORTATION

Surface Transportation Board

[STB Docket No. AB-400 (Sub-No. 3X)]

Seminole Gulf Railway, L.P.–Abandonment Exemption–in Sarasota County, FL

On December 15, 2003, Seminole Gulf Railway, L.P. (SGLR), filed with the Surface Transportation Board a petition under 49 U.S.C. 10502 for exemption from the provisions of 49 U.S.C. 10903 to abandon an approximately 12.43-mile portion of its Venice Branch between milepost SW 892 outside the city limits of the City of Sarasota, and milepost 904.4 near the City of Venice, in Sarasota County, FL. The line includes a "wye" and stub at approximately milepost SW 904.2 and side tracks. The line traverses United States Postal Service Zip Codes 34233, 34238, 34272, 34275, and 34285, and includes the stations of Laurel (milepost SW 900), Nakomis (milepost SW 902), and Venice (milepost SW 904).

The line does not contain federally granted rights-of-way. Any documentation in SGLR's possession will be made available promptly to those requesting it.

The interest of railroad employees will be protected by the conditions set forth in Oregon Short Line R. Co.–Abandonment–Goshen, 360 I.C.C. 91 (1979).

By issuance of this notice, the Board is instituting an exemption proceeding pursuant to 49 U.S.C. 10502(b). A final decision will be issued by April 2, 2004.

EXHIBIT

V

Any offer of financial assistance (OFA) under 49 CFR 1152.27(b)(2) will be due no later than 10 days after service of a decision granting the petition for exemption. Each OFA must be accompanied by a $1,100 filing fee. See 49 CFR 1002.2(f)(25).

All interested persons should be aware that, following abandonment of rail service and salvage of the line, the line may be suitable for other public use, including interim trail use. Any request for a public use condition under 49 CFR 1152.28 or for trail use/rail banking under 49 CFR 1152.29 will be due no later than January 22, 2004. Each trail use request must be accompanied by a $150 filing fee. See 49 CFR 1002.2(f)(27).

All filings in response to this notice must refer to STB Docket No. AB-400 (Sub-No. 3X) and must be sent to: (1) Surface Transportation Board, 1925 K Street, N.W., Washington, DC 20423-0001; and (2) Eric M. Hocky, Gollatz, Griffin & Ewing, P.C., Four Penn Center, Suite 200, 1600 John F. Kennedy Blvd., Philadelphia, PA 19103. Replies to the petition are due on or before January 22, 2004.

Persons seeking further information concerning abandonment and discontinuance procedures may contact the Board's Office of Public Services at (202) 565-1592 or refer to the full abandonment or discontinuance regulations at 49 CFR part 1152. Questions concerning environmental issues may be directed to the Board's Section of Environmental Analysis (SEA) at (202) 565-1539. [Assistance for the hearing impaired is available through the Federal Information Relay Service at 1-800-877-8339.]

An environmental assessment (EA) (or environmental impact statement (EIS), if necessary) prepared by SEA will be served upon all parties of record and upon any

agencies or other persons who commented during its preparation. Other interested persons may contact SEA to obtain a copy of the EA (or EIS). EAs in these abandonment proceedings normally will be made available within 60 days of the filing of the petition. The deadline for submission of comments on the EA will generally be within 30 days of its service.

Board decisions and notices are available on our website at "WWW.STB.DOT.GOV."

Decided: December 22, 2003.

By the Board, David M. Konschnik, Director, Office of Proceedings.

Vernon A. Williams

Secretary

34291 SERVICE DATE - FEBRUARY 13, 2004

SURFACE TRANSPORTATION BOARD
WASHINGTON, DC 20423

ENVIRONMENTAL ASSESSMENT

STB DOCKET NO. AB-400 (Sub-No. 3X)

**Seminole Gulf Railway, L.P. – Abandonment Exemption – in Sarasota County, FL**

## BACKGROUND

In this proceeding, Seminole Gulf Railway, L.P. (SGLR) has filed a petition for exemption under 49 CFR 1152 seeking exemption from the requirements of 49 U.S.C. 10903 for SGLR to abandon 12.43 miles of rail line extending from milepost SW 892 outside the city limits of Sarasota to milepost SW 904.4 near Venice, in Sarasota County, Florida. A map depicting the rail line in relationship to the area served is appended to the report. If the notice becomes effective, SGLR will be able to salvage track, ties and other railroad appurtenances and to dispose of the right-of-way.

## DESCRIPTION OF THE LINE

According to SGLR, the land upon which the line is constructed was acquired by the Seaboard Air Line Railway Company, principally during the latter half of 1910. The railroad was built soon thereafter. The right-of-way begins south of Sarasota. The first two miles are bordered by residential developments, including related road systems. The right-of-way runs south through inhabited and uninhabited areas, including swampy areas and Oscar Scherer State Park. Several small creeks and drainage canals parallel and/or cross the right-of-way. The line ends in Venice. The width of the right-of-way is approximately 100 feet, with minor areas of narrower width, and a wider portion at the most southerly end of the rail line.

SGLR, together with the underlying landowner CSX Transportation, Inc., has granted The Trust for Public Land an option to acquire the rail line for conversion to a trail. The Trust for Public Land will be working with Sarasota County to convert the rail line into a trail. Due to the pending sale of the line proposed for abandonment to The Trust for Public Land, SGLR is planning to leave the right-of-way and structures in place, and is not planning any salvage of the line.

The proposed abandonment includes open deck timber trestle bridges, a steel girder span that connects two timber trestles (milepost SW 900.80), and concrete and cast iron culverts. These structures were built over 50 years ago. Each structure has had components repaired, replaced and/or

EXHIBIT
tabbies
W

been entirely replaced over time. There have been no major repairs since 1987 when SGLR became the owner of the rail line.

According to SGLR, no traffic has moved over the line during 2003 or during the last nine months of 2002. The last delivery to a shipper via the line was on March 14, 2002. During the first three months of 2002, SGLR delivered 20 cars of plywood and lumber to a single customer (Kimal Lumber) at a team track located on the line, where the freight was transloaded to truck. The customer now receives freight cars from SGLR at a team track location on a different line segment. Therefore, there will be no diversion of rail traffic to truck traffic as a result of the proposed abandonment.

SGLR states that only three other customers have received traffic over the line in the last several years, but none have received any cars since May 2001. These customers were Sheckler Produce (one carload delivered via team track in March 2001); Ferrelgas of Sarasota (last car was delivered at the end of 2000); and King Plastic Corporation (21 cars through May 2001 delivered via team track).

**ENVIRONMENTAL REVIEW**

SGLR submitted an environmental report that concludes the quality of the human environment will not be affected significantly as a result of the abandonment or any post-abandonment activities, including salvage and disposition of the right-of-way. The applicants served the environmental and historical reports on a number of appropriate Federal, state, and local agencies as required by the Surface Transportation Board's environmental rules [49 CFR 1105.7(b)]. We have reviewed and investigated the record in this proceeding.

The National Geodetic Survey has advised us that seventeen geodetic station markers have been identified that may be affected by the proposed abandonment.

**HISTORIC REVIEW**

SGLR submitted an historic report as required by the Surface Transportation Board's environmental rules [49 CFR 1105.8(a)]. SGLR served the report on the Florida Division of Historical Resources (SHPO) pursuant to 49 CFR 1105.8(c). The SHPO has submitted comments stating that no historic properties listed in or eligible for inclusion in the National Register of Historic Places (National Register) would be affected by the proposed abandonment. We have reviewed the report and the information provided by the SHPO and concur with the SHPO's comments.

Pursuant to the Advisory Council on Historic Preservation's regulations for implementing the section 106 process of the National Historic Preservation Act at 36 CFR 800.4(d)(1) and 36 CFR 800.8, we have determined that the proposed abandonment will not affect historic properties listed in or eligible for inclusion in the National Register. The documentation for this finding, as specified at 36 CFR

800.11(d), consists of SGLR's historic report, all relevant correspondence, and this EA, which have been provided to the SHPO and made available to the public.

## CONDITIONS

We recommend that the following environmental condition be placed on any decision granting abandonment authority:

1. The National Geodetic Survey (NGS) has identified seventeen geodetic station markers that may be affected by the proposed abandonment. Therefore, SGLR shall notify NGS 90 days prior to salvage activities in order to plan for their relocation.

## CONCLUSIONS

Based on the information provided from all sources to date, we conclude that, as currently proposed, and if the recommended conditions are imposed, abandonment of the line will not significantly affect the quality of the human environment. Therefore, the environmental impact statement process is unnecessary.

Alternatives to the proposed abandonment would include denial (and therefore no change in operations), discontinuance of service without abandonment, and continued operation by another operator. In any of these cases, the existing quality of the human environment and energy consumption should not be affected.

## PUBLIC USE

Following abandonment and salvage of the rail line, the right-of-way may be suitable for other public use. A request containing the requisite four-part showing for imposition of a public use condition (49 CFR 1152.28) must be filed with the Board and served on the railroad within the time specified in the Federal Register notice.

## TRAILS USE

A request for a notice of interim trail use (NITU) is due to the Board, with a copy to the railroad, within 10 days of publication of the notice of the petition for exemption in the Federal Register. Nevertheless, the Board will accept late-filed requests as long as it retains jurisdiction to do so in a particular case. This request must comply with the Board's rules for use of rights-of-way as trails (49 CFR 1152.29).

**PUBLIC ASSISTANCE**

The Board's Office of Public Services responds to questions regarding interim trail use, public use, and other reuse alternatives. You may contact the Office of Public Services directly at (202) 565-1592, or mail inquiries to Surface Transportation Board, Office of Public Services, Washington, DC 20423.

**COMMENTS**

If you wish to file comments regarding this environmental assessment, send an **original and two copies** to Surface Transportation Board, Case Control Unit, Washington, DC 20423, to the attention of Kenneth Blodgett, who prepared this environmental assessment. **Please refer to Docket No. AB-400 (Sub No. 3X) in all correspondence addressed to the Board.** If you have any questions regarding this environmental assessment, you should contact Kenneth Blodgett, the environmental contact for this case by phone at (202) 565-1554, fax at (202) 565-9000, or e-mail at blodgettk@stb.dot.gov.

Date made available to the public: February 13, 2004.

Comment due date: **March 15, 2004 (30 days).**

By the Board, Victoria Rutson, Chief, Section of Environmental Analysis.

Vernon A. Williams
Secretary

Attachment


SARASOTA
ARCADIA
VENICE
PUNTA GORDA
CAPE CORAL
FORT MYERS
NAPLES
CHARLOTTE CO
LEE CO
Serving Southwest Florida
Seminole Gulf Railway
AB-400 (Sub 3X)

34355
EB

SERVICE DATE - LATE RELEASE APRIL 2, 2004

SURFACE TRANSPORTATION BOARD

DECISION AND NOTICE OF INTERIM TRAIL USE OR ABANDONMENT

STB Docket No. AB-400 (Sub-No. 3X)

SEMINOLE GULF RAILWAY, L.P.–ABANDONMENT EXEMPTION–
IN SARASOTA COUNTY, FL

Decided: April 1, 2004

By petition filed on December 15, 2003, Seminole Gulf Railway, L.P. (SGLR) seeks an exemption under 49 U.S.C. 10502 from the prior approval requirements of 49 U.S.C. 10903 to abandon a portion of its Venice Branch between milepost SW 892 outside the city limits of the City of Sarasota, FL, and milepost 904.4 near the City of Venice, FL, a distance of approximately 12.43 miles, in Sarasota County, FL (the line). The line includes a "wye" and stub at approximately milepost SW 904.2 and side tracks. Notice of the filing was served and published in the Federal Register on January 2, 2004 (69 FR 123). A request for issuance of a notice of interim trail use (NITU) and imposition of a public use condition was filed by Sarasota County, FL (the County).[1] The exemption will be granted, subject to environmental, public use, trail use, and standard employee protective conditions.

## BACKGROUND

SGLR purchased the assets comprising the line from CSX Transportation, Inc. (CSXT) in 1987 and currently leases the underlying property from CSXT. SGLR acquired a common carrier obligation when it purchased the line.

According to SGLR, there has been no traffic on the line since March 14, 2002, and there have been no rail movements over the last three miles of the line for over 10 years. During 2002, SGLR delivered 20 cars of plywood and lumber to Kimal Lumber (Kimal) at a team track located on the line. These commodities were then transloaded to trucks. According to petitioner, Kimal now receives cars from SGLR at a team track location on a different line segment for transload to trucks. Three other customers previously received service on the line but none since May 2001. Sheckler Produce received one carload in 2001 and now receives service at another SGLR team track on a different line. Ferrelgas of Sarasota received its last car at the end of 2000. King Plastic Corporation received 21

---

[1] The County states that its comment should be treated as a petition for reconsideration or protest. It also asserts that it takes no position on the merits of the abandonment. Accordingly, the County's comment will simply be considered a request for a NITU and public use condition.

EXHIBIT
tabbies
X

cars through May 2001 at the team track on the line. However, it opened a new plant at a different location and now receives deliveries from SGLR at Fort Ogden on a different line segment. Moreover, SGLR asserts that the four shippers have been served with copies of this petition, and none has responded. Petitioner contends that there is little likelihood of traffic returning to the line and that there is interest in developing the right-of-way for trail use. Finally, SGLR states that it and CSXT have granted The Trust for Public Lands an option to acquire the line for conversion to a trail.

DISCUSSION AND CONCLUSIONS

Under 49 U.S.C. 10903, a rail line may not be abandoned without the Board's prior approval. Under 49 U.S.C. 10502, however, the Board must exempt a transaction or service from regulation when it finds that: (1) continued regulation is not necessary to carry out the rail transportation policy of 49 U.S.C. 10101; and (2) either (a) the transaction or service is of limited scope, or (b) regulation is not necessary to protect shippers from the abuse of market power.

Detailed scrutiny under 49 U.S.C. 10903 is not necessary to carry out the rail transportation policy. By minimizing the administrative expense of the application process, an exemption will reduce regulatory barriers to exit [49 U.S.C. 10101(7)]. An exemption will also foster sound economic conditions and encourage efficient management by relieving SGLR of the expense of maintaining a line no longer generating traffic and revenue and by allowing SGLR to apply its assets more productively elsewhere on its system [49 U.S.C. 10101(5) and (9)]. Other aspects of the rail transportation policy will not be adversely affected.

Regulation of the proposed transaction is not necessary to protect shippers from the abuse of market power because all shippers apparently continue to receive similar rail service on other SGLR lines and there are no prospects of new shippers requiring service on the line. Nevertheless, to ensure that the shippers are informed of the Board's action, SGLR will be required to serve a copy of this decision on the shippers within 5 days of the service date and certify to the Board that it has done so. In light of the market power finding, the Board need not determine whether the proposed abandonment is of limited scope.

Under 49 U.S.C. 10502(g), the Board may not use its exemption authority to relieve a carrier of its statutory obligation to protect the interests of its employees. Accordingly, as a condition to granting this exemption, the Board will impose the employee protective conditions set forth in Oregon Short Line R. Co.–Abandonment–Goshen, 360 I.C.C. 91 (1979).

SGLR has submitted an environmental report with its petition and has notified the appropriate Federal, state, and local agencies of the opportunity to submit information concerning the environmental

impacts of the proposed abandonment. See 49 CFR 1105.11. The Board's Section of Environmental Analysis (SEA) has examined the environmental report, verified the data it contains, and analyzed the probable effects of the proposed action on the quality of the human environment. SEA served an environmental assessment (EA) on February 13, 2004, and requested comments by March 15, 2004.

In the EA, SEA notes that the National Geodetic Survey (NGS) has identified 17 geodetic station markers that may be affected by the proposed abandonment. Accordingly, SEA recommends that SGLR provide NGS with at least 90 days' notice prior to initiation of any salvage operations so that plans can be made for the relocation of the geodetic station markers.

No comments to the EA were filed. Therefore, the condition recommended by SEA in the EA will be imposed. The proposed abandonment, as conditioned, will not significantly affect either the quality of the human environment or the conservation of energy resources.

On January 20, 2004, the County filed a request for interim trail use/rail banking under the National Trails System Act, 16 U.S.C. 1247(d) (Trails Act). The County submitted a statement of willingness to assume financial responsibility for the management of, for any legal liability arising out of the transfer or use of (unless the user is immune from liability, in which case it need only indemnify the railroad against any potential liability), and for payment of any and all taxes that may be levied or assessed against, the right-of-way. The County acknowledged that the use of the right-of-way for trail purposes is subject to the user's continuing to meet its responsibilities and is subject to possible future reconstruction and reactivation for rail service, as required at 49 CFR 1152.29. SGLR has indicated that it is willing to negotiate for interim trail use. Because the County's request complies with the requirements of 49 CFR 1152.29, and SGLR is willing to enter into negotiations, a NITU will be issued as requested. The parties may negotiate an agreement during the 180-day period prescribed below. If an agreement is executed, no further Board action is necessary. If no agreement is reached within 180 days, SGLR may fully abandon the line, subject to the conditions imposed below. See 49 CFR 1152.29(d)(1). Use of the right-of-way for trail purposes is subject to restoration for railroad purposes.

SEA has indicated in its EA that the right-of-way may be suitable for other public use following abandonment. As noted above, the County has also requested that a 180-day public use condition be imposed, precluding SGLR from: (1) disposing of the corridor, other than the tracks, ties, and signal equipment, except for public use on reasonable terms; and (2) removing or destroying potential trail-related structures such as bridges, trestles, culverts, and tunnels. The County submits that this corridor would make an excellent recreational trail and conversion of the property to trail use is in accordance with local plans, and the structures are valuable for recreational trails. The County states that the 180-

day period is needed to assemble or review title and environmental information and to begin negotiations with SGLR.

Persons who file under the Trails Act may also file for public use under 49 U.S.C. 10905. See Rail Abandonments–Use of Rights-of Way as Trails, 2 I.C.C.2d 591, 609 (1986) (Trails). When the need for both conditions is established, it is the Board's policy to impose them concurrently, subject to the execution of a trail use agreement. The County has met the public use criteria prescribed at 49 CFR 1152.28(a)(2) by specifying: (1) the condition sought; (2) the public importance of the condition; (3) the period of time for which the condition would be effective; and (4) justification for the period of time requested. Accordingly, a 180-day public use condition will be imposed, commencing from the effective date of this decision and notice, to enable any State or local government or other interested person to negotiate the acquisition of the line for public use. If a trail use agreement is reached on a portion of the right-of-way, SGLR must keep the remaining right-of-way intact for the remainder of the 180-day period to permit public use negotiations. Also, a public use condition is not imposed for the benefit of any one potential purchaser. Rather, it provides an opportunity for any interested person to acquire the right-of-way that has been found suitable for public purposes, including trail use. Therefore, with respect to the public use condition, SGLR is not required to deal exclusively with the County, but may engage in negotiations with other interested persons.

The parties should note that operation of the trail use and public use procedures could be delayed, or even foreclosed, by the financial assistance process under 49 U.S.C. 10904. As stated in Trails, 2 I.C.C.2d at 608, offers of financial assistance (OFA) to acquire rail lines for continued rail service or to subsidize rail operations take priority over interim trail use/rail banking and public use. Accordingly, if an OFA is timely filed under 49 CFR 1152.27(c)(1), the effective date of this decision and notice will be postponed beyond the effective date indicated here. See 49 CFR 1152.27(e)(2). In addition, the effective date may be further postponed at later stages in the OFA process. See 49 CFR 1152.27(f). Finally, if the line is sold under the OFA procedures, the petition for abandonment exemption will be dismissed and trail use and public use precluded. Alternatively, if a sale under the OFA procedures does not occur, the trail use and public use processes may proceed.

It is ordered:

1. Under 49 U.S.C. 10502, the Board exempts from the prior approval requirements of 49 U.S.C. 10903 the abandonment of the above-described line, subject to the employee protective conditions in Oregon Short Line R. Co.--Abandonment--Goshen, 360 I.C.C. 91 (1979), and the conditions that SGLR shall: (1) provide NGS with at least 90 days' notice prior to initiation of any salvage operations so that plans can be made for the relocation of the geodetic station markers; (2) leave intact all of the right-of-way, including bridges, trestles, culverts, and tunnels (but not track,

ties, and signal equipment) for a period of 180 days from the effective date of this decision and notice, to enable any State or local government agency or any other interested person to negotiate the acquisition of the line for public use; and (3) comply with the interim trail use/rail banking procedures set forth below.

2. SGLR is directed to serve a copy of this decision and notice on all shippers within 5 days after the service date of this decision and notice and certify to the Board that it has done so.

3. If an interim trail use/rail banking agreement is reached, it must require the trail user to assume, for the term of the agreement, full responsibility for the management of, any legal liability arising out of the transfer or use of (unless the user is immune from liability, in which case it need only indemnify the railroad against any potential liability), and for the payment of any and all taxes that may be levied or assessed against, the right-of-way.

4. Interim trail use/rail banking is subject to the future restoration of rail service and to the user's continuing to meet the financial obligations for the right-of-way.

5. If interim trail use is implemented and subsequently the user intends to terminate trail use, it must send the Board a copy of this decision and notice and request that it be vacated on a specified date.

6. If an agreement for interim trail use/rail banking is reached by the 180th day after service of this decision and notice, interim trail use may be implemented. If no agreement is reached by that time, SGLR may fully abandon the line, provided the conditions imposed above are met.

7. An OFA under 49 CFR 1152.27(c)(1) to allow rail service to continue must be received by the railroad and the Board by April 12, 2004, subject to time extensions authorized under 49 CFR 1152.27(c)(1)(i)(C). The offeror must comply with 49 U.S.C. 10904 and 49 CFR 1152.27(c)(1). Each OFA must be accompanied by the filing fee, which currently is set at $1,100. See 49 CFR 1002.2(f)(25).

8. OFAs and related correspondence to the Board must refer to this proceeding. The following notation must be typed in bold face on the lower left-hand corner of the envelope: "**Office of Proceedings, AB-OFA.**"

9. Provided no OFA has been received, this exemption will be effective on May 2, 2004. Petitions to stay must be filed by April 19, 2004, and petitions to reopen must be filed by April 27, 2004.

10. Pursuant to the provisions of 49 CFR 1152.29(e)(2), SGLR shall file a notice of consummation with the Board to signify that it has exercised the authority granted and fully abandoned the line. If consummation has not been effected by SGLR's filing of a notice of consummation by April 2, 2005, and there are no legal or regulatory barriers to consummation, the authority to abandon will automatically expire. If a legal or regulatory barrier to consummation exists at the end of the 1-year period, the notice of consummation must be filed not later than 60 days after satisfaction, expiration or removal of the legal or regulatory barrier.

By the Board, Chairman Nober.

Vernon A. Williams
Secretary




## About TPL

The Trust for Public Land (TPL) is a national, nonprofit, land conservation organization that conserves land for people to enjoy as parks, community gardens, historic sites, rural lands, and other natural places, ensuring livable communities for generations to come.

Request a copy of TPL's Annual Report for 2006

**TPL's Conservation Initiatives**

- **Parks for People:** Working in cities and suburbs across America to ensure that everyone—in particular, every child—enjoys close-to-home access to a park, playground, or natural area.
- **Working Lands:** Protecting the farms, ranches, and forests that support land-based livelihoods and rural ways of life.
- **Natural Lands:** Conserving wilderness, wildlife habitat, and places of natural beauty for our children's children to explore.
- **Heritage Lands:** Safeguarding places of historical and cultural importance that keep us in touch with the past and who we are as a people.
- **Land & Water:** Preserving land to ensure clean drinking water and to protect the natural beauty of our coasts and waterways.

**TPL's Conservation Services**

- **Conservation Vision:** TPL helps agencies and communities define conservation priorities, identify lands to be protected, and plan networks of conserved land that meet public need.
- **Conservation Finance:** TPL helps agencies and communities identify and raise funds for conservation from federal, state, local, and philanthropic sources.
- **Conservation Transactions:** TPL helps structure, negotiate, and complete land transactions that create parks, playgrounds, and protected natural areas.
- **Research & Education:** TPL acquires and shares knowledge of conservation issues and techniques to improve the practice of conservation and promote its public benefits.

Since 1972, TPL has worked with willing landowners, community groups, and national, state, and local agencies to complete more than 3,500 land conservation projects in 47 states, protecting more than 2 million acres. Since 1994, TPL has helped states and communities craft and pass over 330 ballot measures, generating almost $25 billion in new conservation-related funding.

Updated 8/2007

Contact Us | Home | Donate Now | Site Map

© 2007 The Trust for Public Land. All Rights Reserved.
Privacy Policy

EXHIBIT
tabbies
Y

scgov.net

home

Sarasota County Government Online

search




Call Center
941-861-5000 ››

County A-Z ››

Calendar of Events ››

Meetings and Agendas ››

Careers ››

911 Dispatch Reports

Access Sarasota TV Schedule

All America County

County Maps

County Road Projects

Pay Your Water Bill

Permitting/Permit Status

Property Records Search

Sarasota County Links

- Access Sarasota TV Live
- All Hazards Preparation
- GIS Mapping
- Parks and Recreation
- SCAT Bus System

## County News

### Vote Nov. 6



On Nov. 6, you'll have an opportunity to renew the Sarasota County penny sales tax. For two decades, the penny has improved the quality of life for everyone. (MORE)

### Night closures at Bahia Vista/Beneva intersection to begin Nov. 5



Sarasota County Public Works will close the intersection at Bahia Vista Street and Beneva Road beginning Monday, Nov. 5, from 9 p.m. to 6 a.m. (MORE)

### Keep Sarasota County Beautiful 'TAGS' cigarette litter at Reading Festival



With the support of the Sarasota County Commission, Waste Management and local law enforcement, Keep Sarasota County Beautiful is launching a new initiative to engage the public more effectively (MORE)

### Get the "GIS-t" of thin

Sarasota County showcases one of the coolest tools in its arser on Thursday, Nov. 1, wi day-long look at its geographic information system, also known as · a.m.-4:30 p.m (MORE)

### Online registration no Sustainable Communi

Professionals, students citizens, state and local government officials ca now register online for t 2007 Sustainable Communities Workshop (MORE)

### Sarasota County Solic wins second national

Coming off the heels of recognition earlier this y by the Solid Waste Association of North America (SWANA), Sarasota County's Solic Waste program has jus with another national av

Budget Guide | Common Cents | All Hazards Be Prepared

Sarasota County

Sarasota County, Florida | 941-861-5000 | Jobs | Media |

EXHIBIT
tabbies
7