**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| STEPHEN J. ROGERS, et. al. | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Hon. Mary Ellen Coster Williams |
| | ) | |
| v. | ) | |
| | ) | No. 07-273 |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

MARK F. (THOR) HEARNE, II
LINDSAY S.C. BRINTON
Lathrop & Gage, LC
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
314.613.2500 (Phone)
314.613-2550 (fax)
Thornet@ix.netcom.com
ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

**Page**


I. SUMMARY OF THIS MOTION ........ 9

II. STATEMENT OF UNCONTROVERTED FACTS ........ 13

A. In 1910, eight property owners granted the Seaboard Air Line Railway ("Seaboard") easements for a right-of-way upon which to operate a railroad across their property. These easements expressly limited the right to use the property to the operation of a railroad. It was on the basis of these grants of an easement that the Seaboard constructed the approximately twelve and one-half mile long railroad line between Sarasota, Florida and Venice, Florida. 13

1. How The Right-of-Way Was Established ........ 13

2. How the Seaboard Air Line Right-of-Way was Used and Ultimately Transferred To The CSX and SGLR ........ 15

B. The Plaintiffs are the successors in title to the original property owners that granted the rights-of-way to Seaboard; all of the Plaintiffs held fee title to their property abutting and underlying the former Seaboard right-of-way on April 2, 2004. ........ 18

1. Stephen and Linda Rogers ........ 18

2. Donald and Judith Duran. ........ 19

3. Denise Rizzo. ........ 20

4. Dwight and Carolyn Austin ........ 20

5. Kathy Becker. ........ 21

6. Anne Edwards ........ 21

7. Edward and Janice Fatica ........ 21

8. Owen and Laura Harney ........ 22

9. Jan and Karin Heitmann. ........ 22

10. Kenneth and M. LaOra Miles ........ 21

11. Mission Estate Homeowners' Association ........

12. Sue Wetzel Stitt ........ 21

13. Egbert and Barbara Von Papen....21

C. Seaboard's successor railroad, CSX and Seminole Gulf Railroad, LP, ("SGLP") abandoned the railroad easement in 2004. ....25

D. On April 2, 2004, the Surface Transportation Board ("STB") issued a Notice of Interim Trail Use or Abandonment ("NITU") which precluded the Plaintiffs' reversionary rights to their property, converted the abandoned railroad right-of-way into a public-access recreational trail, and imposed an easement for future possible railroad across the Plaintiffs' property....26

III. PARTIAL SUMMARY JUDGMENT IS APPROPRIATE UNDER RULE 56 RCFC....30

IV. SUMMARY JUDGMENT RESTS UPON WELL-SETTLED PRINCIPLES OF LAW....32

A. The Federal Trails Act operates to preclude or preempt the abandonment and reversion of a railroad right-of-way that would have otherwise occurred by operation of state law. ....32

1. Congress Intended the 1983 Trails Act Amendments to Preclude Property Owners "Reversionary" Rights Under State Law ....32

a. The Trails Act Amendments of 1983 Were Adopted to Prevent Abandonment of Railroad Rights-of-Way that Would Otherwise be Abandoned Under State Law....32

b. The Supreme Court's Landmark Decision in *Preseault v. United States* Found The Trails Act To be Constitutional But Required the Payment of "Just Compensation" When the Trails Act "delay[s] (or Burdens) Property Owners' Enjoyment of Their State Law Reversionary Interests."...34

c. The Settled Law After *Preseault I* is that State Law Determines the Nature of a Property Interest Subject To the Trails Act and When the Owner's Enjoyment of that interest is Delayed or Burdened, "Just Compensation" is Due....37

i. The U.S. Federal Circuit Has Held that The Federal Government is Obligated to Pay "Just Compensation" in Similar Trails Act Taking Cases ....38

ii. U.S. Court of Federal Claims Has Held that The Federal Government is Obligated to Pay "Just Compensation" in Similar Trails Act Taking Cases....41

iii. U.S. District Courts in Trails Act Takings Claims Brought Under the "Mini-Tucker" Act Have Held the

Defendant Liable to Pay Compensation for a Taking of Property. ....................................41

d. A Taking of the Property Owner's Land Arises Upon Issuance of a NITU....................................45

B. The rights that property owners enjoy to their property are defined by state law. ....................................46

C. Under Florida law, a railroad easement is abandoned when the property is no longer used for a railroad purpose; a "railroad purpose" does not include a public-access recreational trail. ....................................47

1. An Easement is not an estate in land but merely the right to use property for a specific purpose....................................49

2. The terms of an easement are governed by the unambiguous intention of the parties....................................50

3. The easement holder may only use the property for the specific purpose designated in the grant of the easement ....................................51

4. An easement holder may not increase the burden upon the property. 52

5. A Railroad easement is extinguished and abandoned when the property is conveyed to a non-railroad or used as a hiking trail. ....................................53

6. An easement may be abandoned, extinguished or forfeited. ....................................54

7. When a railroad easement is abandoned, the underlying property owners enjoy the property free of any easement. ....................................55

D. When the Trails Act precludes a property owner from enjoying that owner's "reversionary" right to property, which the owner enjoys under state law, it is a *per se* taking of that property owner's land for which the Fifth Amendment requires the federal government to pay "just compensation"....................................52

1. When the Trails Act precludes a property owner's "reversionary" right to property, it is a taking that requires payment of "just compensation" to the property owner....................................56

2. Precluding a property owner's "reversionary" rights to use and enjoy its property and imposing further burdens on the property for an easement for a public-access recreational trail, as well as a future easement for railroad use, is a substantial per se physical taking of that property owner's property....................................57

V. CONCLUSION ....................................62

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Ackers v. Canas*,
601 So.2d 305 (Fla. App. 1992) ..... 51

*American Real Estate Holding Limited Partnership v. Twin Cities Investors, Inc.*,
740 So. 2d 562 (Fla. App. 1999) ..... 49

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) ..... 30

*Armstrong v. United States,*
364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) ..... 57

*Barclay v. United States*,
127 S.Ct. 1328 (U.S. Feb. 20, 2007) (No. 06-816) ..... 46

*Barclay v. United States*,
443 F.3d 1368 (2006) ..... 45-46

*Beres v. United States*, 64 Fed. Cl. 403 (2005, Judge Horn) ..... 43

*Blendu v. United States*,
75 Fed. Cl. 543 (2007, Judge Hewitt) ..... 43

*Board of Regents v. Roth*,
408 U.S. 564 (1972) ..... 46

*Boyd v. U.S.,*
116 U.S. 616 (1886) ..... 60

*Brower v. County of Inyo*,
489 U.S. 593 (1989) ..... 60

*Caldwell v. United States*,
391 F.3d 1226 (Fed. Cir. 2004) ..... 45-46

*Cannco Contractors Inc. v. Livingston*,
282 Ark. 438, 669 S.W.2d 457 (railroad deeding of right-of-way constituted abandonment), modified, 282 Ark. 438, 670 S.W.2d 454 (1984) ..... 53

*Celotex Corporation v. Cattrett*,
477 U.S. 317 (1986) ..... 30

*Clear Channel Metroplex, Inc. v. Sunbeam Television Corp.*,
922 So.2d 229 (Fla. App. 2005) .......... 51

*Dean v. MOD Properties, Ltd.*,
528 So. 2d 432 (Fla. App. 1988) .......... 49

*Drazich v. Lasson*,
964 P.2d 324 (Utah App. 1998) .......... 50

*Easton v. Appler*,
548 So.2d 691 (Fla. App. 1989) .......... 49

*Ellamae Phillips Co. v. United States*,
77 Fed. Cl. 387 (2007, Judge Baskir) .......... 43

*Entick v. Carrington 19 Howell's State Trials 1029*,
95 Eng. Rep. 807 (C.P. 1765) .......... 60

*Glosemeyer v. United States*,
45 Fed. Cl. 771 (2000) .......... 42-43, 45, 48, 54, 57

*Grantwood Village v. United States*
95 F.3d 654 (1996) .......... 42, 48, 62

*Harvest Queen Mill & Elevator Co. v. Sanders*,
370 P.2d 419 (Kan. 1962) .......... 50

*Hash v. United States*,
403 F.3d 1308 (Fed. Cir, 2005) .......... 37, 40, 44, 48, 62

*Hayes v. Reynolds*,
132 So.2d 781 (Fla. App. 1961) .......... 49

*Huff v. Langman*,
646 N.E.2d 730 (Ind. App. 1995) .......... 50

*Hynes v. City of Lakeland*,
451 So. 2d 505 (Fla. App. 1984) .......... 49

*Illig v. United States*,
58 Fed. Cl. 619 (2003) .......... 43, 62

*International News Service v. Associated Press*,
248 U.S. 215 (1918) .......... 60

*Kaiser Aetna et al. v. United States*,
444 U.S. 164 (1979) .......... 59

*Kempfer v. St. Johns River Water Management Dist.*,
475 So.2d 920 (Fla. App. 1985)........................................................................ 49

*Lawson v. State*,
107 Wash.2d 444, 730 P.2d 1308 (1986)........................................................ 52-3

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982)........................................................................................ 6

*Love v. U.S.*,
889 F. Supp. 1548 (E.D.N.C. 1994).................................................................. 50

*Loveland v. CSX Transp., Inc.*,
622 So.2d 1120, 122 (Fla.App. 1993)............................................................. 52-55

*Marthens v. B & O Railroad*,
170 W.Va. 33, 289 S.E.2d 706 (1982)............................................................. 53

*Moore v. United States*,
63 Fed.Cl. 781 (2005)................................................................................. 42, 62

*Moore v. Stevens*,
106 So. 901 (Fla. 1925).................................................................................. 51

*Nat'l Assoc. of Reversionary Property Owners v. Surface Transp. Bd.*,
158 F. 3d 135 (D.C. Cir. 1998)........................................................................ 45

*National Wildlife Federation v. ICC*,
271 U.S. App. D.C. 1, 11-12, and n. 16, 850 F.2d 694 (1988)...................... 36, 54

*Nature Conservancy v. Kolb*,
853 S.W.2d 864 (Ark. 1993).......................................................................... 54

*Oregon v. Elstad*,
470 U.S. 298 (1985)........................................................................................ 30

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322 (1922)...................................... 57

*Pollnow v. Department of Natural Resource*,
276 N.W. 2d 738 (1979)................................................................................. 53

*Portsmouth Co. v. United States*,
260 U.S. 327 (1922)........................................................................................ 60

*Preseault v. United States*,
100 F.3d 1525 (Fed.Cir.1996) (*en banc*) ..........................37-41, 50, 53, 55, 60, 62

*Preseault v. United States*,
494 U.S. 1 (1990)....................32-34, 37, 46-48, 56

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984).................... 36, 46

*Schmitt v. United States*,
203 F.R.D. 387 (S.D. Ind., 2001).................... 44

*Schnabel v. County of DuPage*,
428 N.E.2d 671 (1981).................... 54

*Sears Roebuck and Co. v. Franchise Finance Corp. of America*,
711 So. 2d 1189 (Fla. App. 1998).................... 49

*Seventy-Ninth Street Improv. Corp. v. Ashley*,
509 S.W.2d 121 (Mo.1974) .................... 52-53

*Shiner v. Baita*,
710 So. 2d 711 (Fla. App. 1998).................... 49

*Silverman v. United States*,
365 U.S. 505 (1961).................... 60

*Swisher v. United States*,
176 F. Supp.2d 1100 (D. Kan, 2001).................... 45

*Toews v. United States*,
53 Fed. Cl. 58 (2002) .................... 39

*Towes v. United States,*
376 F. 3d 1371 (2004).................... 56-57

*United States v. Causby*,
328 U.S. 256 (1946).................... 60

*United States v. Lefkowitz*,
285 U.S. 452 (1932).................... 60

*Walters v. McCall*,
450 So.2d 1139 (Fla. App. 1984).................... 51-52

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
449 U.S., at 164 *Preseault I*, 494 U.S. at 23 .................... 37, 46

*Wiggins v. Lykes Bros.*,
97 So.2d 273 (Fla. 1957).................... 54-55

*Zoltek Corp. v. U.S.*,
442 F.3d 1345 (2006) ........ 30

**Statutes**

16 U.S.C. § 1247(d) ........ 33, 43

28 U.S. C. § 1346 (a)(2) ........ 44, 51

49 U.S.C. 10906 (1982 ed.) ........ 32, 36

Homestead Act of 1862 ........ 41

Pub. L. 98-11, 97 Stat. 48, to the National Trails System Act, Pub. L. 90-543, 82 Stat. 919 (codified, as amended, at 16 U.S.C. §1241 et seq. (Supp. II 1996) ........ 10

Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub. L. 94-210, 90 Stat. 144, as amended, 49 U.S.C. 10906 (1982 ed.) ........ 32, 36

Railroad Revitalization and Regulatory Reform Act of 1976, Section 8(d) ........ 10, 32-33, 39, 45

Railroad Revitalization and Regulatory Reform Act of 1976, Section 809(a) ........ 32

Tucker Act, 28 U.S.C. § 1491(a) ........ 30, 34, 37, 56

**Other Authorities**

David A. Thomas, "Why The Public Plundering of Private Property Rights Is Still A Very Bad Idea." 41 Real Property, Probate And Trust Journal, 25. (Spring 2006) ........ 59

Gregg M. Turner, *Railroads of Southwest Florida*, Arcadia Publishing, 1999 (pages 20-26) ........ 13, 15-18

James Kent, "*Commentaries on American Law*", Lecture XXXIV ........ 58

Jon. W. Bruce and James W. Ely, Jr., The Law of Easements and Licenses in Land ¶ 8.02[1], at 8-3 (rev. ed. 1995) ........ 50

Joseph Story, "*Commentary on the Constitution of the United States*" 1833, Vol. III, §§ 1784 ........ 58-59

William Blackstone, *Commentaries on the Laws of England,* 1753, Book I, §§ 191-192 ........ 58-59

**Rules**

RCFC 56(c) ........................................................................................................ 30

## I. SUMMARY OF THIS MOTION

This case is a claim by thirteen property owners[1] seeking the "just compensation" they are due under the Fifth Amendment for the federal government's taking of their property. Plaintiffs' Motion for Class Certification, which proposes a class size of over one hundred members, is currently pending before this Court. The federal government took the Plaintiffs' property when Section 8(d) of the 1983 amendments to the federal National Trails System Act ("Trails Act")[2] precluded their "reversionary"[3] rights to their property, which they enjoyed under Florida law, and imposed two new easements upon their property, one easement for a public-access recreational trail, and a second easement for use of the Plaintiffs' property in the future as a railroad. The Plaintiffs have filed this motion under RCFC 56 requesting this Court to enter partial summary judgment against the Defendant on the issue of the government's liability for this taking of the Plaintiffs' property.

Summary judgment should be entered against the Defendant on the basis of four uncontested facts and four points of settled law.

---

[1] Several of the property owners are husband and wife, or a husband and wife's living trust. We group these together as a common owner for purposes of this memorandum.

[2] Pub. L. 98-11, 97 Stat. 48, to the National Trails System Act, Pub. L. 90-543, 82 Stat. 919 (codified, as amended, at 16 U.S.C. §1241 et seq. (Supp. II 1996)).

[3] Plaintiffs use the term "reversionary" or "reversion" in this memorandum in the generic sense to describe the Plaintiff's property interest. We employ the term in this generic sense because it is commonly used in this manner by courts considering Trails Act taking cases. This is not a technically correct use of the term. As the Federal Circuit has noted, "as a matter of traditional property law terminology, a termination of the easements would not cause anything to "revert" to the landowner. Rather, the burden of the easement would simply be extinguished, and the landowner's property would be held free and clear of any such burden." *Towes v. United States,* 376 F. 3d 1371, 1376 (2004).

The four uncontested facts are:

(1) In 1910, eight property owners granted the Seaboard Air Line Railway ("Seaboard") easements for a right-of-way upon which to operate a railroad across their property. These easements expressly limited the right to use the property to the operation of a railroad. It was on the basis of these grants of an easement that the Seaboard constructed the approximately twelve and one-half mile long railroad line between Sarasota, Florida and Venice, Florida.

(2) The Plaintiffs are the successors in title to the original property owners that granted the rights-of-way to Seaboard. Each of the Plaintiffs held fee title to their property abutting and underlying the former Seaboard right-of-way on April 2, 2004.

(3) Seaboard's successor railroad, CSX and Seminole Gulf Railroad, LP, ("SGLP") abandoned the railroad easement in 2004.

(4) On April 2, 2004, the Surface Transportation Board ("STB") pursuant to the Trails Act issued a Notice of Interim Trail Use or Abandonment ("NITU") which precluded the Plaintiffs' reversionary rights to their property, converted the abandoned railroad right-of-way into a public-access recreational trail, and imposed an easement for future possible railroad across the Plaintiffs' property.

The four points of settled law are:

(1) The Trails Act operates to preclude or preempt the abandonment and reversion of a railroad right-of-way that would have otherwise occurred by operation of state law.

(2) The rights that property owners enjoy to their property are defined by state law, in this case Florida law.

(3) Under Florida law, a railroad easement is abandoned when the property is no longer used for a railroad purpose; a "railroad purpose" does not include a public-access recreational trail.

(4) When the Trails Act precludes a property owner from enjoying that owner's "reversionary" right to property, which the owner enjoys under state law, it is a *per se* taking of that property owner's land for which the Fifth Amendment requires the federal government to pay "just compensation."

On the basis of these four uncontested facts and four points of well-settled law, judgment should be entered against the Defendant on its obligation to pay "just compensation" for the taking of Plaintiffs' property when the Trails Act precluded the Plaintiffs from enjoying their reversionary rights to property they owned under Florida law and imposed upon that property an easement for a public-access recreational trail and an easement for a possible future railroad.

## II. Statement of Uncontroverted Facts

**A. In 1910, eight property owners granted the Seaboard Air Line Railway ("Seaboard") easements for a right-of-way upon which to operate a railroad across their property. These easements expressly limited the right to use the property to the operation of a railroad. It was on the basis of these grants of an easement that the Seaboard constructed the approximately twelve and one-half mile long railroad line between Sarasota, Florida and Venice, Florida.**

1. How The Right-of-Way Was Established

The history of the Seaboard Air Line Railway from Sarasota to Venice, Florida line is recounted in *Railroads of Southwest Florida*, which states as follow:

> Bertha Honore Palmer [a wealthy and prominent Chicago widow] chartered a Pullman car and came to Sarasota from Chicago in 1910. So impressed with the region, she purchased more than 60,000 acres of land, much of it bay front, including what is now Venice Beach. But the sale hinged on the Seaboard [Air Line Railway] extending itself from Sarasota to Venice.
>
> [Ms. Palmer] convinced the Seaboard to extend its track south of Fruitville to Venice, where she owned extensive land holdings. Work commenced on the 16-mile extension in January 1910, by way of Osprey and Laurel. The project was completed in fall, 1911.[4]

The Palmer family, including Bertha Honore Palmer's son, Potter Palmer, Jr., and her brother, Adrian C. Honore, granted the Seaboard Air Line Railway easements to use their property for the construction and operation of a railroad.[5] The easements expressly conditioned the use of the property for the creation and operation of a railroad. The easements provided,

> [the grantors] hereby remise, release and forever quitclaim unto the SEABOARD AIR LINE RAILWAY, a corporation of the State of Virginia and other States, a **right-of-way for railroad purposes** over and across the following described parcel of land.

---

[4] Gregg M. Turner, *Railroads of Southwest Florida*, Arcadia Publishing, 1999 (pages 20-26).

[5] See easement conveyances by Adrian C. Honore and Potter Palmer, Jr. (*See* Plaintiffs' Statement of Uncontroverted Facts, and Tab A and Tab B).

***

> This conveyance is made upon the express condition, however, that if the Seaboard Airline Railway shall not construct upon said land and commence the operation thereon with (sic) one year of the date hereof of a line of railroad, or, **if at any time thereafter the said Seaboard Air Line Railway shall abandon said line for railroad purposes then the above described pieces and parcels of land shall *ipso facto* revert to and again become the property of the undersigned, his heirs, administrators and assigns.**[6]

These easements from the Palmer family, as well as a similar easement conveyed by Sarah O. Webber,[7] were the instruments by which the Seaboard Air Line Railway acquired the vast majority of the right-of-way between Sarasota and Venice, Florida – estimating at more than 132 out of a total of 155 acres.[8] The remaining portion of the right-of-way was created by six easements granted by other land owners for the express purpose of a railroad right-of-way.[9]

---

[6] *Id.*

[7] The Webber deed contains the following conditional language, "[i]t is understood and agreed that if the said premises shall hereafter be abandoned by the said party of the second part its successors or assigns for railroad purposes in that event the said premises shall *ipso facto* revert to the party of the first part whereas executors, administrators, and assigns." (*See* Plaintiffs' Statement of Uncontroverted Facts, and Tab C).

[8] The Quit Claim Deed from CSX to The Trust for Public Land indicates that the abandoned right-of-way converted to trail use covered approximately 155 acres. *See*, Plaintiff's Statement of Uncontroverted Facts, and Tab FF. Of this 155 acres, approximately 3.1 were owned by Sarah O. Webber, 1.15 by Potter Palmer, Jr., *Et Ux*, and approximately 128 acres were owned by Adrian C. Honore. (*See* Plaintiffs' Statement of Uncontroverted Facts, and Tabs A-C. Mr. Honore's property was divided into 4 sections: 22.5 acres, 20.5 acres, 80.76 acres, and 4.6 acres. This calculation of acreage is derived from the legal descriptions in the four conveyance documents. (The figure of 80.76 was calculated by multiplying the length of the right-of-way strip (35,180 feet) by the width (100 feet) and dividing this number (3,518,000) by 43,560.17 feet (the number of square feet in an acre)).

[9] The six other easement conveyances are:

2. <u>How the Seaboard Air Line Right-of-Way was Used and Ultimately Transferred To The CSX and SGLR</u>

The Seaboard Air Line Railway did not enjoy great success over this route and ultimately suffered a receivership, bankruptcy and was forced to merge with their competitor the Atlantic Coast Line.[10] In the years since World War II, and especially since the 1950's, various segments of the railroad corridor were abandoned.[11] The combined Seaboard Atlantic Coast Line was finally acquired by the CSX.[12] The CSX, in turn, found the route unprofitable and sold it to a shortline, the Seminole

---

(1) Easement granted by H.M. Frazee and his wife, Bertie Frazee, to Seaboard Air Line Railway Company, signed September 5, 1910. (*See* Plaintiffs' Statement of Uncontroverted Facts, and Tab D).

(2) Easement granted by Clement Phillips and his wife, Lula Phillips, to Seaboard Air Line Railway Company, signed September 5, 1910. (*See* Plaintiffs' Statement of Uncontroverted Facts, and Tab E.

(3) Easement granted by Jesse Knight to Seaboard Air Line Railway Company, signed September 3, 1910. (*See* Plaintiffs' Statement of Uncontroverted Facts, and Tab F).

(4) Easement granted by Jesse Knight and F.R. Knight to Seaboard Air Line Railway Company, signed September 3, 1910. (*See* Plaintiffs' Statement of Uncontroverted Facts, and Tab G).

(5) Easement granted by J.B. Hutchings and Lena Hutchings to Seaboard Air Line Railway Company, signed September 29, 1910. (*See* Plaintiffs' Statement of Uncontroverted Facts, and Tab H).

(6) Easement granted by A.E. Blackburn, Et Ux to Seaboard Air Line Railway Company, signed September 5, 1910. (*See* Plaintiffs' Statement of Uncontroverted Facts, and Tab I.

[10] *Railroads of Southwest Florida*, *supra*, note 4.

[11] *Id.*

[12] *Id.*

Gulf Railroad L.P.13 The SGLP likewise found the line unprofitable and in 2004 abandoned the railroad corridor between Sarasota and Venice.[14]

---

[13] *Id.*

[14] *Railroads of Southwest Florida* describes this period of decline in more detail as follows:

> The Atlantic Coast Line and Seaboard Air Line railroads competed for the transportation business of Southwest Florida for nearly 70 years. Passengers provided valuable revenues for each firm, but the serious money was made in the movement of freight. To obtain it, business had to be pursued ***
>
> Both the Seaboard and Coast Line dealt with explosive growth during the Roaring Twenties, but the decade which held so much ended on a sour note. The stock market crashed, a national depression loomed, and railroads everywhere hunkered down to survive ***
>
> S. Davies Warfield, Seaboard's dynamic leader whose faith in Florida was unshakable, died in 1927. That year Seaboard reported a mere $31,576 of net income on revenues of $61.7 million. The company's Boom projects had proved costly, plus the railroad was facing heightened competition - as was the Coast line - from automobiles, trucks, buses, boat lines, and airplanes. Economies were quickly instituted by both companies. Expenses were slashed, and poorly patronized passenger trains were canceled. But the measures, at least for the Seaboard, were not enough. In 1930, the company slipped into receivership where it remained until 1946. ***
>
> In 1942, in an effort to cut expenses, the Seaboard abandoned parts of its Fort Myers-Naples Extension, which was a mere 15 years old. A 27-mile section between Punta Rassa Junction (South Fort Myers) and Naples was scrapped and almost 2 miles were lopped off the Punta Rassa Branch from Truckland to San Carlos. Thirteen miles also vanished on the LaBelle Subdivision between Alva and LaBelle, including the LaBelle uptown spur. The cost of maintaining these lines was prohibitive, and the traffic insignificant. ***
>
> In May 1945, in the following year, a new Seaboard Airline Railroad emerged from the bankruptcy courts, and both it and the Coast Line began adjusting to the postwar economy.

Whereas both the Seaboard and Coast Line experienced postwar industrial growth along its routes, not all areas of Florida benefited. In 1950, traffic had declined to such a point in Southwest Florida that the Seaboard decided to abandon the last of its Fort Myers-Naples Extension. The company complained to the Interstate Commerce Commission that timber deposits of the region had depleted, truckers were moving most of the citrus and vegetable harvests, and what was left could easily be moved by the Atlantic Coast Line. Company officials also documented that the Seaboard's physical plant needed rebuilding. Rails on the little-used LaBelle subdivision (Fort Myers to Alva) were now completely worn out, plus the archaic, crank-lift bridge over the Orange River faced major repairs. Worst of all was the decaying condition of the Calooshatchee River drawbridge at Fort Myers which needed total replacement. ***

As the Seaboard's 1952 annual report noted: 'In view of diminished traffic without prospect for sufficient improvements to justify continued operation, coupled with the immediate need for heavy maintenance…your Company sought and obtained authority from the ICC to abandon its line from Hull (Fort Ogden) to Fort Myers and the two extensions Fort Myers to San Carlos and to Alva, a total of 65 miles.' Operations were discontinued in November 1952, and the physical removal of the lines commenced at once. *** In 1958 when the Seaboard and Coast Line jointly announced that they were in merger discussions.*** (page 89-92)

The Interstate Commerce Commission approved the merger of the Seaboard Air Line and Atlantic Coast Line railroads in December 1963. However, certain other railroads and organizations opposed the marriage and fought the ICC decision. Only after the United States Supreme Court refused to hear any further appeals was the matter laid to rest. The Seaboard Coast Line Railroad came into being in July 1, 1967….

The National Railroad Passenger Corporation (Amtrak) came into being on May 1, 1971, and its mission was to relieve many railroad companies of passenger train operations. Seaboard Coast Line joined the program, paid an entrance fee of some 30 million dollars, whereupon Amtrak assumed its passenger train responsibilities. (Amtrak, in turn, contracted Seaboard Coast Line to operate its Florida trains.) Unfortunately, service to Southwest Florida was not included in the Amtrak plan and thus was completely eliminated. ***

In 1979, the Seaboard Coast Line announced that it was going to merge with another big American railroad – The Chessie System. Hearings were subsequently held before the Interstate Commerce Commission which approved the merger in September 1980. ***

**B. The Plaintiffs are the successors in title to the original property owners that granted the rights-of-way to Seaboard; all of the Plaintiffs held fee title to their property abutting and underlying the former Seaboard right-of-way on April 2, 2004.**

The Plaintiffs are a group of thirteen families, individuals, and associations that own thirteen parcels of property in Sarasota County, Florida.[15] Each of the plaintiffs own fee title to property that was once encumbered by an easement granted to the Seminole Gulf Railway, L.P. ("SGLR") for the limited purpose of a railroad. By reason of the Trails Act, the Plaintiffs' property is now subject to an easement for interim public-access recreational trail and possible future railroad reactivation. All plaintiffs are residents and citizens of the United States of America.

1. Stephen and Linda Rogers

Plaintiffs Stephen and Linda Rogers are husband and wife. They are both residents and citizens of Sarasota County, Florida. The Childers acquired their home in Sarasota County on July

---

> The Seaboard Coast Line and Louisville & Nashville Railroads were later melded into a new CSX unit called Seaboard System Railroad. On July 1, 1986, all rail properties came under the umbrella of CSX Rail Transportation. ***
>
> The rail unit of CSX began to restructure itself in December 1985. Nearly 1,500 miles of lightly used lines were sold or abandoned, 13 rail yards were closed, 8 locomotive and car facilities were consolidated, and employment fell to 43,279 persons. Marginal or unproductive assets were also written down, and separation payments were made to certain employees. ***
>
> CSX Transportation ultimately determined that the railroad requirements of Southwest Florida would be best served by shortline railroads. In November 1987, Bay colony Railroads of Lexington, Massachusetts, was named the successful bidder for most of the remaining trackage in the region, i.e. between Oneco, Sarasota, and Venice, and from Arcadia south to Vanderbilt (Naples). Bay Colony established Seminole Gulf Railway to operate the lines. (page 111-112).

25, 2003.[16] Their property includes fee title to property that abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails Act) for an interim public access trail and possible future railroad reactivation. The Rogers were fee owners of this property[17] on the April 2, 2004 Notice of Interim Trail Use ("NITU").

2. Donald and Judith Duran

Plaintiffs Donald and Judith Duran are husband and wife. They are both residents and citizens of Sarasota County, Florida. The Durans acquired their home in Sarasota County on August 1, 2000.[18] Their property includes fee title to property that abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails Act) for an interim public access trail and possible future railroad reactivation. The Durans were fee owners of this property[19] on the April 2, 2004 NITU date.

---

[15] The Sarasota County Appraiser assigns each parcel of real estate a unique "Parcel ID" number. We reference these numbers as a convenient means to identify the property involved in this case. Several of these parcels are contiguous or adjoining parcels.

[16] The Rogers' warranty deed is recorded in the Sarasota County Recorder of Deeds Office as Instrument Number 2003151152. A copy of the Warranty deed by which the Rogers acquired their home is attached as Tab J.

[17] The Rogers' property is Parcel Identification number 0163-16-0005

[18] The Durans' warranty deed is recorded in the Sarasota County Recorder of Deeds Office as File Number 11209.42. A copy of the Warranty deed by which the Durans acquired their home is attached as Tab K.

[19] The Durans' property is Parcel Identification number 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.