3. Denise Rizzo

Plaintiff Denise Rizzo is a resident and citizen of Sarasota County, Florida. Ms. Rizzo acquired her home in Sarasota County on November 6, 2001.[20] This property includes fee title to property that abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails Act) for an interim public access trail and possible future railroad reactivation. Ms. Rizzo was fee owner of this property[21] on the April 2, 2004 NITU date.

4. Dwight and Carolyn Austin

Plaintiffs Dwight and Carolyn Austin are husband and wife. They are both residents and citizens of Sarasota County, Florida. The Austins acquired their home in Sarasota County on September 30, 2002.[22] Their property includes fee title to property that abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails Act) for an interim public access trail and possible future railroad reactivation. The Austins were fee owners of this property[23] on the April 2, 2004 NITU date.

[20] Ms. Rizzo's warranty deed was recorded with the Sarasota County Recorder of Deeds Office on December 5, 2001 as Instrument Number 2001176034. A copy of the Warranty deed by which Ms. Rizzo acquired her home is attached as Tab L.

[21] Ms. Rizzo's property is Parcel Identification number 0163-09-0031.

[22] The Austins' warranty deed was recorded with the Sarasota County Recorder of Deeds Office on October 1, 2002 as Instrument Number 2002161556. A copy of the Warranty deed by which the Austins acquired their home is attached as Tab M.

[23] The Austins' property is Parcel Identification number 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.

5. Kathy Becker

Plaintiff Kathy Becker acquired her home in Sarasota County, Florida on December 12, 2003.[24] This property includes fee title to property that abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails Act) for an interim public access trail and possible future railroad reactivation. Ms. Becker was fee owner of this property[25] on the April 2, 2004 NITU date.

6. Anne Edwards

Plaintiff Anne Edwards was fee owner of property[26] in Sarasota County, Florida on April 2, 2004.[27] The property owned by Anne Edwards on April 2, 2004 abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails Act) for an interim public access trail and possible future railroad reactivation.

7. Edward and Janice Fatica

Plaintiffs Edward and Janice Fatica are husband and wife. They are both residents and citizens of Sarasota County, Florida. The Faticas acquired their home in Sarasota County on February

---

[24] Ms. Becker's warranty deed was recorded in the Sarasota County Recorder of Deeds Office on December 23, 2003 as Instrument Number 2003255099. A copy of the Warranty deed by which Ms. Becker acquired her home is attached as Tab N.

[25] Ms. Becker's property is Parcel Identification number 163160006.

[26] Ms. Edwards' property was Parcel Identification number 163080021.

[27] Anne Edwards subsequently sold that property to James and Patricia Dossett on August 24, 2005. A copy of the Warranty deed by which Anne Edwards sold her home is attached as Tab O.

4, 2000.[28] Their property includes fee title to property that abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails Act) for an interim public access trail and possible future railroad reactivation. The Faticas were fee owners of this property[29] on the April 2, 2004 NITU date.

8. Owen and Laura Harney

Plaintiffs Owen and Laura Harney are husband and wife. They are both residents and citizens of Sarasota County, Florida. The Harneys acquired their home in Sarasota County on July 9, 1999.[30] Their property includes fee title to property that abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails Act) for an interim public access trail and possible future railroad reactivation. The Harneys were fee owners of this property[31] on the April 2, 2004 NITU date.

9. Jan and Karin Heitmann

Plaintiffs Jan and Karin Heitmann are husband and wife. They are both residents and citizens of Sarasota County, Florida. The Heitmanns acquired their home in Sarasota County on January 15,

---

[28] The Facticas' warranty deed was recorded with the Sarasota Recorder of Deeds Office on February 15, 2000 as Instrument Number 2000018927. A copy of the Warranty deed by which the Faticas acquired their home is attached as Tab P.

[29] The Faticas' property is Parcel Identification number 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.

[30] The Harneys' warranty deed was recorded with the Sarasota Recorder of Deeds Office on July 9, 1999 as Instrument Number 1999094147. A copy of the Warranty deed by which the Harneys acquired their home is attached as Tab Q.

[31] The Harneys' property is Parcel Identification number 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.

2002.[32] Their property includes fee title to property that abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails Act) for an interim public access trail and possible future railroad reactivation. The Heitmanns were fee owners of this property[33] on the April 2, 2004 NITU date.

10. Kenneth and M. LaOra Miles

Plaintiffs Kenneth and M. LaOra Miles are husband and wife. They are both residents and citizens of Sarasota County, Florida. The Miles acquired their home in Sarasota County on October 17, 2003.[34] Their property includes fee title to property that abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails Act) for an interim public access trail and possible future railroad reactivation. The Miles were fee owners of this property[35] on the April 2, 2004 NITU date.

11. Mission Estate Homeowners' Assocation

Plaintiff Mission Estate Homeowners' Association ("Mission Estate") acquired title to the common property in Mission Valley Homeowners' Association by dedication of the plat and neighborhood restrictions and indentures. Mission Estate's property includes fee title to property that

[32] The Heitmanns' warranty deed was recorded with the Sarasota Recorder of Deeds Office on January 18, 2002 as Instrument Number 2002010330. A copy of the Warranty deed by which the Heitmanns acquired their home is attached as Tab R.

[33] The Heitmanns' property is Parcel Identification number 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.

[34] The Miles's warranty deed was recorded with the Sarasota Recorder of Deeds Office on October 24, 2003 as Instrument Number 2002010330. A copy of the Warranty deed by which the Miles acquired their home is attached as Tab S.

[35] The Miles's property is Parcel Identification number 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.

abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails Act) for an interim public access trail and possible future railroad reactivation. Mission Estate was fee owner of this property on the April 2, 2004 NITU date.

12. Sue Wetzel Stitt

Plaintiff Sue Wetzel Stitt was fee owner of property in Sarasota County, Florida on April 2, 2004.[36] Sue Wetzel Stitt subsequently conveyed that property to Sue Wetzel Stitt, Trustee of the Sue Wetzel Stitt Revocable Trust on April 9, 2007.[37] The property owned by Sue Wetzel Stitt on April 2, 2004 abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails Act) for an interim public access trail and possible future railroad reactivation.

13. Egbert and Barbara Von Papen

Plaintiffs Egbert and Barbara Von Papen are husband and wife. They are both residents and citizens of Sarasota County, Florida. The Von Papen's acquired their home in Sarasota County on December 11, 2001.[38] Their property includes fee title to property that abuts and underlies the abandoned SGLR right-of-way that is now subject to the easement (created by operation of the Trails

---

[36] Sue Wetzel Stitt's property was identified as Parcel Identification number 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.

[37] A copy of the warranty deed by which Sue Wetzel Stitt conveyed her property is attached as Tab U.

[38] The Von Papen's warranty deed is recorded as Instrument Number 2001180901. A copy of the Warranty deed by which the Von Papen's acquired their home is attached as Tab V.

Act) for an interim public access trail and possible future railroad reactivation. The Von Papen's were fee owners of this property[39] on the April 2, 2004 NITU date.

**C. Seaboard's successor railroad, CSX and Seminole Gulf Railroad, LP, ("SGLP") abandoned the railroad easement in 2004.**

"On December 15, 2003, Seminole Gulf Railway, L.P. ("SGLR"), filed with the Surface and Transportation Board ("STB") a petition under 49 U.S.C. 10502 for exemption from the provisions of 49 U.S.C. 10903 to abandon an approximately 12.43-mile portion of its Venice Branch between milepost SW 892 outside the city limits of the City of Sarasota, and milepost 904.4 near the City of Venice, in Sarasota County, FL."[40] The STB noted that this "line does not contain federally granted rights-of-way."[41]

On February 13, 2004, the STB found as follows:

> no traffic has moved over the line during 2003 or during the last nine months of 2002. The last delivery to a shipper via the line was on March 14, 2002. During the first three months of 2002, SGLR delivered 20 cars of plywood and lumber to a single customer (Kimal Lumbar) at a team track located on the line, where the freight was transloaded to a truck. . . . only three other customers have received traffic over the line in the last several years, but none have received any cars since May 2001.[42]

---

[39] The Von Papen's property is Parcel Identification number 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.

[40] STB, Docket No. Ab-400 (Sub-No. 3x), January 2, 2004 decision. *See* Plaintiffs' Statement of Uncontroverted Facts, and Tab W.

[41] *Id.*

[42] STB Docket No. Ab-400 (Sub-No. 3x), February 13, 2004 decision. *See* Plaintiffs' Statement of Uncontroverted Facts, and Tab X.

The STB later stated that, "there have been no rail movements over the last three miles of the line for over 10 years. . . .[SGLR] contends that there is little likelihood of traffic returning to the line and that there is interest in developing the right-of-way for trail use."[43]

**D. On April 2, 2004, the Surface Transportation Board ("STB") issued a Notice of Interim Trail Use or Abandonment ("NITU") which precluded the Plaintiffs' reversionary rights to their property, converted the abandoned railroad right-of-way into a public-access recreational trail, and imposed an easement for future possible railroad across the Plaintiffs' property.**

On the basis of these findings that the right-of-way was no longer being used for railroad service, the STB found that, "SGLR states that it and CSXT have granted The Trust for Public Lands an option to acquire the line for conversion to a trail. . . . On January 20, 2004, [Sarasota] County filed a request for interim trail use/rail banking under the [Trails Act]."[44] Accordingly, the STB issued the NITU on April 2, 2004.[45] The Public Trust for Land agreed to work with Sarasota County to covert the abandoned right-of-way into a public-access recreational trail.[46]

The STB ordered that,

> [b]ecause the County's request complies with the requirements of 49 CFR 1152.29, and SGLR is willing to enter negotiations, a NITU will be issued as requested. The parties may negotiate an agreement during the 180-day period prescribed below. If an agreement is executed, no further Board action is necessary. If no agreement is reached within 180 days, SGLR may fully abandon the line.[47]

---

[43] STB Docket No. Ab-400 (Sub-No. 3x), April 2, 2004 decision (Notice of Interim Trail Use or "NITU"). *See* Plaintiffs' Statement of Uncontroverted Facts, and Tab Y.

[44] *Id.*

[45] *Id.*

[46] STB's February 14, 2004 decision, supra, note 42.

[47] STB's NITU, *supra*, note 43.

The Trust for Public Land is a tax-exempt public charity and Sarasota County is a municipality.[48] Neither is a railroad and neither Sarasota County nor the Trust for Public Lands possesses the legal authority to operate a railroad.[49]

On October 14, 2004, the STB granted a ninety day extension to the negotiating period and ruled, "The NITU negotiating period is extended until December 28, 2004."[50] On December 20, 2004, a Quit Claim Deed was executed by CSX Transportation (Inc.) conveying to the Trust for Public Land whatever interest CSX may have held in the abandoned right-of-way.[51] This Quit Claim Deed, which affects approximately 156 acres of property in Sarasota County, Florida, was recorded on January 13, 2005 and was expressly executed in reliance upon the STB's issuance of the NITU and provisions of the Trails Act.[52] The Quit Claim Deed specifically provides that the Grantor, CSX Transportation, Inc.,

> does hereby RELEASE, REMISE and forever QUITCLAIM unto [The Trust for Public Land], its successors and assigns, all right, title and interest of [CSX], if any, in and to those certain tracts of parcels of land situate, laying and being in Sarasota, Florida . . . TO HAVE AND TO HOLD the Premises, and all the estate, right, title, lien, interest and claim whatsoever of [CSX] therein, either in law or equity, and all improvements thereon and appurtenances thereto, unto the proper use, benefit and

---

48 *See* the website for The Trust for Public Land: http://www.tpl.org/tier2_sa.cfm?folder_id=170 (print-out attached as Tab Z); *see also* the website for Sarasota County: http://www.scgov.net (print-out attached as Tab AA).

49 *Id.*

50 STB Docket No. AB-400 (Sub-No. 3X), October 13, 2004 decision, *See* Plaintiffs' Statement of Uncontroverted Facts, Tab BB.

51 A copy of this Quit Claim Deed is attached as Tab CC.

52 *Id.*

> enjoyment of [The Trust for Public Land], [it's] heirs and assigns or successors and assigns, forever.

The Quit Claim Deed further provides that:

> [b]y Decision and Notice of Interim Trial Use or Abandonment served April 2, 2004 in the Surface Transportation Board ("STB") Docket No. AB-400, Sub.-No.3X, the STB imposed a Notice of Interim Trail Use ("NITU") on the Premises. [The Trust for Public Land] for itself, its successors and assigns, acknowledges that the Premises remain subject to the jurisdiction of the STB for purposes of reactivating rail service.[53]

Pursuant to the Quit Claim Deed, the SGLR (and CSX) conveyed whatever interest they may have had in the railroad right-of-way to The Trust for Public Land.[54] The Trust for Public Land has subsequently sold this property to Sarasota County for use as a public-access recreational trail.

Since April 2004, the approximately 12.43 mile long former SGLR railroad right-of-way has been transformed into a public-access recreational trail called "The Legacy Trail."[55] The railroad rails and ties have been removed from the former right-of-way and Sarasota County has graded the former roadbed for use as a public-access recreational trail.[56] Sarasota County states that the Legacy Trail will eventually be comprised of a 14-foot wide asphalt trail, rest-stop shelters, and additional entries into local neighborhoods.[57] According to The Trust for Public Land, the Legacy Trail will be

---

[53] *Id.*

[54] *Id.*

[55] *See* the website for Sarasota County: jttp://www.scgov.net/PublicWorks/ RailsToTrails/ Rails.asp; a copy of this website print-out is attached as Tab DD.

[56] *See id.*, *see also* photographs of the trail construction posted on the Sarasota County website at: http://www.scgov.net/PublicWorks/RailsToTrails/Photos.asp, collectively attached as Tab EE.

[57] *See Tab* DD, website for Sarasota County.

"the centerpiece of [Sarasota] county's planned trail system and a major bicycle/pedestrian commuter link between Sarasota and Venice."[58]

The Plaintiffs have never received "just compensation" for this taking of their property and the federal government has never offered to pay the Plaintiffs any compensation for this taking of their property.

---

[58] *See* the website for The Trust for Public Land: http://www.tpl.org/tier3_cd.cfm?content_item_id=19837&folder_id=250; a copy of this website print-out is attached as Tab FF.

## III. PARTIAL SUMMARY JUDGMENT IS APPROPRIATE UNDER RULE 56 RCFC

On May 1, 2007, the Plaintiffs filed this action seeking "just compensation" for the taking of their property. The Fifth amendment is self-executing.[59] This Court has jurisdiction to hear such a claim pursuant to the Tucker act.[60]

The Plaintiffs have filed this motion for partial summary judgment on the question of the government's liability for a taking of their property in violation of the Fifth Amendment pursuant to Rule 56 RCFC.

Summary judgment motions isolate and eliminate factually unsubstantiated cases and are appropriate in cases when the pleadings, depositions, formal discovery requests, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[61] A "genuine issue" of fact exists only if a "reasonable jury" could find in favor of the non-moving party.[62]

As Plaintiffs demonstrate below, there are no genuine issues of material fact and the Court should enter summary judgment finding that the federal government, by operation of the Trails Act and the STB's issuance of a NITU, has precluded the Plaintiff's reversionary property rights and has

---

[59] *Oregon v. Elstad*, 470 U.S. 298, 350 (1985); *Zoltek Corp. v. U.S.*, 442 F.3d 1345, 1376 (2006).

[60] Tucker Act, 28 U.S.C. § 1491(a).

[61] RCFC 56(c); *Celotex Corporation v. Cattrett*, 477 U.S. 317, 323 (1986).

[62] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

taken two easements across the Plaintiffs' property without paying "just compensation," in violation of the Fifth Amendment to the U.S. Constitution.

## IV. <u>SUMMARY JUDGMENT RESTS UPON WELL-SETTLED PRINCIPLES OF LAW</u>

### A. The Federal Trails Act operates to preclude or preempt the abandonment and reversion of a railroad right-of-way that would have otherwise occurred by operation of state law.

1. <u>Congress Intended the 1983 Trails Act Amendments to Preclude Property Owners "Reversionary" Rights Under State Law</u>

   *a. The Trails Act Amendments of 1983 Were Adopted to Prevent Abandonment of Railroad Rights-of-Way that Would Otherwise be Abandoned Under State Law*

The unfortunate financial plight of the Seaboard Air Line Railway was not unique. As Justice Brennan recounted in his introduction to the Court's opinion in *Preseault v. United States*, 494 U.S. 1 (1990) (*Preseault I*), Congress became concerned about the nation's loss of railroad right of way.

> In 1920, the Nation's railway system reached its peak of 272,000 miles; today only about 141,000 miles are in use, and experts predict that 3,000 miles will be abandoned every year through the end of this century. Concerned about the loss of trackage, Congress included in the Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub. L. 94-210, 90 Stat. 144, as amended, 49 U.S.C. 10906 (1982 ed.), several provisions aimed at promoting the conversion of abandoned lines to trails. Section 809(a) of the 4-R Act required the Secretary of Transportation to prepare a report on alternative uses for abandoned railroad rights-of-way. Section 809(b) authorized the Secretary of the Interior to encourage conversion of abandoned rights-of-way to recreational and conservational uses through financial, educational, and technical assistance to local, state, and federal agencies. See note following 49 U.S.C. 10906 (1982 ed.). Section 809(c) authorized the Interstate Commerce Commission (ICC or Commission) to delay the disposition of rail property for up to 180 days after the effective date of an order permitting abandonment, unless the property had first been offered for sale on reasonable terms for public purposes including recreational use. See 49 U.S.C. 10906 (1982 ed.).
>
> By 1983, Congress recognized that these measures "ha[d] not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes." H. R. Rep. No. 98-28, p. 8 (1983) (H. R. Rep.); S. Rep. No. 98-1, p. 9 (1983) (S. Rep.) (same). Congress enacted the Amendments to the Trails Act, which authorize the ICC to preserve for possible future railroad use rights-of-way not currently in service and to allow interim use of the land as recreational trails. Section 8(d) provides that a railroad wishing to

> cease operations along a particular route may negotiate with a State, municipality, or private group that is prepared to assume financial and managerial responsibility for the right-of-way. If the parties reach agreement, the land may be transferred to the trail operator for interim trail use, subject to ICC-imposed terms and conditions; if no agreement is reached, the railroad may abandon the line entirely and liquidate its interest.
>
> Section 8(d) of the amended Trails Act provides that interim trail use "shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. 1247(d). at 6-8 *(footnotes omitted)*.

As Justice Brennan noted, it was Congress's intent to create a result under federal law (preservation of a railroad corridor for future railroad use and interim recreational trail use) that was not possible under existing state law. Congress did this by preempting or precluding the abandonment of railroad rights-of-way under state law. This preclusion of state law abandonment of railroad corridors was why Congress in 1983 adopted section 8(d) of the Trails Act to provide, "that interim trail use 'shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.'"

The United States Congress has made clear that the 1983 Amendments to the Trails Act were intended to pre-empt state law and that when they did, "just compensation" would be paid to property owners. Congressmen Barr, a chairman of the House judiciary sub-committee holding hearings into this legislation noted,

> [a]t first glance, it may appear Congress did not consider the fact that if the railroad land was not transferred in fee simple it may belong to the property owner, and not the railroad. However, Congress intended the railbanking aspect of this Federal law would preempt State law and hold the land essentially in perpetuity, until possible rail reactivation. In the 1996 *en banc* decision in *Preseault v. United States*, involving the same plaintiffs as in the Supreme Court case I just mentioned, the U.S. Court of Appeals for the Federal Circuit held that railroad abandonment constituted a per se taking, and

therefore would require payment of just compensation to the affected land owners, under the Fifth Amendment.[63]

b. *The Supreme Court's Landmark Decision in Preseault v. United States Found The Trails Act To be Constitutional But Required the Payment of "Just Compensation" When the Trails Act "delay[s] (or Burdens) Property Owners' Enjoyment of Their State Law Reversionary Interests."*

The Preseaults owned fee title to land underlying an abandoned railroad easement in Vermont.[64] The railroad was converted to interim trail use by the ICC's issuance of a Notice of Exemption pursuant to the Trails Act.[65] The Preseaults challenged this action by claiming that Congress's preemption of state law by passing the Trails Act was an act beyond Congress's constitutional authority.[66] The Preseaults contended that the Trails Act preemption of the rights they enjoyed in their property under Vermont law violated the Commerce Clause and the Fifth Amendment.[67] The Supreme Court held that the Trails Act amendments were not an unconstitutional act by Congress but a constitutional exercise of eminent domain by Congress.[68] The Court further held that, to the extent the Trails Act preempted any property owner's reversionary right to their property enjoyed under state law, the federal government was required to pay "just compensation."[69]

---

[63] U.S. House of Representatives, Judiciary Committee, Subcommittee on Commercial and Administrative Law, "Litigation and Its Effect on the Rails-to-Trails Program," June 20, 2002/

[64] *Preseault v. United States*, 494 U.S. 1, 9 (1990).

[65] *Id.*

[66] *Id.* at 10.

[67] *Id.*

[68] *Id.* at 17-19.

[69] *Id.*

The Supreme Court then held that the Tucker Act provided this Court with jurisdiction to award "just compensation" when the Trails Act worked such a taking.[70] As the Court recognized,

> This language [the 1983 Trails Act Amendment] gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests . . . .[71]

Congress specifically intended to achieve a result (the creation of a new easement for recreational trail use and a new easement for possible future railroad use) that would not have occurred were state law to apply. The Court noted Congress's intent to preclude the right of property owners to their property under state law, stating that,

> The key finding of this amendment is that interim use of a railroad right-of-way for trail use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes. This finding alone should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use. This amendment would ensure that potential interim trial use will be considered prior to abandonment.[72]

---

[70] *Id.*

[71] *Id.* at 8. Florida courts have also noted what Justice Brennan observed, namely that most railroads do not own fee title to their rights-of-way but only hold an easement to use the property for a right-of-way. "The [Florida] Telegraph Act [which allowed telegraph lines to be located in railroad rights-of-way] would have been entirely futile if it depended on the assumption that all Florida railroads had obtained their rights-of-way years before in fee simple title. Except to site a station house or similar land use here and there, the railroads had no need or desire for any interest except 'right-of-way.'" *Davis v. MCI*, 606 So 2d 734, 738 (Fl. App., 1992).

[72] *Preseault*, supra, note 63, at 9, *citing* H. R. Rep., at 8-9.

As the legislative history quoted by Justice Brennan notes, the "problems with the program" prior to the 1983 Amendment were that under state law a "railroad purpose" did not include "railbanking" or "interim trail use" and the fee owners of the property regained their right to the property when railroad service was abandoned.[73] As Justice Brennan observed, "because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. *** [and] frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations."[74]

[73] The word "abandonment" is a term of art in the context of railroad real estate title and regulation. "Abandonment" is used in very different ways depending upon the context. There are two contexts in which the same word "abandonment" is used.

First, "abandonment" is used in the context of state property rights to refer to the loss of a railroad's right to use specific property for the operation of a railroad. A railroad's right to use specific property is defined by the real estate and property law of the relevant state. If a railroad holds only an easement to use the property for a specific purpose – which is customarily the manner in which railroads obtained the right to use property for operation of a railroad – this right can be lost by being "abandoned". Whether the railroad has "abandoned" its right to use the property is determined by reference to the relevant state's real estate law. "Many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests." *Preseault,* supra, note 63, at 8.

The second use of "abandonment" is in the context of federal regulation of interstate railroads. (*See*, Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub. L. 94-210, 90 Stat. 144, as amended, 49 U.S.C. 10906 (1982 ed.).) In this context the term "abandonment" refers not to the railroad's title or interest in the real estate over which it provides railroad service but to the obligation of the railroad to provide interstate railroad service over a given corridor or route. A railroad may not cease, or "abandon", its obligation to provide railroad service over a given railroad corridor without first obtaining the permission of the STB to terminate such interstate railroad service.

[74] *Preseault*, supra, note 63, at 9.

Congress's intent to preserve these otherwise abandoned railroad corridors was being frustrated by state law. So, Congress adopted the 1983 amendments to preclude the operation of state law. This preclusion or forestalling of state law property rights is what gave rise to a taking.

"The Commission's actions may delay property owners' enjoyment of their reversionary interests, but that delay burdens and defeats the property interest rather than suspends or defers the vesting of those property rights."[75] Any other conclusion would convert the ICC's power to pre-empt conflicting state regulation of interstate commerce into the power to pre-empt the rights guaranteed by state property law, a result incompatible with the Fifth Amendment. *See Ruckelshaus v. Monsanto Co.*, 467 U.S., at 1012 ("If Congress can `pre-empt' state property law in the manner advocated by EPA, then the Taking Clause has lost all vitality. [A] sovereign, `by *ipse dixit*, may not transform private property into public property without compensation . . . . This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent'"), quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S., at 164 *Preseault I*, 494 U.S. at 23. (concurring opinion of O'Connor).

*c. The Settled Law After Preseault I is that State Law Determines the Nature of a Property Interest Subject To the Trails Act and When the Owner's Enjoyment of that interest is Delayed or Burdened, "Just Compensation" is Due.*

The settled law after the U.S. Supreme Court's decision in *Preseault* was described succinctly by the Federal Circuit, "[i]n *Preseault [I]*, the Court held that if abandonment of railway use and application of the Trails Act effects a taking when the easement would otherwise revert to the owner

[75] See *National Wildlife Federation v. ICC*, 271 U.S. App. D.C. 1, 11-12, and n. 16, 850 F.2d 694, 704-705, and n. 16 (1988).

of the servient estate, the landowner may sue for compensation under the Tucker Act. 494 U.S. at 4-5, *** *See also Preseault v. United States,* 100 F.3d 1525 (Fed.Cir.1996) (*en banc*) [(*Preseault II*)] (applying state law of reverter to determine rights of the owner of the servient estate)." *Hash v. United States*, 403 F.3d 1308 (Fed. Cir, 2005).

We noted above Justice Brennan and Justice O'Connor's direction that state law defines the nature and extent of any property interest taken by application of the Trails Act. This has been followed by the Federal Circuit, this Court, and district courts, in cases finding that the Trails Act and the ICC's (now STB's) issuance of a NITU took an interest in a property owner's land.

*i. The U.S. Federal Circuit Has Held that The Federal Government is Obligated to Pay "Just Compensation" in Similar Trails Act Taking Cases*

The Federal Circuit has repeatedly held that when the Trails Act precludes a property owner from regaining the "reversionary" rights that the owner possesses under state law, it is taking of the owner's property for which the federal government must pay "just compensation."

In *Preseault II,*[76] the Federal Circuit identified two alternative means by which the Trails Act had taken the landowner's interest in their property. Judge Plager wrote,

> [I]f the Preseaults have interests under state property law that have traditionally been recognized and protected from governmental expropriation, and if, over their objection, the Government chooses to occupy or otherwise acquire those interests, the Fifth Amendment compels compensation. The record establishes two bases on which the Preseaults are entitled to recover. One, if the [recreational trail] easements were in existence in 1983 when, pursuant to ICC Order, the City of Burlington established the public recreational trail, its establishment could not be justified under the terms and within the scope of the existing easements for railroad purposes. The taking of possession of the lands owned by the Preseaults for use as a public trail was in effect a

[76] *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. en banc 1996).

> taking of a new easement for that new use, for which the landowners are entitled to compensation. As discussed previously, some courts consider that the establishment of a use outside the scope of an existing easement has the effect of causing an abandonment, and thus termination, of the existing easement. Either way, the result is the same-a new easement for the new use, constituting a physical taking of the right of exclusive possession that belonged to the Preseaults.
>
> Two, as an alternative basis, in 1983 when the ICC issued its Order authorizing the City to establish a public recreational biking and pedestrian trail on Parcels A, B, and C, there was as a matter of state law no railroad easement in existence on those parcels, nor had there been for more than ten years. The easement had been abandoned in 1975, and the properties were held by the Preseaults in fee simple, unencumbered by any former property rights of the Railroad. When the City, pursuant to federal authorization, took possession of Parcels A, B, and C and opened them to public use, that was a physical taking of the right of exclusive possession that belonged to the Preseaults as an incident of their ownership of the land.[77]

More recently, the Federal Circuit affirmed Judge Bruggink's decision in *Toews v. United States*, 53 Fed. Cl. 58 (2002). The government appealed Judge Bruggink's decision. The Federal Circuit rejected the government's argument on appeal and noted,

> [t]he Government contends that, as a matter of California law, use of these railroad rights of way for railbanking and interim use as a recreational trail did not go beyond the scope of the easements. Further, it is the Government's view that, under California law, there was no abandonment or extinguishment of the easements caused by the federal actions under § 8(d) of the National Trails System Act. And thirdly, the Government states that these questions should not be subject to decision by the federal courts but should be referred to the California courts for resolution.

arguing that railroad use.[78]

The Federal Circuit rejected all three of the government's contentions. The Federal Circuit reaffirmed the analysis to be applied in a Trails Act taking as follows.

---

[77] *Id.* at 1551.

[78] *Towes v. United States* 376 F.3d 1371, 1375 (2004).

It is elementary law that if the Government uses (or authorizes the use of-a point to be considered later) an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. The consent of the railroad to the new use does not change the equation-the railroad cannot give what it does not have.

> And it appears beyond cavil that use of these easements for a recreational trail-for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway-is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens. In the one case there was an occasional train passing through (no depots or turntables or other appurtenances are involved on these rights of way). In the other, individuals or groups use the property, some passing along the trail, others pausing to engage in activities for short or long periods of time. In the one case, the landowner could make such uses of the property as were not inconsistent with the railroad's use, crossing over the tracks, putting a fruit stand on one edge of the property, or whatever. In the other, the government fenced the trail in such a way as to deny that access.
>
> Some might think it better to have people strolling on one's property than to have a freight train rumbling through. But that is not the point. The landowner's grant authorized one set of uses, not the other. Under the law, it is the landowner's intention as expressed in the grant that defines the burden to which the land will be subject.[79]

*Towes* is especially relevant to the immediate case because, as in *Towes*, the terms of the grant of the relevant railroad easement to Seaboard are clearly and expressly limited to use of the property for the purpose of operating a railroad and provide for "reversion" of the property upon termination of railroad use. The grants of the railroad easement in *Towes*, like those in this case, contained express provision for reversion. The court stated,

---

[79] *Towes v. United States*, 376 F.3d 1371, 1376-77 (2004).