**BIN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| STEPHEN J. and LINDA L. ROGERS, Husband and Wife, | ) | |
| et. al | ) | Hon. Mary Ellen Coster Williams |
| For Themselves and As Representatives of a Class of Similarly Situated Persons, | ) | No. 07-273 L |
| Plaintiffs, | ) | |
| vs. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR RELIEF PURSUANT TO RCFC 56(f)**

COME NOW Plaintiffs and for their Response to Defendant's Motion for Relief Pursuant to RCFC 56(f), hereby state as follows:

## I. BACKGROUND

In recent years, the United States Congress has become concerned with the government's management of Trails Act litigation given its "time-consuming and resource-intensive"[1] nature. As such, Congress has called upon the United States Department of Justice to improve its management of these cases and to ensure they are handled in an efficient and cost-effective manner. In June, 2002,

[1] *See* Assistant Attorney General Thomas J. Sansonetti's testimony before Congress on June 20, 2002, "Litigation and its Effects on the Rails-to-Trails Program," *available online at*: http://commdocs.house.gov/committees/judiciary.

Congress held hearings to address these concerns wherein Congressmen Barr, Chairman of the House Judiciary sub-committee, noted,

> This complex and resource-intensive litigation is the unintended, unanticipated consequence of enactment of this Federal program. Clearly, there will be significant Federal budgetary concerns to contend with in the next decade, as the number of cases will significantly increase as railbanking continues.
>
> This Subcommittee must examine how the Department of Justice has litigated these cases to date, and if a possible resolution to litigation exists or can be developed. After consideration of all factors, this Subcommittee may recommend Congress act legislatively, or suggest an administrative remedy for the compensation of affected land owners in advance of a potential crisis.[2]

The Defendant's motion to indefinitely stay this proceeding and delay resolution of a determination "of who actually owns the reversionary interest" in the abandoned railroad right-of-way is inconsistent with the congressional testimony of Assistant Attorney General Thomas J. Sansonetti on how the Department of Justice would seek to manage these Trails Act taking cases in a cost-efficient manner so as to provide "deserving property owners" the "just compensation" to which they are entitled under the Fifth Amendment of the United States Constitution.

The Defendant's Motion also fails to satisfy the threshold requirements of RCFC 56(f). The additional discovery sought (even if relevant to the issues in the Plaintiffs' motion for partial summary judgment) has been known to the Defendant for more than 200 days. The Plaintiffs' Motion for Partial Summary Judgment did not present any issue or fact that was not presented in the Plaintiffs' original and First Amended Complaints. There is no justification to indefinitely stay these proceedings so that the Defendant may engage in any further discovery.

Accordingly, the Defendant's "request for relief" should be denied.

## A. The Justice Department's Stated Policy for Managing Trails Act Litigation

In June 2002, Assistant Attorney General Thomas J. Sansonetti testified before Congress regarding the Justice Department's policy for managing Trails Act litigation:

> Each of these [Trails Act taking cases] results in significant expenditures of time and resources, and complicates **our ability to resolve cases and ensure that truly deserving landowners receive just compensation in as expeditious manner as possible**.
>
> The defense of the rails-to-trails cases poses special challenges for the Environment Division. Although the total potential monetary exposure from these cases is only about one per cent of the total potential monetary exposure of the entire takings litigation docket presently being handled by the Environment and Natural Resources Division, three of the nine attorneys assigned to our "Takings Team" devote the majority of their time to these cases, along with two others who devote a considerable portion of their time as well. ***
>
> Thus, we increasingly are being called upon to spend more to defend these cases than we might pay out in just compensation. ***
>
> The law that created [the Rails-to-Trails Program], however, has led to time-consuming and resource intensive litigation. We anticipate that the number of cases will continue to rise. ***
>
> You asked about: Is it in our best interest to also try and streamline the procedures? Definitely. And as I mentioned in my oral statement, some of the things we're trying to do is to work with the courts where we have the majority of our cases-the Court of Federal Claims-to **get their rules lined out for these kinds of cases, so we can move more quickly through the determination stage of who actually owns the reversionary interest. That's the first thing.**
>
> And making sure that, right from the get-go, the **discovery process is shortened, by making sure that the plaintiff already brings to the table, right at the start, whatever deeds they're relying on, conveyances, old easements, rights-of-way, right from the get-go**....So those are the kinds of things we're trying to do.[3]

---

[2] *Id.*

[3] Statement of Assistant Attorney General Thomas Sansonetti, *See* Assistant Attorney General Thomas J. Sansonetti's testimony before Congress on June 20, 2002, "Litigation and its Effects on the

We have highlighted three phrases from Assistant Attorney General Sansonetti's testimony to the House Judiciary Committee. The Defendant's present "request for relief" is inconsistent with these statements of how the Justice Department will respond to Trails Act litigation.[4]

**B. Procedural History in this Case**

This Court has not amended the Rules of the Court of Federal Claims as proposed by Assistant Attorney General Sansonetti. Nonetheless, the Plaintiffs "[brought] to the table, right at the start, whatever deeds they're relying on, conveyances, old easements, rights-of-way, right from the get-go."

The Plaintiffs' original Complaint filed on May 1, 2007 (Docket No. 1) had attached to it a list of the "deeds they're relying on, conveyances, old easements, rights-of-way, right" and included the date and the book and page for each conveyance by which the Seaboard Air Line Railway right-of-way was established. The Plaintiffs' Complaint also included copies of the NITU issued by the STB, Quitclaim Deed between CSX Transportation, Inc. and The Trust for Public Land, several of the instruments by which the right-of-way had been established, and a copy of the deeds by which the Plaintiffs acquired title to their property adjoining and underlying the abandoned right-of-way on or before the April 2, 2004 date of the NITU.

---

Rails-to-Trails Program," *available online at*: http://commdocs.house.gov/committees/judiciary. (emphasis supplied).

[4] The Plaintiffs realize that Thomas Sansonetti is no longer the Assistant Attorney General of the Environment and Natural Resources Division and that Ronald J. Tenpas is now the Acting Assistant Attorney General for Environment and Natural Resources Division. However, it is the Plaintiffs' understanding that former Assistant Attorney General Sansonetti's statement of how the Justice Department would manage Trails Act litigation is still a current statement of the Justice Department's policy.

Plaintiffs filed their First Amended Complaint on June 26, 2007 (Docket No. 6). This First Amended Complaint added ten additional property owners as Plaintiffs. This First Amended Complaint also contained the above-described list of the "deeds they're relying on, conveyances, old easements, rights-of-way, right" and included the date and the book and page for each conveyance by which the Seaboard Air Line Railway right-of-way was established. This First Amended Complaint added as additional exhibits the deeds by which the additional named Plaintiffs acquired title to the property adjoining or underlying the abandoned railroad right-of way and which deeds also established that the Plaintiffs were the owners of the property on April 2, 2004.

On November 2, 2007, Plaintiffs filed a Motion for Partial Summary Judgment under RCFC 56 (Docket No. 23). This motion for partial summary judgment presents this Court with essentially two issues: (1) Did the Seaboard Air Line Railway acquire fee simple title to the land upon which it constructed a railroad right-of-way in 1910? And, (2) did the thirteen named Plaintiffs hold fee title to the land adjoining and underlying the now abandoned railroad right-of-way on April 2, 2004, the date that the STB issued the NITU? Together with this Motion, the Plaintiffs filed Plaintiffs' Proposed Findings of Uncontroverted Fact (Docket No. 24). The Uncontroverted Facts contained a description of and copy of every "deed ... conveyances, old easements, rights-of-way" or other document necessary for entry of judgment against the Defendant on the noted issues.

On November 9, 2007, in compliance with the RCFC Rule 26(a)(1), the Plaintiffs provided the Defendant with a copy of all non-privileged documents within their possession, including the Plaintiffs' deeds as well as a copy of the original conveyances which established the right-of-way together with other title documents then in possession of Plaintiffs' counsel.

Defendant's response to Plaintiffs' Motion was due on December 3rd. However instead of responding to the merits of Plaintiffs' Motion, Defendant filed a "Motion for Relief Pursuant to RCFC 56(f)"seeking additional time for discovery. The Defendant asks this Court to indefinitely stay this proceeding so that Defendant can conduct unspecified additional discovery seeking to find a "wild deed" or a "fraudulent deed" in the chain of title.[5]

## C. The Justice Department's Current Motion Seeks To Further Delay This Case

Defendant's Motion seeks "relief under RCFC 56(f) and asks this Court to grant it an opportunity to conduct discovery in order to respond to Plaintiffs' Motion for Partial Summary Judgment." (Defendant's Motion, P. 2). Defendant states that "proceedings on Plaintiffs' motion should be stayed and Defendant should be allowed an opportunity to conduct discovery in the form of title searches and document gathering prior to making a response to Plaintiffs' motion." (Defendant's Motion, P. 4-5).

"Defendant seeks to conduct full historical title searches of the properties owned by the named Plaintiffs and a full historical title search of the chain of title from the Seaboard Air Line Railroad...Defendant also seeks the historical documents that would be associated with such title transactions in order to assemble a complete picture of the circumstances surrounding the title issues in this case." (Defendant's Motion, P 5).

[5] Plaintiffs note that Defendant's Motion appears to be yet another attempt to delay "mov[ing] more quickly through the determination stage of who actually owns the reversionary interest." Previously, the Justice Department has sought to prevent the Plaintiffs from filing a motion for summary judgment on the issue of the government's threshold liability until after the entire class of potential property owners had been certified. (Docket No. 22).

"Defendant has two bases for expecting that the discovery it seeks will 'engender a genuine issue of material fact.'" The first, is that "the Palmer, Honore and Webber deeds appear to have conveyed a fee simple determinable or a fee simple subject to a condition subsequent to Seaboard." (Defendant's Motion, P. 6). "Defendant's second expected basis for establishing a genuine issue of material fact arises from the Florida Marketable Record Title Act." (Defendant's Motion, P. 7). Defendant states that "the MRTA has had powerful, if sometimes harsh, consequences. For example, the MRTA has been used to validate the chain of title ensuing from a forged or 'wild' deed....The MRTA has also been used to strip subdivisions of their use restrictions when they were not re-recorded in manner specified in the act." (Defendant's Motion, P. 7-8).

"Accordingly, Defendant respectfully requests that this Court stay proceedings on Plaintiffs' Motion for Partial Summary Judgment and allow Defendant time to conduct the discovery detailed above." (Defendant's Motion, P. 11).

## II. THE "RELIEF" REQUESTED BY THE DEFENDANT IS INCONSISTENT WITH THE DEPARTMENT OF JUSTICE'S OWN POLICY FOR HANDLING TRAILS ACT LITIGATION AND IS UNNECESSARY IN THIS CASE FOR RESPONDING TO PLAINTIFFS' MOTION.

As Assistant Attorney General Sansonetti testified, the Department of Justice seeks to manage Trails Act litigation in "as expeditious manner as possible." Plaintiffs share the desire to "ensure that truly deserving landowners receive just compensation in as expeditious manner as possible." Plaintiffs share the desire to "streamline the procedures...so that we can move more quickly through the determination stage of who actually owns the reversionary interest." Plaintiffs share the desire in "making sure that, right from the get-go, the discovery process is shortened, by making sure that the

plaintiff already brings to the table, right at the start, whatever deeds they're relying on, conveyances, old easements, rights-of-way, right from the get-go."

Plaintiffs have no interest in "railroading" the United States of America "by preventing it from developing its case." Plaintiffs simply seek this case to be efficiently managed in the manner Assistant Attorney General Sansonetti described in his testimony before Congress more than five years ago. The Plaintiffs seek to obtain "just compensation" for the taking of their property in as timely and as efficient a manner as possible.

**A. Defendant's Desire to Conduct a "Full Historical Title Search" is Unnecessary; Even if Defendant Felt Such a Search Were Necessary, Defendant Has Been Provided With Plenty of Time to Do So.**

The Plaintiffs' motion for partial summary judgment, as noted above, presents two issues: The first issue concerns the effect of nine documents by which the railroad easement was established in 1910. Plaintiffs' Motion presents these issues in connection with thirteen parcels of real estate owned by thirteen property owners. And, as noted, the title documents necessary to resolve these issues have been attached to the Plaintiffs' Complaints and Proposed Findings of Uncontroverted Facts.

1. <u>Defendant has had full and ample opportunity to conduct any title search it felt necessary to address the limited issues in the Plaintiffs' Motion for Partial Summary Judgment.</u>

As of May 1, 2007, the date Plaintiffs filed their Complaint, the Defendant possessed a list detailing each of the nine conveyances by which the Seaboard Air Line Railway acquired its original right-of-way in 1910. This list, which was part of an attachment to the Quitclaim Deed between the Trust for Public Land and CSX Transportation, Inc., included the book and page number for each of the conveyances that was recorded with the Sarasota County, Florida Recorder of Deeds Office.

The Sarasota Recorder of Deeds Office is open from 8:30am to 5:00pm on all business days, with the exception of major holidays.[6] Their office is open to the public and any member of the public is welcome to search and obtain copies of the Sarasota County public land ownership records. Additionally, many of these land records and deeds are available electronically as pdf files over the internet.[7]

There are more than one hundred different title company offices in Sarasota County, Florida.[8] The Plaintiffs have retained Stewart Title Guaranty Company. If the Government felt it were necessary to retain a title company to perform historical title searches, it could have retained any one of the more than one hundred title companies to do this for them or reviewed the on-line land records at the Sarasota County website. There are more than 419 daily flights between the Washington, DC metropolitan area and Sarasota, Fort Myers and Tampa, Florida.[9] Had they felt it necessary, the Government could have, at anytime, visited Sarasota County to conduct the discovery searches it felt were necessary.

However, for whatever reason the Defendant has chosen not to conduct discovery into the land title issues they believe relevant. Defendant states that they have begun "the process of engaging

---

6 *See* website for the Sarasota County Recorder of Deeds Office: http://www.sarasotaclerk.com/default.asp?Page=50.

7 *See id.*

8 *See* Yellow Pages online listing for Sarasota Title Companies: http://www.yellowpages.com/Sarasota-FL/Title-Companies?search_terms=title+company. A number of the title companies have multiple offices in and around Sarasota County, Florida.

9 This number was calculated based on the daily flights between Washington Ronald Reagan National Airport, Washington Dulles International Airport, Baltimore Washington International Airport and Tampa International Airport, Sarasota/Bradenton Airport, and Fort Myers SW Florida International Airport. *See* http://www.travelocity.com.

LECG, a firm that does title-related work on a contractual basis, to do the title searches that are necessary to defend against Plaintiffs' Motion" and "LECG stands ready to do the title work that is necessary to Defendant's response to Plaintiff's motion." The Defendant does not explain why this title work has not been done before now and why LECG is only just "standing by".

The trial attorneys that are counsel for the United States Department of Justice in this case are Mark T. Romley and William Shapiro. Both Mr. Romley and Mr. Shapiro are experienced in litigating Trails Act taking cases. Mr. Shapiro has been counsel in at least seven of these cases including *Toews v. United States*, 53 Fed.Cl. 58 (2002) and *Toews v. United States*, 376 F.3d 1371 (2004).

From the moment the Government was served with the original Complaint in this case on May 1, 2007, they have known that the Plaintiffs' title to the land upon which the abandoned railroad right-of-way ran would be an issue. The Government has also known that the conveyances by which the Seaboard Air Line Railway acquired the right-of-way would be an issue. These issues were not first presented to the Government in Plaintiffs' Motion for Partial Summary Judgment.

Plaintiffs' counsel has been informed by Stewart Title Guarantee Company of Sarasota, Florida that title search with a full historical chain of title normally takes two to three weeks in the ordinary course of business and can be done in just one week on an expedited basis.

The Government now seeks to indefinitely stay resolution of this case so that it can undertake these title searches but nowhere does the Department of Justice explain why they did not conduct this investigation before now. This reminds us of the familiar axiom – "lack of planning on your part, does not constitute an emergency on my part."

The United States Government is a very large organization with great resources. It certainly has enough resources to conduct a "full historical title search" within the more than two hundred days since this case was filed. Their failure to conduct discovery into issues they have known of since this case was filed does not merit relief under RCFC 56 (f).

2. A "full historical title search" is not necessary to resolve the issues posed in Plaintiffs' Motion for Partial Summary Judgment.

As previously indicated, there are two essential issues in this case: (1) Did the Seaboard Airline Railway acquire fee simple title to the property upon which it constructed a railroad right-of-way in 1910; and (2) Did the named Plaintiffs own their property adjoining and underlying the right-of-way on the NITU date of April 2, 2004. To fully answer both of these questions, one need only review two sets of documents: (1) the nine original conveyances by which the Seaboard Airline Railway acquired its easement, and (2) the thirteen deeds by which each Plaintiff acquired title to their property adjoining and underlying the right-of-way. The Defendant has possessed both sets of documents since this action was initially filed. Should they believe that additional discovery into these documents or the "historical chain of title" related to these documents is necessary, they have had more than ample opportunity to conduct such discovery.

The Plaintiffs provided Defendant with both sets of documents "right from the get go" in order to "streamline" the litigation and "shorten the discovery." A simple review of the original right-of-way conveyances confirms that Seaboard acquired only an easement to use the property for a railroad right-of-way and did not acquire fee simple title. Likewise, the deeds by which the Plaintiffs acquired their property clearly indicate that the Plaintiffs owned fee title to their property adjoining and underlying the right-of-way prior to the date of the NITU and held that title on the NITU date. The

intermediate transactions between 1910 and April 2, 2004 are not relevant so long as the Plaintiffs can establish fee ownership on the NITU date.

**B. Defendant's Desire "to Assemble a Complete Picture of the Circumstances Surrounding the Title Issues in this Case" May Provide Interesting Reading, but is Not at Issue in this Case.**

Defendant wants to indefinitely stay this action "to assemble a complete picture" of the history surrounding the Seaboard Air Line Railway's acquisition of the right-of-way. The Plaintiffs share a fascination with the history of this particular railroad right-of-way. The Plaintiffs note some of this history including the role of Bertha Palmer and her family and the use of the right-of-way as a corridor for the Ringling Brothers Circus train to reach its winter headquarters in Venice, Florida. (Docket No. 25, P. 13)

The historical context by which this railroad corridor was established and subsequently came to be abandoned is interesting but it is not necessary to respond to the limited issues presented in the Plaintiffs' motion for partial summary judgment. As mentioned above, the Defendant's liability turns upon essentially two factual issues: (1) Did the Seaboard Airline Railway acquire fee simple title to the property upon which it constructed a railroad right-of-way in 1910; and, (2) Did the named Plaintiffs own their property adjoining and underlying the right-of-way on the NITU date of April 2, 2004. There is no need for the Government to "assemble a complete picture" of the "historical circumstances" in order to adequately and appropriately address Plaintiffs' claims.

During the four months since it filed its Answer, Defendant has "attempted to discover what facts it could through informal discovery." For example, Defendant states that it has "been in contact with the Trust for Public Land ("TPL") and officials in Sarasota County," but that "thus far neither

effort has been successful." "Defendant anticipates that it may need to issue formal subpoenas to obtain the relevant documents."

Plaintiffs are unclear why the Defendant is just coming to this realization four months later and why such subpoenas were never issued. Apparently the four months it took Defendant to anticipate that such subpoenas might be necessary are the "hurdles which have, until now, prevent it from discovering the facts." Further, the purported land title issues that the Defendant claims require additional discovery concern legal title to land in Sarasota County, Florida. It is not necessary to obtain a subpoena to examine or obtain copies of land title records. As noted, the Recorder of Deeds Office is open to the public and there are a number of private title companies in Sarasota County, Florida that are able to undertake this title investigation. Many of the land title records are also available online.

"The overarching reason Defendant has not transmitted any formal discovery to obtain relevant information is that this case was only recently filed and no order setting a discovery schedule had been entered." (Defendant's Motion, P. 10). Plaintiffs note that as of the date of Defendant's Motion, their Complaint had been filed for 217 days. A party does not need to wait for a formal order from the Court to begin discovery of the relevant facts.

Defendant further claims that it "was not in possession of all of the 1910 granting deeds until Plaintiffs filed their Motion for Partial Summary Judgment on November 2." (Defendant's Motion, P. 10). As previously noted, Plaintiffs provided Defendant with a list of each of the 1910 granting deeds in both its original Complaint as well as its First Amended Complaint. As of May 1, 2007, the

Defendant could have made a simple telephone call to the Sarasota County Recorder of Deeds Office or a title company to acquire these nine deeds.

**C. The Hypothetical Legal Arguments Raised by the Defendant Do Not Justify an Indefinite Stay of this Case.**

In its Motion, Defendant raises hypothetical legal arguments but does not brief or assert they're applicability to the present case. Plaintiffs do not seek to argue these points, nonetheless, Plaintiffs pause to take note that the legal points raised by Defendant are not relevant to this case and to the extent they are, these issues have been known by the Defendant since May.

1. However Defendant chooses to classify the railway's non-fee interests, the outcome is the same – Seaboard did not acquire fee simple title to the right-of-way – and Plaintiffs must be paid for a taking of their property.

Defendant notes that the Palmer, Honore, and Webber deeds "appear to have conveyed a fee simple determinable or a fee simple subject to a condition subsequent to Seaboard." This point is specious. Whether the deed conveyed an "easement," a "fee simple determinable," or a "fee simple subject to a condition subsequent" is a distinction without a difference. All lead to the same result – Seaboard did not acquire fee simple title to the property upon which the right-of-way was constructed. While this analysis of various types of non-fee simple interests might be an interesting discussion for a first year law school real property exam, it has no relevance to a determination of the outcome of the issues in this case.

However the Defendant chooses to classify the railroad's non-fee simple interest, the outcome is the same – the Plaintiffs owned the land on April 2, 2004 when the abandoned railroad right-of-way was converted to a public access recreational trail by reason of the STB issuing a NITU. Whether the Plaintiffs held title to this land in fee simple subject to an easement for a railroad right-of-way (the

Plaintiffs' position) or whether the Plaintiffs (as the assignee of the original fee owner - Palmer, Webber or Honore -) acquired fee when the railroad's interest was "determined" upon the cessation of railroad operations (the hypothetical possibility raised by the Defendant), make no difference. Both roads lead to the same point. The result is the same. The Plaintiffs were the fee owners of the property when the STB issued and NITU and are entitled to "just compensation" for the Government taking their land.

2. Defendant's reliance on the Florida Marketable Record Title Act is a totally misplaced effort that will do nothing but waste the government's time, energy, and resources.

In its request for relief the Defendant suggests that the Florida Marketable Title Act, Fla. Stat. § 712.01 et seq. (West 2000) ("MRTA"), has been used to validate the chain of title ensuing from a forged or 'wild' deed." The Defendant apparently seeks to argue some application of MRTA by reference to a yet unknown but hoped for "forged or wild deeds" that will allow the Defendant to achieve the "harsh, consequence" of denying the Plaintiffs "just compensation." (Defendant's Motion, P. 7-8).

Presumably, the Defendant believes that if it is allowed enough time to cast about in the Sarasota County Recorder of Deeds Office it will be able to locate a "forged or wild" deed that, like a *dues ex machine*, will excuse the defendant from an obligation to pay "just compensation" for the taking of these Florida property owners' land. Toward this end, the Defendant is asking this court to indefinitely stay these proceedings so that Defendant can engage in this hunt for a "forged or wild deed" to invalidate the Plaintiffs' titles to their homes.

First, should the Defendant believe that a "forged or wild deed" in the chain of title will excuse it from its obligation to pay just compensation" to these Plaintiffs, the Defendant has known of

this possibility since this action was filed in May. The Defendant has had more than 200 days to conduct this search for a "forged or wild deed" but has chosen not to do so.

Second, the Defendant does not present any claim that, even if they find a "forged or wild deed," MRTA will in fact lead to the "harsh consequence" of defeating any property owner's title to their land. Defendant's resort to MRTA is akin to "evaluating the potential significance of unknown facts in regard to unadjudicated issues [as] something of a metaphysical exercise." (Defendant's Motion, P. 4). As such, the hypothetical MRTA issues are, at most, a bizarre hypothetical and Defendant has made no showing that there is any real prospect that any possible application of MRTA will be relevant to resolution of the specific issues presented in the Plaintiffs Motion for Summary Judgment. Further, to the extent that any issue under MRTA involving a "forged or wild deed" may exist, the Defendant has known of this possibility since May. The hypothetical MRTA claims that the Defendant believes they may possible be able to make if allowed an indefinite stay to find a "forged or wild deed" are simply not sufficient justification for relief under RCFC 56(f).

Defendant's casting about in some sort of MRTA hunt for a "forged or wild" deed is a totally misplaced effort that will do nothing but increases the costs of litigation and delay this case even further.

**D. The Defendant has failed to show that Plaintiffs have presented any new fact or issue in their Motion for Partial Summary Judgment that would necessitate a RCFC 56(f) stay for additional discovery under the *Jade Trading* standard.**

The Defendant has failed to show that the Plaintiffs have presented any new fact or issue in their motion, which the Defendant did not have notice of as of the date of Plaintiffs' filing of their original Complaint and First Amended Complaint, or which would necessitate additional discovery.

Applying the standards used by this Court in *Jade Trading, LLC v. United States*, 60 Fed.Cl. 558 (2004), supports a denial of Defendant's request for relief under RCFC 56(f).

The Defendant erroneously cites to this Court's decision in *Jade Trading* to support its position that it will be "railroaded" by the Plaintiffs if it is not given the "opportunity for adequate discovery." In *Jade Trading*, however, there are several reasons for the granting of a RCFC 56(f), which are not present in this case.

In *Jade Trading,* the "Plaintiffs urge[d] the Court to accept the affidavit of Ari Bergmann, the Senior Managing Member of Sentinel Advisors, as 'incontrovertible' in its recitation of Jade Trading's activities, transactions, and agreement, and grant Jade Trading summary judgment recognizing its partnership for tax purposes." *Id.* at 565. The Court ruled, however, that granting the summary judgment motion "without giving Defendant the opportunity for adequate discovery would 'railroad' Defendant by preventing it from developing its case and prematurely resolving on motion, a matter that precedent suggests dictates a trial." *Id.* The Court noted that although the Defendant had previously initiated written discovery by serving requests for admission, interrogatories, and requests for production of documents, the Plaintiffs had objected to many of these requests and the Defendant had been unable to develop its case. *Id.* at 566. Thus, "there was no failure on Defendant's part to have discovered these facts any sooner in this litigation." *Id.* The Court concluded that because the Defendant did not have the facts necessary to respond to the assertions made by Plaintiffs in the affidavit proposed as "incontrovertible," a RCFC 56(f) stay was therefore necessary. *Id.*

Unlike *Jade Trading*, the Plaintiffs in this case have not in their motion for partial summary judgment presented the Defendant with any new or novel fact or issue which necessitates further

discovery. The Defendant has possessed all of the documents necessary to address the claims in Plaintiffs' motion for partial summary judgment since this action was originally filed. Throughout the 217 days since this action was filed, the Defendant had the opportunity to conduct any discovery or title searches it felt necessary; Defendant, however, chose not to do so. Thus, unlike as in *Jade Trading*, there **was a failure on Defendant's part** to have discovered these facts sooner in this litigation. In their motion, Plaintiffs' did not assert any new claims or facts which were not raised in their Complaints or which would necessitate additional discovery. As such, Defendant has failed to show how the facts necessitate a RCFC 56(f) stay for additional discovery.

## III. CONCLUSION

In his first State of the Union Address President Lincoln said, "It is as much the duty of government to render prompt justice against itself in favor of citizens as it is to administer the same between private individuals." President Lincoln said this in reference to the legislation that created the U.S. Court of Claims.

The Plaintiffs property was taken from them on April 2, 2004. The Plaintiffs seek to promptly resolve their claim for "just compensation". The Plaintiffs do not seek to "railroad" the federal government or prevent the United States Department of Justice from opportunity to fairly assert any appropriate or legitimate defense that the Unites States may have.[10]

[10] For the reasons noted in the Plaintiff's Memorandum of Law in support of the Motion for Partial summary Judgment, the Plaintiff does not believe that to the best of Plaintiff's knowledge there is any legitimate defense upon which the Defendant can avoid liability on the issues presented in the Motion for Partial Summary Judgment. Nothing in the Defendant's request for relief shows otherwise.

As noted, the issues before the Court in the Plaintiffs' motion for partial summary judgment are resolved by reference to the necessary "deeds they're relying on, conveyances, old easements, rights-of-way, right," which have all been presented to the Government. To the extent that the Department of Justice believes they require additional discovery into facts legitimately related to the issues presented in the Motion for Partial Summary Judgment, the Defendant has enjoyed ample opportunity to conduct such discovery.

The Defendant's Request for Relief fails to merit an indefinite stay of this proceeding under RCFC 56(f). Plaintiffs do not object to the fourteen day enlargement of time, as requested by the Defendant in its Motion, for filing Defendant's response to Plaintiffs' motion for partial summary judgment. However anything over this time frame, including a stay of all proceedings, is over and above what is needed for the Defendant to fully and fairly respond to Plaintiffs' Motion.

WHEREFORE, Plaintiffs respectfully request this Honorable Court to deny the Defendant's Motion for an indefinite stay of this proceeding pursuant to RCFC 56(f), and to order Defendant to respond to Plaintiffs' Motion in a timely manner.

| | |
|---|---|
| Date: 12/10/07 | Respectfully submitted,<br><br>LATHROP & GAGE L.C.<br><br>By: /s/ Mark F. (Thor) Hearne, II<br>MARK F. (THOR) HEARNE, II<br>LINDSAY S.C. BRINTON<br>10 South Broadway, Suite 1300<br>St. Louis, MO 63102-1708<br>(314) 613-2500<br>(314) 613-2550 (fax)<br>Thornet@ix.netcom.com<br><br>ATTORNEYS FOR PLAINTIFFS |