# Exhibit 6

BCC APPROVED 9/28/04

## PURCHASE AND SALE AGREEMENT

**THIS AGREEMENT** entered into this 28th day of September 2004, between **The Trust for Public Land, a nonprofit California corporation** ("Seller"), having an address of 306 N. Monroe St., Tallahassee, Florida, 32301-7266 and **Sarasota County, a political subdivision of the State of Florida** ("Purchaser"), having an address of 1660 Ringling Boulevard, Sarasota, Florida 34236.

### RECITALS

A. The addresses and telephone numbers of the parties to this Agreement are as follows. Telephone numbers are included for information only.

SELLER:

THE TRUST FOR PUBLIC LAND
1595 Bay Street SE. Suite #3
St. Petersburg, Florida 33701
Attention: John Garrison, Project Manager
Telephone: 727-895-5090
Facsimile: 727-895-5190
E-mail: john.garrison@tpl.org

With a copy to:

Peter Fodor, Florida Counsel
THE TRUST FOR PUBLIC LAND
306 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 222-7911, ext. 29
Facsimile: (850) 222-8909
E-mail: peter.fodor@tpl.org

PURCHASER:

SARASOTA COUNTY
1660 Ringling Blvd.
Sarasota, Florida 34236
Attention: John S. Herrli
Telephone: 941-861-0755
Facsimile: 941-861-0881
Email: jherrli@scgov.net

With a copy to:

Stephen E. DeMarsh, Deputy County Attorney
SARASOTA COUNTY
1660 Ringling Blvd.
Sarasota, Florida 34236
Telephone: 941-861-7272
Facsimile: 941-861-7267
Email: sdemarsh@scgov.net

B. Seller represents and Purchaser acknowledges that the Property is currently owned and operated as a rail corridor by CSX Transportation, Inc. ("CSX") and Seminole Gulf Railway L.P. ("SGR") operating on the Property as a common carrier. The parties acknowledge and agree that this Purchase and Sale Agreement (the "Agreement") is contingent upon SGR obtaining abandonment authority from the United States Surface Transportation Board ("STB") and a Notice of Interim Trial Use ("NITU") being issued by the STB in favor of Purchaser or its qualified designee.

Seller represents and Purchaser acknowledges that Seller has a binding Option to purchase (the "Option") certain real property in Sarasota County, Florida, which property is more particularly described in Exhibit "A" attached hereto and incorporated herein by this reference (hereinafter referred to as the "Property") comprising 153 acres, more or less, and is not presently the owner of the Property. Seller's obligations under this Agreement are contingent upon Seller exercising the Option and acquiring title from the current owners, CSX and SGR as more fully described above. The Property includes any and all improvements located thereon including without limitation the tracks, ties, corridor bed material and other track material, fixtures, tressels, crossing signals and equipment, and culverts and bridges and all easements and all rights, tenements, hereditaments, members, privileges, licenses and appurtenances thereon, and all of Seller's right, title and interest in and to all public and private ways adjoining or serving the same, and all riparian rights and interests in waterbodies, and the beds of waterbodies on or adjacent to the Property, and any and all appurtenant rights, including but not limited to timber rights, access rights and mineral rights.

C. Seller wishes to sell the Property to Purchaser and Purchaser wishes to purchase the Property from Seller on the terms and conditions set forth in this Agreement.

THE PARTIES AGREE AS FOLLOWS:

1. **Purchase and Sale**. In consideration of an earnest money deposit by Purchaser to Seller in the amount of Ten Thousand Dollars ($10,000.00) and other good and valuable consideration, paid by Purchaser within 15 days of the effective date of this Agreement, the receipt and sufficiency of which are hereby acknowledged, Seller agrees to sell and Purchaser agrees to buy the Property on the terms and conditions set forth in this Agreement. The earnest money deposit paid above (the "Deposit") shall be credited toward the Purchase Price (as defined below). Seller shall return the Deposit to Purchaser if the sale of the Property is not completed under this Agreement because of Seller's failure, refusal or inability to perform any of Seller's obligations under this Agreement. The Deposit shall be paid by County check or wire transfer within seven (7) days from the effective date of this Agreement to be held in an interest bearing account held by Timothy A. Burleigh, P. A.

November 30, 2004

2. **Inspection Period**. That period of time from the effective date of this Agreement through ~~October 30, 2004~~ November 30, 2004 shall constitute Purchaser's inspection period (the "Inspection Period"). During the Inspection Period, Purchaser, through its employees, agents and contractors may enter upon the Property for the purpose of making any inspections and investigations, as Purchaser deems appropriate in order to assess the condition of the Property and the improvements and personal property located thereon. During the Inspection Period, Purchaser, may in its sole discretion terminate this Agreement by delivering written notice to Seller prior to the end of the Inspection Period if Purchaser deems the survey, status of title, physical or environmental condition (including subsurface conditions), the agreements and obligations with respect to parties in possession, satisfaction of permit or grant conditions, or the



D 0063

obligations to be assumed as Interim Trail Manager to be unacceptable to Purchaser for its intended purposes.

3. **Purchase Terms**.

a) Price. The purchase price for the Property shall be ELEVEN MILLION SEVEN HUNDRED FIFTY THOUSAND DOLLARS AND NO CENTS ($11,750,000.00) (the "Purchase Price"), which after reduction by the amount of the Deposit and accrued interest thereon, shall be paid by the Purchaser at closing.

b) Method of Payment. The Purchase Price shall be payable by crediting the Deposit paid against the Purchase Price and the payment of $11,740,000.00 at closing by County check or by wire transfer of immediately available funds, subject to credits, prorations and adjustments as provided in this Agreement.

4. **Closing**. In the event Purchaser does not terminate this Agreement as permitted herein, the Closing shall take place on December 1, 2004, at a time mutually agreeable to the parties. Closing shall take place in the Office of the County Attorney, 1660 Ringling Boulevard, Sarasota FL 34236.

Seller shall deliver to Purchaser at closing the following documents prepared by Seller's counsel:

a) a Quit Claim deed to the Property conveying all of Seller's right, title and interest in and to the Property to Purchaser;

b) an owner's affidavit attesting to the absence of mechanic's or materialmen's liens, proceedings involving Seller which might affect title to the Property, or parties in possession other than Seller and such lessees or licensees as may be in possession pursuant to Leases, Licenses and Agreements listed in Exhibit "B" attached hereto and incorporated herein by reference, provided that Purchaser agrees to assume such Leases, Licenses and Agreements (hereinafter and referred to as the "Leases, Licenses and Agreements");

c) a Foreign Investment and Real Property Tax Act (FIRPTA) affidavit and such other instruments and documents as Purchaser's counsel may reasonably request for the purpose of confirming proper and lawful execution and delivery of closing documents and conveyance of the Property to Purchaser in accordance with this Agreement, and any of the requirements of any title insurer;

d) an Assignment and Assumption Agreement with respect to the Leases, Licenses and Agreements affecting the Property as described in Exhibit "B", provided that Purchaser agrees to assume such Leases, Licenses and Agreements,

e) an Assignment and Assumption Agreement with respect to certain contract rights benefiting Seller or its Assignee; and

f) a Bill of Sale for personal property, if any.

g) a Termination of Lease from CSX and SGR terminating SGR's leasehold interest in the Property.



D 0064

Possession of the Property shall also pass to Purchaser at the time of closing.

5. **Closing Expenses and Prorations.**

a) The expense of the title insurance commitment, the title insurance premium, documentary stamps on the deed, if any, and the cost of recording the deed of conveyance shall be paid by Purchaser.

b) The parties acknowledge that SGR pays a unitary tax on all of its properties, including the Property. For the purposes of this Agreement, the Unitary Tax or Unitary Taxes shall mean a share of the taxes paid by SGR to Sarasota County determined by dividing the total number of "road miles" in Sarasota County leased by SGR by the total number of "road miles" included in the Property. At the time of abandonment, CSX and SGR are obligated to notify the Florida Department of Revenue ("DOR") of such abandonment and obtain a release from DOR for further liability for Unitary Tax on the Property. SGR is obligated to pay all Unitary Taxes due on the Property at the time of closing. Ad Valorem Taxes, if any, for the current year shall be paid in accordance with Section 196.295, Florida Statutes, and if Purchaser acquires the Property between January 1 and November 1, Seller shall place in escrow with the county tax collector an amount equal to the current ad valorem property taxes prorated to the date of transfer, based upon the current assessment and millage rates on the Property. In the event the Purchaser acquires fee title to the Property on or after November 1, Seller shall pay to the county tax collector an amount equal to the taxes that are determined to be legally due and payable by the county tax collector. Other fees, rents and charges shall be allocated in accordance with the laws of the State of Florida and the customary practice of Sarasota County, Florida. All other expenses, including, without limitation, attorneys' fees, shall be paid by the party incurring the same.

c) The Purchase Price and consideration being given by the Purchaser hereunder constitute the total consideration to be paid Seller in connection with the acquisition of the Property and any consequences or impacts incurred by Seller in connection therewith. Purchaser and Seller warrant that they have not dealt with any real estate broker, agent, salesperson or finder in connection with the purchase and sale of the Property, and each agrees to indemnify, defend and hold the other harmless from any claims and demands of any real estate broker, agent, salesperson or finder claiming to have dealt with either Purchaser or Seller in connection with this purchase and sale. Purchaser is not responsible for any of the Seller's attorney fees for settlement/contract negotiations and transfer of the Property. Purchaser's undertaking pursuant to this paragraph is subject to the limitations set forth in Section 768.28, Florida Statutes and shall not be deemed to constitute a waiver of Purchaser's sovereign immunity.

6. **Condition of Title.**

a) Within thirty (30) days of the effective date of this Agreement, Seller will provide, a commitment for a title insurance policy on the Property in the amount of the Purchase Price insuring Purchaser's Title to the Property, subject only to liens, encumbrances, exceptions set forth in this Agreement and those which shall be discharged by Seller at or before closing.

b) Any defects in title (including, without limitation, those that might be revealed by an appropriate survey meeting applicable State minimum technical standards and

an inspection of the Property, but excluding the items or matters identified in Exhibit "C" attached hereto and incorporated herein by reference (hereinafter referred to as the "Permitted Exceptions"), which Purchaser agrees do not constitute defects in title to the Property) which render title unmarketable and which Purchaser is unwilling to accept, must be reported to Seller in writing within forty five (45) days following receipt of the commitment for a title insurance policy and the survey. Within ten (10) days of receipt of Purchaser's written objections, Seller shall advise Purchaser in writing whether Seller is willing or able to remove or cure Purchaser's objections, in which event the Closing may be postponed for a period not to exceed 30 days to accomplish removal or cure of Purchaser's objections. If Seller advises Purchaser that Seller is unwilling or ultimately unable to remedy Purchaser's reported objections, Purchaser may elect to (a) accept such title as Seller is willing to give, with such defects, without reduction in Purchase Price, or (b) terminate this Agreement by giving written notice to Seller within fifteen (15) days after receipt of Seller's response. Upon such termination, the parties hereto shall be released from any and all further duties and obligations hereunder, including the duty to close and any liability for breach of any of the provisions hereunder and Seller shall immediately return the Deposit including accrued interest thereon.

c) Purchaser acknowledges that the Property remains subject to the jurisdiction of the United States Department of Transportation Surface Transportation Board and may not treat this as a title objection.

d) Purchaser acknowledges that certain portions of the Property may be subject to reversionary interests of adjacent property owners and that such interests shall not be treated as title objections under this Agreement. Purchaser agrees that it may not treat as an objection any matter shown on the commitment resulting from any act or failure to act by Purchaser, including but not limited to claims of lien resulting from work performed on the Property by Purchaser during the Inspection Period.

7. <u>Purchaser's Right of Entry and Survey</u>. Seller shall obtain, at Purchaser's expense, a current certified boundary survey performed by a registered Florida land surveyor in form acceptable to Purchaser. The plat of the survey shall show the boundaries of, and state the acreage of the Property, rounded to the nearest one-hundredth (1/100) of an acre. The legal description in Exhibit "A" shall be changed, if necessary, to conform to the survey and to the requirements of the title commitment, if any. If the survey shows encroachments onto the Property or that improvements located on the Property encroach on setback lines, easements, lands of others or violate any restrictions or regulations affecting the Property, the same shall constitute a title defect.

8. <u>Hazardous Materials Audit and Remediation</u>.

a. Not later than 30 days before the scheduled Closing of the purchase and sale of the Property pursuant to this Agreement, Purchaser may obtain a report of an investigation of the Property carried out and prepared by a licensed engineer or geologist selected by Purchaser employing procedures that a prudent purchaser would employ under the circumstances ("Phase II Audit"). A copy of the final report for the Phase II Audit will be delivered by Purchaser to Seller not later than 30 days prior to Closing. In the event that the Phase II Audit final report states that it is likely that there are Recognized Environmental Conditions, which would include Hazardous Materials, present on the Property, or that further investigations are necessary to determine whether Recognized Environmental Conditions are present ("Unsatisfactory Report"), Purchaser may elect to either terminate this Agreement by giving notice as required herein and thereafter the parties shall have no further obligations

under this Agreement or accept the condition of the Property "as is". Seller expressly disclaims any and all obligation and liability to Purchaser regarding any defects which may exist with respect to the condition of the Property

b. After execution of this Agreement by all parties, and no later than 30 days prior to Closing, Purchaser and/or its agents shall be permitted to have access to the Property, subject to the rights of any tenant, licensee, utility or other third party occupying any portion of the Property, in order to make surveys, make measurements, conduct the Phase II Audit or additional engineering tests (including drilling and coring for pre-construction soil analysis), and to make such physical inspections and analyses thereof as Purchaser shall deem necessary; PROVIDED, however, that Purchaser hereby assumes all risks of such entry and agrees, subject to the limitations of Section 728.68, Florida Statutes and without waiving its right of sovereign immunity, to defend, indemnify and save Seller and CSX harmless from and against any claim, cost or expense resulting from any damage to or destruction of any property (including the Property or any improvements thereon) and any injury to or death of any person(s), arising from the acts or omissions of Purchaser or its agents in the exercise of this right-of-entry. Prior to entering onto the Property, Purchaser's environmental contractor shall sign CSX's standard right of entry form and shall satisfy CSX's insurance requirements for entry onto the Property. Purchaser agrees to do no act which would encumber title to the Property in exercising this right-of-entry. Any drilling and coring holes shall be filled upon completion of testing. All investigation-derived waste, including without limitation drilling waste, ground water and cuttings, shall be promptly handled, characterized and disposed of properly and in accordance with all local, State and Federal requirements, all at Purchaser's sole cost.

c. Purchaser acknowledges that Seller makes no guarantee, representation or warranty regarding the physical or environmental condition of the Property, and Seller expressly disclaims any and all obligation and liability to Purchaser regarding any defects which may exist with respect to the condition of the Property.

d. Purchaser acknowledges that CSX has reserved the right to monitor and approve all procedures in the conduct of any environmental assessments, tests, studies, measurements or analyses performed by or for Purchaser in, on, to or with respect to the Property. Purchaser shall also notify Seller and CSX in writing no less than five (5) days prior to initiating any such environmental work; keep Seller and CSX fully apprised of the progress of, and procedures followed with respect to, all such environmental work; and fully cooperate with all reasonable requests of Seller in undertaking and carrying out such work. Purchaser shall deliver to Seller, at no cost to Seller, within five (5) days after receipt, copies of all results, assessments, reports and studies, whether of an environmental nature or otherwise, resulting from any tests or inspections conducted by Purchaser pursuant to this section or otherwise in accordance with this Agreement.

e. If Purchaser elects not to secure environmental tests or inspections, or if Purchaser does not elect to terminate after receipt of test results, Purchaser shall take the Property "as is" at Closing, and hereby assumes all risks associated with the environmental condition of the Property, regardless of the cause or date of origin of such condition, and also hereby releases all rights or claims against Seller relating to such condition or for any costs of remediation or cure of any environmental condition. Purchaser does not release any rights or claims against CSX, SGR or any third party relating to such condition or for any costs of remediation or cure of any environmental condition, except as expressly agreed to in writing by Purchaser and CSX or SGR.

f. The provisions of this Section 8 shall survive Closing.

Hazardous Materials Defined: Hazardous Materials means any substance: 1) the presence of which requires investigation, remediation, or is, or becomes regulated under any federal, state, or local statute, regulation, ordinance, order, action, policy, or common law; or 2) which is or becomes defined as a "hazardous substance," pollutant, or contaminant under any federal, state or local statute, regulation, rule, or ordinance or amendments thereto including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601 et seq.) and/or the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.); or 3) which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, or poses, or threatens to pose a hazard to the health or safety of persons on or about the Property, and is or becomes regulated by any governmental authority, agency, department, commission, board, or instrumentality of the United States, the state in which the Property is located or any political subdivision thereof.

9. **Representations and Warranties of Seller**. Seller represents and warrants to Purchaser that Seller will have acquired CSX's interest in the Property by virtue of a Quit Claim deed by the time of closing. Seller has full power and authority to enter into this Agreement and to convey title to the Property in accordance with this Agreement. With the exception of those Leases, Licenses and Agreements listed in Exhibit "C", no one other than Seller will be in possession of, nor have any right of possession of, any portion of the Property at the time of conveyance to Purchaser. If, before the conveyance to Purchaser, Seller discovers any information or facts that would materially change the foregoing warranties and representations, Seller shall immediately give notice to Purchaser of those facts and information. If the facts which cause any warranty or representation to be inaccurate are not remedied before the date of conveyance to Purchaser, Purchaser may elect to either (a) terminate this Agreement, prior to the end of the Inspection Period, in which case Purchaser shall have no obligation to accept title to the Property, or (b) defer the closing date for a period of up to 30 days to permit Seller to remedy the problem.

10. **Remedies Upon Default.**

a. In the event of a default by Purchaser under this Agreement (including, but not limited to payment of the Deposit within the time specified), Seller may elect to terminate this Agreement by delivery of notice to Purchaser and to retain the Deposit and any other money paid by Purchaser to or for the account of Seller, or seek specific performance against Purchaser.

b. In the event of a default by Seller under this Agreement, Purchaser may seek specific performance, or terminate this Agreement by delivery of notice to Seller and to receive an immediate return of the Deposit together with accrued interest thereon and reimbursement for any reasonable third-party expenses incurred by Purchaser pursuant to this Agreement, not to exceed $50,000, as agreed-upon liquidated damages in full settlement of any and all claims arising under or in any way related to this Agreement. Purchaser irrevocably waives any and all right to pursue any other legal or equitable remedy otherwise available to Purchaser.

c. Upon the termination of this Agreement pursuant to this Section, Purchaser and Seller shall be relieved of all obligations under Agreement, including the duty to close, other than any liability for breach of any of the provisions of this Section shall remain as obligations of Purchaser.

d. "Default" shall include not only the failure to make prompt payment of any sums when due under this Agreement, but also the failure to fully and timely perform any other acts required of Purchaser under this Agreement.

11. **Notices**. All notices, demands, requests or other communications permitted or required by this Agreement shall be in writing and shall be deemed to have been duly given if by the date called for under this Agreement: (i) delivered by hand, or (ii) by nationally-recognized, overnight express delivery service, or (iii) by U.S. registered or certified mail, postage prepaid, return receipt requested, or (iv) by electronic transfer ("telefacsimile/fax") with prompt telephone confirmation, to the parties as set forth on Page 1.

Any notice or other communication mailed as hereinabove provided shall be deemed effectively given or received on the date of delivery, except fax notices shall be deemed effectively received when sent or, if sent after 5:00 p.m. eastern time, shall be deemed received at 9:00 a.m. eastern time on the first business day following actual receipt by the addressee. If any notice properly addressed or transmitted, but returned for any reason, such notice shall be deemed to be effective notice and to be given on the date of sending.

12. **Entire Agreement**. This Agreement supersedes all prior discussions and agreements between the parties with respect to the Property and other matters contained herein and constitutes the sole and entire agreement and understanding between Seller and Purchaser with respect to the transaction contemplated hereby. This Agreement shall not be modified or amended except by an instrument in writing signed by or on behalf of both parties.

13. **Applicable Law**. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida.

14. **Effective Date**. As used herein, the terms "date of this Agreement," "date hereof" and "effective date of this Agreement" shall mean the date on which the last of the parties executes this Agreement.

15. **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and all of which counterparts together shall constitute the same instrument. Legible fax copies and photocopies of documents signed by either party are deemed to be equivalent to originals.

16. **Parties Bound**. All of the terms, covenants and conditions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

17. **Headings; Rules of Construction**. The headings used in this Agreement are for convenience of reference only and shall not be construed to alter or affect the meaning of any of the provisions. All references to the singular shall include the plural, and vice versa. The parties agree that this Agreement is the result of negotiation by the parties, each of whom was represented by counsel, and thus, this Agreement shall not be construed against either party because of authorship.

18. **Assignability**. Purchaser may freely assign this Option but only to an organization recognized under Section 501(c)(3) of the Internal Revenue Code of 1986 as a charitable organization, or to a public agency.



D 0069

19. **Time of Essence**. Time is of the essence of this Agreement.

20. **Severability**. Each provision of this Agreement is severable from any and all other provisions of this Agreement. Should any provision of this Agreement be for any reason unenforceable, the balance shall nonetheless remain in full force and effect, but without giving effect to such provision.

21. **No Waiver**. Neither the failure of either party to exercise any power given such party hereunder or to insist upon strict compliance by the other party with its obligations hereunder, nor any custom or practice of the parties at variance with the terms hereof shall constitute a waiver of either party's right to demand exact compliance with the terms hereof.

22. **Delay**. Notwithstanding any other term of this Agreement, all dates for the performance of obligations of the parties shall be automatically extended one business day for any due date falling on a Saturday, Sunday or holiday, or shall be automatically extended for a reasonable time period if any event, including but not limited to, natural disasters, strikes, civil disorder, war, national or local days of mourning, cause the county courthouse and/or major public services to be closed or suspended in Seller's or Purchaser's locale ("Disaster"). This Section is to be liberally construed so as to save the transaction and to avoid defaults.

23. **Trail Use Agreement.** If the STB imposes Notice of Intended Trail Use, ("NITU"), conditions on the Property, the following shall constitute the Interim Trail Use Agreement:

a. By Decision and Notice of Interim Trail Use or Abandonment served to Sarasota County, in STB Docket No. AB-400 Sub. No. 3X, the Surface Transportation Board ("STB") imposed a 180-day period for Purchaser to negotiate an interim trail use/rail banking agreement with CSX and SGR for the Property.

b. Purchaser agrees that upon acceptance of a Quit Claim deed conveying the Property to Purchaser pursuant to the STB's aforementioned order, Purchaser or its designee or assignee shall assume full responsibility for management of the Property; Purchaser shall be responsible for any and all taxes that may be levied or assessed against the Property after Closing; and Purchaser shall assume full responsibility for potential legal liability arising out of transfer or use of the Property pursuant to this Agreement arising from and after the date of closing.

c. Purchaser acknowledges that the Property remains subject to the jurisdiction of the STB for purposes of reactivating rail service. As an inducement to Purchaser to enter into this Agreement, and in the event action is taken to reactivate rail service on the Property, Seller agrees to assign certain contract rights obligating CSX or SGR to compensate the Interim Trail Manager in the event of rail service reactivation. The contract rights to be assigned to Purchaser are set forth in Exhibit "D" attached hereto and incorporated herein by reference (hereinafter referred to as the "Assigned Contract Rights").

d. This Agreement shall be deemed to be the interim trail use agreement between Purchaser, CSX, SGR and Seller for purposes of 16 U.S.C. 1247 (d) and all STB orders relating to same pertaining to the Property.

e. The provisions of this paragraph shall survive Closing and acceptance of the deed by Purchaser.

24. **Execution By County Commission**. Notwithstanding any action taken on the Agreement by the Sarasota County Board of County Commissioners or any agent thereof, or County employee, the Agreement shall not be enforceable against the County unless approved by the Board of County Commissioners and executed by the Chairman of the Board of County Commissioners.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed and sealed by its duly authorized signatory(ies) on the dates set forth below

SELLER:
**The Trust for Public Land, a nonprofit California corporation**

BY: [signature]
Gregory J A Chelius, Florida State Director

Date: 9-25-04

[signature]
Witness

[signature]
Witness

(CORPORATE SEAL)

PURCHASER:
**Sarasota County, a political subdivision of the State of Florida**
**By its: Board of County Commissioners**

By: [signature]
Name:
Chair
Date: 9/20/04

ATTEST:
KAREN E. RUSHING, Clerk
of the Circuit Court and
Ex-Officio Clerk of the
Board of County Commissioners
BY: [signature]
Deputy Clerk

Approved as to form and correctness:

[signature]
County Attorney



D 0071

**EXHIBIT A**

**LEGAL DESCRIPTION**
**(CSX-SARASOTA)**

**Page 1 of 4**

*A 100.00 foot wide strip of land lying in Sections 23, 26 and 35, Township 37 South, Range 18 East, and lying in Sections 1, 2, 12, 13, 24 and 25, Township 38 South, Range 18 East, and lying in Sections 30 and 31, Township 38 South, Range 19 East, and Sections 6, 7, 17 and 18, Township 39 South, Range 19 East, all lying and being in Sarasota County, Florida, and lying 50.00 feet on each side of the following described centerline:*

*Commence at a Parker–Kalon Concrete Nail and Brass Disk set bearing the inscription "GFY LB021" marking the Northwest corner of Section 23, Township 37 South, Range 18 West, Sarasota County, Florida; thence on the North boundary of said Section 23, South 89°51'29" East, a distance of 1401.74 feet to a point on the centerline of an existing railroad right–of–way formerly known as Seaboard Air Line Railway Co., Venice Branch right–of–way, a 100.00 foot wide right–of–way, said point bearing North 89°51'29" West, a distance of 1278.42 feet from a 2 inch Iron Pipe found under water marking the Northeast corner of the Northwest 1/4 of said Section 23; thence on said centerline South 11°45'41" East, a distance of 766.21 feet to the POINT OF BEGINNING of the centerline of the property herein described, said point being at mile marker 892 of said railroad; thence continue the following eighteen (18) courses on said centerline of railroad right–of–way: (1) South 11°45'41" East, a distance of 1824.85 feet; (2) South 11°47'30" East, a distance of 2596.37 feet to a point on the North boundary of Section 26, Township 37 South, Range 18 West, Sarasota County, Florida, said point bearing North 89°33'41" West, a distance of 231.92 feet from a 2 inch Iron Pipe found under water marking the Northeast corner of the Northwest 1/4 of said Section 26; (3) South 11°47'01" East, a distance of 5532.53 feet to a point on the North boundary of Section 35, Township 37 South, Range 18 West, Sarasota County, Florida, said point bearing South 89°47'35" East, a distance of 917.02 feet from a 1/2 inch iron rod set with a plastic cap bearing the inscription "GFY LB021" marking the Northwest corner of the Northeast 1/4 of said Section 35, and bearing North 89°47'35" West, a distance of 1760.35 feet from a found 5/8 inch iron rod with a plastic cap bearing the inscription "LB6754" marking the Northeast*

EXHIBIT A

LEGAL DESCRIPTION
(CSX-SARASOTA)

Page 2 of 4

corner of said Section 35; (4) South 11°45'36" East, a distance of 5323.62 feet to a point on the North boundary of Section 2, Township 38 South, Range 18 West, Sarasota County, Florida, said point bearing North 89°51'28" East, a distance of 2348.60 feet from a found 5 inch square concrete monument bearing the inscription "Sarasota County" at the Northwest corner of the Northeast 1/4 of said Section 2, and bearing South 89°51'27" West, a distance of 321.63 feet from a found 5/8 inch iron rod with a plastic cap bearing the inscription" LB 6754" marking the Northeast corner of said Section 2; (5) South 11°45'19" East, a distance of 1535.56 feet to a point on the West boundary of Section 1, Township 38 South, Range 18 West, Sarasota County, Florida, said point bearing South 00°20'05" West, a distance of 1504.18 feet from a 5/8 inch iron rod with a plastic cap bearing the inscription" LB 6754" marking the Northwest corner of said Section 1, and bearing North 00°20'05" East, a distance of 3947.70 feet from a railroad spike found in pavement marking the Southwest corner of said Section 1; (6) South 11°45'19" East, a distance of 4039.11 feet to a point on the North boundary of Section 12, Township 38 South, Range 18 West, Sarasota County, Florida, said point bearing South 89°32'29" East, a distance of 845.99 feet from a railroad spike found in pavement marking the Northwest corner of said Section 12, and North 89°32'29" West, a distance of 1829.99 feet from a 1-1/2 inch iron pipe found under water, marking the Northeast corner of the Northwest 1/4 of said Section 12; (7) South 11°46'41" East, a distance of 5236.30 feet to a point on the North boundary of Section 13, Township 38 South, Range 18 West, Sarasota County, Florida, said point South 89°38'15" East, a distance of 1935.03 feet from a found 4" square concrete monument bearing the inscription "PRM 1747" marking the Northwest corner of said Section 13, and bearing North 89°38'14" West, a distance of 693.40 feet from a found 1/2 inch iron rod marking the Northeast corner of the Northwest 1/4 of said Section 13; (8) South 11°47'38" East, a distance of 5414.75 feet to a point on the North boundary of Section 24, Township 38 South, Range 18 West, Sarasota County, Florida, said point bearing South 89°44'10" East, a distance of 3093.22 feet from the a found 5 inch square concrete monument bearing the inscription "Sarasota County" marking the Northwest

**EXHIBIT A**

**LEGAL DESCRIPTION
(CSX-SARASOTA)**



corner of said Section 24, and bearing North 89°44'10" West, a distance of 2200.39 feet from a found 2 inch iron pipe marking the Northeast corner of said Section 24; (9) South 11°47'26" East, a distance of 5423.91 feet to a point on the North boundary of Section 25, Township 38 South, Range 18 West, Sarasota County, Florida, said point bearing South 89°36'18" East, a distance of 4224.41 feet from a found 5/8 inch iron rod marking the Northwest corner of said Section 25; (10) South 11°46'14" East, a distance of 4929.19 feet to a point on the West boundary of Section 30, Township 38 South, Range 19 West, Sarasota County, Florida, said point South 00°36'00" West, a distance of 2165.18 feet from a 1/2 inch iron rod set with a plastic cap bearing the inscription "GFY LB021" marking the Northwest corner of the Southwest 1/4 of said Section 30, and bearing North 00°36'00" East, a distance of 488.09 feet from a found 5 inch square concrete monument bearing the inscription "Sarasota County" marking the Southwest corner of said Section 30; (11) South 11°46'14" East, a distance of 498.29 feet to a point on the North boundary of Section 31, Township 38 South, Range 19 West, Sarasota County, Florida, said point bearing North 89°51'45" East, a distance of 106.76 feet from a found 5 inch square concrete monument bearing the inscription "Sarasota County" marking the Northwest corner of said Section 31, and bearing North 89°51'45" East, a distance of 2528.32 feet from a found 5 inch square concrete monument bearing the inscription "Sarasota County" marking the Northeast corner of the Northwest 1/4 of said Section 31; (12) South 11°46'40" East, a distance of 5746.18 feet to a point on the North boundary of Section 6, Township 39 South, Range 19 West, Sarasota County, Florida, said point bearing North 89°55'00" West, a distance of 1224.25 feet from a found Parker–Kalon Concrete Nail and Brass Disk set bearing the inscription "LB 1856" marking the Northeast corner of the Northwest 1/4 of said Section 6; (13) South 11°47'09" East, a distance of 5391.71 feet to a point on the North boundary of Section 7, Township 39 South, Range 19 West, Sarasota County, Florida, said point bearing South 89°26'54" East, a distance of 1218.66 feet from a Parker–Kalon Concrete Nail and Brass Disk bearing the inscription " LB 021 " set as a witness corner 1300.00

**EXHIBIT A**

**LEGAL DESCRIPTION**
**(CSX-SARASOTA)**



*feet Easterly of the Northwest corner of said Section 7, and bearing North 89°26'54" West, a distance of 110.93 feet from a found 1/2 inch iron rod marking the Northeast corner of the Northwest 1/4 of said Section 7; (14) South 11°46'14" East, a distance of 3082.14 feet to a point of curvature; (15) Southerly 1048.54 feet along the arc of a curve to the left, said curve being concave Easterly, having a radius of 2864.79 feet, a central angle of 20°58'15", and a chord bearing and distance of South 22°15'22" East, 1042.70 feet to a point of tangency; (16) South 32°44'29" East, a distance of 1611.73 feet to a point on the North boundary of Section 18, Township 39 South, Range 19 West, Sarasota County, Florida, said point bearing South 89°44'39" East, a distance of 4511.01 feet from a found 12 inch round concrete monument with a Florida Department of Natural Resources brass disk marking the Northwest corner of said Section 18, and bearing North 89°44'38" West, a distance of 823.71 feet from a railroad spike found in asphalt pavement marking the Northeast corner of said Section 18; (17) South 32°44'29" East, a distance of 1495.62 feet to a point on the West boundary of Section 17, Township 39 South, Range 19 West, Sarasota County, Florida, said point bearing South 00°40'33" West, a distance of 1254.41 feet from a railroad spike found in asphalt pavement marking the Northwest corner of said Section 17, and bearing North 00°40'33" East, a distance of 4077.27 feet from a found 5 inch square concrete monument bearing the inscription "Sarasota County" marking the Southwest corner of said Section 17; (18) South 32°44'29" East, a distance of 4891.21 feet to the POINT OF TERMINATION, said point being on the South boundary of said Section 17, said point bearing South 89°11'09" East, a distance of 22.52 feet from a 5/8 inch iron rod found in asphalt pavement marking the Southwest corner of the Southeast 1/4 of said Section 17, and bearing North 89°12'26" West, a distance of 2649.30 feet from a Parker-Kalon concrete nail and brass disk found in asphalt pavement marking the Southeast corner of said Section 17, and the boundaries of the land described herein shall be lengthened or shortened to terminate on the South boundary of said Section 17.*

Together with: The Railroad Right of Way located in Section 17, Township 39 South, Range 19 East of Sarasota County Florida, commonly known as the "Y" track as shown on the Right of Way and Track Map of Seaboard Air Line Railway Co., Venice Branch, dated December 3, 1927, for which a legal description will be provided prior to the end of the Inspection Period.

**EXHIBIT B**

**Leases, Licenses and Agreements**
(To Be Finalized Prior To Closing)

| | Name of Party | Parcel Location /Description | Agreement # | Facility Type | Public Utility /Purpose |
|---|---|---|---|---|---|
| 1 | Bahes Rvee | SW 903.86 | SGLR 0178 | Land Lease | |
| 2 | Buckeye Gas (Northern Propane) | SW 899.93 | SCL 18997 | Sidetrack | |
| 3 | Builders Concrete | SW 902.50 | SAL 52490 | Unloading Pit | |
| 4 | Cement Product | SW 903.46 | SCL 15693 | Unloading Pit | |
| 5 | City of Venice | SW 902 | SGLR 0311 | Land Lease | Land Lease |
| 6 | City of Venice | SW 903.1 | SGLR 0241 | Waterline | Waterline |
| 7 | Comcast Cable | SW 892.55 | SGLR 0215 | Wireline | Cable |
| 8 | Comcast Cable | SW 893.08 | SBD 5565 | Wireline | Cable |
| 9 | Comcast Cable | SW 900.01 | SCL 2158 | Wireline (2) | Cable |
| 10 | Comcast Cable | SW 902.41 | CSX629 (A) | Wireline | Cable |
| 11 | Comcast Cable (Venice Central Antenna) | SW 902.77 | SCL 2020 | Wireline | |
| 12 | Comcast Cable (Venice Central Antenna) | SW 904.27 | SCL 22033 | Wireline | Tv Cable |
| 13 | Comcast Cable | SW900.02 | SCL 33536 | Wireline | |
| 14 | Culverhouse, H | SW 892.24 | SBD 5978 | Land Lease | |
| 15 | Culverhouse, H | SW 897.04 | SBD 6773 | Private Road | |
| 16 | EAGLE POINT | SW 902.13 | SGLR 0138 | Water | |
| 17 | EAGLE POINT | SW901.7 | SAL 13993 | Spoil Easement | |

| | Name of Party | Parcel Location /Description | Agreement # | Facility Type | Public Utility /Purpose |
|---|---|---|---|---|---|
| 18 | FLORIDA DOT | SW 902 11 | SGLR 0081 | Crossing PUBLIC ROAD | PUBLIC ROAD |
| 19 | FLORIDA DOT | SW 902 12 | SAL 62287 | Signal Maint | Signal Maint |
| 20 | FLORIDA DOT | SW 902 74 | SAL 62406 | Overpass | Overpass |
| 21 | FLORIDA DOT | SW901 36 | SAL 56428 | Signal Install | Signal Install |
| 22 | FLORIDA DOT | SW 897 91 | SCL 26887 | Overpass | Overpass |
| 23 | Florida Power | SW 892 55 | SGLR 2008 | Wireline | |
| 24 | Florida Power | SW 895 94 | SCL 32966 | Private Road | |
| 25 | Florida Power | SW 900 01 | GA-3340-20 | Wireline | |
| 26 | Florida Power | SW 902 70 | GA3340-3 | Wireline | |
| 27 | Florida Power | SW 902 77 | GA3340-4 | Wireline | |
| 28 | Florida Power | SW 902 77 | GA3340-12 | Wireline | |
| 29 | Florida Power | SW 903 62 | GA 3340-5 | Wireline | |
| 30 | Florida Power | SW 904 25 | GA3340-S39 | Wireline | |
| 31 | Florida Power | SW 904 30 | SCL 27934 | Wireline | |
| 32 | Florida Power | SW 982 55 | SGLR 2008 | Wireline | |
| 33 | Florida Power | SW902 10 | GA-3340-7 | Wireline | |
| 34 | Florida Power | SW 893 85 | SGLR 2002 | Wireline | |
| 35 | GTE FLORIDA | SW 893 88 | SGLR 01 56 | Wireline | |
| 36 | GTE FLORIDA | SW 895 18 | GT 017 | Wireline | |
| 37 | GTE FLORIDA | SW 900 01 | GT034 | Wireline | |

| | Name of Party | Parcel Location /Description | Agreement # | Facility Type | Public Utility /Purpose |
|---|---|---|---|---|---|
| 38 | GTE FLORIDA | SW 902.71 | GT 043 | Wireline | |
| 39 | GTE FLORIDA | SW 902.73 | GT026 | Wireline | |
| 40 | GTE FLORIDA | SW 902.73 | sbd 5041 | Wireline | |
| 41 | GTE FLORIDA | SW 902.71 | GT 016 | Wireline | |
| 42 | GTE FLORIDA | SW 904.24 | GT044 | Wireline | |
| 43 | GTE FLORIDA | SW900.02 | GT 153 | Wireline | |
| 44 | GTE FLORIDA | SW902.10 | GT031 | Wireline | |
| 45 | Harbor Lights | SW 902.31 | SAL 52245 | Water | |
| 46 | Jansen & Sons | SW 902.48 | SCL 17164 | Track Lease | |
| 47 | Hanson Pipe | SW 904.1 | SGLR 0164 | Land Lease | |
| 48 | Joelson Concrete | SW 904.32 | SAL 53416 | Sidetrack | |
| 49 | Joelson Concrete | SW 904.32 | SCL15001 | Unloading Pit | |
| 50 | Joelson Concrete | SW 904.38 | SCL 30769 | Land Lease | |
| 51 | Joelson Concrete | SW 904.44 | SCL3816 | Land Lease | |
| 52 | Kimal Lumber | SW901.37 | SBD 9166 | Land Lease | |
| 53 | Kimal Lumber | SW901.37 | SBD 8928 | Track Lease | |
| 54 | Litrell Concrete | SW 902.50 | SAL53970 | Sidetrack | |
| 55 | Nokomis Build | SW900.16 | SAL15388 | Sidetrack | |
| 56 | Omega Door | SW 903.78 | SGLR 0181 | Land Lease | |
| 57 | Sarasota County | SW 892.56 | SGLR 0188 | Land Lease | |

| | Name of Party | Parcel Location /Description | Agreement # | Facility Type | Public Utility /Purpose |
|---|---|---|---|---|---|
| 58 | Sarasota County | SW 892.56 | SGLR 0187 | Xing Maint | Xing Maint |
| 59 | Sarasota County | SW 893.91 | SGLR 0148 | Land Lease | |
| 60 | Sarasota County | SW 893.91 | SGLR 0149 | Xing Maint | Xing Maint |
| 61 | Ringling Brothers | SW 903.89 | SAL 61742 | Sidetrack | |
| 62 | Ringling Brothers | SW 903.89 | SAL 58085 | Storage Track Lease | |
| 63 | Ringling Brothers | SW 904 | SBD5276 | Track Lease | |
| 64 | Sarasota County | SW 892.35 | SBD 8360 | Sewer | Sewer |
| 64.5 | Sarasota County | SW 892.56 | 2003-299 | Signal Crossing | |
| 65 | Sarasota County | SW 892.56 | SGLR 0158 | Sewer | Sewer |
| 66 | Sarasota County | SW 893.07 | SGLR 2002-189 | Sewerline | Sewerline |
| 67 | Sarasota County | SW 893.08 | SBD5565 | Sewer | Sewer |
| 68 | Sarasota County | SW 896.03 | SGLR 2002-188 | Sewerline | Sewerline |
| 69 | Sarasota County | SW 896.18 | SGLR 2002-187 | Sewerline | Sewerline |
| 70 | Sarasota County | SW 900.01 | SGLR 0078 | Easement Crossing | Road Crossing & Signal Maint |
| 71 | Sarasota County | SW 900.01 | SGLR 0078 | Easement Transmission Line Water | WATER |
| 72 | Sarasota County | SW 900.22 | SBD 3325 | Drainage | Drainage |
| 73 | Sarasota County | SW 900.22 | SBD 3325 | Maintenance DRAINAGE DITCH | DRAINAGE DITCH |
| 74 | Sarasota County | SW 904.03 | SAL 65707 | Sewer | Sewer |
| 75 | Sarasota County | SW 904.03 | SAL 65708 | Water | Water |

| | Name of Party | Parcel Location /Description | Agreement # | Facility Type | Public Utility /Purpose |
|---|---|---|---|---|---|
| 76 | SEACONCHIELD (William Gill) | SW 904.01 | SGLR 0163 | Land Lease | |
| 77 | Donald G. Lowry | SW 903.20 | SGLR 0180 | Land Lease | |
| 78 | Storage Depot | SW 904.7 | SGLR 0344 | Land Lease | |
| 79 | Stottlemeyer | SW 904.19 | SCL 26727 | Sidetrack | |
| 80 | Stottlemeyer | SW 904.19 | SCL 26726 | Sidetrack Sale | |
| 81 | Stottlemeyer | SW 904.32 | SCL 24742 | Land Lease | |
| 82 | Teco, People Gas | SW 893.72 | SGLR0046 SGLR0161 | Gas Main | |
| 83 | Tampa Electric Co | SW 904.28 | CSX 3532 | Gas Main | |
| 84 | Teco Gas | SW902.10 | SGLR 0282 | Gas Pipeline | |
| 85 | TEXGAS | SW 903.27 | SCL11973 | Sidetrack | |
| 86 | Thompson, L | SW900.02 | SAL21243 | Land Lease | No |
| 87 | Thompson, L | SW900.15 | SAL21901 | Sidetrack | |
| 88 | Tyler & Seider | SW 904.3 | SBD 5609 | Land Lease | |
| 89 | Venice Concrete | SW 903.18 | SCL2241 | Unloading Pit | |
| 90 | Venice Dodge | SW 903.66 | SGLR 0339 | Land Lease | |
| 91 | Venice Lumber | SW 903.15 | SAL28012 | Sidetrack | |
| 92 | Venice Terrazzo | SW901.21 | SAL62372 | Land Lease | |
| 93 | City of Venice | SW 902.13 | SGLR 0137 | Pipeline | Water Main Line |
| 94 | City of Venice | SW 902.72 | SGLR 0036 | Water | Water |
| 95 | City of Venice | SW 902.73 | SCL18658 | Water | Water |

| | Name of Party | Parcel Location /Description | Agreement # | Facility Type | Public Utility /Purpose |
|---|---|---|---|---|---|
| 96 | City of Venice | SW 902 74 | SCL 7611 | Public Road | Public Road |
| 96.5 | City of Venice | SW 902 39 | SGLR 0437 | City Water Line | Water |
| 97 | City of Venice | SW 902 74 | SGLR 0035 | Sewer | Sewer |
| 98 | City of Venice | SW 902 74 | SBD6221 | Water | Water |
| 99 | City of Venice | SW 902 76 | SCL 34856 | Sewer | Sewer |
| 100 | City of Venice | SW 902 8 | SAL 56247 | Sewer | Sewer |
| 101 | City of Venice | SW 903 19 | SAL 60506 | Water | Water |
| 102 | City of Venice | SW902 09 | SCL17263 | Sewer | Sewer |
| 103 | City of Venice | SW902 09 | SAL10872 | Water | Water |
| 104 | City of Venice | SW902 09 | SAL63396 | Water/Sewer | Water/Sewer |
| 105 | WCIND, Xing agency sublease | SW 902 52 | SGLR 0312 | Xing Agmnt Land Lease | Xing Agmnt |
| 106 | Wickes Corp | SW 903 75 | SCL 13978 | Sidetrack | |
| 103 | City of Venice (A) | SW902 74 | SGLR 0277 | Reclaimed Water | |
| 104 | City of Venice (A) | SW903 58 | SGLR 0241 | Stormwater & Line | |



D 0081

**EXHIBIT "C"**
Permitted Exceptions

1. Easement in favor of Florida Power & Light Company recorded in Official Records Book 14, Page 439 (Section 35-37-18.

2. Permanent Easement Agreement in favor of Seminole Gulf Railway, L.P. and CSX Transportation, Inc., recorded in Official Records Book 2400, Page 365 (Section 25-38-18).

3. Easement in favor of Florida Power and Light Company recorded in Deed Book 64, Page 10 (Section 30-38-19).

4. Easement in favor of Florida Power and Light Company recorded in Deed Book 64, Page 12 (Section 31-38-19).

5. Easement in favor of Florida Power and Light Company recorded in Official Records Book 451, Page 791 (Section 31-38-19 and Section 25-38-18)

6. Easement in favor of Florida Power and Light Company recorded in Official Records Book 519, Page 468 (Section 30-38-19).

7. Resolution annexing lands into the City of Venice recorded in Official Records Book 1179, Page 1919 (Sections 6 & 7-39-19

8. Resolution for Exchange of Right of Way recorded in Official Records Book 2204, Page 1550 (Section 6-39-19)

9. Non-exclusive Permanent Utility Easement in favor of Florida Power & Light Company recorded in Official Records Instrument No. 2001000340 (Section 7-39-19)

10. Permit recorded in Official Records Book 1105, page 552 (section 17-39-19).

11. Easement in favor of Florida Power & Light Company recorded in Official Records Book 353, Page 675.

12. Grant of Guaranteed Access in favor of Florida Power & Light Company recorded in Official Records Book 1348, Page 1113 (Section 1-38-18).

13. Right of way Agreement recorded in Deed Book 66, page 169.

14. All easements, licenses and agreements which Buyer agrees to assume in accordance with the terms of this Purchase and Sale Agreement.

**Exhibit D**

**Assignment of Contract Rights**
**as contained in Option Agreement between The Trust for Public Land,**
**CSX, Transportation, Inc. and Seminole Gulf Railway, L. P. dated 8/23/03**

**Paragraph 30, <u>Trail Use Agreement.</u> ( c ) ( i )**

**In the event the STB, or any other entity of the United States Government compels Seller, its successors or assigns, to reactivate rail service on the Property, or in the event Seller, its successors or assigns, voluntarily takes steps to reactivate rail service on the Property or consummate abandonment by seeking to vacate the Notice of Interim Trail Use (the "NITU"), and if the STB approves the vacation of the NITU and reactivation of rail service requiring conveyance of the Property by the Interim Trail Manager to the Seller, then, in such event, Seller, its successors or assigns, shall pay to the Interim Trial Manager at the time of reactivation a sum equivalent to the market value of the Property, excluding any improvements.**

**In the event that rail service is reactivated and reimbursement is required by Buyer, its successors or assigns, as set forth herein, Buyer, it successors or assigns, shall re-convey the Property together with all improvements located thereon to Seller.**