determinable because the Honore deed "includes a reversionary clause, a concept related to future reversionary interests that has no bearing in relation to easement interests."[87]

Point One: It is not necessary that a grantor use "magic words" to create an easement. "No particular form and language are necessary to create an easement; rather, any words clearly showing the intention of the parties to create a servitude on a sufficiently identifiable estate is sufficient."[88]

Point Two: Adrian Honore's use of the term "revert" does not convert the grant of an easement into a conveyance of conditional fee or qualified fee. See, *DEAN V. MOD PROPERTIES*, 528 So.2d 432 (Fla. App. 1988), where the court held that the draftsman's inartful use of the term "revert" did not mean that a fee estate was conveyed.[89]

---

[87] Govt's Cross-Motion, 24.

[88] *HAYNES V. CITY OF LAKELAND* 451 So.2d 505 (Fla. App. 1984) (citing among other authorities *SEABOARD AIR LINES RAILWAY CO. V. DORSEY*, 111 Fla. 22, 149 So. 759, 761 (Fla. 1933)) ("No stock words or phrases are required to constitute any of these instruments [an easement or a license]; it is only necessary that such words be employed as will show the grantor's intent."). See also *RICHARDSON V HOLMAN*, 160 Fla. 65, 33 So.2d 641 (Fla. 1948) (holding that though words employed in a deed are important, words or phrases in isolation will not be permitted to defeat the purpose of the grantor when that purpose can be gleaned from the instrument as a whole).

[89] "[T]he draftsman of the 'road right-of-way easement' to the City of Sanford in 1974 was certainly not clear as to the legal differences and distinctions as to landed estates, easements, and licenses. However, the implication of a conveyance of the fee simple title raised by the inept words 'the reversion or reversions thereof' is, in our opinion, clearly overwhelmed by the repeated qualified phrases limiting the interest conveyed to be for the 'purpose of road right-of-way' and 'for public road right-of-way purposes,'" *DEAN*, 528 So.2d at 434.

Indeed, in *PRESEAULT I* wrote, Justice Brennan wrote, "frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations." Clearly, Justice Brennan was not using the term "revert" in a manner having "no bearing in relation to easement interests."

**6. The government's resort to *Richardson v. Holman* as a basis upon which to recast the Honore Deed as a conveyance of "Fee Simple Determinable" instead of the granting of an Easement is woefully misplaced.**

*RICHARDSON V. HOLMAN* 160 Fla. 65, 33 So.2d 641 (Fla. 1948) involved an undisputed conveyance of a fee estate in land to a street car line. *RICHARDSON* did not involve a dispute over whether the conveyance granted an easement or conveyed a fee estate. The disputed deed was to a railroad and contained a provision which said "the conveyance is made subject to and upon the express condition that should the [railroad] cease to use the foregoing land for street railroad purposes, then and in that event the title to said property shall revert to and vest in the said [grantor] and his heirs and assigns."[90] Thirty years later the street car "ceased to operate street cars and abandoned the property in question."[91] The grantor had since conveyed a large tract of land (which included the parcel that was conveyed to the street car company) by deeds that contained a reservation stating that the conveyance was subject to the prior deed to the street car company. The current owners claimed the reversionary right to the land that the street car company had abandoned. The heirs of the original grantor also appeared and claimed the reversionary right to the land. The heirs argued that the deed to the railroad created a fee estate subject to a condition subsequent which is personal to the grantor and could not be assigned to subsequent purchasers. The current owners claimed that the deed to the railroad was a fee simple determinable estate which they acquired by mesne conveyances from the original grantor.

The court expressly avoided an esoteric discussion of these two constructions. "We do not think it essential to the disposition of the question here, to precipitate a discourse in semantics on the difference between a fee simple determinable and estate on condition

---

[90] *RICHARDSON*, 33 So. 2d at 641-42.
[91] *Id* at 642.

subsequent, when a possibility of reverter is or is not alienable, or when a fee is qualified, what constitutes a naked possibility, a conditional limitation, or any other uncertain interest in land."[92]

The court rejected "feudal" concepts of title which limited the assignability of an interest and went on to hold that "The statutes of Florida abrogates many of these old feudal concepts and contemplate that any interest in land may be the subject of conveyance…with a purpose to shake off the old restrictions of common law, such as livery of seisin and sale of pretended titles…[93] As such, the court held that a reversionary interest could be assigned, irrespective of whether it is characterized as "fee simple determinable" or a "fee estate subject to a condition subsequent."

*RICHARDSON* is an important case with a number of principles relevant to the immediate discussion, such as "[the] operation and effect of a deed depends less on artificial rules than it does on the application of common sense and sound equity to the object and purpose of the contract under review."[94] Also, the Florida Supreme Court will honor the intention of the grantor and "words or phrases in isolation will not be permitted to defeat the purpose of the grantor when that may be unmistakably gleaned from the four corners of the instrument."[95]

However, *RICHARDSON* most decidedly does not stand for the proposition for which the government cites the case as "show[ing] that the Florida Supreme Court would determine that the Honore Deed, like the deed construed in *RICHARDSON*, conveyed a fee simple determinable to Seaboard and not an easement."[96]

---

[92] *Id.*
[93] *Id.* at 644.
[94] *Id.* at 643.
[95] *Id.* at 642.
[96] Govt's Cross-Motion, 22.

a) The Bird Bay Instruments

In 1910, the land now owned by Bird Bay was owned by Adrian Honore. In 1911, Adrian Honore transferred title to this land to Sarasota-Venice Company.[97] Adrian Honore was president of the Sarasota Venice Company.[98] The deed to Sarasota-Venice Company made no reference to the existence of any railroad right of way. The railroad line between Venice and Sarasota was in operation in late 1911. On October 27, 1911 there was "[a]n early train wreck - the Seaboard train from Venice strikes several cows as it enters the corporate limits of [Sarasota] suffering derailment."[99] In 1921, Sarasota-Venice Company conveyed this land to Honore Palmer and Potter Palmer.[100] This deed provided that the conveyance was subject to the then existing Seaboard Air Line Railway right of way. Neither the Plaintiffs nor the government have found any instrument by which this right of way was established (i.e., there is no conveyance from Adrian Honore or Sarasota-Venice Company to the Seaboard Air Line Railway by which the railroad was conveyed the land or an easement to establish a railroad upon this land.) The only conveyances that the parties have found to the Seaboard Air Line Railway are the 1927 B.L.E. and 1941 Venice-Nokomis deeds. Both deeds specifically describe the identical strip of land as being the location of the existing railroad right of way physically in existence before the respective instrument was executed.[101] The property described is a strip of land used for an existing railroad right of way on which tracks were located. The land was not used for (nor capable of being used for) permanent structures such as station or depot. Further, the 1941

[97] *See* Tab 5.
[98] *Id.*
[99] Sarasota County Government History Center web site. http://www.scgov.net/CommunityServices/HistoryCenter/Historic_Sarasota/timeline2.asp (last accessed, August 6, 2008).
[100] See Tab 6.
[101] The BLE Deed references a "proposed Wye Track." The 1941 Venice Deed uses the exact same legal description but eliminates the word "proposed."

Venice deed states that the interest conveyed is "to be held, used and disposed of as a part of the receivership estate."[102] Each deed also recites nominal consideration for the interest conveyed (one dollar in the BLE Deed and five dollars in the Venice Deed).

So, the question is: Given this language in the documents and the circumstances in which they were drafted, what interest did the parties intend the Seaboard to obtain in or to the land by reason of the Venice-Nokomis and BLE deeds? The government contends that "the Venice Deed unambiguously conveyed a fee simple absolute interest to Seaboard."[103] But did it?

It is common real estate practice to record a deed as a means to resolve ambiguities or disputes over the boundary and location of easements or to clarify ambiguities or gaps in the chain of title.[104]

Given both the language in the deeds as well as the circumstances of their execution, the BLE and Venice Deeds, consistent with the approach taken by the Federal Circuit considering the Manwell deed in *PRESEAULT II*, should be seen as acknowledging an existing railroad easement held by the Seaboard. This is so for the following reasons: (1) the deed describes and the property by reference to an existing surveyed railroad right of way (See, *PRESEAULT II*); (2) it is for nominal consideration; (3) the only interest a railroad needed to obtain in the land was an easement; (4) the Venice Deed was executed in the context of receivership litigation in which the special master was seeking to clarify the Seaboard's assets and was a time when the Seaboard would certainly not be needlessly purchasing a fee estate in property upon which it already held an easement; and (5) the railroad right of way described in the Venice Deed is the exact same as

---

[102] The Seaboard Air Line Railway was insolvent and had been in receivership since 1930. *GUARANTY TRUST CO. OF NEW YORK V. SEABOARD AIR LINE RAILWAY*, 53 F. Supp 672 (E.D. Va. 1943).

[103] Govt's Cross Motion, 33.

[104] See, *e.g.*, *GOLDEN V. HAYES*, 277 So.2d 816 (Fla. App. 1973) (allowing a correction deed to be filed to correct the erroneous spelling of the grantee's name).

that described in the BLE deed recorded 14 years earlier. (If these deeds were the conveyance of a fee estate, the government fails to explain how the Venice Deed conveyed anything since – under the government's view – the fee estate would have already been conveyed by the earlier BLE Deed. Indeed, if a deed in the form of the Venice Deed conveyed a fee estate why did the parties execute the Venice Deed at all since – if the government's view were correct – the Seaboard would already hold a fee estate to the right of way under the earlier BLE Deed. The government makes no effort to explain this inconsistency in their argument.)

These facts all indicate that the BLE and Venice Deeds were not a new conveyance granting fee estate in the land but were an acknowledgement of an existing railroad easement.

## VI. PART TWO: Neither Public-Access Recreational Trail Use Nor "Railbanking" Are a "Railroad Purpose" Under Florida Law Nor Are They Within The Uses Permitted By The Railroad's Interest Obtained From Adrian Honore.

The government contends that "railbanking" and "Interim Trail Use" are within the scope of the railroad's interest in the subject corridor."[105] In making this contention the government sets before itself an incredible task. The government must show that the Sarasota County Park Department in operating a public recreational hiking and biking trail is a "railroad." This is an even more difficult task because, as the government itself acknowledges, it must show that this use of the land is not only a "railroad purpose" under the general law of Florida but that it is also specifically within the scope of the easement granted to the Seaboard Air Line Railway in 1910.

As we show below. This is not just a difficult task. It is impossible.

### 1. The government argues that "railbanking" and interim trail use are within the scope of the railroad's interest in the land.

The government asserts, "Railbanking is a permissible railroad use, plainly within the scope of the railroad's property interest."[106] The entirety of the government's four sentences written in support of this contention are, "The term 'railbanking' refers to the 'preservation of railroad corridor for future rail use" which "furthers a national policy to preserve established railroad rights-of-way. Railbanking thus provides railroads with an alternative to abandonment…and the loss of the corridor as part of the national transportation system."[107]

---

[105] Govt's Cross-Motion, 24-25.
[106] *Id.*
[107] *Id.* at 24-25.

The government argues, "The Court should conclude, therefore, that railbanking is a railroad purpose, within the scope of the uses permitted by the Honore Deed."[108]

The government then turns from consideration of "railbanking" to interim trail use and contends, "interim trail use is within the scope of the railroad's interest in the subject corridor."[109] The government advances two reasons why it claims this is so. "First, interim trail use furthers and serves the original purpose of the railroad's interest allowing the railroad to preserve the corridor for future rail service."[110] The government continues, "[second] interim trail use is within the scope of the railroad's interest because interim trail use is a permissible public use of the corridor under Florida law." The only Florida authority that the government cites for this proposition is a 1999 Florida statute "authorizing the Florida Department of Environmental Protection to acquire land to expand the Greenways and Trails Program."[111]

The government's position is wrong for the following reasons: (1) it is not supported by – and is indeed flatly contrary to - Florida law; (2) it utterly ignores the contrary language of the Honore Deed; (3) it seeks to redefine state law property interests by *ipsi dixit* in a manner expressly prohibited by the Fifth Amendment and directly contrary to settled precedent of the U.S. Supreme Court, Federal Circuit, and D.C. Circuit; (4) it ignores the principle that property interests are determined by the intent of the parties at the time the conveyance was granted – in this case 1910; and (5) it wrongly interprets the 1983 Amendment to the Trails Act and its intended effect upon state law.

---

[108] *Id.* at 25.
[109] *Id.*
[110] This is actually just a restatement of the "railbanking" argument since it turns upon "preserving the railroad corridor" not upon using it for a public recreational trail.
[111] *Id.* at 26. See Fla. Stat § 260.012(5) (1999); see also Fla. Stat § 260.015(1999).

**2. The uses of the right of way authorized by the Trails Act – railbanking and interim trail use – are NOT permissible uses of the right of way under Florida law.**

While the government agrees that "Florida law defines the nature and scope of the relevant property interests,"[112] in its argument that "railbanking" and interim trail use are "within the scope of the railroad's interest," the government never cites a single Florida case in support of its proposition.[113]

The only reference the government makes to any Florida case is to *LOVELAND V. CSX*, 622 So.2d 1120 (Fla. App. 1993) and that is not to cite *LOVELAND* as supporting the government's contention, but rather, as an effort to try and explain why *LOVELAND* does not refute the government's argument. *LOVELAND* absolutely and unequivocally destroys the government's contention that "railbanking" and recreational trail use are a "railroad purpose" under Florida law.

Polly Loveland was the successor in title to land that Redland Sales Company had originally owned in 1926. Redland transferred title to the land to the Seaboard All-Florida Railway (predecessor to the CSX) for use as both a railway and a passenger depot. The instrument was a conveyance of fee estate in the land made by warranty deed with a provision that stated, "Said property is to be used for freight and passenger station and other purposes incident to the operation of the S.A.F.Ry., but is to revert to grantor, or its assigns, if said railroad does not extend its present line from Miami to Homestead, or should said railroad be

---

[112] Govt's Cross-Motion, 24.

[113] The government's argument on these points is found at pages 24-29 (heading "D") in its Cross-Motion. The government's only reference to Florida law in support of its proposition is the 1999 Florida statute authorizing the state EPA to acquire greenways. This, as we show below, is utterly irrelevant.

subsequently abandoned and said property no longer used for railroad purposes."[114] Seaboard and its successors built the railway and passenger station on the land. But, in three transactions in 1984, 1985, and 1986, the railroad sold or donated portions of the land to non-railroads. Importantly, the railroad was still actively using other portions of the land for on-going operation of the railroad.

Polly Loveland, as successor in title to Redland, sued claiming that "the reversion clause was triggered by the [CSX's] sale of the parcels of the land." The trial court held that the railroad had not abandoned the property – and the reversion had not been triggered – because portions of the land were still being used for active operation of a railroad. The Florida Court of Appeals reversed and considered on appeal "the question before this court is whether selling portions of the property triggered the reverter clause so that the three parcels or the whole property should revert."[115] The court held that "once the parcels of property were sold the reversion clause was triggered but only as to those portions of property that were sold."[116]

The Florida court in *LOVELAND* held that "If property is sold, it can no longer be used for railroad purposes unless it is conveyed to someone who will use the land for a railroad purpose."[117] The court looked to the decision of the Washington Supreme Court in *LAWSON V. STATE*, 107 Wash.2d 444, 730 P.2d 1308 (1986), which the court cited for the holding, "sale of railroad right-of-way to county for use as hiking trail was not used for railroad purpose, and it constituted abandonment."[118] The Florida court looking to *LAWSON* is especially noteworthy as *LAWSON* (along with *POLLNOW*) were both embraced by the Federal Circuit in *PRESEAULT II* for

---

[114] *LOVELAND*, 622 So. 2d at 1121.
[115] *Id.* at 1122.
[116] *Id.* at 1123.
[117] *Id.* at 1122.
[118] *Id.* (emphasis supplied).

the same proposition that a railroad's sale of land to a County for a trail was an abandonment of the right of way by the railroad.

In *ATLANTIC COAST LINE R. CO. V. DUVAL COUNTY*, 114 Fla. 254, 154 So. 331, 332 (Fla. 1934) the Florida Supreme Court expressly held that a public highway is not a use permitted within the scope of a railroad right of way and, should a railroad right of way be opened to public use as a highway, it is an exercise of eminent domain for which the owner must be paid compensation.[119]

**3. The government's "'railbanking' is a railroad purpose" argument has been repeatedly rejected by every court to consider the argument.**

The government's argument that "recreational public-access trail use and 'railbanking' is a permissible 'railroad purpose'" is an argument the government makes in virtually every Trails Act taking case. This argument has been consistently and repeatedly rejected by every court that has ever considered the argument.[120] Today the government advances, yet again, this losing

---

[119] The court noted "two lines of authority" – "the first line holding that a railroad right of way is private property dedicated to a public use and that the opening of a highway across it constitutes an appropriation for a highway across it constitutes an appropriation for the use of a public for which compensation must be made in full to the owner, while the second line holds that a railroad right of way is by its very nature appropriated to one public use for highway purposes and that to authorize its further use for the public for highway purposes is not an appropriation of private property for a public use requiring compensation therefor. *** the rule prescribed by the first line of cases must be the law in this state." *ATLANTIC COAST LINE R. CO.*, 154 So. at 332.

[120] See *POLLNOW V. STATE*, 88 Wis. 2d 350, 276 N.W.2d 738 (Wisc. 1979); *LAWSON V. STATE*, 107 Wash.2d 444, 730 P.2d 1308 (Wash. 1986); *GLOSEMEYER V. UNITED STATES*, 45 Fed. Cl. 771 (2000); *TOEWS V. UNITED STATES*, 376 F. 3d 1371 (Fed. Cir. 2004); *PRESEAULT V. UNITED STATES*, 100 F.3d 1525 (Fed. Cir. 1996) (*PRESEAULT II*); *MICHIGAN DNR V. CARMODY-LAHTI REAL ESTATE, INC.*, 472 Mich. 359, 699 N.W. 2d 272 (Mich. 2005); among other cases.

argument. It should be, once again, rejected as it is an argument contrary to both Florida law and to the decisions of the Federal Circuit.[121]

In *PRESEAULT II*, the government sought to avoid paying compensation for the Trails Act conversion of a railroad right of way by arguing that "railbanking" was a permissible "railroad purpose" under federal law. The government lost this argument. The Federal Circuit "reject[ed] the Government's central thesis that general federal legislation providing for the governance of interstate railroads, enacted over the years of the Twentieth Century, somehow redefined state-created property rights and destroyed them without entitlement to compensation."[122]

---

[121] The government cites *CHEVY CHASE LAND* for the proposition that, "the courts have found that railbanking and interim trail use fall within the scope of a railroad easement." Govt's Memo at p. 17. The government is fond of this disingenuous argument claiming, as they do in this case, that *CHEVY CHASE LAND CO. V. UNITED STATES*, 733 A.2d 1055 (Md. 1999); *CHEVY CHASE LAND V. UNITED STATES*, 230 F.3d 1375 (Fed. Cir. 2000); *WASHINGTON WILDLIFE PRES., INC. V. MINNESOTA*, 329 N.W. 2d 543 (Minn. 1983); and *REIGER V. PENN CENTRAL CORP.*, No. 85-CA-11, slip op. (Ct. App. Greene County, Ohio, May 21, 1985) [available on WESTLAW, 1985 WL 7919] hold that recreational trail use and "railbanking" are permissible uses of an easement for railroad purposes.

However, these cases specifically involved an easement that was not limited to railroad purposes – a finding that was central to each holding. As such, it is fundamentally dishonest to claim that *CHEVY CHASE LAND* holds that "railbanking" and recreational trail use are within the scope of an easement limited to railroad purposes.

Indeed, the Maryland Supreme Court in *CHEVY CHASE LAND* took great pains to note that the easement at issue was not limited to railroad use. The Federal Circuit's application of the Maryland Supreme Court's decision held that, "The court unanimously held that the 1911 conveyance was an easement, and that the terms of the original conveyance were sufficiently broad to embrace its use as a recreational trail. *** Citing its law, the court held that since the easement is not limited in scope to railroad purposes, and embraces the current trail use." *CHEVY CHASE LAND*, 230 F.3d 1375. 1999 WL 1289099, *2. (emphasis supplied). See also *TOEWS*, 376 F. 3 at 1380, where the Federal circuit noted this point that the easement in CHEVY CHASE LAND was not limited to railroad purposes.

[122] *PRESEAULT II*, 100 F.3d at 1530. See also *WEBB'S FABULOUS PHARMACIES* 449 U.S. at 164, ("Neither the *** legislature by statute, nor the ***courts by judicial decree, may accomplish the result the [government] seeks simply by recharacterizing the" private funds as "public money").

After losing the argument that federal railroad regulatory law redefined state property rights in the land used for railroad rights of way, the government attempted to claim that "railbanking" and recreational trail use were a "railroad purpose" within the scope of an easement granted for the operation of a railroad under state law – in that case Vermont law. The government lost that argument as well. The Federal Circuit wrote, "We find no support in

---

To the extent that the government's reference to Florida Greenways Act of 1999 or the 1983 Amendments to the Trails Act as sources to define (or redefine) the meaning of a railroad, it is an attempt to argue the so-called "Shifting Public Use Doctrine". The Federal Circuit *en banc* held that "[property] interests were fixed at the time of their creation." *PRESEAULT II*, 100 F.3d at 1540 and the Federal Circuit went on to a lengthy consideration – and rejection – of the so-called "Shifting Public Use Doctrine" applied to Trails Act conversions of railroad rights of way to public trail use. (See, discussion at *PRESEAULT II*, 100 F.3d at 1541 – 44.)

The Federal Circuit specifically rejected the "Shifting Public Use Doctrine" in *PRESEAULT II* and noted with approval the state supreme court cases of *POLLNOW V. DNR*, 276 N.W. 2d. 738 (Wisc. 1979) and *LAWSON V. STATE*, 107 Wash. 2d 444, 730 P.2d 1308 (1986), that rejected the "Shifting Public Use Doctrine". The D.C. Circuit has similarly rejected this argument. See *NATIONAL WILDLIFE FOUNDATION*, 850 F.2d at 706 – 709.

The U.S. Supreme Court has rejected the notion that either Congress or a state may redefine existing property interests without incurring the Fifth Amendment's obligation to pay "just compensation" for the redefinition or destruction of the property. See, *LEO SHEEP CO. V. UNITED STATES*, 440 U.S. 668 (1979), ("This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation."); and *HASTINGS V. WHITNEY*, 132 U.S. 357 (1889) ("[A] tract lawfully appropriated to any purpose becomes thereafter severed from the mass of public lands, and that no subsequent law or proclamation will be construed to embrace it, or to operate upon it, although no exception be made of it, has been reaffirmed and applied by this court in such a great number and variety of cases that it may now be regarded as one of the fundamental principles underlying the land system of this country"). The Federal Circuit cited both of the forgoing cases and applied these holding to reject the government's attempt to argue that the federal Trails Act redefined a landowner's property interests. *HASH V. UNITED STATES*, 403 F.3d 1308 (Fed. Cir. 2005).

Vermont law for the proposition…that the scope of an easement limited to railroad purposes should be read to include public recreational hiking and biking trails."[123]

In *TOEWS*, the government argued that under California state law the "so-called shifting public use doctrine…transmogrif[ed] one type of easement into another." The Federal Circuit rejected this attempt and wrote, "a public transportation easement defined as one for railroad purposes is not stretchable into an easement for a recreational trail and linear park for skateboarders and picnickers, however desirable such uses may be for these linear strips of land."[124]

In *GLOSEMEYER V. UNITED STATES*, (consolidated for decision with *MOORE V. UNITED STATES* and *TOWN OF GRANTWOOD VILLAGE V. UNITED STATES*), the government attempted to argue that "railbanking" and recreational trail use were a "railroad purpose" under Missouri law. Judge Bruggink rejected this argument and noted, "trail use, by itself, would not constitute a railroad purpose. The transportation use contemplated by a railroad purpose would clearly be the movement of trains over rails. Recreational hiking, jogging and cycling are not connected with railroad use in any meaningful way."[125] "[The government] contends that holding out the possibility of a reactivation, even if remote and indefinite, is a railroad purpose in and of itself. This future potential use becomes a present railroad purpose in the view of the government."[126] The court rejected this contention, "In sum, neither component of railbanking – the preservation of the rail line for future use nor the 'interim' use of the easement as a recreational trail – constitutes a railroad purpose under Missouri law."[127]

---

[123] *PRESEAULT II*, 100 F. 3d at 1530.
[124] *TOEWS*, 376 F.3d at 1379.
[125] *GRANTWOOD*, 95 F.3d at 778.
[126] *Id.* at 781.
[127] *Id.*

The Federal Circuit similarly held,

> Realistically, nature trails are for recreation, not transportation. Thus when the State sought to convert the easement into a recreational trail, it exceeded the scope of the original easement and caused a reversion…the State's transparent attempt to retain property condemned for a narrow transportation use crumbled when it converted that property to a recreational trail…The United States and Vermont have converted a right to use the [landowners] land for a railroad into a right to hold the land in perpetuity. The vague notion that the State may at some time in the future return the property to the use for which it was originally granted, does not override its present use of that property inconsistent with the easement. That conversion demands compensation."[128]

As we show below, this "'railbanking' is a 'railroad purpose'" argument similarly fails as a matter of federal and Florida law and is contrary to the express terms of the Honore grant.

### 1. As a matter of plain English, "railbanking" and recreational trail use are not a "railroad purpose."

As the government acknowledges, "[u]nder the unambiguous language of the Honore Deed, Plaintiff's possibility of reverter is triggered only if the railroad 'shall abandon said land for railroad purposes.'"[129] We also note that the Honore Deed is even more explicit than Florida law generally because Adrian Honore specifically included a provision in his grant providing that reversion would occur if the "Seaboard Air Line Railway shall not construct upon said land <u>and commence operation</u> thereon within one year of the date hereof a line of railroad…(emphasis supplied).

Thus, it is fair to ask the question: What does "use for railway purposes" mean (as a matter of Florida law and as used by Adrian Honore) and is the Plaintiffs' land still being used for such purposes? We start with the basic question – what is the definition of a "railroad" or "railway"? We can look to three sources for the definition: the common dictionary meaning,

---

[128] *PRESEAULT II*, 100 F.3d at 1554 (J. Rader, concurring).
[129] Govt's Cross-Motion, 27.

Florida statutory law, and federal statute. In the context of the Honore deed, the meaning is even more definitively limited to active railroad operations.

### a) The definition of "Railway" and "Railroad"

The Oxford English Dictionary defines "railroad" as "a railway." "Railway" is, in turn, defined as "a way or road laid with rails."[130] Florida law defines a "Railroad" as "A carrier of persons or property upon cars operated upon stationary rails," and a "Railroad Train" as "A steam engine, electric or other motor, with or without cars coupled thereto, operated upon rails, except a streetcar."[131] The U.S. Congress has defined a railroad at 11 U.S.C.§ 101, (44) as follows, "The term 'railroad' means common carrier by railroad engaged in the transportation of individuals or property or owner of trackage facilities leased by such a common carrier."

As this Court recognized in a similar Trails Act taking case, "The term 'railroad purpose'…does not encompass other forms of transportation, such as walking or bicycling…The proposed development of a hiking, biking, cross-country skiing, and nature trail is completely unrelated to the operation of a railway and consistent only with an intent to wholly and permanently cease railway operations."[132]

### b) The definition of a "recreational trail"

The Oxford English Dictionary defines "recreation" as "an activity or pastime pursued" and "trail" as "a beaten track or path or track, esp. in a wild or uninhabited region. Also, a marked route through countryside, around a town, etc., indicating points of interest or historical significance."[133] "Hiking" is described as "to walk vigorously" and "biking" is described as

---

[130] THE NEW SHORTER OXFORD ENGLISH DICTIONARY (1993).
[131] Florida Statutes Annotated, § 316.003 (35) and (37).
[132] *GLOSEMEYER*, 45 Fed. Cl. at 779 (citing *BOYLES V. MISSOURI FRIENDS OF THE WABASH TRACE NATURE TRAIL, INC.*, 981 S. W. 2d 644 (Mo App. W.D. 1998).
[133] *Id.*

"ride on a bike."[134] The Florida Act §260.012 et. seq[135] defines "Greenways" and "trails" as something quite different from a railroad. The Act describes trails as "providing, where appropriate, recreational opportunities, including, but not limited to, equestrian activities, hiking, bicycling, canoeing, jogging, and historical and archaeological interpretation, thereby improving the health and welfare of the people."[136]

None of these terms include or reference anything that can be remotely characterized as having anything to do with operating a railroad. The Federal Circuit has recognized that these recreational activities are very different from those of a railroad, "It appears beyond cavil that use of these easements for a recreational trail – for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway – is not the same use made by a railroad, involving tracks, depots, and the running of trains."[137]

#### c) The definition of "railbanking"

"Railbanking" is not defined by The Oxford English Dictionary. "Railbanking" is a term created by federal law and is alien to Florida (and other state) law. There is no Florida statute or state case that ever uses the term "railbanking" to describe Florida law. Railbanking is the short-hand term that describes operation of 16 U.S.C. §1247(d), the 1983 Amendments to the Trails Act.[138] "Railbanking" is the preservation of a railroad corridor that is not being used by a railroad and relieving any railroad from responsibility for maintaining the corridor while it is

---

[134] *Id.*

[135] This Act is cited by the government for the proposition that "interim trail use is within the scope of a railroad's interest".

[136] Florida Statutes Annotated, § 260.012(1).

[137] *Toews*, 376 F.3d at 1376.

[138] See, generally, *Goos v. I.C.C.*, 911 F.2d 1283 (8th Cir. 1990); and *National Wildlife Foundation v. I.C.C.*, 850 F.2d 694 (D.C. Cir. 1988).

used by a non-railroad for a public trail. As such, by definition, "railbanking" does not mean operating a railroad. At most, it is the possibility that the STB may authorize that some unspecified railroad may build a rail line on the land at some indefinite point in the future.

This is even further qualified by the fact that it applies to any small "r" railroad. In other words, it is not specific to any existing operating railroad, such as CSX. The ability to construct a new rail line over this corridor in the future is not held exclusively by CSX. Rather, the right to construct a new railroad upon the land is held by the STB which has the authority to grant that request to any railroad, including the CSX's competitors. As such, "railbanking" is, by definition, not using the land for active railroad operations.

It is especially absurd to contend that "railbanking" is a use intended by Adrian Honore when he granted the Seaboard an easement to use his land for the operation of a railroad and expressly mandated that the railroad must be constructed and operation begun within one year or lose the right to use his land. There is absolutely no way that the concept of "railbanking" can be squared with Adrian Honore's explicit language.

#### d) Conclusion: "railbanking" and recreational trail use have nothing to do with the operation of a railroad and are not a "railroad purpose" as either a matter of Florida law or the terms of Adrian Honore's easement.

"'When *I* use a word,' Humpty Dumpty said in rather a scornful tone, 'it means just what I choose it to mean — neither more nor less.'" "'The question is,'" said Alice, "'whether you *can* make words mean so many different things.'" "'The question is,'" said Humpty Dumpty, "'which is to be master— that's all.'"[139] The parody LAWYERS HANDBOOK teaches that, "With regard to definitions, do not hesitate to define things in improbable ways. A good lawyer feels no compunction about defining 'person' to mean 'corporations, partnerships, and livestock';

---

[139] Lewis Carroll, *THROUGH THE LOOKING GLASS AND WHAT ALICE FOUND THERE*, 1871.

'automobile' to mean 'airplanes, submarines, and bicycles'; and 'cash' to mean 'stocks, bonds, and whiskey.'"[140]

Were we to follow the counsel of Humpty Dumpty or the *LAWYERS HANDBOOK* it may be possible to contend that a "locomotive" is a "bike," a "railroad" is a "hiking trail," and "railbanking," the non-use of an abandoned right of way by a non-railroad, is a "railroad purpose." However, such use of language empties words of their meaning and is an attempt to do precisely what the Supreme Court has said the sovereign cannot do – to redefine state property interests by *ipsi dixit* in an effort to avoid paying compensation. The sovereign may indeed redefine state property interests. However, when doing so destroys the citizens' property interest, "just compensation" must be paid.

**2. The 1983 Amendments to the Trails Act provided for railbanking and recreational trail use of abandoned railroad rights of way precisely because such uses were NOT a "railroad purpose" under existing state law.**

By arguing that both "railbanking" and recreational trail use are a "railroad purpose," the government is attempting to bootstrap into Florida law and the terms of the Honore Deed a concept invented by Congress in the 1983 Amendment to the Trails Act. This effort fails for the additional reason that it misinterprets the intent and meaning of the 1983 Trails Act Amendment. The 1983 Amendment to the Trails Act was adopted precisely because Congress understood that "railbanking" and recreational trail use were not a "railroad purpose" under state law. If "railbanking" and recreational trail use were a "railroad purpose" under state law, there would have been no need for the 1983 Amendment to the Trails Act.

---

[140] D. Robert White, Esq., *THE OFFICIAL LAWYER'S HANDBOOK*, Simon & Schuster, Inc. (1983), 185-86.

The United States Supreme Court and the United States Courts of Appeal have detailed at length the intent and operation of the 1983 Amendments to the Trails Act and how the Trails Act operates to work a taking of a landowner's "reversionary" right in their property.[141] We do not

---

[141] *PRESEAULT I*, 494 U.S. 1 (holding Trails Act to be constitutional but noting that the Fifth Amendment requires "just compensation" when §8(d) preempts a landowner's state law reversionary interest in land subject to rail to trail conversion.); *PRESEAULT II*. 100 F. 3d 1525 (holding that conversion of abandoned railroad easement to recreational trail use under the Trails Act was a compensable taking requiring payment of "just compensation"); *NATIONAL WILDLIFE FOUNDATION V. ICC*, 850 F2d 694 (D.C. Cir. 1988) (holding that Trails Act did not provide the ICC authority to compel a railroad to convert abandoned right of way to trail use when railroad did not agree to conversion and "that reversionary property owners whose property interests are defeated by the preemptive effect of the Trails Act upon state laws" have a claim for "just compensation" for the taking of their a taking of property); *CITIZENS AGAINST RAILS-TO-TRAILS V. SURFACE TRANSPORTATION BOARD*, 267 F. 3d 1144 (D.C. Cir. 2001) (STB's issuance of NITU is ministerial and is not subject to National Environmental Policy Act [NEPA]); *GOOS V. ICC*, 911 F.2d 1283 (8th Cir. 1990), (STB's issuance of NITU is ministerial and is not is not subject to NEPA); *JOST V. SURFACE TRANSP BD*. 194 F. 3d 79 (D.C. Cir. 1999) (holding that the STB "shall" impose a trail condition, and not permit abandonment of a line whenever a railroad is prepared to convey the right-of-way to a [trail sponsor]" the statute gives the [STB] 'little, if any, discretion to forstall a voluntary agreement to effect a conversion to trail use.'"); *NATIONAL ASSOCIATION OF REVERSIONARY PROPERTY OWNERS V. SURFACE TRANSPORTATION BOARD*, 158 F. 3d 135 (D.C. Cir. 1998) (holding that STB is not required to provide actual notice to landowners of a proposed rail-to-trail conversion and noting that, "[b]ut for the negotiation of a trail use agreement, state property law would be revived and, possibly, trigger the extinguishment of rights-of-way and the vesting of reversionary interests. When such a reversion is blocked, the interim trail use has been deemed a taking and the holder of a reversionary interest that does not vest because of a trail use may seek compensation in the United States Court of Federal Claims"); *RLTD V. SURFACE TRANSPORTATION BOARD*, 166 F. 3d 808 (6th Cir. 1999) STB does not retain jurisdiction of railroad lines that are not part of the national rail system and that "railbanking may be had only in conjunction with an abandonment application."); *BECKER V. SURFACE TRANSPORTATION BOARD*, 132 F. 3d 60 (D.C. Cir. 1997); *BIRT V. STB*, 90 F. 3d 580 (D.C. Cir. 1996) (the STB was without jurisdiction to issue a second NITU after its jurisdiction had terminated upon the railroad consummating abandonment under the original NITU.); *GRANTWOOD VILLAGE V. MO. PAC.* 95 F. 3d 654 (8th Cir. 1996) ("ICC's determination of abandonment is plenary, pervasive and exclusive of state law and federal law preempts state law on question of abandonment. *** State law claims can only be brought *after* the ICC has authorized an abandonment."); *FRITSCH V. I.C.C.*, 59 F. 3d 248 (D.C. Cir. 1995) (STB lost jurisdiction over abandoned railroad right of way when railroad abandoned right of way); *HASH V. UNITED STATES*, 403 F. 3d 1308 (Fed. Cir. 2005) (the General Railroad Right-Of-Way Act of 1875 granted railroads only an easement across public lands and the fee title was conveyed to Homesteaders, and their successors in title, who subsequently acquired title from