need to re-plow this ground other than to note several settled points of law relevant to the government's claim that "railbanking" is a railroad purpose under the law of Florida or that public recreational trail use is not inconsistent with the scope of an easement for a railroad purpose.

As the Court of Appeals for the D.C. Circuit noted in *NATIONAL WILDLIFE FOUNDATION V. ICC*, 850 F.2d 694, 698 (1988), "As originally enacted, the Trails Act made no specific provision for the conversion of abandoned railroad rights-of-way to trails. Congress's first effort to encourage this type of adaptive re-use appeared in § 809 of the Railroad Revitalization and Regulatory Reform ("4-R") Act of 1976."[142] Section 10906 of the 4-R Act authorized the ICC to delay disposition of abandoned railroad corridors for up to 180 days after an effective abandonment order "unless the property had been first offered on reasonable terms for sale for public purposes." *Id.* "Section 10906 is referred to as a "Public Use Condition."

Section 10906 did not, however, achieve Congress's hoped-for result. As the D.C. Circuit noted, "Section 10906 has no railbanking provision that would preempt state laws that could otherwise result in reversion of rights-of-way to abutting landowners upon a cessation of rail service."[143]

---

federal government. Trails Act conversion of these abandoned railroad rights of way to trail use required the government to pay landowners compensation for taking their property); *TOEWS V. UNITED STATES*, 376 F. 3d 1371 (Fed. Cir. 2004) (grant of easement to railroad did not include right to use property for recreational trail use and the Fifth Amendment mandated that owners of "reversionary" interest in abutting property be paid just compensation.), *CALDWELL V. UNITED STATES*, 391 F. 3d 1226 (Fed. Cir. 2005) (Fifth Amendment taking claim for compensation in Trails Act taking arose upon STB's issuance of NITU); *BARCLAY V. UNITED STATES* 443 F. 3d 1368 (Fed. Cir. 2006) (consolidated on appeal with *RENEWAL BODY WORKS V. UNITED STATES*) (reaffirmed holding in *CALDWELL* that taking claim arose upon STB issuing NITU).

[142] P.L. 94-210, Title VIII, 90 Stat. 144 (codified as amended at 49 U.S.C. §10906 (1982)).

[143] *NATIONAL WILDLIFE FOUNDATION*, 850 F.2d at 701.

The lack of a "railbanking" provision that preempted state laws providing for reversion created a "problem" in that railroad rights of way for which the railroad held an easement would be lost under state law when the railroad abandoned the right of way. For this reason, "Congress renewed its effort to promote the conversion of railroad rights-of-way to trail use when it enacted the current §8(d) as part of the 1983 Trails Act Amendments."[144] Section 8(d) was added to

> reflect[] the concern that previous congressional efforts have not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes. *** [this provision] should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use.[145]

"One of the major impediments to preserving these rights-of-way existed in state property laws which prescribed that once rail service is discontinued after the ICC's approval of abandonment, such easements would automatically expire and the rights-of-way would revert to adjacent property owners. In response to this problem, Congress enacted the Trails Act Amendments of 1983."[146] "By deeming interim trail use to be like discontinuance rather than abandonment, Congress sought to prevent property interests from reverting to the landowners under state law."[147]

---

[144] *Id.*

[145] H.R. Rep. No. 28, 98th Cong., 1st Sess. 8-9 (1983), *U.S. Code Cong. & Admin. News* 1983, 112. Congress adopted the Trails Act and the 4-R Act to address the loss of railroad rights of way. Congress was not alone in noting the decline of railroads in the 1970's. See Steve Goodman, *The City of New Orleans* (1970) ("And the steel rail still ain't heard the news. The conductor sings his songs again 'The passengers will please refrain: This train got the disappearing railroad blues.'" (Sung most famously by Arlo Guthrie on the album Hobo's Lullaby (1972)).

[146] *Grantwood Village v. Missouri Pacific Railroad Company*, 95 F.3d 654 (8th Cir. 1996).

[147] *Citizens Against Rails-to-Trails v. Surface Transportation Board*, 267 F. 3d 1144, 1149 (D.C. Cir. 2001), citing *Preseault I* 494 U.S. 1 at 8. See also *National Wildlife Foundation*, 850 F.2d at 702.

The United States Congress itself has made clear that the 1983 Amendments to the Trails Act were intended to pre-empt state law and that, when the Trails Act operated to preempt property rights enjoyed by landowners under state law, "just compensation" would be paid to the landowners. Congressmen Barr, then Chairman of the House Judiciary sub-committee holding hearings into the Trails Act noted:

> "[a]t first glance, it may appear Congress did not consider the fact that if the railroad land was not transferred in fee simple it may belong to the property owner, and not the railroad. However, Congress intended the railbanking aspect of this Federal law would preempt State law and hold the land essentially in perpetuity, until possible rail reactivation. In the 1996 *en banc* decision in *PRESEAULT v. UNITED STATES*, involving the same plaintiffs as in the Supreme Court case I just mentioned, the U.S. Court of Appeals for the Federal Circuit held that railroad abandonment constituted a *per se* taking, and therefore would require payment of just compensation to the affected land owners, under the Fifth Amendment.[148]

Here is the point. It is beyond dispute that Congress, the United States Supreme Court and the Courts of Appeal all understand that the "railbanking" provision of the 1983 Trails Act Amendment was intended to preempt contrary state law and, in so doing, to take the reversionary property owner's interest in their land. If "railbanking" and interim recreational trail use were understood to already be a "railroad purpose" under existing state law, there would have been no "problem" with the Trails Act that Congress needed to "fix" with the 1983 Amendment.

---

[148] U.S. House of Representatives, Judiciary Committee, Subcommittee on Commercial and Administrative Law, "LITIGATION AND ITS EFFECT ON THE RAILS-TO-TRAILS PROGRAM," Statement of Chairman Barr, June 20, 2002.

## B. It is Not Necessary to Establish that the Railroad has Abandoned the Right of Way. But, to the Extent that Abandonment is Considered, it is Absolute and Unequivocal that the Former Seaboard Air Line Railway Right of Way has been Abandoned for Any Railroad Use as a Matter of Fact and as a Matter of Law.

### 1. It is not necessary to establish that a railroad right of way was abandoned in order for landowners to bring a claim for the Trails Act taking their reversionary interest in their land.

The government spends six and one-half pages in their Cross-Motion contending that "the subject corridor is still being used for a railroad purpose and has not been abandoned."[149] This is both inaccurate and unnecessary.

The Federal Circuit in *PRESEAULT II* wrote, "we find the question of abandonment is not the defining issue, since whether abandoned or not the Government's use of the property for a public trail constitutes a new, unauthorized use."[150] The Federal Circuit again reiterated this point in *TOEWS*:

> Further, it is the Government's view that, under California law, there was no abandonment or extinguishment of the easements caused by the federal actions under §8(d) of the [Trails Act]. The trial court concluded that, as a factual matter, the railroad's management had acted in an unequivocal and decisive manner clearly showing an intention to abandon that section of the line. *** However, just as the trial court itself indicated that its conclusion on this matter was not necessary to the result reached, for the reasons that follow we need not definitively decide this issue either."[151]

The Federal Circuit expressly held in a Trails Act taking cases involving three separate trails, the landowners' taking claim arose upon issuance of the NITU even though "the railroad continued to use the right-of-way for railroad purposes after the NITU was issued" and the railroad had not abandoned the right of way.[152] "But even if under state law, the reversion would not occur until after federal authorization of abandonment, that state law reversion was still

---

[149] Govt's Cross-Motion, 28.
[150] *PRESEAULT II*, 100 F.3d at 1549.
[151] *TOEWS*, 376 F.3d at 1375 – 76.
[152] *BARCLAY V. UNITED STATES*, 4432 F.3d 1368, 1374 (Fed. Cir. 2006).

delayed by the issuance of the NITU, and the claim still accrued with the issuance of the NITU. It similarly makes no difference that the railroad use may have continued after the NITU issued. The termination of railroad use was still delayed by the NITU." *Id.*

**2. To the extent that a showing of abandonment is necessary, the Seaboard Air Line Railway has been absolutely and unequivocally abandoned as a matter of fact.**

Both parties agree that in order for the railroad to abandon a right of way, there must be an intent to relinquish together with external acts by which the intent is carried into effect. The focus on "intent" is important because it focuses on the "intent" of the specific railroad that holds the easement at issue. In the case of the former Seaboard right of way, the railroad is Seminole Gulf and CSX. So, when determining whether this railroad easement was abandoned, we look to the actions of Seminole Gulf and CSX.

The government twice claims, "Plaintiffs also fail to show that the railroads took any action in furtherance of intent to abandon the subject corridor."[153] (emphasis supplied).

Humm. Let's see. The government agrees that "the railroad ceased active service on the corridor and removed the rails and ties."[154] The government agrees that the CSX and Seminole Gulf have quitclaimed any interest in the right of way to a non-railroad, The Trust for Public Land and subsequently Sarasota County. The government agrees that the federal STB has authorized Seminole Gulf to abandon all railroad operations over the former right of way. The government agrees that the right of way is now being operated as a public recreational hiking and bicycling trail. The government agrees that "there has been no traffic on the line since March 14, 2002, and there have been no rail movements over the last three miles of the line for over 10

---

[153] Govt's Cross-Motion, 31.
[154] *Id.*

years" and that "there is little likelihood of traffic returning to the line and that there is interest in developing the right-of-way for trail use."[155] "The last delivery to a shipper via the line was on March 14, 2002" when…[156] "All of the former shippers have moved elsewhere or use other arrangements for their traffic;…Because of residential and recreational development of the land along the right-of-way there are few, if any, parcels available for industrial development for new rail shippers…It is clear that the lack of traffic, and the development of the area around the Subject Line that there is little likelihood of there ever being a future demand for local rail service over the Subject Line …there are no shippers remaining on the Subject Line, and no prospects of future shippers."[157] (emphasis supplied). Indeed, the forgoing statements are taken from the government's own pleadings.

It is difficult to imagine what else the CSX and Seminole Gulf could have done to more clearly establish their intent to abandon the right of way for railroad purposes. As we show below, as a matter of settled Florida law, the railroad right of way has been absolutely and unequivocally abandoned.

### 3. To the extent that a showing of abandonment is necessary, the Seaboard Air Line Railway has been absolutely and unequivocally abandoned as a matter of law.

In making the argument that the CSX and Seminole Gulf have not abandoned the right of way the government faces an insurmountable obstacle – Florida law and especially *LOVELAND V. CSX TRANSPORTATION, INC.* The *LOVELAND* decision is on all fours with the issue before the Court today and settles the issue beyond dispute. The court held that "once the parcels of

---

[155] STB, Notice of Interim Trail Use or Abandonment, April 2, 2004, STB Docket No. AB-400 (Sub-No. 3x), 1 - 2. Attached in its entirety to Govt's Memo as Exhibit 4 (Hereafter, "NITU"). See also, Abandonment Petition, 3.
[156] STB Environmental Assessment.
[157] Abandonment Petition, 4-6.

property were sold the reversion clause was triggered but only as to those portions of property that were sold."[158]

The Florida court in *LOVELAND* held that "If property is sold, it can no longer be used for railroad purposes unless it is conveyed to someone who will use the land for a railroad purpose."[159] The court looked to the decision of the Washington State Supreme Court in *LAWSON v. STATE*, 107 Wash.2d 444, 730 P.2d 1308 (1986), which the court cited for the holding, "sale of railroad right-of-way to county for use as hiking trail was not used for railroad purpose, and it constituted abandonment."[160] The Florida court looking to *LAWSON* is especially noteworthy as *LAWSON* (along with *POLLNOW*) were both embraced by the Federal Circuit in *PRESEAULT II* for the same proposition.

The Federal Circuit *en banc* held that the railroad had abandoned the railroad easement when, in *PRESEAULT II*, 100 F.3d at 1547, the "Vermont Railway ceased using the easement for active transport operations and used the tracks solely to store railroad cars…Vermont Railroad removed the rails and other track materials from the segment of line crossing the Preseault's property."[161] The Federal Circuit went on, *en banc*, to note that, "While it is not disputed that an easement will not be extinguished through mere non-use, removing the tracks and switches from a railway cannot be termed non-use. Non-use of the easement began in 1970; abandonment occurred, as evidenced by the more permanent lack of operability, in 1975 [upon removal of the tracks]."[162]

---

[158] *LOVELAND*, 622 So.2d at 1123.
[159] *Id.* at 1122.
[160] *Id.* (emphasis supplied).
[161] *PRESEAULT II*, 100 F.3d at 1547.
[162] *Id.* at 1553 (concurring opinion of Judge Rader joined by Judge Lourie).

The government, understandably, does not like *LOVELAND* (or *PRESEAULT II*). They seek to avoid the clear and directly on-point holding of *LOVELAND* by claiming that *LOVELAND* "supports the Defendant's position, not the Plaintiff's position."[163] The government further attempts to redefine *LOVELAND* by claiming that, "Although the court recognized that private non-public uses of a railroad corridor were not 'railroad purposes,' the court expressly stated that, under Florida law, a 'railroad purpose' is one which is primarily for the benefit of the public, and not a private individual.'"[164]

As such, the government is seeming to claim that: "Loveland holds that because a railroad serves a "public purpose" therefore, any public purpose – such as a park or trail – since it is a "public purpose", is also a "railroad purpose" and that so long as a railroad right of way is used for such a "public purpose" – however broadly or loosely that may be defined – there has been no abandonment because it is still being used for a "public purpose."[165]

The most powerful antidote to this bizarre misreading of *LOVELAND* by the government is to simply read the court's decision.

The court's opinion in *LOVELAND* is clear, direct and well written. *LOVELAND* stands for the straight forward (and widely held) principle that when a railroad sells a portion of land which is subject to a right of reversion when the land is no longer used for a "railroad purpose" to a non-railroad, the event of selling the property to a non-railroad means the right of reversion has been triggered. This is so even when the railroad continues to use another portion of the land for active operation of a railroad. In reaching this conclusion, the *LOVELAND* court specifically

---

[163] Govt's Cross-Motion, 26, quoting from *CANNCO CONTRACTORS, INC V. LIVINGSTON*, 669 S.W.2d 457, 460 (Ark. 1984).
[164] Govt's Cross-Motion, 26-27.
[165] *Id.*

embraced the holding of the Washington State Supreme Court in *LAWSON* which held that a railroad right of way is abandoned when it is sold to a county for a recreational trail.

We welcome the government's attempt to import into the *LOVELAND* court's opinion the reasoning of the Arkansas Supreme Court in *CANNCO CONTRACTORS V .LIVINGSTON*, 282 Ark. 438, 669 S.W.2d 457 (Ark., 1984). *CANNCO* involved two deeds which the court held to grant the Missouri Pacific Railroad an easement to use a right of way "for so long as 'used for the purposes of a railroad and no longer.'"[166] The land was a large tract that was the location of two businesses and also a right of way upon which the MoPac had laid tracks and over which it operated a railroad. Livingston acquired a deed to the entire parcel of land from the MoPac and Cannco acquired a deed to the entire parcel from the heirs of the original grantor that held the fee estate subject to the easement. After the sale, Livingston continued to use the railroad line to service their business and MoPac continued to run trains on this section of rail line under an "industrial track agreement with Livingston." The MoPac had, however, stopped paying taxes on the land.

On these facts, Cannco claimed that the railroad easement had been abandoned. The trial court disagreed and held that the railroad tracks were still in use and the MoPac continued to run trains over the land, albeit for the benefit of Livingston. The Arkansas Supreme Court disagreed and held that the "railroad purpose" and the easement had terminated and had been abandoned when the MoPac sold the right of way to Livingston. This was so even though the line and tracks were still in existence and even when the MoPac continued to operate trains over the railroad line for which the MoPac "derived an incidental benefit." The court reached this

---

[166] *CANNCO*, 669 S.W. 2d at 458.

conclusion because, "when [the grantor] granted the easement to the railroad a public corporation…they [did not] intend for 'railroad purposes' to include private enterprise."[167]

So, here is the point. If we read *LOVELAND* through the lens of the Arkansas Supreme Court's opinion in *CANNCO*, the *LOVELAND* holding is even more powerful support for the Plaintiffs. And, by no means does the *LOVELAND* court's reference to *CANNCO* support the government's attempt to read *LOVELAND* as holding that a railroad easement is not abandoned so long as the public is making some use of the land.

In *ATLANTIC COAST LINE R. CO. V. DUVAL COUNTY*,[168] the Florida Supreme Court expressly rejected the government's argument that a public highway is a use permitted within the scope of a railroad easement.[169]

Under any standard, CSX and Seminole Gulf's actions are definite and conclusive. As a matter of law and as a matter of fact, CSX and Seminole Gulf abandoned the Sarasota County right of way. The government's sole point in rebuttal is that – by virtue of the Trails Act and the STB's continued jurisdiction – it remains a possibility that some railroad may use this land at some indefinite point in the future for a railroad. Under Florida law this does not mean that the CSX and Seminole Gulf have not abandoned the right of way. And, as the Federal Circuit noted, "The vague notion that the State [in this case the County] may at some time in the future return the property to the use for which it was originally granted, does not override its present use of the property inconsistent with the easement. That conversion demands compensation."[170]

---

[167] *Id.* at 459.
[168] *Supra* p.40.
[169] See the quoted portion of the Court's decision above at note 119.
[170] *PRESEAULT II*, 100 F.3d at 1354 (J. Rader concurring).

## VII. CONCLUSION

By reason of the STB's issuance of the NITU pursuant to the Trails Act, the Plaintiffs' "reversionary" right to their land was taken and their land was burdened with new easements for a public recreational trail and "railbanked" for a possible future railroad. The federal government may indeed take these citizens land in this manner but the Fifth Amendment of the United States Constitution requires that they receive "just compensation" for this taking of their property. Accordingly, the Plaintiffs' motion for partial summary judgment on the question of the government's liability should be granted and the government's cross-motion seeking to exonerate the government from liability for this taking of property without paying "just compensation" should be denied.

| | |
|---|---|
| Date: August 6, 2008 | LATHROP & GAGE L.C.<br><br>By /s/ Mark F. (Thor) Hearne, II<br><br>MARK F. (THOR) HEARNE, II<br>LINDSAY S.C. BRINTON<br>MEGHAN S. LARGENT<br>10 South Broadway, Suite 1300<br>St. Louis, MO 63102-1708<br>(314) 613-2500<br>(314) 613-2550 (fax)<br>Thornet@ix.netcom.com<br><br>ATTORNEYS FOR PLAINTIFFS<br><br>PROFESSOR DALE A. WHITMAN<br>University of Missouri<br>School of Law<br>203 Hulston Hall<br>Columbia, Missouri 65211<br>573-884-0946<br>Whitmand@missouri.edu<br>OF COUNSEL FOR PLAINTIFFS |

# Appendix "A"

## Other state court decisions holding similar instruments as conveying only an easement and not a fee estate in the land.

*HARVEST QUEEN MILL & ELEVATOR V. SANDERS*, 189 Kan. 536, 541-42, 370 P.2d 419, 423-24 (Kan. 1962).

"We have held that when land is devoted to railroad purposes it is immaterial whether the railway company acquired it by virtue of an easement by condemnation, right-of-way deed, or other conveyance. If or when it ceases to be used for railway purposes the land concerned returns to its prior status as an integral part of the freehold to which it belonged prior to its subjection to use for railway purposes. This court has uniformly held that railroads do not own fee title to narrow strips taken as right-of-way, regardless of whether they are taken by condemnation or right-of-way deed. The rule is in conformity with this state's long-standing public policy and gives full effect to the intent of the parties who execute right-of-way deeds rather than going through lengthy and expensive condemnation proceedings. Generally, **a railroad company in acquiring land for railroad right-of-way, whether it be by grant or condemnation proceedings, is held to take not the fee, but only a special interest therein usually termed an "easement," which special interest or title is taken for railroad purposes**, that is, public purposes, so that the railroad has no right to take from such right-of-way any underlying minerals and appropriate them to its own use or convey them to others." (emphasis supplied) (numerous citations omitted)"

*BROWN V. WEARE*, 348 Mo. 135, 152 S.W. 2d 649 (1941), ("There can be no dispute, nor is there any, that this deed so far as the right of way is concerned granted the railroad company an easement only. This is established by the terms of the deed granting a 'right of way' and then further clinched by the provision limiting the use of the grant for railroad purposes. The law is settled in this state that where a railroad acquires a right of way whether by condemnation, by voluntary grant or by a conveyance in fee upon a valuable consideration the railroad takes but

a mere easement over the land and not the fee.") *SCHUERMANN ENTERPRISES, INC. V. ST. LOUIS COUNTY*, 436 S.W. 2d 666 (Mo. 1969) (In a case construing a Warranty Deed from a land owner to a railroad, the court held that only an easement was conveyed, notwithstanding the fact that the instrument was in the form of a general warranty deed and the railroad paid valuable consideration. "Railroads may hold, purchase, or convey the fee in land when the acquisition is by general warranty deed without any restriction on the quantum of title conveyed and for a valuable consideration, but where the acquisition is for right of way only, whether by condemnation, voluntary grant or conveyance in fee upon a valuable consideration, the railroad takes only an easement over the land and not the fee. Such easement is extinguished when the railroad ceases to run trains over the land, and, upon that occurrence, the use of the land is again in the original owner or his grantees, free of the burden of the easement." At 669 (citations omitted.),

*BUHL ET. AL V. U.S. SPRINT COMMUNICATIONS CO.* 840 S.W. 2d 904 (Tenn 1992), (Right-of-way acquired by condemnation "is a grant of an easement and the title to the easement, and nothing more… the fee, under this construction, remained with the owner, the railway acquiring a mere easement. *** An easement merely gives to a railroad company a right of way in the land – that is, the right to use the land for its purposes." At 909. (internal citations omitted),

*HIGHLAND REALTY CO. V. CITY OF SAN RAFAEL*, 46 Cal. 2d 669, 298 P.2d 15, 20 (1956) ("the grant of land as a right of way recognizes nothing but an easement. *** [T]he grant by [fee owner] to the railroad of a right of way 'upon, over, and along a strip of land' conveyed only an easement, and not the underlying land. Further, the general rule is that 'in construing contracts and deeds for railroad rights of way such deeds are usually construed as giving a mere right of way, although the terms of the deed would be otherwise apt to convey a fee." (citing, *COOPER V. SELIG*, 48 Cal. App. 228, 191 P. 983, *SAN RAFAEL RANCH CO. V. RALPH ROGERS CO.* 154 Cal. 76, 96 P. 1092 (1908), *Coon v. Sonoma Magnesite Co.* 183 Cal. 597 189 P. 271 (1920), *PEOPLE, BY AND THROUGH DEPARTMENT OF PUBLIC WORKS V. THOMPSON*, 43 Cal 2d 13, 271 P. 2d 507 (1954), *OCEAN SHORE RAILROAD V. DOELGER*, 127 Cal. App. 2d 392, 274 P.2d 23 (1954), *MOAKLEY V. LOS ANGELES PACIFIC RY. CO.* 139 Cal. App. 421, 34 P.2d 218 (1934), *TAMALPAIS LAND & WATER CO. V. NORTHWESTERN PAC. R. CO.* 73 Cal. App. 2d 917,

167 P.2d 825 (1946), *THOMPSON ON REAL PROPERTY*, Perm. Ed., Vol. 2, pp. 11-12, 461 and p. 14, 462 and 132 A.L.R. 142-187.)

*BROWN V. PENN CENTRAL CORP.* 510 N.E. 2d 641, 644 (Ind. 1987), ("A deed that conveys a right generally conveys only an easement. The general rule is that a conveyance to a railroad of a strip, piece or parcel of land, without additional language as to the use or purpose to which the land is to be put or in other ways limiting the estate conveyed, is to be construed as passing an estate in fee, but reference to a right-of-way in such a conveyance generally leads to its construction as conveying only an easement." Citing *RICHARD S. BRUNT TRUST V. PLANTZ*, Ind. App. 458 N.E.2d 251 (1983), *L&G REALTY & CONSTRUCTION CO. V. INDIANAPOLIS*, 127 Ind. App. 35, 139 N.E.2d 580 (1957).

*NEIDER V. SHAW* 138 Idaho 503, 530, 65 P.3d 525 (Idaho 2003) ("[A] substantive provision of the conveyance instrument, in handwriting, grants a "right of way" to the Railroad, which this Court has identified as language that creates an easement. The conveyance instrument from the Bows to the Railroad granted an easement to the Railroad rather than a fee simple."

*SHERMAN V. PETROLEUM EXPLORATION*, 280 Ky. 105, 132 S.W.2d 768, 770 (1930) ("In the problem of construction of any deed, the test is that of intention, which is to be gathered from the context of the instrument, read in those lights which are properly employed in construing writings. We think it may be well said that an indefinite or ambiguous conveyance of land specifically for a railroad right of way is in its 100 F.3d at 1547 interpretation subject to the influence of a general knowledge that much railroad right of way is expressly or by operation of law limited to an easement, which has been usually found sufficient for the purpose desired.")

*MICHIGAN DEPT. OF NATURAL RESOURCES V. CARMODY-LAHTI REAL ESTATE, INC.*, 699 N.W.2d 272 (Mich. 2005). ("We think the court below was correct in holding that the deed conveyed an easement only, and not a fee. It does not purport to convey a strip of land 40 feet wide, etc., but the right of way over a strip 40 feet wide. *** Although our sole concern is the intent of the parties as manifested in the plain language of the deed at issue here, it is worth noting that this analysis of the deed is consistent with our prior jurisprudence in this

area. In general, this Court has construed deeds that purport to convey a right-of-way as transferring an easement. In fact, we have been unable to discover a *single* case in which this Court construed a deed conveying a "right of way" as transferring a fee estate, and plaintiff has directed us to none.

In *JONES V. VAN BOCHOVE*, 103 Mich. 98, 61 N.W. 342 (1894) for example, the court considered a deed with a granting clause that conveyed

> "[a]ll that certain piece or parcel of land situate * * * and described as follows, to wit: The right of way for a railroad, running from the marl bed of said cement company to their works, on the west side of the Kalamazoo river, and described as follows: 'A strip of land 40 feet wide * * * and 952 feet in length.[']  *Id.* at 100, 61 N.W. 342. See also *WESTMAN V. KIELL*, 183 Mich. App. 489, 494, 455 N.W.2d 45 (1990), holding that a deed conveying a " 'right of way *upon* and *across* lands of Henry Salee ... for the uses and purposes of said Railroad Company' " transferred an easement rather than a fee. (Emphasis in original).

The court held that this granting clause conveyed an easement rather than a fee, noting that the deed "does not purport to convey a strip of land 40 feet wide, etc., but *the right of way over a strip 40 feet wide.*" *JONES*, 103 Mich. at 100, 61 N.W. 342. (Emphasis added).  The court determined that the following language conveyed an easement rather than a fee estate:

> "That the said parties of the first part, for and in consideration of the future construction, continued maintenance and operation of a first-class, standard-gauge steam railroad (over which shall be transported passengers and freight) within the time, limits and conditions hereinafter to be defined, ... have granted, bargained, sold and conveyed and by these presents do grant, bargain, sell, convey and quitclaim unto the party of the second part, his successors or assigns, *for a right of way for a railroad forever* ...."  (citing *JONES V. VAN BOCHOVE*, 103 Mich. 98, 61 N.W. 342 (1894)).

.