# In the United States Court of Federal Claims

No. 07-273L
No. 07-426L
(Filed November 23, 2009)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| STEPHEN J. and LINDA L. ROGERS, DONALD E. and JUDITH DURAN, DENISE RIZZO, DWIGHT and CAROLYN AUSTIN, KATHY BECKER, ANNE EDWARDS, EDWARD and JANICE FATICA, OWEN and LAURA HARNEY, JAN and KARIN HEITMANN, KENNETH and M. WETZEL STITT, EGBERT and BARBARA VON PAPEN, for Themselves and As Representatives of a Class of Similarly Situated Persons, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | Motion For Partial Summary Judgment; Class Action; Fifth Amendment Takings; Trails Act; 16 U.S.C. § 1247(d); Florida Law; Fee Simple; Right-of-Way; Creation of Easement Under Florida Law; Prescriptive Easement; Abandonment of Easement; Equitable Estoppel; Reversion. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\* \* \* \*

BIRD BAY EXECUTIVE GOLF CLUB,
INC., NATHAN and DEBORAH CHILDERS,
MCCANN HOLDINGS, LTD., PALMER
RANCH HOLDINGS, LTD., MISSION
VALLEY GOLF AND COUNTRY CLUB, INC.,
DENNIS T. and MARY ANN MARLIN
REVOCABLE TRUSTS dated July 15, 2000, A.
MERLE CLARK GLUECK TRUST dated
February 26, 1996, JMC-REAL ESTATE
HOLDINGS, LLC,

Plaintiffs,

```
                                              *
                      v.                      *
                                              *
THE UNITED STATES,                            *
                                              *
                 Defendant.                   *
                                              *
* * * * * * * * * * * * * * * * * * ** * * * *
```

    <u>Mark F. (Thor) Hearne, II</u>, <u>Lindsay S.C. Brinton</u> and <u>Meghan S. Largent</u>, Lathrop & Gage, LLP, 10 South Broadway, Suite 1300, St. Louis, MO, for Plaintiffs.

    <u>Kelle S. Acock</u> and <u>William Shapiro</u>, Natural Resources Section, Environmental and Natural Resources Division, U.S. Department of Justice, P.O. Box 663, Washington DC, for Defendant.

---

## OPINION AND ORDER

---

**<u>WILLIAMS</u>**, Judge.

    In this action, Plaintiffs claim that the Government effected a taking of their property when it converted an inactive railroad right-of-way to a recreational trail, pursuant to the National Trails System Act Amendments of 1983 ("Trails Act"). Plaintiffs claim that their predecessor owners granted easements to the Seaboard Air Line Railway for the sole purpose of operating a railroad, and that once these rights-of-way were no longer used for railroad operations, they obtained the exclusive right to physical ownership, possession, and use of this property.

    Currently before the Court are the parties' cross-motions for partial summary judgment.[1] Because some Plaintiffs have established a taking, they are due compensation under the Fifth Amendment. One of the named Plaintiffs -- Mission Estates Homeowners' Association, Inc. ("Mission Estates") -- has not demonstrated a taking based upon the record on summary judgment,

---

[1] This decision concerns two actions that relate to the same railroad corridor. On December 14, 2007, this Court consolidated the actions for proceedings on liability. The first filed action, <u>Rogers v. United States</u>, No. 07-273L, was certified as a class action on November 21, 2007, and over 300 plaintiffs have opted to join the class. The instant motion in <u>Rogers</u> concerns the 21 named <u>Rogers</u>' Plaintiffs -- the class representatives -- who own 13 parcels of land.

The second action, <u>Bird Bay Executive Golf Club, Inc. v. United States</u>, No. 07-426L, has not been certified as a class action, and the pending motion concerns the parcels of land owned by the nine named <u>Bird Bay</u> Plaintiffs. Because some of the Plaintiffs are joint owners of the parcels at issue, 21 parcels of land owned by 30 named Plaintiffs are the subject of the instant motions.

and Defendant has not established that this Plaintiff is foreclosed from recovery as a matter of law. Further, the issue of whether a different Plaintiff, Bird Bay Executive Golf Club, Inc. ("Bird Bay"), has a cognizable property interest in the right-of-way under Florida law is not amenable to disposition on summary judgment at this juncture.

Accordingly, Plaintiffs' Motions for Partial Summary Judgment are granted in part. Defendant's Cross-Motion for Summary Judgment is denied without prejudice.[2]

## Background[3]

### The Railroad Right-of-Way

Beginning in 1910, the Seaboard Air Line Railway ("Seaboard") acquired the right to operate a railroad line between the cities of Sarasota and Venice, Florida via a series of conveyances with multiple landowners. Def.'s Cross-Mot. for Partial Summ. J. and Mem. in Supp. of its Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Partial Summ. J. ("Def.'s Mot.") Ex. 1; Pls.' Proposed Findings of Uncontroverted Fact ("Pls.' PFUF") Exs. A to I. The railroad line was used for, among other things, the operation of trains for the Ringling Brothers Circus. No railroad traffic has moved over this railroad line since March 2002, and Plaintiffs allege that it is unlikely that traffic will return to the line. Rogers Am. Compl. ¶ 8, Ex. B.; Bird Bay Am. Compl. ¶ 8.

### The Railroad's Petition to "Abandon" the Corridor

On December 15, 2003, the successor to Seaboard, Seminole Gulf Railway, L.P. ("SGLR"), filed a petition with the Surface Transportation Board ("STB") to abandon an approximately 12.43 mile portion of its railway corridor between Sarasota and Venice, Florida. Pls.' Response to Jan. 15, 2009 Order Requesting Supplemental Briefing ("Pls.' Resp. to Jan. 15, 2009 Order") Ex. 3(b).[4] According to SGLR's petition, CSX was the "underlying landowner" of this portion of the railroad corridor. Id.

---

[2] Defendant's single cross-motion addressed the claims raised by Plaintiffs in both Rogers and Bird Bay as Defendant filed its cross-motion after the Court consolidated the actions.

[3] This background is derived from the parties' pleadings, motion papers and the attachments thereto.

[4] A railroad may abandon a right-of-way by either: (1) filing a standard abandonment application with the STB that meets the requirements of 49 U.S.C. § 10903; or (2) seeking an exemption under 49 U.S.C. § 10502. Caldwell v. United States, 391 F.3d 1226, 1228 (Fed. Cir. 2004). "The [STB] has authority to regulate the construction, operation, and abandonment" of the majority of the railroad lines in the United States. Id. SGLR's petition sought an exemption under 49 U.S.C. § 10502 from the prior approval requirements of 49 U.S.C. § 10903 to effect the abandonment. Pls.' Resp. to Jan. 15, 2009 Order Ex. 3(b).

On April 2, 2004, the STB issued a Decision and Notice of Interim Trail Use or Abandonment ("NITU") wherein SGLR and CSX -- as successors and assigns of Seaboard -- granted the Trust for Public Land ("the Trust"), a national, nonprofit, land conservation organization, an option to acquire the railway right-of-way for conversion to a trail. Rogers Am. Compl., Ex. B; Bird Bay Am. Compl., Ex. B.[5]   The Trust agreed to work with Sarasota County to convert the right-of-way into a public access recreational trail.  On January 13, 2005, CSX and the Trust, in reliance upon the NITU, executed a quitclaim deed to effect this conversion.  Rogers Am. Compl, Ex. C; Bird Bay Am. Compl, Ex. C.  The quitclaim deed affects the property owned by Plaintiffs and states that the premises covered by the deed "remain subject to the jurisdiction of the STB for purposes of reactivating rail service."  Rogers Am. Compl, Ex. C; Bird Bay Am. Compl, Ex. C.

**The Landowners**[6]

Plaintiffs claim that the landowners in both <u>Rogers</u> and <u>Bird Bay</u> acquired their parcels prior to the STB's issuance of the NITU on April 2, 2004.   With the exception of Plaintiff Mission Estates, Defendant does not dispute that when the STB issued the NITU on April 2, 2004, the landowners owned property that abutted the railroad corridor. Def.'s Resp. to Pls.' PFUF at 14; Pls.' Resp. to May 1, 2009 Order Ex. A.[7]  In contending that Mission Estates owned property that abuts the railroad corridor on April 2, 2004, Plaintiffs submitted a copy of an indenture, as well as an associated plat, conveying property to Mission Estates Homeowners Association, Inc. in Sarasota County, Florida on March 17, 2000.  Pls.' PFUF in Resp. To Government's Cross-Mot. For Summ. J. Tab 2, Tab 3.  However, Plaintiffs failed to produce evidence that Mission Estates owned this

---

[5]  The grant of such petition does not constitute a common law abandonment because the property may be reactivated for future rail service under the statute.  <u>See</u> 49 U.S.C. § 10903.  Specifically, Section 8(d) of the Rails to Trails Act established a mechanism known as "railbanking," whereby railroads ceasing operations on particular lines would convey the lines to qualified entities to operate the rights-of-way as interim recreational trails pending future reactivation of rail service.  16 U.S.C. § 1247(d); <u>see</u> <u>Preseault v. Interstate Commerce Comm'n</u>, 853 F.2d 145, 147 (2d Cir. 1988).

[6]  Although these actions concern the claims of numerous landowners, the motions <u>sub judice</u> concern only the claims of the named Plaintiffs.  For the sake of convenience, the Court refers to these named Plaintiffs collectively as "landowners."

[7]  Plaintiffs proffered a "chart . . . referencing the citation to the record by which the government admitted that the respective Plaintiff owned the land on April 2, 2004 and the citation to the relevant deeds and other title documents in the record that evidence such ownership."  Pls.' Jan. 16 Resp. to Jan. 15, 2009 Order at 2.  Defendant did not admit that Mission Estates owned property adjacent to the railroad corridor on April 2, 2004.  <u>Id.</u> Ex. A.  Further, although Plaintiffs posited that "[t]here has been no subsequent conveyance of this land" owned by Mission Estates, they have not proffered a declaration, affidavit, or other documentation that supports this contention.  Pls.' Resp. to May 1, 2009 Order at 3.

property four years later at the time of the alleged taking on April 2, 2004.  See Pls.' Resp. to May 1, 2009 Order at 3.  Defendant disputes that this landowner holds "any reversionary interest in the railroad corridor itself."  Def.'s Resp. to Pls.' PFUF at 14.

## The Honore Conveyance

The railroad right-of-way adjacent to all parcels except Bird Bay's was established by a single instrument from Adrian C. Honore to Seaboard in 1910 ("the Honore conveyance").  Pls.' Resp. to Def.'s Cross-Mot. for Summ. J. ("Pls.' Resp.") at 2-3;   Def.'s  Mot. at 11.  Adrian C. Honore granted "a right of way for railroad purposes over and across" his property to Seaboard.  Def.'s Mot. Ex. 7.  The conveyance states:

> ADRIAN C. HONORE . . . does hereby remise, release, and forever quit claim unto the SEABOARD AIR LINE RAILWAY . . . a right of way for railroad purposes over and across the following described parcels of land . . .
> . . . .
>
> This conveyance is made upon the express condition, however that if the Seaboard Air Line Railway shall not construct upon said land and commence the operation thereon [within] one year of the date hereof of a line of railroad, or, if at any time thereafter the said Seaboard Air Line Railway shall abandon said land for railroad purposes then the above described pieces and parcels of land shall ispo facto revert to and again become the property of the undersigned, his heirs, administrators and assigns.

Def.'s Mot. Ex. 7.

## Plaintiff Bird Bay's Property

The portion of the railway corridor that abuts Bird Bay's property has a nebulous history.  The instrument that originally established Seaboard's interests in the right-of-way running along and/or through Bird Bay's property is either lost or never existed.  Multiple instruments appear either to convey or reiterate Seaboard's property interest in this segment.  The title history is further complicated by the fact that this section of the right-of-way was relocated in the 1920s.  Although the construction of the railroad occurred in the early 1900s, this section of the right-of-way is not mentioned in any conveyance in the chain of title for Bird Bay's property until June 20, 1921.[8]  The

---

[8] On January 15, 2009, the Court ordered the parties to file supplemental briefing concerning the chain of title of the portion on the subject railway corridor abutting the parcel owned by Plaintiff Bird Bay.  The parties responded to the Court's order and filed, among other things, a  joint chain of title spanning nearly a century.

parties agree that the right-of-way abutting Bird Bay's property was not conveyed, and is not governed, by the 1910 Honore instrument that conveyed the interests at issue for the remaining Plaintiffs. See Pl.'s Resp. to Def.'s Cr. Mot. for Summ. J. at 2 n. 6.

Based on the parties' representations, Bird Bay's property comprises 31 acres and is wholly located within Section Six, Township 39 South, Range 19 East of Sarasota County, Florida. See Pl.'s Supplemental Briefing Regarding the Chain of Title ("Pl.'s Supplemental Br.") at 7; Joint Chain of Title For Bird Bay Executive Golf Club, Inc. and Adjacent Railroad Right-Of-Way ("Joint Chain of Title") Tab 33. The property is bordered by Curry Creek to the North, by a condominium development to the East, and by another development to the South. See id. It is Bird Bay's western border that abuts the railroad right-of-way. Specifically, the railroad right-of-way runs along 975 feet of Bird Bay's western boundary. See Pl.'s Supplemental Br. at 7. When discussing Plaintiff Bird Bay's claim, the Court refers generally to this strip of land abutting Bird Bay's western boundary as the "right-of-way."[9] Pertinent land transfers concerning this portion of the railway are described below.

### Parcels Acquired by Sarasota-Venice Company

On May 31, 1910, J. H. Lord and Frane W. Lord conveyed an undivided one-third interest in 9,750 acres to Adrian Honore. Joint Chain of Title Tab 1. This conveyance included land that was owned by Bird Bay on the day the NITU was issued.

On October 2, 1911, Adrian Honore conveyed an undivided one-half interest in this land to Sarasota-Venice Company ("Sarasota-Venice"), a land development company run by Honore and Bertha Palmer. Id. at Tab 2; Pls.' Supplemental Br. at 9. That same day, Sarah O. Webber also conveyed an undivided one-half interest in this land to Sarasota-Venice. Id. at Tab 3.[10] Both instruments conveyed the land to Sarasota-Venice "[t]ogether with all and singular the tenements, hereditaments and appurtenances [of the grantor] . . . . To have and hold . . . forever in fee simple." Id. at Tabs 2 & 3. The land conveyed included the land presently owned by Bird Bay. Id. (describing the parcel encompassing Bird Bay's land as "the south half of the northwest quarter, the southeast quarter of the southeast quarter, and lots two (2) and three (3) in Section six (6)"). Neither of the two instruments associated with these transfers mentioned Seaboard Railroad or the railroad corridor.

---

[9] The Court uses the term "right-of-way" to describe this strip of land for convenience, and not as a legal determination of the parties' property interests or rights.

[10] It is unclear how and when Sarah O. Webber obtained this interest. However, it appears that Frane W. Lord is the sole heir of Sarah O. Webber. Joint Chain of Title Tab 8.

**The Interstate Commerce Commission ("ICC") Valuation Table**

According to an ICC valuation table dated June 30, 1918, multiple sections of Seaboard's railway corridor as they existed in 1918, including a section adjacent to Bird Bay's property, had been held or used "by possession." Def.'s Mot. Ex. 1.  The ICC valuation table concerns "lands owned <u>or</u> used for purposes of a common carrier." Id. (emphasis added).

**Sarasota-Venice Company to Palmer**

Aside from the entry in the ICC valuation table, the railway corridor is first mentioned in a conveyance dated June 20, 1921.  Joint Chain of Title Tab 4.  On that date, Adrian Honore, as president of Sarasota-Venice Company, conveyed 6,594 acres of the company's property to Honore Palmer and Potter Palmer as trustees of the testamentary trust established under Bertha Honore Palmer's will.  Id.  The conveyance included portions in Section Six of Township 39 South, Range 19 East -- the plat in which Bird Bay is now located.  In conveying portions of Section Six, the deed expressly "except[ed]  Seaboard Air Line Railroad right-of-way, Section Six (6)." Id.[11]

On the following day, June 21, 1921, Sarasota-Venice Company executed a quitclaim deed ("the 1921 quitclaim deed") remitting any interests it had to the Seaboard's right-of-way, as well as land used by Seaboard for the purpose of operating the railway to Potter Palmer.  This instrument stated:

> That the said party of the first part [Sarasota-Venice Company] for and in consideration of the sum of One Dollar and other valuable consideration in hand paid by the said party of the second part [Potter Palmer], the receipt whereof is hereby acknowledged, has remised, released and quitclaimed, and by the presents does remise, release, and quit-claim unto the said party of the second part, and his heirs and assigns, forever, all the right, title, interest, claim and demand which the said party of the first part has in and to the following described lot, piece or parcel of land to wit: The right of way of the Seaboard Air Line Railway Company in the Southeast quarter of Southwest quarter of Section Six (6); East Half of Northwest Quarter and the East Half of Southwest Quarter of Section Seven (7), Township Thirty-nine (39) South, Range Nineteen (19), being more particularly described as a

---

[11]  This conveyance, like others, purports to transfer parcels of land according to the Sarasota County property grid, which is divided into townships (rows) and ranges (columns), each of which contains grids with numbered sections.  See, e.g., Joint Chain of Title Tab 4.  However, this conveyance also references "lots" within the sections (e.g. lot three in Section Six).  The parties have not provided information with which the Court can locate these lots in relation to the numbered grid. The parties, however, do not dispute that Bird Bay's property and the area within which the railroad corridor passed were included within the lands transferred in these early instruments.

strip of land one hundred (100) feet in width, being fifty (50) feet wide on each side of the center line of railroad of the Seaboard Air Line Railway Company, as the same is now located and constructed, and extending from the South shore of Curry Creek in the Southeast Quarter of Southwest Quarter of Section Six (6), Township Thirty-nine South, Range Nineteen East, to the present terminus of the railroad of said Seaboard Air Line Railway Company in the Southwest Quarter of Section Seven (7) Township Thirty-nine South, Range Nineteen East. Also, the lands now used and occupied by the said Seaboard Air Line Railway Company for station grounds, yards, Y tracks and terminals.

. . . .

Id. at Tab 5.  This instrument does not further describe the nature of Seaboard's right-of-way or purport to limit the easement to use for railroad purposes.  See id.[12]

**Palmer to Albee**

On August 15, 1925, Honore Palmer and Potter Palmer, as trustees under the trust established in Bertha Honore Palmer's will, conveyed 1,468.55 acres of land to Fred H. Albee.  Joint Chain of Title Tab 6.  Among other lands, this deed conveyed land in Section Six, Township 39 South, Range 19 East:

Beginning at SE Cor. of SE1/4 of said sec. 6, thence N 1638.5 ft to waters of Curry Creek; thence SW along shore of Curry Creek to E line of right-of-way of Seaboard Air Line Railroad; thence S along said right-of-way line to S Line of SW1/4 of Sec. 6, thence E 384.7 ft. to point of beginning, containing 10.38 acres, more or less.

Also NE1/4 of SE1/4 of NE1/4, W1/2 of SE1/4 & NE1/4 of SE1/4 of SW1/4 of NE1/4, Sec. 6, Twp 39 South, Range 19 East, containing 35 acres more or less.

Id.  This specific conveyance included the land presently owned by Bird Bay and referenced the Seaboard Air Line Railroad right-of-way.  Id.  In particular, the deed conveyed the land adjacent to the east line of Seaboard's right-of-way, but did not purport to convey any interest in the right-of-way itself as a distinct piece of property.  The Section Six conveyance stretched from the shore of

---

[12]   According to the record, Sarasota-Venice's first conveyance excepted Seaboard's right-of-way, but the subsequent quitclaim then conveyed whatever interest it had previously excepted.  See Joint Chain of Title Tabs 4 & 5.  Because the subsequent conveyance was made via quitclaim, the record does not establish what right or interest, if any, Sarasota-Venice had in the right-of-way.

Curry Creek to the southern boundary of Section Six.  In other words, this conveyance included all of Bird Bay's property running alongside the railroad right-of-way.

### Land Transfers to B.L.E. Realty Corporation

In the mid-to-late 1920s, B.L.E. Realty Corporation ("B.L.E.") acquired through various deeds and indentures:

> 1) 1,468.55 acres of land from Fred Albee and Louella B. Albee on October 6, 1925;[13]

> 2) an interest in tracks of land from Joseph H. Lord and Frane Lord on March 8, 1926;

> 3) any interest that Honore Palmer and Potter Palmer, as trustees of the testamentary trust established under Bertha Honore Palmer's will, had in the 1,468.55 acres of land that B.L.E. Realty Corporation previously acquired from Fred Albee and Louella B. Albee on March 22, 1926;

> 4) the parcel of land "over which the Seaboard Air Line Railway Company has exercised its right-of-way in the Southeast Quarter of Section Six . . . as the same is now located and constructed, and extending from the South shore of Curry Creek" as well as "the lands now used and occupied by the said Seaboard Air Line Railway Company for station grounds, yards, Y tracks and terminals" from Honore Palmer, Potter Palmer, and their wives via a quitclaim deed[14] as well as any interest that Honore Palmer and Potter Palmer, as trustees of the testamentary trust established under Bertha Honore Palmer's will, had in this land on August 31, 1926.

Joint Chain of Title Tabs 7-11.

Two deeds conveyed interests in the right-of-way to B.L.E., and both were executed on August 31, 1926.  Id. Tabs 10-11.  The first was a quitclaim deed conveying the land over which Seaboard exercised its right-of-way from Honore Palmer and Potter Palmer as well as their wives, to B.L.E., in which the Palmers quitclaimed "all the estate, right, title, interest, claim and demand

---

[13] The deed concerning this transfer of land was "subject to a first mortgage on said lands made and executed by Fred H. Albee to Honore Palmer and Potter Palmer, Trustees under the will of Bertha Honore Palmer, deceased . . . ."  Joint Chain of Title Tab 7.

which said [the Palmers] have in and to the" right-of-way as described above.  The second deed --
a trustee deed concerning the estate of Bertha Palmer -- conveyed "all the estate, right, title, interest,
claim and demand whatsoever in law or in equity which the said Bertha Honore Palmer, Testatrix,
had at the time of her death."  <u>Id.</u> Tab 10.

### B.L.E. Realty Corporation to Seaboard Air Line Railway Corporation

On April 4, 1927, B.L.E. executed an indenture to Seaboard Air Line Railway Company
conveying "all of its right, title, and interest" in three parcels of land:

> 1) a "strip of land 100 feet wide, that is, fifty feet on each side of
> center line of railway . . . through the lands of the grantor in Sections
> <u>6</u>, 7, 16 and 17 of Township 39 South, Range 19 East, Sarasota
> County, Florida;"
>
> 2) a "tract of land 200 feet by 1607 feet, more or less;"
>
> 3) and a "certain tract of land . . . lying between two lines fifty feet
> distant from and parallel to the center lines of wye track to be
> constructed."

<u>Id.</u> at Tab 12 (emphasis added).  The strip of land in this deed -- the first parcel listed -- extended
from the "the center line of existing railroad where said center line crosses the channel of Curry
Creek . . . to a point on the south line of Section 17."  <u>Id.</u>  This land began at Curry Creek and
stretched far south of Section Six, and, thus, encompassed all of the corridor running next to Bird
Bay's land.  This indenture (the "B.L.E. Deed") stated that B.L.E. granted Seaboard the property at
issue "together with the rights, members and appurtenances thereunto belonging or appertaining,
unto . . . [Seaboard], its successors and assigns in fee simple, forever."  <u>Id.</u>

### The Foreclosure Sales

On February 27, 1933, the Circuit Court of the 27th Judicial Circuit of Florida in Sarasota
County ("the Circuit Court"), found that B.L.E. had been in default on its mortgage since July 31,
1929, in a case concerning the priority of a crop lien.  <u>Id.</u> at Tab 13 (<u>Knight v. B.L.E. Realty Corp.</u>,
No. 2737, (Fl. Sarasota County Ct. Feb. 27, 1933)).  The portion of the land subject to the mortgage
in default included property that is currently owned by Bird Bay, but did not include the portion of
Bird Bay's land running alongside the railroad corridor.  <u>See id.</u>[15]   In its final decree, the Circuit
Court appointed a special master to sell the land subject to the mortgage at public auction.  <u>Id.</u>  The
right-of-way, as described in the above-mentioned deeds, was not listed among the mortgaged

---

[15]   The land subject to this foreclosure was located exclusively within the south<u>east</u> quarter
of section six.  Other instruments demonstrate that the railroad corridor runs alongside Bird Bay's
property in the south<u>west</u> quarter of section six.  <u>See</u> Joint Chain of Title Tabs 7, 9, 15.

properties in the decree.  Id. Tab 13.  The land was sold at public auction to Levi Knight on April 12, 1933.  Id. at Tab 14.[16]

On September 3, 1934, the Circuit Court issued another final decree in a separate foreclosure action, and foreclosed on the mortgage that Fred H. Albee held on property that he previously had transferred to B.L.E. on October 6, 1925.  Id. Tab 15; see also id. Tab 7.[17]  This affected property included the portion of Bird Bay's land running alongside the railroad corridor.  See id. Tab 15 (describing land as located within the southwest quarter of section six and running along "the East line of the right-of-way of the Seaboard Air Line Railroad").  The Circuit Court appointed a special master and ordered the sale of the land at public auction.  Joint Chain of Title Tab 15.  The lands subject to the public auction were expressly limited to the lands listed in the court's 1934 final decree, which included Bird Bay's land adjacent to the right-of-way, but not the right-of-way as a distinct piece of property.  Id.  The final decree provided that B.L.E. and all other defendants to that action were barred "from the equity of redemption"[18] and from claiming interest in the mortgaged property.  Id.  Following a public auction, the subject property was ultimately assigned via deed to the Venice-Nokomis Holding Corporation on December 10, 1934.  Id. Tab 16.

### Venice-Nokomis Holding Corporation to Seaboard Air Line Railway - The Venice Deed

Approximately seven years after the public auction, on November 10, 1941, the Venice-Nokomis Holding Corporation conveyed to Seaboard via a deed, the same property described in the 1927 indenture between B.L.E. and Seaboard, which conveyed, inter alia:

> A strip of land 100 feet wide, that is, fifty feet on each side of center line of railway . . . through the lands of the grantor in Sections 6, 7, 16 and 17 of Township 39 South, Range 19 East, Sarasota County, Florida.
> . . . .
>
> Beginning at the center line of the main track of Seaboard Air Line Railway Company where said center line crosses the channel of Curry Creek . . . to a point on the south line of Section 17.

---

[16]  Although it is clear that Levi Knight obtained this land via public auction, the bulk of the deed concerning this transaction is illegible, and the details concerning this transaction remain unclear.

[17]  Plaintiffs argue that this foreclosure extinguished any right-of-way established by the B.L.E. Deed.

[18]  Under Florida law, "[t]he right of redemption is the mortgagor's valued and protected equitable right to reclaim her estate in foreclosed property."  Sudhoff v. Fed. Nat'l Mortgage Ass'n, 942 So.2d 425, 428 (Fla. 5th Dist. Ct. App. 2006) (citations omitted).

Id. at Tab 17 (emphasis added).  This strip of land encompassed the entire stretch of track running next to Bird Bay's property.  However, this strip of land was not expressly included among the parcels in the 1934 indenture to Venice-Nokomis.  Nevertheless, Venice-Nokomis purportedly conveyed the property to Seaboard:

> TO HAVE AND TO HOLD, together with all and singular the rights, member, hereditaments and appurtenances thereunto belonging or in any [illegible] incident or appertaining, unto the party of the second part, its successors and assigns, in fee simple forever, but subject to be held, used and disposed of as a part of the receivership estate as aforesaid.

Id. at Tab 17; see also id. at Tab 12.

### Bird Bay Obtains Property Adjacent to the Right-Of-Way

Ultimately, Bird Bay obtained the property adjacent to the railroad right-of-way at issue here.  See Joint Chain of Title Tabs 18-33.  The section of the railroad right-of-way adjacent to Bird Bay's property consists of two separate corridors as a result of the relocation of the railroad tracks during the 1920s.  A portion of the right-of-way was established prior to this relocation. Conveyances that reference the right-of-way adjacent to the Bird Bay property after the relocation of the tracks refer to both the old right-of-way and the right-of-way created after the relocation, as the two overlap.  See Notice of Filing of Exhibits 10 and 11 to Def.'s Reply Mem. at Ex. 11; Pls.' Supplemental Br. at Ex. F.[19]

At this juncture, the parties have not found an instrument  -- other than the ICC valuation table -- by which the railroad right-of-way conveyed in the 1921 quitclaim deed between Sarasota-Venice Company and Potter Palmer was first established.  See Pls.' Supplemental Br. at 33.  The only conveyances that the parties have found referencing what might be construed to be the establishment of the right-of-way are the B.L.E. Deed of 1927, and the Venice Deed of 1941, both of which appear to have been issued after the relocation of this section of the corridor in the 1920s. Id.; Def.'s Resp. to Jan. 15, 2009 Order at 1,8.

### Discussion

### Summary Judgment Standard

Summary judgment is appropriate where the evidence demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c)(1) of the Rules of the United States Court of Federal Claims ("RCFC"); see also

---

[19] A map, provided by Defendant, indicating the location of the railroad corridor prior to and after the location is annexed to this opinion as Appendix A.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  A genuine issue is one that "may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A fact is material if it "might affect the outcome of the suit." Id. at 248.  The moving party bears the burden of establishing the absence of any material fact, and any doubt over factual issues will be resolved in favor of the non-moving party. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) and SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1116 (Fed. Cir.1985)).  Once this burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. Liberty Lobby, 477 U.S. at 256.  It is not necessary that such evidence be admissible, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Liberty Lobby, 477 U.S. at 249-50; Mingus Constructors, 812 F.2d at 1390-91.

A court does not weigh each side's evidence when considering a motion for summary judgment, but "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Diebold, 369 U.S. at 655).

When opposing parties both move for summary judgment, the Court reviews the motions under the same standard. First Annapolis Bancorp, Inc.  v. United States, 75 Fed. Cl. 263, 275 (2007) (citation omitted).  In such instances, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Mingus, 812 F.2d at 1391.  Accordingly, there are instances when cross-motions for summary judgment will be denied, as the Court will not grant any party's motion "if disputes remain as to material facts." Id.; First Annapolis, 75 Fed. Cl. at 275.

### Takings Claims and the Trails Act

Congress enacted the Trails Act to preserve shrinking rail trackage by converting unused rights-of-way to recreational trails. Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 5 (1990) ("Preseault I"); see also 16 U.S.C. § 1241 et seq.  The operation of the Trails Act is subject to the Fifth Amendment to the United States Constitution which provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V.  Accordingly, when private property interests are taken by the Government pursuant to the Trails Act, the property owners are entitled to just compensation. See Preseault I, 494 U.S. at 13.  Because property rights arise under state law, Florida law governs whether the landowners have a compensable property interest. See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1001(1984); Preseault I, 494 U.S. at 16.

In a rails-to-trails case, a taking, if any, occurs when "state law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use." Caldwell v. United States, 391 F.3d 1226, 1228 (Fed. Cir. 2004).  The Trails Act prevents a common law abandonment from being effected by the conversion of the railroad right-of-way to

an interim trail use, thus precluding state law reversionary interests from vesting. Id. at 1229.  As the Federal Circuit has explained:

> Abandonment is suspended and the reversionary interest is blocked "when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)" of the Trails Act. . . .We concluded that "[t]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way." . . . Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU.

Barclay, 443 F.3d at 1368 (quoting Caldwell, 391 F.3d at 1233-34 (emphasis in original)).  If standard abandonment had occurred under 49 U.S.C. § 10903, the railroad, as the owner of the servient estate, would not retain any property interest in the right-of-way, and that property interest would revert to the dominant landowner.  Thus, by preventing this reversion under state law, the Trails Act effects a taking.  See Barclay, 443 F.3d at 1371.  In another sense -- the dominant consideration in these types of taking cases -- the taking occurs when the government, pursuant to the Trails Act, creates a new easement for a new use over land that was encumbered by an easement limited to railroad purposes.  See Preseault v. Interstate Commerce Comm'n, 100 F.3d 1525, 1550 (Fed. Cir. 1996) ("Preseault II") (describing the conversion of a railroad easement to a recreational trail as "a new easement for [a] new use").  The statutory imposition of this second easement -- which otherwise had not been granted -- is a taking.

In any takings case, "only persons with a valid property interest at the time of the taking are entitled to compensation." Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001).  Here, the NITU was issued on April 2, 2004, and the record establishes that the plaintiff landowners -- with the exception of Mission Estates -- were the owners of the parcels at issue on that date.  As such, these named landowners have cleared a preliminary hurdle in pursuit of their takings claims; they owned land adjacent to the railway when the taking allegedly occurred.[20]  However, that is not the end of the matter.  This Court must determine whether the landowners had property interests in the right-of-way and whether the Government's actions constituted a taking of those interests.

In  Preseault II,  the Federal Circuit explained that whether a plaintiff is entitled to compensation under the Tucker Act in a rails-to-trails case depends on three determinative issues:

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad

---

[20]  Because Plaintiffs have not established that Mission Estates owned its property on April 2, 2004, their motion for partial summary judgment with respect to Mission Estates is denied.

acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

Preseault II, 100 F.3d at 1533.   The Court addresses each issue in turn.

### 1) Who Owned the Strips of Land: Did the Railroad Acquire Only Easements, or Did It Obtain Fee Simple Estates?

Ultimately, whether the named landowners have a property interest in the land underlying the railroad right-of-way depends upon the nature of the original conveyance that established Seaboard's right to operate a railroad on the property at issue.   Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373-74 (Fed. Cir. 2009).   With regard to the subject parcels affected by the 1910 Honore conveyance, the property interests were conveyed unaltered down the chain of title until the NITU was issued.   According to Plaintiffs, the Honore conveyance granted Seaboard an easement limited to the operation of a railroad, and once that operation ceased, ownership reverted to them.   Defendant claims that Seaboard obtained a fee simple determinable interest in this property meaning that Plaintiffs never acquired any property interest in the right-of-way.[21]

Under Florida law, a court should "consider the language of the entire instrument in order to discover the intent of the grantor, both as to the character of estate and the property attempted to be conveyed, and to so construe the instrument as, if possible, to effectuate such intent."   Reid v. Barry, 112 So. 846, 852 (Fla. 1927); see also Thrasher v. Arida, 858 So.2d 1173, 1175 (Fla. 2d Dist. Ct. App. 2003).   An easement can be created by one of three different means under Florida law: (1) by express grant, (2) by implication, or (3) by prescription.   Burnham v. Davis Islands, Inc., 87 So.2d 97, 100 (Fla. 1957).[22]   Therefore, an easement can be expressly described in a deed, can be inferred from

---

[21]   Moreover, Plaintiffs claim in the alternative that pursuant to the language of the Honore conveyance and Florida law, SGLR abandoned the railroad, and as such, "Plaintiffs regained the right to use and possess their property free of any easement."   Rogers Am. Compl. ¶ 79.

[22]   Under Florida Law, an easement by prescription is created by methods substantially similar to those by which title is obtained through adverse possession. Downing v. Bird, 100 So.2d 57, 64 (Fla. 1958).   In Florida, to establish an easement by prescription, one must show:

> (1) that he or she and any predecessors in title have made actual, continuous and uninterrupted use of the lands of another for the prescriptive period (twenty years); (2) that (when the claim is to a right-of-way) the use has entailed a definite route with a reasonably certain line, width and termini; (3) that the use has been either with

15

the language of a deed, or can result from "long and continuous enjoyment" and use of a parcel of land. Id.

Here, the plain language of the Honore conveyance indicates that Seaboard was granted an easement.  Def.'s Mot. at Ex. 7.  The conveyance states:

> ADRIAN C. HONORE . . . does hereby remise, release, and forever quit claim unto the SEABOARD AIR LINE RAILWAY . . . a right of way for railroad purposes over and across the following described parcels of land . . .
>
> . . . .
>
> This conveyance is made upon the express condition, however that if the Seaboard Air Line Railway shall not construct upon said land and commence the operation thereon [within] one year of the date hereof of a line of railroad, or, if at any time thereafter the said Seaboard Air Line Railway shall abandon said land for railroad purposes then the above described pieces and parcels of land shall ispo facto revert to and again become the property of the undersigned, his heirs, administrators and assigns.

Id.  The Honore conveyance does not refer to the outright transfer of land; it refers to "a right of way for railroad purposes over and across the . . . parcels of land," thereby indicating that the grantor retained an interest in the land referenced in the conveyance and granted an easement to Seaboard. See Trailer Ranch, Inc. v. City of Pompano Beach, 500 So.2d 503, 506 (Fla. 1986) (explaining that the words "across, over, and under" in a conveyance were indicative of an easement, not a fee simple estate); Irv Enterprises, Inc. v. Atl. Island Civic Ass'n, 90 So.2d 607, 609 (Fla. 1956) (construing deed as granting an easement where deed contained restrictions on use and stipulated reversion upon

---

> the actual knowledge of the owner or so open, notorious and visible that knowledge of the use must be imputed to the owner; and (4) that the use has been adverse to the owner-that is, without permission (express or implied) from the owner, under some claim of right, inconsistent with the rights of the owner and such that, for the entire period, the owner could have sued to prevent further use.

Suwannee River Water Mgmt. Dist. v. Price, 651 So.2d 749, 750 (Fla. 1st Dist. Ct. App. 1995) (citations omitted). Although the analysis is similar to adverse possession, the rights obtained from a prescriptive easement are akin to an ordinary easement, in which title to the land remains with the owner of the servient estate.  Downing, 100 So.2d at 64 ("Title so acquired [by prescriptive easement] is a corporeal right, and it is the nature of the right acquired which marks the principal difference between a prescriptive right and title by adverse possession.").

discontinuance of said use).

Defendant argues that Richardson v. Holman, 33 So.2d 641, 641-42 (Fla. 1948), mandates a conclusion that the Honore deed conveyed a fee simple determinable to Seaboard as opposed to an easement because the deed in that case is similar to the Honore deed.  This Court disagrees.  Richardson concerned a deed which stated:

> [T]his conveyance is made subject to and upon the express condition that should the party of the second part cease to use the foregoing land for railroad purposes, then and in that event the title to said property shall revert to and vest in the [grantor] and his heirs and assigns.

Richardson, 33 So.2d at 641-42.

The court in Richardson did not address whether the language of the deed conveyed an easement or land in fee simple.  Id. at 644.  Rather, the issue before the Richardson court was whether the deed established an assignable reversionary right.  The court decided that this type of reversionary interest could be assigned.  Id.  Richardson did not hold that language stating that the land shall revert when the grantee ceases to use the land for railroad purposes must be construed as conveying a fee simple determinable interest.  Rather, Richardson stands for the unremarkable principle that a conveyance should be construed to effectuate the intent of the grantor.

Defendant asserts that railroad rights-of-way under Florida law are not easements, but are "ordinarily" interests in fee.  Def.'s Cr. Mot. at 19-20 (citing Atl. Coast Line Rail Co. v. Duval County, 154 So. 331, 332 (Fla. 1934)).  This Court recognizes that in Atlantic Coast Line, the Florida Supreme Court stated:

> [a] railroad right of way in . . . [Florida] is not a mere easement or use for railroad purposes.  Like other property it is acquired by purchase or condemnation and vests a fee in the company acquiring it which cannot be divested except as the law provides.

154 So. at 332.  Although this dicta might be construed to mean that a railroad right-of-way can never be an easement, that construction would take the court's statement out of context and would contravene longstanding precedent in Florida.  See, e.g., Reid v. Barry, 112 So. 846, 852 (Fla. 1927); Silver Springs O. & G.R. v. Van Ness, 34 So. 884, 890 (Fla. 1903); Cohen v. Pan Am. Aluminum Corp., 363 So.2d 59, 60 (Fla. 3d Dist. Ct. App. 1978) (recognizing that railroad obtained a right-of-way in the form of an easement).  In Atlantic Coast Line, the parties agreed that the railway "own[ed] the fee to its right of way." 154 So. at 331.  Thus, when the Florida Supreme Court stated that a railroad right-of-way was not an easement, it did so in the context where there was no question that the railway had obtained the land in fee simple.  See id. at 332.  Similarly, in Florida Power Corporation v. McNeely, 125 So.2d 311, 315-16 (Fla. 2d Dist. Ct. App. 1960) (reh'g denied,138

17

So.2d 341 (Fla. 1961) (without opinion)), an intermediate Florida appellate court stated in dicta, "[o]rdinarily, a railroad right of way in Florida is not a mere easement . . . but is a fee vested in the railroad."  However, the McNeely court later clarified and narrowed this broad dicta recognizing, "[t]his is not to say that a railroad by arrangement or otherwise could not under any circumstances operate by virtue of an easement." Id. at 317.  Contrary to Defendant's arguments, these Florida precedents do not hamstring the Court's ability to parse the language of the conveyances in determining the nature of the property interest conveyed.

Here, the words of the Honore conveyance indicate that the parties intended to create an easement. The Honore conveyance transferred a "right of way for railroad purposes over and across the . . . described parcels of land." Def. Mot. Ex. 7.  Further, like the deed in Irv Enterprises, the Honore conveyance placed an explicit limitation on the use of the property interest conveyed and contained an unequivocal stipulation that title would revert to the grantor upon discontinuance of the use of the parcel for its intended railroad purpose.  See Irv Enters., 90 So. 2d at 609.  The Honore conveyance has no language that suggests that title to described parcel was conveyed outright, i.e. that the transfer was made "in fee simple."[23]

Because Seaboard obtained an easement in the Honore conveyance, successors to the Honore grantees retained fee title to the underlying land encumbered by the easement.  Under Florida law, title to the land bordering an easement extends to the centerline of the easement. Smith v. Horn, 70 So. 435, 436 (Fla. 1915).  As the Supreme Court of Florida explained in the analogous situation of street and highway easements:

> Where the owner of land has it surveyed, mapped, and platted, showing subdivisions thereof, with spaces for intervening streets or other highways between the subdivisions clearly indicated upon the map or plat, and conveyances in fee of the subdivisions are made with reference to such map or plat, the owner thereby evinces an intention to dedicate an easement in the streets or other highways to the public use as such, the title to the land under the street remaining in the owner or his grantees; and, where such conveyances are made with

---

[23] Defendant argues that because the Honore deed differs from the deed at issue in Cohen v. Pan American Aluminum Corporation, 363 So.2d 59 (Fla. 3d Dist. Ct. App. 1978), it cannot be construed as conveying an easement because the conveyance at issue in Cohen expressly stated that the grantor conveyed a "'perpetual easement'" to the grantee.  Cohen, 363 So.2d at 60.  Thus, Defendant appears to suggest that a grantor must use the term "perpetual easement" to convey an easement.  This is not the law in Florida. See generally Seaboard Air Line Ry. Co. v. Dorsey, 149 So. 759, 761 (Fla. 1932) (explaining that "[n]o stock words are required to create" the various types of conveyances, and "it is only necessary that such words be employed as will show the grantor's intent"). Cohen does nothing to alter the conclusion that the Honore deed conveyed an easement -- with its express conveyance of "a right-of-way for railroad purposes over and across the land" and its clear condition of ipso facto reversion if the railroad abandoned the land for railroad purposes.

> reference to the map or plat, the dedication of the easement for street purposes cannot be subsequently revoked as against the grantees, and the title of the grantees of subdivisions abutting on such streets, in the absence of a contrary showing, extends to the center of such highway, subject to the public easement. And, where the highway is lawfully surrendered, the then holder of the title to abutting property and to the center of the street has the property relieved of the public easement.

Horn, 70 So. at 436; see also Servando Bldg. Co. v. Zimmerman, 91 So.2d 289, 291 (Fla. 1956); Jacksonville, T. & K.W. Ry. Co. v. Lockwood, 15 So. 327, 330 (Fla. 1894); Florida Southern Ry. Co. v. Brown, 1 So. 512, 513-14 (Fla. 1887) (stating that "[i]t seems to be established that where a street or highway is the boundary of a lot or piece of land, that the owner of such land owns the soil to the center of such street or highway, subject to the right of the public to pass and repass over and along it").[24]  Consistent with this precedent, such Plaintiff landowners hold title to the center line of the easement.

### 2) Were The Terms of the Easements Limited to Use For Railroad Purposes or Did They Include Future Use As Public Recreational Trails?

The Honore conveyance granted Seaboard a right-of-way for railroad purposes across the Honore land so long as Seaboard did not abandon using the land for railroad purposes.  Although the Florida Supreme Court had not had occasion to construe the phrase "railroad purposes" at the time the Honore right-of-way was conveyed, that Court had recognized that a railroad company is bound by the terms of the instrument granting the right-of-way.  Taylor v. Florida East Coast Ry. Co., 45 So. 574, 578 (Fla. 1907) ("[A]ny valid contract or agreement contained in the deed of conveyance is binding upon the railroad . . . [and] may be enforced.").

In Preseault II, the Federal Circuit found that the terms of the easements at issue did not contemplate the use of the land as public trails.  The Preseault II court explained:

> When the easements here were granted to the Preseaults' predecessors in title at the turn of the century, specifically for transportation of goods and persons via railroad, could it be said that the parties contemplated that a century later the easements would be used for recreational hiking and biking trails, or that it was necessary to so construe them in order to give the grantee railroad that for which it bargained? We think not. Although a public recreational trail could be described as a roadway for the transportation of persons, the nature of the usage is clearly different. In the one case, the grantee is a

---

[24]  The named landowners in Rogers hold title to land described as lots by referencing specific plats, and the plats indicate that these lots abut the railway corridor.  The deeds of the named Plaintiff landowners in Bird Bay reference the railway corridor as a parcel boundary.

19

> commercial enterprise using the easement in its business, the transport of goods and people for compensation. In the other, the easement belongs to the public, and is open for use for recreational purposes, which happens to involve people engaged in exercise or recreation on foot or on bicycles. It is difficult to imagine that either party to the original transfers had anything remotely in mind that would resemble a public recreational trail.

Preseault II, 100 F.3d at 1542-43.

Like the easements before the Preseault II Court, the Honore conveyance is an express easement, and the extent of the easement created by that conveyance is fixed. Id. (quoting 5 Restatement of Property § 482 (1944)). In Florida, the scope of an easement does not increase with time, and accordingly, the "burden of a right of way upon the servient estate must not be increased to any greater extent than reasonably necessary and contemplated at the time of initial acquisition." Crutchfield v. F. A. Sebring Realty Co., 69 So.2d 328, 330 (Fla. 1954). Here, as in Preseault II, the use of the right-of-way as a public trail while preserving the right-of-way for future railroad activity was not something contemplated by the original parties to the Honore conveyance back in 1910. As the Federal Circuit explained, when examining a right-of-way acquired in 1899, the usage of a right-of-way as a recreational trail is "clearly different" from the usage of the same parcel of land as a railroad corridor. Preseault II, 100 F.3d at 1542. As such, the terms of the Honore easement were limited to use for railroad purposes and did not contemplate use for public trails. Thus, the governmental action converting the railroad right-of-way to a public trail right-of-way imposed a new easement on the landowners and effected a Fifth Amendment taking of their property. Id. at 1550.

Because it is clear that the Honore easement did not encompass recreational trails, this Court need not reach the third prong of the Preseault II analysis -- i.e., whether, even if the grants of the railroad's easements were broad enough to encompass recreational trails, these easements had terminated prior to the alleged taking. See Preseault II, 100 F.3d at 1549 ("[W]e find the question of abandonment is not the defining issue, since whether abandoned or not the Government's use of the property for a public trail constitutes a new, unauthorized, use.").[25]

---

[25] Under Florida law, an easement is abandoned when all of the elements of equitable estoppel are satisfied. Wiggins v. Lykes Bros. Inc., 97 So.2d 273, 276 (Fla. 1957). In Florida, the elements of the doctrine of estoppel are:

> (1) a representation by the party estopped to the party claiming the estoppel as to some material fact, which representation is contrary to the conditions of affairs later asserted by the estopped party; (2) a reliance upon the representation by the party claiming the estoppel; and (3) a change in the position of the party claiming the estoppel to his detriment, caused by the representation and his reliance thereon.

In conclusion, railbanking and trail use do not fall within the scope of the easement created by the Honore deed, and the conversion of the section of the railroad right-of-way governed by this deed to a public trail creates a new, unauthorized easement. As such, all of the landowners who owned property on April 2, 2004, that abuts the railroad right-of-way established by the Honore deed are entitled to just compensation under the Fifth Amendment.

## The Bird Bay Property

The history of the section of the railroad corridor adjacent to Bird Bay's property is more complicated. The parties jointly provided a complete compilation of the instruments conveying interests in land since 1910 -- the approximate year of the railroad's construction. Conspicuously absent from the chain of title, however, is the instrument that first conveyed the right-of-way, and the attendant interests or rights, to Seaboard. Under Preseault II, whether Bird Bay has a present property interest in the land underlying the right-of-way depends upon the nature of the original conveyance. Preseault II, 100 F.3d at 1534 ("The question of what estates in property were created . . . requires a close examination of the conveying instruments read in light of the common law and [the state law then in effect].").

In the absence of an original instrument, the Court relies upon subsequent instruments in the chain of title, extrinsic evidence demonstrating the parties' intent, and Florida law in effect at the time of the instruments' executions. See id. On the record here are three early instruments -- the ICC valuation table, the B.L.E. Deeds, and the Venice Deed -- that address the property interests that Seaboard obtained in the right-of-way.

### The ICC Valuation Table

Defendant claims that Seaboard obtained the land underlying the original corridor by adverse possession based upon an Interstate Commerce Commission valuation table dated June 30, 1918, that indicates that the parcel was taken "By Possession." Def.'s Reply at 8. If Seaboard obtained the right to the land via adverse possession, it obtained title to the land, and Bird Bay has no property interest in the land underlying the section of the corridor referenced in the ICC Valuation Table. See Atl. Coast Line R. Co. v. Seward, 150 So. 257, 258 (Fla. 1933).

---

Jewett v. Leisinger, 655 So.2d 1210, 1212 (Fla. 4th Dist. Ct. App. 1995) (citing Leibowitz v. City of Miami Beach, 592 So.2d 1213 (Fla. 3d Dist. Ct. App. 1992), review denied, 601 So.2d 552 (Fla. 1992)). Additionally, "the servient owner must show conduct by the dominant owner which outwardly manifests an intent to no longer use the easement or conduct inconsistent with the continuance of the easement." Id. (citing Enos v. Casey Mountain Inc., 532 So.2d 703 (Fla. 5th Dist. Ct. 1988), review denied, 542 So.2d 988 (Fla.1989)). Abandonment of an easement is a question of intent, and the party asserting abandonment has the burden of proof. Dade County, 69 So.2d at 783; see also Leibowitz, 592 So.2d at 1214 (explaining that party asserting abandonment has to demonstrate that there was a clear affirmative intent to abandon the easement).

Contrary to Defendant's assertion, the Court cannot rely on this valuation table in and of itself as proof that Seaboard in fact obtained fee simple title to the land via adverse possession. The valuation table by its terms applies to "lands owned or used for purposes of a common carrier." (emphasis added). It does not identify which lands in the table were "owned" by the railroad and which were "used" by the railroad. Def.'s Mot. Ex. 1.[26] Thus, the Court cannot conclude, based only on the ICC Valuation Table, that Seaboard obtained fee title to the right-of-way on the original corridor by adverse possession.

### The B.L.E. and Venice Deeds

Both the April 4, 1927 deed from B.L.E., and the November 10, 1941 deed from Venice-Nokomis purport to convey interests or rights in the right-of-way to Seaboard. While the ICC valuation table does not demonstrate that Seaboard held fee simple title to the right-of-way, the language and form of subsequent instruments -- specifically the habendum clauses in the April 4, 1927 B.L.E. Deed and the November 10, 1941 Venice Deed -- may be interpreted to convey fee simple title in the right-of-way to Seaboard. However, as the Federal Circuit concluded in Preseault II regarding interests in railway rights-of-way, terms indicating a transfer in fee, may have the legal effect of conveying merely an easement. Id. at 1536 ("[D]espite the apparent terms of the deed indicating a transfer in fee, the legal effect was to convey only an easement.").

Based on the instant record, it is not clear to the Court, specifically as a matter of Florida law, what estates in property, if any, Seaboard obtained in the right-of-way. In this regard, it is not apparent whether the grantors in the B.L.E and Venice deeds purporting to convey fee simple title to Seaboard possessed the property interests to do so. Accordingly, the Court cannot, on the present record, determine on summary judgment what estates in property were created or already held when these instruments were executed. As such, the Court denies the cross-motions for summary judgment regarding the Bird Bay property. See Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[S]ummary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues."); Blue Lake Forest Prod., Inc. v. United States, 86 Fed. Cl. 366, 381 (2009) (same).

In order to determine whether, as a matter of state law, Seaboard obtained fee simple title to the right-of-way or whether the instruments merely conveyed an easement for the railroad's use, the Court requests that the parties submit supplemental briefing on relevant Florida law, as outlined

---

[26]  The Court also notes that the October 2, 1911 indentures conveying A.C. Honore's and Sarah Weber's fee simple interests in Bird Bay's property predate the ICC Valuation Table by less than seven years. See Joint Chain of Title Tabs 2-3; Def.'s Resp. to Jan. 15, 2009 Order Ex. D. At the time, the statutory period of adverse possession in Florida was seven years. See Horton v. Smith-Richardson Inv. Co., 87 So. 905, 908 (Fla. 1921). This further undermines Defendant's assertion that Seaboard obtained title to the property "by possession."

below.[27]

In their supplemental briefing, the parties may raise any other issues prompted by the instant ruling.

### Conclusion

1.      Plaintiffs' Motion for Partial Summary Judgment in the <u>Rogers</u> action is granted with respect to all Plaintiffs <u>except</u> Mission Estates.  With respect to Plaintiff Mission Estates, Plaintiffs' motion is denied.

2.      Plaintiffs' Motion for Partial Summary Judgment in the <u>Bird Bay</u> action is granted in part with respect to all Plaintiffs except Bird Bay.  Plaintiffs' motion for summary judgment with respect to Plaintiff Bird Bay is denied.

3.      Defendant's Cross-Motion For Partial Summary Judgment is denied.

4.      In accordance with this opinion and order, the parties shall file supplemental briefs, <u>not to exceed 25 pages</u>, addressing Plaintiff Bird Bay and the following issues under Florida law:

   a.      Whether B.L.E. obtained clear fee simple title to the right-of-way vis-a-vis the August 31, 1926 quitclaim and trustee deeds from the prior possessors;

   b.      Whether Venice-Nokomis obtained clear fee simple title to the right-of-way as a result of the foreclosure proceedings against B.L.E.;

   c.      Whether, and to what extent, the property interests or possessory rights conveyed to Seaboard in the B.L.E. and Venice deeds were affected by Seaboard's status as a railroad company;

   d.      Whether, to what extent, and how, the amount of consideration is relevant in interpreting the instruments; and

   e.      Whether it would be appropriate for the Court to consider extrinsic evidence in determining the intent of the parties to the instruments. If so, what extrinsic evidence would each party rely upon and what further proceedings, if any, are warranted?

---

[27]   Under the Florida Rules of Appellate Procedure, this Court may not submit certified questions of Florida law to the Supreme Court of Florida.  <u>See</u> Florida Rules of App. Proc., Rule 9.150(a) (providing that only the Supreme Court of United States and a United States court of appeals may certify a question of law to the Supreme Court of Florida).

5.      The Court will conduct a telephonic conference call on **December 3, 2009, at 10:30 a.m. EST** to discuss further proceedings.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

**Appendix A**

