# In the United States Court of Federal Claims

**No. 07-273L**
**No. 07-426L**
**No. 08-198L**
**(Filed: June 28, 2010)**

```
* * * * * * * * * * * * * * * * * * * * * * * *
STEPHEN J. ROGERS, et al.,          *
                                    *
            Plaintiffs,             *
                                    *
      v.                            *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant.              *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
BIRD BAY EXECUTIVE GOLF             *
CLUB, INC., et al.,                 *
                                    *
            Plaintiffs,             *
                                    *
      v.                            *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant.              *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
BAY PLAZA PROPERTIES, LLC, et al.   *
                                    *
            Plaintiffs,             *
                                    *
      v.                            *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant.              *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

Rails-to-Trails; Takings; Fee Simple;
Easement; Florida Law; Deed
Interpretation; Extrinsic Evidence;
Consideration; Chain of Title.

Mark F. (Thor) Hearne, II, Lindsay S.C. Brinton and Meghan S. Largent, Arent Fox LLP, 112 S. Hanley Drive, Suite 200, Clayton, MO 6310, for Plaintiffs.

Kelle S. Acock and William Shapiro, Natural Resources Section, Environmental and

Natural Resources Division, U.S. Department of Justice, P.O. Box 663, Washington DC, for Defendant.

---

**OPINION AND ORDER**

---

**WILLIAMS**, Judge

In these consolidated "rails-to-trails" actions, Plaintiffs claim that the Government effected a taking of their properties when it converted an inactive railroad right-of-way stretching from Sarasota to Venice, Florida, to a recreational trail, pursuant to the National Trails System Act Amendments of 1983 ("Trails Act"). This is the Court's second opinion addressing the parties' cross-motions for partial summary judgment on liability. On November 23, 2009, the Court granted, in part, Plaintiffs' motions for partial summary judgment in the Rogers (No. 07-273) and Bird Bay (No. 07-426) actions, except with respect to Plaintiffs Mission Estates Homeowners Association, Inc. ("Mission Estates") and Bird Bay Executive Golf Club ("Bird Bay"). Rogers v. United States, 90 Fed. Cl. 418, 434 (2009).[1] Currently before the Court are the parties' cross motions for partial summary judgment regarding Plaintiff Bird Bay.

In its November 23, 2009 Opinion, the Court denied the parties' cross-motions for summary judgment regarding Plaintiff Bird Bay because it was "not clear to the Court, specifically, as a matter of Florida law," whether Seaboard Air Line Railway ("Seaboard")[2] obtained a fee simple estate in the railroad corridor, or an easement over land presently owned by Bird Bay. Rogers, 90 Fed. Cl. at 434. The Court requested that the parties submit supplemental briefing on matters of Florida law.[3]

---

[1] On February 2, 2010, the Court granted Plaintiffs' motion for partial summary judgment with regard to Mission Estates after Plaintiffs submitted additional evidence demonstrating Mission Estates' ownership interests as of April 2, 2004.

[2] Seaboard is the railroad company that operated rail service along the subject railway corridor in the early- to mid-twentieth century. It is the predecessor in interest to CSX and the Seminole Gulf Railway, which, in 2003, petitioned to abandon the railway corridor. 90 Fed. Cl. at 421.

[3] The Court requested that the parties address the following issues, under Florida law:

   a. Whether B.L.E. obtained clear fee simple title to the right-of-way vis-à-vis the August 31, 1926 quitclaim and trustee deeds from the prior possessors;

   b. Whether Venice-Nokomis obtained clear fee simple title to the right-of-way as a result of the foreclosure proceedings against B.L.E.;

2

For the reasons set forth below, the Court concludes that Seaboard obtained fee simple title in the railroad corridor abutting Bird Bay's property. As such, Plaintiff Bird Bay has no right or interest in the corridor, and has no claim for a taking related to the corridor. See Preseault v. United States, 100 F.3d 1525, 1533 (Fed. Cir. 1996) ("Clearly, if the Railroad obtained fee simple title to the land over which it was to operate, and that title inures, as it would, to its successors, the [adjoining landowners] today would have no right or interest in those parcels and could have no claim related to those parcels for a taking.").

### Background[4]

On December 15, 2003, Seminole Gulf Railway, L.P. ("SGLR"), filed a petition with the Surface Transportation Board ("STB") to abandon an approximately 12.43 mile portion of its railway corridor between Sarasota and Venice, Florida. On April 2, 2004, the STB issued a Decision and Notice of Interim Trail Use of Abandonment ("NITU") wherein SGLR and CSX Corporation ("CSX") -- as successors and assigns of Seaboard -- granted the Trust for Public Land ("the Trust"), a national, nonprofit, land conservation organization, an option to acquire the railway right-of-way for conversion to a trail. On January 13, 2005, CSX and the Trust executed a quitclaim deed to effect the conversion of the railroad corridor to a recreational trail. See Rogers, 90 Fed. Cl. at 421.

Bird Bay owns a 31-acre parcel of land, a portion of which runs alongside the subject corridor. Bird Bay's western border abuts 975 feet of the corridor. The property is bordered by Curry Creek to the North, by a condominium development to the East, and by another development to the South. Bird Bay's property is wholly located within Section Six, Township 39 South, Range 19 East of Sarasota County, Florida. See Rogers, 90 Fed. Cl. at 422-23.

As the Court noted in its previous Opinion, the ownership history of the corridor as it relates to Bird Bay's property has been difficult to reconstruct. The instrument that originally established Seaboard's interests in the right-of-way running along Bird Bay's property is either

---

    c.  Whether, and to what extent, the property interests or possessory rights conveyed to Seaboard in the B.L.E. and Venice deeds were affected by Seaboard's status as a railroad company;

    d.  Whether, to what extent, and how, the amount of consideration is relevant in interpreting the instruments; and

    e.  Whether it would be appropriate for the Court to consider extrinsic evidence in determining the intent of the parties to the instruments. If so, what extrinsic evidence would each party rely upon and what further proceedings, if any, are warranted?

90 Fed. Cl. at 434.

[4] This background is derived from the Court's November 23, 2009 Opinion and Order and the attachments and exhibits to the parties' motion papers.

lost or never existed. The chain of title spans more than 100 years and involves almost 50 recorded documents. The pertinent land transfers concerning this portion of the subject corridor and Bird Bay's property are described below.[5]

### Parcels Acquired by Sarasota-Venice Company

On May 31, 1910, J. H. Lord and Frane W. Lord conveyed an undivided one-third interest in 9,750 acres to Adrian Honore. Jt. Chain of Title, Tab 1. This conveyance included the land that was owned by Bird Bay on the day the NITU was issued. There is no mention of Seaboard or the railroad corridor.[6]

On October 2, 1911, Adrian Honore conveyed an undivided one-half interest in this land to Sarasota-Venice Company ("Sarasota-Venice"), a land development company run by Honore and Bertha Palmer. Id. Tab 2; Pls.' Suppl. Br. in Resp. to Jan. 15, 2009 Order at 9. That same day, Sarah O. Webber conveyed an undivided one-half interest in this land to Sarasota-Venice. Jt. Chain of Title, Tab 3. Both instruments conveyed the land to Sarasota-Venice "[t]ogether with all and singular the tenements, hereditaments and appurtenances [of the grantor] . . . . [t]o have and hold . . . forever in fee simple." Id. Tabs 2 & 3. The land conveyed included the land presently owned by Bird Bay. Id. (describing the parcel encompassing Bird Bay's land as "the south half of the northwest quarter, the southeast quarter of the southeast quarter, and lots two (2) and three (3) in Section six (6)"). Neither of the two instruments associated with these transfers mentioned Seaboard or the railroad corridor.

### The Interstate Commerce Commission ("ICC") Valuation Table

According to an ICC valuation table dated June 30, 1918, multiple sections of Seaboard's railway corridor as they existed in 1918, including a section adjacent to Bird Bay's property, had been held or used "by possession." Def.'s Cross-mot. for Summ. J., Jun. 6, 2008, Ex. 1. The ICC valuation table concerns "lands owned or used for purposes of a common carrier." Id.

### Sarasota-Venice Company to Palmer

The railway corridor is first mentioned in a conveyance dated June 20, 1921. Jt. Chain of Title, Tab 4. On that date, Adrian Honore, as president of Sarasota-Venice Company, conveyed 6,594 acres of the company's property to Honore Palmer and Potter Palmer as trustees of the

---

[5]   As a result of the relocation of the railroad tracks during the 1920s, there are two corridors in the area adjacent to Bird Bay's property. A portion of the corridor was established prior to this relocation. Conveyances that reference the corridor adjacent to the Bird Bay property after the relocation of the tracks refer to both the old right-of-way and the right-of-way created after the relocation, as the two overlap. See Notice of Filing of Exhibits 10 and 11 to Def.'s Reply Mem., Ex. 11; Pls.' Suppl. Br. in Resp. to Jan. 15, 2009 Order, Ex. F.

[6]   Historical accounts indicate that Seaboard began running trains between Sarasota and Venice, Florida in 1911. See Pls.' Suppl. Br. in Resp. to Jan. 15, 2009 Order at 12 (citing George E. Youngberg and W. Earl Aumann, Venice and the Venice Area (Feather Fables Publishing Co.) (1969)).

testamentary trust established under Bertha Honore Palmer's will.  Id.  The conveyance included portions in Section Six of Township 39 South, Range 19 East -- the plat upon which Bird Bay is now located.  In conveying portions of Section Six, the deed expressly "except[ed] Seaboard Air Line Railroad right-of-way, Section Six (6)."  Id.

On the following day, June 21, 1921, Sarasota-Venice Company executed a quitclaim deed ("the 1921 quitclaim deed") remitting to Potter Palmer all interest Sarasota-Venice had in Seaboard's right-of-way, as well as land used by Seaboard for the purpose of operating the railway.  This instrument stated:

> That the said party of the first part [Sarasota-Venice Company] for and in consideration of the sum of One Dollar and other valuable consideration in hand paid by the said party of the second part [Potter Palmer], the receipt whereof is hereby acknowledged, has remised, released and quitclaimed, and by the presents does remise, release, and quit-claim unto the said party of the second part, and his heirs and assigns, forever, all the right, title, interest, claim and demand which the said party of the first part has in and to the following described lot, piece or parcel of land to wit: The right of way of the Seaboard Air Line Railway Company in the Southeast quarter of Southwest quarter of Section Six (6); East Half of Northwest Quarter and the East Half of Southwest Quarter of Section Seven (7), Township Thirty-nine (39) South, Range Nineteen (19), being more particularly described as a strip of land one hundred (100) feet in width, being fifty (50) feet wide on each side of the center line of railroad of the Seaboard Air Line Railway Company, as the same is now located  and constructed, and extending from the South shore of Curry Creek in the Southeast Quarter of Southwest Quarter of Section Six (6), Township Thirty-nine South, Range Nineteen East, to the present terminus of the railroad of said Seaboard Air Line Railway Company in the Southwest Quarter of Section Seven (7) Township Thirty-nine South, Range Nineteen East.  Also, the lands now used and occupied by the said Seaboard Air Line Railway Company for station grounds, yards, Y tracks and terminals.
>
> . . . .

Id. Tab 5 (emphasis added).  This instrument does not further describe the nature of Seaboard's right-of-way or purport to limit the right-of-way to use for railroad purposes.  See id.

### Palmer to Albee

On August 15, 1925, Honore Palmer and Potter Palmer, as trustees under the trust established in Bertha Honore Palmer's will, conveyed 1,468.55 acres of land to Fred H. Albee. Jt. Chain of Title, Tab 6.  Among other lands, this deed conveyed land in Section Six, Township 39 South, Range 19 East:

> Beginning at SE Cor. of SE1/4 of said sec. 6, thence N 1638.5 ft to waters of Curry Creek; thence SW along shore of Curry Creek <u>to E line of right-of-way of Seaboard Air Line Railroad; thence S along said right-of-way line to S Line of SW1/4 of Sec. 6</u>, thence E 384.7 ft. to point of beginning, containing 10.38 acres, more or less.
>
> Also NE1/4 of SE1/4 of NE1/4, W1/2 of SE1/4 & NE1/4 of SE1/4 of SW1/4 of NE1/4, Sec. 6, Twp 39 South, Range 19 East, containing 35 acres more or less.

<u>Id.</u> (emphasis added).  This conveyance included the land presently owned by Bird Bay and referenced the Seaboard Air Line Railroad right-of-way twice.  <u>Id.</u>  In particular, the deed conveyed the land adjacent to the east line of Seaboard's right-of-way, but did not purport to convey any interest in the right-of-way itself as a distinct piece of property.  The Section Six conveyance stretched from the shore of Curry Creek to the southern boundary of Section Six.  In other words, this conveyance included all of Bird Bay's property running alongside the railroad right-of-way.

### Land Transfers to B.L.E. Realty Corporation

In the mid-to-late 1920s, B.L.E. Realty Corporation ("B.L.E.") acquired through various deeds and indentures:

> 1) 1,468.55 acres of land from Fred Albee and Louella B. Albee on October 6, 1925;
>
> 2) an interest in tracks of land from Joseph H. Lord and Frane Lord on March 8, 1926;
>
> 3) any interest that Honore Palmer and Potter Palmer, as trustees of the testamentary trust established under Bertha Honore Palmer's will, had in the 1,468.55 acres of land that B.L.E. Realty Corporation previously acquired from Fred Albee and Louella B. Albee on March 22, 1926;
>
> 4) the parcel of land "<u>over which the Seaboard Air Line Railway Company has exercised its right-of-way in the Southeast Quarter of Section Six . . . as the same is now located and constructed</u>, and extending from the South shore of Curry Creek" as well as  "<u>the lands now used and occupied by the said Seaboard Air Line Railway Company for station grounds, yards, Y tracks and terminals</u>" from Honore Palmer, Potter Palmer, and their wives via a quitclaim deed as well as any interest that Honore Palmer and Potter Palmer, as trustees of the testamentary trust established under Bertha Honore Palmer's will, had in this land on August 31, 1926.

Jt. Chain of Title, Tabs 7-11 (emphasis added).

6

Among the lands included in the October 6, 1925 deed between Fred and Louella Albee and B.L.E. was a parcel described as:

> Beginning at the Southeast Corner of the Southwest Quarter of said Section Six, thence North __ feet to the waters of ___ Creek; thence ____ along the shore of ___ Creek to the East line of the right-of-way of the ___ Air Line Railroad; thence Southerly along the said right-of-way to the South line of the Southwest Quarter of Section Six; thence East ___ feet to the point of beginning, containing ___ acres, more or less.

Id. Tab 7.[7]  In addition, "THIS DEED [was] made subject to a first mortgage on said lands made and executed by Fred N. Albee to Honore Palmer and Potter Palmer, Trustees under the will of Bertha Honore Palmer, deceased, dated the 15th day of August A.D. 1925."  Id.[8]  The railroad corridor -- as the distinct parcel of land described in prior conveyances -- was not among the properties included in this deed.  Compare id. Tab 7 with Tab 5.

Two quitclaim deeds conveyed interests in the subject corridor to B.L.E., and both were executed on August 31, 1926.  Id. Tabs 10-11.  The first was a quitclaim deed from Honore Palmer and Potter Palmer and their wives conveying "[t]hat certain parcel of land over which the Seaboard Air Line Railway Company has exercised its right-of-way" to B.L.E.  Id. Tab 10.  In this deed, the Palmers quitclaimed "all the right, title, interest, claim and demand which [the Palmers] have in and to the" right-of-way as described above in the 1921 Quitclaim Deed.  The second deed -- a trustee's deed concerning the estate of Bertha Palmer -- conveyed "all the estate, right, title, interest, claim and demand whatsoever in law or in equity which the said Bertha Honore Palmer, Testatrix, had at the time of her death."  Id. Tab 11.  This trustee's deed used identical descriptions to convey the same strip of land as the 1921 and 1926 quitclaim deeds.  Id. Tab 11.

## B.L.E. Realty Corporation to Seaboard Air Line Railway Corporation

On April 4, 1927, B.L.E. executed an indenture to the Seaboard Air Line Railway Company, in which B.L.E "grant[s], bargain[s], convey[s], alien[s], remise[s] and release[s] . . . all of its right, title, and interest" in three parcels of land:

> 1) a "strip of land 100 feet wide, that is, fifty feet on each side of center line of railway as located and constructed through the lands of the grantor in Sections 6, 7, 16 and 17 of Township 39 South, Range 19 East, Sarasota County, Florida;"
>
> 2) a "tract of land 200 feet by 1607 feet, more or less . . . ;"

---

[7] Portions of the instruments that are illegible are indicated with a "__."

[8] None of the other instruments conveying property interests to B.L.E. were made subject to an existing mortgage.

3) and a "certain tract of land . . . lying between two lines fifty feet distant
from and parallel to the center lines of wye track to be constructed."

Id. Tab 12 (emphasis added).  The strip of land in this deed -- the first parcel listed -- extended
from the "the center line of existing railroad where said center line crosses the channel of Curry
Creek . . . to a point on the south line of Section 17."  Id.  This land began at Curry Creek and
stretched far south of Section Six, and, thus, encompassed the entirety of Bird Bay's property
abutting the corridor.  This indenture (the "B.L.E. Deed") stated that B.L.E. granted Seaboard the
property at issue "together with the rights, members and appurtenances thereunto belonging or
appertaining, unto . . . [Seaboard], its successors and assigns in fee simple, forever."  Id.
(emphasis added). The deed also stated that the grantor, B.L.E., "fully warrant[ed] the title to the
said lands and would defend the same against the lawful claims of all persons whomsoever."  Id.
(emphasis added).

### The Foreclosure Sales

On February 27, 1933, the Circuit Court of the 27th Judicial Circuit of Florida in Sarasota
County ("the Circuit Court"), found that B.L.E. had been in default on its mortgage since July
31, 1929, in a case concerning the priority of a crop lien ("first foreclosure").  Id. Tab 13 (Knight
v. B.L.E. Realty Corp., No. 2737, (Fl. Sarasota County Ct. Feb. 27, 1933)).  The portion of the
land subject to the mortgage in default included property that is currently owned by Bird Bay,
but did not include the portion of Bird Bay's land running alongside the railroad corridor.  See
id.[9]  Seaboard's section of the corridor, as described in the above-mentioned deeds, was not
listed among the mortgaged properties in the decree.  Id.

On September 3, 1934, the Circuit Court issued a final decree in a second foreclosure
action, and foreclosed on the mortgage that Fred H. Albee held on property that he previously
had transferred to B.L.E. on October 6, 1925 ("second foreclosure").  Id. Tab 15; see also id. Tab
7.  This affected property included the portion of Bird Bay's land running alongside the railroad
corridor.  See id. Tab 15 (describing land as located within the southwest quarter of section six
up to, and running alongside, "the East line of the right-of-way of the Seaboard Air Line
Railroad").  The Circuit Court appointed a special master and ordered the sale of the land at
public auction.  Id.  The lands subject to the public auction were expressly limited to the lands
listed in the court's 1934 final decree, which included Bird Bay's land adjacent to the right-of-
way, but not the right-of-way itself as a distinct piece of property.  Thus, while the lands abutting
the corridor were included, the corridor itself was not included among the foreclosed properties.
The decree stated:

Beginning at the Southeast Corner of the Southwest Quarter of said Section Six,
thence North 1638.5 feet to the waters of Curry Creek; thence Southwesterly
along the shore of Curry Creek to the East line of the right-of-way of the
Seaboard Air Line Railroad; thence Southerly along the said right-of-way line to

---

[9]  The land subject to this foreclosure was located exclusively within the southeast quarter
of section six.  Other instruments demonstrate that the railroad corridor runs alongside Bird
Bay's property in the southwest quarter of section six.  See Joint Chain of Title, Tabs 7, 9, 15.

This is page 9 of 21.

the South line of the Southwest Quarter of Section Six; thence East 384.7 feet to
the point of beginning, containing 10.38 acres, more or less.

Id.  The final decree provided that B.L.E. and all other defendants to that action were barred
"from the equity of redemption"[10] and from claiming interest in the mortgaged property.   Id.
Following a public auction, the subject property was ultimately assigned via deed to the Venice-
Nokomis Holding Corporation on December 10, 1934.  Id. Tab 16.

### Venice-Nokomis Holding Corporation to Seaboard Air Line Railway - The Venice Deed

Approximately seven years after the public auction, on November 10, 1941, the Venice-
Nokomis Holding Corporation conveyed to Seaboard via a deed, the same three parcels
described in the 1927 deed from B.L.E.  The granting clauses stated that Venice-Nokomis:

[D]oes by these presents grant, bargain, sell and convey, unto [Seaboard]
its successors and assigns, to be held, used and disposed of as a part of the
receivership estate and in accordance with such further orders and decrees
as may be entered by the United States District Court in the Consolidated
Cause of Guaranty Trust Company of New York and Merrel P. Callaway,
as Trustees, et al. against [Seaboard] the following real estate…

Id. Tab 17.  Like B.L.E. in 1927, Venice-Nokomis in 1941 conveyed interests in, inter alia:

A strip of land 100 feet wide, that is, fifty feet on each side of center line
of railway as now located and constructed through the lands of the grantor
in Sections 6, 7, 16 and 17 of Township 39 South, Range 19 East, Sarasota
County, Florida.
. . . .

Beginning at the center line of the main track of Seaboard Air Line
Railway Company where said center line crosses the channel of Curry
Creek . . . to a point on the south line of Section 17.

Id. (emphasis added).  This strip of land encompassed the entire stretch of track running next to
Bird Bay's property.  This strip of land had not been expressly included among the parcels in the
1934 indenture by the Circuit Court's special master to Venice-Nokomis.  Nevertheless, Venice-
Nokomis purportedly conveyed the property, via quitclaim, to Seaboard:

TO HAVE AND TO HOLD, together with all and singular the rights,
members, hereditaments and appurtenances thereunto belonging or in any
[illegible] incident or appertaining, unto the party of the second part, its

---

[10]   Under Florida law, "[t]he right of redemption is the mortgagor's valued and protected
equitable right to reclaim her estate in foreclosed property."   Sudhoff v. Fed. Nat'l Mortgage
Ass'n, 942 So. 2d 425, 428 (Fla. Dist. Ct. App. 2006) (citations omitted).

successors and assigns, <u>in fee simple forever, but subject to be held, used
and disposed of as a part of the receivership estate as aforesaid</u>.

<u>Id.</u> (emphasis added); <u>see also</u> <u>id.</u> Tab 12.

Ultimately, Bird Bay obtained the property adjacent to the railroad corridor at issue here.
<u>See</u> Jt. Chain of Title, Tabs 18-33.

**<u>Discussion</u>**

**<u>Summary Judgment Standard</u>**

Summary judgment is appropriate where the evidence demonstrates that there is "no
genuine issue as to any material fact and that the moving party is entitled to a judgment as a
matter of law."   Rule 56(c)(1) of the Rules of the United States Court of Federal Claims
("RCFC"); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986).  A genuine issue
is one that "may reasonably be resolved in favor of either party."   <u>Liberty Lobby</u>, 477 U.S. at
250.  A fact is material if it "might affect the outcome of the suit."   <u>Id.</u> at 248.  The moving party
bears the burden of establishing the absence of any material fact, and any doubt over factual
issues will be resolved in favor of the non-moving party.  <u>Mingus Constructors, Inc. v. United
States</u>, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654,
655 (1962) and <u>SRI Int'l v. Matsushita Elec. Corp.</u>, 775 F.2d 1107, 1116 (Fed. Cir.1985)).  Once
this burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a
dispute over a material fact that would allow a reasonable finder of fact to rule in its favor.
<u>Liberty Lobby</u>, 477 U.S. at 256.

A court does not weigh each side's evidence when considering a motion for summary
judgment, but "'the inferences to be drawn from the underlying facts . . . must be viewed in the
light most favorable to the party opposing the motion.'"   <u>Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting <u>Diebold</u>, 369 U.S. at 655).

When opposing parties both move for summary judgment, the Court reviews the motions
under the same standard.  <u>First Annapolis Bancorp, Inc.  v. United States</u>, 75 Fed. Cl. 263, 275
(2007) (citation omitted).   In such instances, "the court must evaluate each party's motion on its
own merits, taking care in each instance to draw all reasonable inferences against the party
whose motion is under consideration." <u>Mingus</u>, 812 F.2d at 1391.

**<u>Rails-to-Trails Takings Actions</u>**

When private property interests are taken by the Government pursuant to the Trails Act,
the property owners may be entitled to just compensation as guaranteed by the Fifth
Amendment.  <u>Preseault v. Interstate Commerce Comm'n</u>, 494 U.S. 1, 13 (1990) ("<u>Preseault I</u>").
In a rails-to-trails case, a taking, if any, occurs when "state law reversionary interests are
effectively eliminated in connection with a conversion of a railroad right-of-way to trail use."
<u>Caldwell v. United States</u>, 391 F.3d 1226, 1228 (Fed. Cir. 2004).  The Trails Act, by converting
a railway to a recreational trail, prevents state law reversionary interests from vesting.  <u>Id.</u> at

10

1229; see also Barclay v. United States, 443 F.3d 1368, 1373 (Fed. Cir. 2006) ("Abandonment is suspended and the reversionary interest is blocked 'when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU' . . . . Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU.") (quoting Caldwell, 391 F.3d at 1233-34).

In another sense -- the dominant consideration in these types of taking cases -- the taking occurs when the government, pursuant to the Trails Act, creates a new easement for a new use over land that was encumbered by an easement limited to railroad purposes.  See Preseault v. Interstate Commerce Comm'n, 100 F.3d 1525, 1550 (Fed. Cir. 1996) ("Preseault II") (describing the conversion of a railroad easement to a recreational trail as "a new easement for [a] new use"). The statutory imposition of this second easement -- which otherwise had not been granted -- is a taking.

In Preseault II, the Federal Circuit explained that whether a plaintiff is entitled to compensation under the Tucker Act in a rails-to-trails case depends on three issues:

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

Preseault II, 100 F.3d at 1533.  For Plaintiff Bird Bay, the first issue -- whether the railroad obtained an easement or a fee simple estate -- is dispositive.

Property interests, such as estates in fee and easements, "are not created by the Constitution," but "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).  Here, Florida law governs whether the railroad obtained a fee simple estate in, or an easement over, the land abutting Bird Bay's property. Rogers, 90 Fed. Cl. at 427.[11]

---

[11]   This Court considered the possibility of referring this issue to a state court in Florida, but Florida rules do not authorize such a referral.  See Florida Rules of App. Proc., Rule 9.150(a) (providing that only the Supreme Court of the United States and a United States court of appeals may certify a question of law to the Supreme Court of Florida).

**Florida Law**

**Interpreting Deeds of Conveyance**

Under Florida law, a court should "consider the language of the entire instrument in order to discover the intent of the grantor, both as to the character of the estate and the property attempted to be conveyed, and to so construe the instrument as, if possible, to effectuate such intent." Reid v. Berry, 112 So. 846, 852 (Fla. 1927); see also Thrasher v. Arida, 858 So.2d 1173, 1175 (Fla. Dist. Ct. App. 2003) ("[T]the intention of the parties . . . governs the interpretation of a document."); 19 Fla. Jur. 2d Deeds § 108 ("The primary consideration in the construction of a deed is the intention of the parties thereto.").

"If there is no ambiguity in the language employed then the intention of the grantor must be ascertained from that language." Saltzman v. Ahern, 306 So. 2d 537, 539 (Fla. Dist. Ct. App. 1975) (citing Thompson v. Ruff, 78 So. 489 (Fla. 1918)); see also Gendzier v. Bielecki, 97 So. 2d 604, 608 (Fla. 1957) ("The test of the meaning and intention of the parties is the content of the written document."); 19 Fla. Jur. 2d Deeds § 108.  Thus, when interpreting a deed under Florida law, a court does not endeavor to discover the intent of the parties based on circumstances allegedly surrounding the deed's enactment, and then interpret the deed's text in such a way as to effectuate that perceived intent.  On the contrary, "[t]he Court's function in interpreting and enforcing a contract is to determine the parties' intent from the express text of the Contract." Fin. Healthcare Assoc. v. Public Health Trust, 488 F. Supp. 2d 1231, 1239 (S.D. Fla. 2007) (interpreting Florida law); Mason v. Roser, 588 So. 2d 622, 624 (Fla. Dist. Ct. App. 1991) ("With respect to deeds of conveyance, the general rule is that if there is no ambiguity in the language employed then the intention of the grantor must be ascertained from that language.") (citing Saltzman, 306 So. 2d at 539) (emphasis added).

**Seaboard Obtained Fee Simple Title to the Portion of the Railroad Corridor Bordering Bird Bay's Property**

Since at least 1921, the instruments conveying interests in the railway corridor running south of Curry Creek[12] and the instruments conveying the lands abutting the corridor have treated the corridor as a separate parcel of land, separate and distinct from the larger parcels bordering the corridor.  In this regard, parties in the chain of title have conveyed fee title to the corridor, rather than rights or easements to use the corridor.  First, the June 20, 1921 warranty deed between Sarasota-Venice and Honore and Potter Palmer specifically excepted the "Seaboard Air Line Railroad right-of-way" as it ran though section six. Jt. Chain of Title, Tab 4. The "right-of-way" was not excepted as an easement, but as land withheld from the conveyance. The next day, June 21, 1921, Sarasota-Venice quitclaimed its title to the corridor and lands "used and occupied by" Seaboard to Potter Palmer.  Id. Tab 5.  This conveyance did not convey an easement or a right to use the corridor.  Rather, this indenture conveyed fee title to the corridor. Id.  In 1926, Potter Palmer, holding title to the corridor as a distinct piece of property, subsequently passed that title to B.L.E.  Id. Tabs 10-11.  The year prior, B.L.E. had obtained title to the adjacent lands from Dr. Albee through a separate instrument encumbered by a mortgage. Id. Tab 7.  Thus, B.L.E. held title to both the corridor and the lands abutting the corridor when it

---

[12] This includes the original corridor and the corridor as it was relocated.

and Seaboard executed the B.L.E. Deed in 1927. The lands abutting the corridor were encumbered by a mortgage held by Dr. Albee. Id.

Though the record is replete with instruments conveying interests in the railroad corridor and the lands bordering the corridor, the Court's interpretations of two deeds -- the 1927 B.L.E. Deed and the 1941 Venice Deed -- are determinative of whether Bird Bay has a claim related to the corridor for a taking.[13] These deeds are determinative because they both purport to convey interests in the subject corridor -- as it passed down the chain of title as a distinct parcel of land -- to the Seaboard Railroad. These are the same interests that Seaboard's successors-in-interest, SGLR and CSX, possessed over the corridor bordering Bird Bay's property when the STB issued the NITU on April 2, 2004.

## The B.L.E. Deed Unambiguously Conveyed Fee Simple Title to the Corridor to Seaboard

The parties agree that B.L.E. held fee simple title to the lands conveyed to Seaboard on April 4, 1927. Pls.' Suppl. Br., Feb. 11, 2010, at 6; Def.'s Suppl. Br., Feb. 11, 2010, at 6-10. Based on the plain language of the B.L.E. Deed, the grantor intended to convey its entire present interest in the three described parcels of land to Seaboard. The granting clause of the B.L.E. Deed dated April 4, 1927, demonstrates that B.L.E., after acknowledging receipt of consideration, intended to transfer full title in the land to Seaboard. The clause states: "[B.L.E.] grant[s], bargain[s], convey[s], alien[s], remise[s] and release[s], unto [Seaboard and its successors and assigns], forever, all of its right, title and interest in and to the following real estate . . . ." Jt. Chain of Title, Tab 12. Because B.L.E. held the lands in fee simple and transferred "all of its right, title and interest" to Seaboard, it conveyed fee simple title. The granting clause does not contain language limiting the interests conveyed to certain uses or purposes, nor does it reference an easement. This unambiguous language is in stark contrast to the Honore conveyance discussed in this Court's prior Opinion, in which the grantor transferred to Seaboard an easement, described as "a right of way for railroad purposes over and across the following described parcels of land." Rogers, 90 Fed. Cl. at 429.

In addition, the descriptions of the three conveyed parcels reference a "strip of land," and two "tract[s] of land." Jt. Chain of Title, Tab 12. Beyond the metes and bounds of the parcels, the descriptions contain no language that describes or refers to the lands in terms of certain restricted or enumerated uses or purposes.[14] This is further indication that the parties intended to

---

[13] The parties agree that these two deeds are dispositive. See, e.g., Pls.' Suppl. Br. in Resp. to Jan. 15, 2009 Order at 38-39 ("Thus, the [1927] B.L.E. Realty Indenture and the 1941 Venice-Nokomis Instrument are the only recorded instruments by which Seaboard may claim an interest in the land upon which the original or the relocated railway was located."); Tr. 51, Jun. 10, 2010 (Ms. Acock) ("[It] seems like we all agree that the 1927 B.L.E. conveyance and the 1941 Venice-Nokomis conveyance are the two really controlling conveyances here.").

[14] The description of the third parcel makes reference to a "wye track to be constructed." Jt. Chain of Title, Tab 12. This language is descriptive as it refers to the "proposed" wye track to identify the "tract of land" being conveyed. It does not limit or restrict the grantee's use of the parcel.

convey land, rather than a right to use or control land for a limited purpose.  See, e.g., A.E. Korpela, Deed to railroad company as conveying fee or easement, 6 A.L.R. 3d 973, § 4 ("Deeds purporting to convey to railroads a strip, piece, parcel or tract of 'land,' which do not contain additional language describing or otherwise referring to the land in terms of the use or purpose to which it is to be put . . . are generally construed as passing an estate in fee.").[15]

Finally, the habendum clause, the purpose of which "is 'to define the estate which the grantee is to take in the property conveyed, whether a fee, life estate, or other interest,'" Reid v. Barry, 112 So. 846, 851 (Fla. 1927) (citing Devlin on Deeds (3d ed.) §§ 213, 220), characterizes the estate conveyed to Seaboard and its successors and assigns as one in "fee simple, forever." Jt. Chain of Title, Tab 12.  Like the other parts of the deed, the habendum clause does not contain language which would limit or restrict the grantee's use of the lands.  In addition, the clause is followed by covenants of title, in which B.L.E. "fully warrant[ed] the title to the said lands and will defend the same against the lawful claims of all persons whomsoever."  Id.  It is again useful to compare this warranty deed to the Honore conveyance construed in the Court's first opinion.  In the habendum clause to the Honore conveyance, the grantor conveyed the "right of way" to Seaboard for its "own proper use, benefit and behoof forever for railroad purposes." See Def.'s Cross-mot. for Summ. J., Jun. 6, 2008, Ex. 7 (emphasis added).  And, rather than being followed by covenants of title such as those in the B.L.E. Deed, the Honore conveyance's habendum clause is followed by a clause expressly conditioning the conveyance upon Seaboard's use of the premises for railroad purposes.  Id.

Plaintiffs maintain that the B.L.E. Deed granted Seaboard only an easement, but they do not parse the language of the deed and instead argue that foreclosure proceedings against B.L.E. in 1934 extinguished the property interests that Seaboard had obtained in the 1927 B.L.E. Deed. See, e.g., Pls.' Suppl. Br., Feb. 11, 2010, at 5-7.  According to Plaintiffs, the subject corridor was included within the 1,468.55 acres that Fred and Louella Albee had conveyed via deed to B.L.E. on October 6, 1925.  This deed was subject to a first mortgage from Fred Albee.  From this, Plaintiffs contend that, when the Circuit Court foreclosed the Albee mortgage against B.L.E. in 1934 -- the second foreclosure[16] -- it extinguished any interests Seaboard had obtained in the subject corridor in the 1927 B.L.E. Deed.  Pls.' Suppl. Br., Feb. 11, 2010, at 6 (citing Jt. Chain of Title, Tab 15).  However, the record does not demonstrate that the railway corridor was subject to those foreclosure proceedings.  According to the Circuit Court's decree, the foreclosure proceedings were limited to the properties specifically described in that decree.  Jt. Chain of Title, Tab 15.  The court's decree included Bird Bay's property (i.e. the land adjacent to the corridor) but it did not mention the subject corridor, as the separate piece of property described in the B.L.E. Deed and in earlier instruments.

---

[15] So too, the fact that a station was sited on one of the three tracts and the wye track expanse located on another – both to be owned and operated by the railroad – is indicative of an intent to convey land outright.

[16] There is no dispute that the first foreclosure did not include the portion of the corridor abutting Bird Bay's property.  Rogers, 90 Fed. Cl. at 425 n.14; Pls.' Suppl. Resp., Mar. 2, 2010, at 8.

Plaintiffs contend that the court's decree's reference to the "right-of-way of the Seaboard Air Line Railroad" in Section six is evidence that the corridor was among the foreclosed properties. Pls.' Suppl. Resp., Mar. 2, 2010, at 8.  However, the decree described the foreclosed property in section six as extending southwest "to the East line of the right-of-way" and south "along said right-of-way."  Id. (emphasis added).  Contrary to Plaintiffs' contention, this language suggests that the foreclosed properties bordered the corridor, but did not include it.  In addition, B.L.E. did not obtain title to the subject corridor from Dr. Albee, but from the Palmers, via two quitclaim deeds executed on August 31, 1926. Jt. Chain of Title, Tabs 10 & 11.  Unlike the Albee deed, the Palmer deeds were not made subject to mortgages.  Id.  Furthermore, the B.L.E. Deed of April 4, 1927, had conveyed fee title interest in the relocated corridor to Seaboard, free and clear of any mortgages, seven years prior to the court's final decree.  See id. Tab 12.  Plaintiffs have not demonstrated how a foreclosure proceeding affecting specifically described lands owned by B.L.E. in 1934 could somehow "extinguish" the ownership rights of Seaboard (a third party), which had obtained title in 1927 -- seven years earlier -- to a parcel not included among the foreclosed properties.[17]

In sum, B.L.E.'s fee simple title to the subject corridor was free and clear of any mortgage.  B.L.E.'s subsequent transfer of title to Seaboard in 1927 was neither encumbered by the Albee mortgage nor otherwise affected by the 1934 foreclosures.

## Plaintiffs' Reliance on the Venice Deed is Erroneous

Plaintiffs contend that the 1934 foreclosure proceedings extinguished the ownership rights obtained by Seaboard via the 1927 B.L.E. Deed and that "Venice-Nokomis obtained clear fee simple title to the right-of-way" when the Circuit Court's Special Master, following the foreclosure, auctioned the land and conveyed title to Venice-Nokomis. Pls.' Suppl. Br., Feb. 11, 2010, at 6 (citing Jt. Chain of Title, Tabs 15 & 16).  From there, Plaintiffs argue that Venice-Nokomis conveyed an easement to Seaboard when it executed the Venice Deed on November 10, 1941 based on the language of the deed and extrinsic evidence surrounding the deed's execution. Pls.' Suppl. Br., Feb. 11, 2010, at 16-17.  As explained above, Plaintiffs' argument that the foreclosure proceedings extinguished Seaboard's title to the corridor is not supported by the record.  Seaboard's interest was not extinguished in 1934, and it is this Court's holding that, in 1941, Seaboard already held title to the corridor via the 1927 B.L.E. Deed.  Nevertheless, Plaintiffs' interpretation of the Venice Deed -- that it only conveyed an easement to Seaboard -- is also erroneous.  The 1941 Venice Deed -- a quitclaim deed, perhaps redundant given that Seaboard already held title -- conveyed fee simple title to the described lands to Seaboard, including title to the corridor.

---

[17]  Plaintiffs intimate that the relocated corridor was completed in 1926, and that this new corridor was included among the lands subject to the 1934 foreclosure proceedings. Tr. 22-23, Jun. 10, 2010 (Mr. Hearne).  However, the record does not support such a finding.  The foreclosure proceedings were limited to lands explicitly described in the Circuit Court's decree. Not only is the relocated corridor not among the parcels described in the decree, but the decree includes land "to" and "along" the right-of-way, rather than land including the right-of-way.

Like the B.L.E. Deed, the Venice Deed is unambiguous, and, thus, the Court must ascertain the parties' intent from the face of the deed.  See, e.g., Saltzman v. Ahern, 306 So. 2d 537, 539 (Fla. Dist. Ct. App. 1975).  The granting clause of the Venice Deed states that, in exchange for consideration, the grantor, Venice-Nokomis, "granted, bargained, sold and conveyed . . . the following real estate situated in Sarasota County, Florida."  Jt. Chain of Title, Tab 17.  The granting clause does not restrict the transfer of such lands for use as a railroad or for railroad purposes.  Nor does the clause indicate the parties' intent to transfer a right of use. On the contrary, the deed conveys "real estate."  The descriptions of the three parcels are identical to the descriptions in the B.L.E. Deed and, as they did in the B.L.E. Deed, these descriptions evidence the parties' intent to convey land, rather than a right to use the land for railroad purposes.  Id.  Like the B.L.E. Deed, the habendum clause to the Venice Deed defines the interests in the lands conveyed to Seaboard, its successors, and assigns, as interests in "fee simple forever."  Id.  There is no language indicating that the parties intended to convey anything less than title to the lands in fee simple.  Thus, even assuming Plaintiffs are correct that Seaboard did not already have fee title in 1941 and that Venice-Nokomis held title to the corridor following the 1934 foreclosure proceeding, Venice-Nokomis transferred its title to Seaboard via the Venice Deed in 1941.

Plaintiffs isolate two provisions in the Venice Deed to argue that this deed conveyed an easement over the subject corridor.[18]  First, Plaintiffs contend that the deed's language "expressly states that [the deed] was created to grant Seaboard a right to use a strip of land 'through the lands of the grantor.'"  Pls.' Suppl. Reply, Mar. 16, 2010, at 8.  According to Plaintiffs, the use of the clause "through the lands of the grantor" demonstrates the parties' intention to limit the interest conveyed to an easement.  Contrary to Plaintiffs' interpretation, the Venice Deed did not grant Seaboard merely a right to use a strip of land "through the lands of the grantor."  Rather, the deed conveyed to Seaboard all of the rights and title that Venice-Nokomis possessed in three specific parcels of land – one of which was the subject corridor.  The language "through the lands of the grantor" in the deed merely describes the location of the strip of land conveyed to Seaboard and does not define or characterize the nature of the property interest conveyed to Seaboard.  See Jt. Chain of Title, Tab 17 (conveying "real estate" including "[a] strip of land 100 feet wide, that is, fifty feet on each side of center line of railway as now located and constructed through the lands of the grantor in Sections 6, 7, 10 and 17. . . ").  This language in no way qualifies or limits the property interests the parties intended to convey.  Moreover, the language "through the lands of the grantor," which is used to describe just one of the three parcels conveyed -- the strip of land abutting Bird Bay's land **--** cannot be read to change or contradict the parties' intent as it is reflected throughout the instrument, especially as their intent to convey fee simple title is evident in the habendum clause.[19]

---

[18]  One of these provisions -- the provision regarding Seaboard's receivership estate -- appears once in the granting clause of the Venice Deed and again in the habendum clause.  Jt. Chain of Title, Tab 17.

[19]  Plaintiffs state, but do not develop, the same argument regarding the phrase "through the lands of the grantor" as it appears in the B.L.E. Deed.  The Court's finding with regard to the language "through the lands of the grantor" as it appears in the Venice Deed is also applicable to the B.L.E. Deed.

Second, Plaintiffs argue that the language in the granting and habendum clauses of the Venice Deed stating that the conveyed lands are "to be held, used and disposed of as a part of the receivership estate and in accordance with such further orders and decrees as may be entered" by Seaboard's bankruptcy court limits the interest conveyed in the Venice Deed to an easement over the subject corridor, rather than a fee estate.  <u>See, e.g.</u>, Pls.' Suppl. Br., Feb. 11, 2010, at 13. Arguing that railroads in Florida should "only acquire the interest in land necessary to achieve the lawful purpose for which they were established," <u>id.</u> at 6, Plaintiffs contend that "Seaboard could use its assets for only those limited purposes necessary to operate a railroad."  Pls.' Suppl. Br., Feb. 11, 2010, at 17; Tr. 30, Jun. 10, 2010 (Mr. Hearne) ("There was no need -- and we cited both <u>Dean</u> and <u>MCI v. Davis</u> -- as Florida law say[s], that all the railroad needed -- all that Seaboard needed at this time to do -- to accomplish its purpose as a railroad, to continue operating a rail line, was an easement.  So because it's in receivership, we wouldn't want to infer that it's trying to acquire this property for some other purpose.").

However, the language in the Venice Deed limiting the conveyance "to be held, used and disposed of as part of [Seaboard's] receivership estate" does not, as Plaintiffs argue, limit the property interest conveyed to an easement.  Plaintiffs suggest that "an instrument with limiting conditions conveys less than fee simple title."  Pls.' Suppl. Reply, Mar. 16, 2010, at 8.  In other words, in Plaintiffs' view, because the Venice Deed contains language conveying the land to be used as part of Seaboard's receivership estate, it should not be read to convey fee simple title to Seaboard.  This argument has no basis in law, and Plaintiffs have not tried to support it with any. This language merely acknowledges that the grantee is in receivership and limits the grantee's ability to dispose of the property outside of the context of the receivership estate, but does not constitute a limitation on the estate conveyed.  It has no effect upon the intent of the grantor to convey all of its interests in the properties to the grantee.  The grantor's intent to convey all of its interests in three parcels is clear throughout the deed.  Accordingly, the Venice-Nokomis Deed unambiguously conveyed fee simple title to Seaboard.

That there are two instruments -- the B.L.E. Deed and the Venice Deed --conveying fee simple title to Seaboard does not alter the Court's conclusion that Seaboard obtained title to the corridor.  If, as the Court finds here, Seaboard's fee simple interest conveyed in the B.L.E. Deed survived the foreclosure proceedings, then Venice-Nokomis had no interest to quitclaim to Seaboard because Seaboard already owned fee simple title to the subject corridor.  Plaintiffs endeavor to refute the contention that Seaboard already held fee title to the corridor in 1941 by contending that, under this scenario, the Venice Deed would be a "meaningless and futile nullity," which is something "sophisticated" parties would never have executed.  Pls.' Suppl. Resp., Mar. 2, 2010, at 10.  However, it is well established that: "[q]uite often the release by quitclaim is sought simply to put to rest a dormant or doubtful claim."  <u>Thompson on Real Property</u>, § 94.07(b)(3)(i) (Thomas ed. 2002).  Thus, while the Venice Deed may have been redundant, it was not a legal nullity and confirmed Seaboard's title to the corridor.

## The Fact that the Grantee – Seaboard – Was a Railroad Does Not Inhibit Its Right to Acquire Fee Title to Corridor

The fact that Seaboard was a railroad, which may or may not have possessed the power of eminent domain, does not, as Plaintiffs argue, inhibit its right to acquire fee simple title to

lands, even when it was in receivership.  Under Florida law, railroad companies may acquire land over which to construct rails and operate locomotive trains either as an estate in fee or they may acquire a right to cross over such land with an easement.  Compare Atl. Coast Line. R. Co. v. Duval Cty., 154 So. 331, 332 (Fla. 1934) ("Like other property [a railroad right of way is] acquired by purchase or condemnation and vests a fee in the company acquiring it which cannot be divested except as the law provides.") with Cohen v. Pan Am. Aluminum Corp., 363 So. 2d 59, 60 (Fla. Dist. Ct. App. 1978) (finding that a railroad obtained a right-of-way in the form of an easement).  In Florida, the term right-of-way, as it relates to railroads, can refer either to a "right of crossing" -- an easement -- or to "a strip of land which a railroad takes, upon which to construct its railroad" -- an estate in fee.  43 Fla. Jur. 2d Railroads § 32.  Whether the railroad obtains a "right" or "land" depends on the intent of the parties as reflected by the deed of conveyance.  As explained above, the B.L.E. and Venice-Nokomis deeds conveyed title to land to Seaboard.

In Preseault II, the Federal Circuit interpreted a warranty deed as conveying only an easement to a railroad, even though the deed "appear[ed] to be the standard form used to convey a fee simple title from a grantor to [the railroad]."  100 F.3d at 1535-36.  However, that ruling was limited to a situation where a railroad exercised eminent domain under principles of Vermont law.  Id.  Under these principles, a condemning authority exercising eminent domain is not permitted to acquire a greater property interest than necessary to serve the public purpose for which the property is acquired.  Id.  Plaintiffs argue that Florida law recognizes these same principles and, from that, contend that the operative deeds should be construed to give the railroad only the interest it needed – an easement over which to operate a rail line.  Pls.' Suppl. Reply, Mar. 16, 2010, at 6.  According to Plaintiffs, "the Federal Circuit held that because a railroad possessed the power of eminent domain, even a voluntary conveyance of land to the railroad 'retained its eminent domain flavor, and the railroad acquired only that [interest] which it needed, an easement.'"  Id. at 5 (citing Preseault II, 100 F.3d at 1537).

In Preseault II, unlike in the instant case, it was the actual exercise of the railroad's eminent domain power that resulted in a limitation of the interests conveyed in the warranty deed, and not the railroad's mere possession of such power, as Plaintiffs argue.  According to the court, "the act of survey and location [was] the operative determinant, and not the particular form of transfer."  Preseault II, 100 F.3d at 1537.  Indeed, the Federal Circuit concluded that the warranty deed at issue in Preseault II simply confirmed and memorialized the railroad's action in exercising its eminent domain powers.  Id.

In this regard, Florida law is consistent with Vermont law, but only to the extent that Florida adheres to the unremarkable principle of eminent domain law that the condemnor only acquires interests sufficient to satisfy the purpose of the taking.  See Robertson v. Brookville & Inverness Ry., 129 So. 582, 584 (Fla. 1930); Trailer Ranch, Inc. v. City of Pompano Beach, 500 So. 2d 503, 507 (Fla. 1986) ("A condemning authority exercising the power of eminent domain is not permitted to acquire a greater quantity of property or interest therein than is necessary to serve the public purpose for which the property is acquired.").  In Preseault II, the land was acquired by the railroad via its compulsory power of eminent domain derived under Vermont law and not via an arms-length transaction reflected in a bargained-for deed.  In contrast, there is no evidence in this record that Seaboard acquired the corridor by exercising eminent domain

derived under Florida law. As such, the terms of the deeds are controlling and not the context in which the property was acquired. Because there is no evidence that Seaboard, acting as a public authority, exercised eminent domain in acquiring the corridor at issue, Florida law does not limit the interest in property that the railroad acquired to that of a de jure easement.

It is also important that, in addition to the 100 feet wide strip of land abutting Bird Bay's property, the dispositive instruments here, the B.L.E. Deed and the Venice Deed, conveyed two other pieces of real estate to Seaboard -- one the railroad used for a wye track and another upon which the railroad sited a train depot. See Tabs 12 & 17; Pls.' Suppl. Br. in Resp. to Jan. 15, 2009 Order at 23. Even the court in Davis v. MCI Telecommunications Corporation, 606 So. 2d 734 (Fla. App. 1992), which Plaintiffs cite to support their argument that a railroad in Florida would not acquire more interest than it needed to operate its line, noted that fee simple title would be appropriate "to site a station house or similar land use." 606 So.2d at 738. The B.L.E. and Venice deeds did not simply convey lands over which Seaboard would run track. On the contrary, Seaboard obtained parcels upon which to site a train depot and operate a wye track. As Florida law recognizes, it would have been appropriate for Seaboard to obtain these two parcels in fee simple, rather than via an easement over such parcels. Interpreting the language of conveyance in the B.L.E. and Venice deeds as conveying fee simple title in two of the parcels, but only an easement over the third would be incongruous.

## The Amount of Consideration Does Not Inform the Interpretation of the Deeds

Plaintiffs contend that the amount of consideration in the B.L.E. Deed and the Venice Deed is relevant because "it is a factor which informs us what interest the grantor intended to convey." Pls.' Suppl. Br., Feb. 11, 2010, at 11. Plaintiffs argue that the allegedly nominal consideration included in the two deeds demonstrates that the grantors intended to convey easements, rather than estates in fee because "'the acquiring of easements . . . would be less expensive than acquiring title to land.'" Pls.' Suppl. Reply, Mar. 16, 2010, at 10 (quoting Florida Power Corp. v. McNeely, 125 So. 2d 311, 317 (Fla. App. 1960)).

With regard to whether the amount of consideration is relevant to determining whether a deed conveys an estate in fee or an easement, Florida law is clear. "It is fundamental that the law will not consider the adequacy or the sufficiency of the consideration given for a conveyance or transaction." Venice East, Inc. v. Manno, 186 So. 2d 71, 75 (Fla. Dist. App. 1966). Indeed, "the consideration clause in a deed of conveyance is conclusive for the purpose of giving effect to the operative words of a deed creating a right or extinguishing a title." Fla. Moss Prods. Co. v. City of Leesburg, 112 So. 572, 574 (Fla. 1927) (emphasis added). Extrinsic evidence as to the adequacy of consideration offered to challenge the "operation and effect" of a deed is not appropriate. Id. In Florida, "[e]ven nominal consideration will support a deed." Kingsland v. Godbold, 456 So. 2d 501, 502 (Fla. Dist. App. 1984) (reversing the trial court's decision to void a deed for lack of consideration where the deed recited consideration of $10.00 for title to a condominium unit); Naseer v. Mirabella Foundation, 2008 WL 4853623, n.1 (M.D. Fla. 2008). Both the B.L.E. Deed and the Venice-Nokomis Deed include consideration clauses and are unambiguous on their faces. Contrary to Plaintiffs' argument here, the amount of consideration may not inform the Court as to the parties' intentions, especially if that evidence varies, alters, or contradicts the face of the documents. See Fla. Moss Prods. Co., 112 So. at 574-74.

**Extrinsic Evidence May Not Be Used to Interpret the Unambiguous Deeds**

Plaintiffs also offer extrinsic evidence that they argue shows that the parties to the B.L.E. Deed and the Venice-Nokomis Deed understood that these conveyances transferred an easement to Seaboard. Specifically, Plaintiffs offer evidence that deals with, inter alia, Seaboard's status as a railroad, the interrelationships among the parties to the deeds, the manner in which Seaboard's right-of-way is described in subsequent instruments, and the economic circumstances under which the deeds were executed.

Under Florida law, a court may not look beyond the four corners of a deed if the deed is "clear and certain in meaning and the grantor's intention is reflected by the language employed." Saltzman, 306 So. 2d at 539. Indeed, "[r]ules of construction will be utilized only where the meaning or effect of the deed is doubtful." Id. Similarly, as both parties recognize, extrinsic evidence may not be used by a court "to vary, contradict, or defeat the terms of a complete and unambiguous written instrument." Fla. Moss Prods. Co., 112 So. at 573; Pls.' Suppl. Br., Feb. 11, 2010, at 14; Def.'s Suppl. Resp., Mar. 1, 2010, at 3.

The Supreme Court of Florida has recognized narrow exceptions to its parol evidence rule. A court may examine extrinsic evidence where the written instrument does not represent the entire agreement between the parties, and in circumstances where the character of the consideration cannot be discerned from the face of the instrument (e.g. a deed that purports to convey "other valuable considerations"). Fla. Moss Prods. Co., 112 So. 573-74. Florida courts have also admitted separate and contemporaneous deeds or instruments in order to discern the real intent of an otherwise ambiguous instrument. Nourachi v. United States, 632 F. Supp. 2d 1101, 1110 (M.D. Fla. 2009); Kach v. Cooley, 201 So. 2d 254, 255 (Fla. Dist. Ct. App. 1967); 19 Fla. Jur. 2d Deeds § 110.

In addition, Florida courts have recognized, as Plaintiffs point out, that "[w]henever a party presents an arguable claim that a document contains a latent ambiguity, the court is obliged to consider the extrinsic evidence, at least to the extent necessary to determine whether the claimed latent ambiguity actually exists." Bd. of Trs. of Internal Improvement Trust Fund v. Lost Tree Vill. Corp., 805 So. 2d 22, 26 (Fla. Dist. Ct. App. 2001); Landis v. Mears, 329 So. 2d 323, 325-26 (Fla. Dist. Ct. App. 1976). "A latent ambiguity in a deed description is said to exist when the deed, clear on its face, is shown by some extraneous fact to present an equivocation by being susceptible to two or more possible meanings." Lost Tree Vill. Corp., 805 So. 2d at 25. See also Black's Law Dictionary (8th ed. 2004) (defining a latent ambiguity as "an ambiguity that does not readily appear in language of a document, but instead arises from a collateral matter when the document's terms are applied or executed"). The extrinsic evidence is allowable to the extent it "removes" or clarifies the ambiguity, but it may not be used to "vary, alter, or contradict a written instrument." Whitfield v. Webb, 131 So. 786, 788 (Fla. 1931) ("This rule does not violate, but is complementary to, the general rule that parol evidence is not admissible to vary, alter, or contradict a written instrument.").

The exceptions to Florida's parol evidence rules are inapplicable here. There is no evidence that the B.L.E. Deed or the Venice-Nokomis Deed do not comprise the entire agreement between the parties, and the Court need not resort to extrinsic evidence to discern the

"real intent" of the parties.  In addition, Plaintiffs have not identified any latent ambiguity that would require the Court resort to extrinsic evidence.  Once again, the B.L.E. Deed and the Venice Deed are unambiguous on their faces.  They both conveyed fee simple title to the portion of the railroad corridor abutting Bird Bay's property to Seaboard.  Neither of the deeds conveyed easements.  Because the instruments are unambiguous, the Court will not consider the extrinsic evidence proffered by Plaintiffs.

## Conclusion

Under Florida law, Seaboard obtained fee simple title in the railroad corridor abutting Bird Bay's property.  As such, Plaintiff Bird Bay has no right or interest in the corridor, and has no claim related to the corridor for a taking.  See Preseault v. United States, 100 F.3d 1525, 1533 (Fed. Cir. 1996).  Accordingly, Defendant's motion for partial summary judgment regarding Plaintiff Bird Bay is **GRANTED.**

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**