# In the United States Court of Federal Claims

No. 07-273L
No. 07-426L
No. 08-198L
No. 10-187L
No. 10-200L
(Filed:  October 31, 2011)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                            *
STEPHEN J. ROGERS, et al.,                  *       Motion for Partial Summary Judgment;
                                            *       RCFC 56; Fifth Amendment Taking;
            Plaintiffs,                     *       Rails-to-Trails Act; Florida Law;
                 v.                         *       Fee Simple; Right-of-Way;
                                            *       Abandonment; Measurement of Just
THE UNITED STATES,                          *       Compensation.
                                            *
            Defendant.                      *
                                            *
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Mark (Thor) Hearne, II, Lindsay Brinton, and Meghan Largent, Arent Fox LLP, 112 S. Hanley Drive, Suite 200, Clayton, MO 63105, for Plaintiffs.

Carol Draper and William Shapiro, United States Department of Justice, 601 D. Street, N.W., Room 3114, Washington, D.C. 20530, for Defendant.

_____

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT ON VALUATION**
_____

**WILLIAMS**, Judge.

These Fifth Amendment taking actions come before the Court on the parties' cross-motions for partial summary judgment for a determination of the proper method for valuation of property. In a previous opinion, the Court determined that the Government was liable for a taking of Plaintiffs' property pursuant to the National Trails System Act Amendments of 1983 ("Trails Act"). See Rogers v. United States, 90 Fed. Cl. 418, 434 (2009). The parties dispute the measure of "just compensation" due to Plaintiffs. Plaintiffs claim that they are owed the difference between the fair market value of a fee simple estate and the fair market value of the same estate burdened by a recreational trail easement. Defendant argues that the proper measure of compensation is the difference in fair market value between an estate burdened by a rail

1

easement and an estate burdened by a trail easement.  For reasons discussed below, the Court grants Plaintiffs' motion.

## Background

**Takings Claims and the Trails Act**

Congress enacted the Trails Act to preserve shrinking rail trackage by converting unused rights-of-way to recreational trails.  Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 5 (1990) ("Preseault I"); see also 16 U.S.C. § 1241 et seq.  The operation of the Trails Act is subject to the Fifth Amendment to the United States Constitution which provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.  Accordingly, when private property interests are taken by the Government pursuant to the Trails Act, the property owners are entitled to just compensation.  See Preseault I, 494 U.S. at 12.  Because property rights arise under state law, Florida law governs whether the landowners have a compensable property interest.  See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1001(1984); Preseault I, 494 U.S. at 20-25 (O'Connor, J., concurring).

In a rails-to-trails case, a taking, if any, occurs when "state law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use."  Caldwell v. United States, 391 F.3d 1226, 1228 (Fed. Cir. 2004).  The Trails Act prevents a common law abandonment of the railroad right-of-way from being effected, thus precluding state law reversionary interests from vesting.  Id. at 1229.  Stated in traditional property law parlance, upon abandonment or termination of a railroad easement, "the burden of the easement would be extinguished, and the landowner's property would be held free and clear of any such burden."  Toews v. United States, 376 F.3d 1371, 1376 (Fed. Cir. 2004).  By preventing the abandonment and concomitant restoration of a fee simple unburdened by the easement, the Trails Act effects a taking.  See Barclay v. United States, 443 F.3d 1368, 1371 (Fed. Cir. 2006).  As the Federal Circuit has explained, the taking occurs when the Surface Transportation Board ("STB"), the regulatory body that oversees construction, operation, and abandonment of most railroad lines in the United States, issues a Notice of Interim Trail Use or Abandonment ("NITU"):

> Abandonment is suspended and the reversionary interest is blocked "when the railroad and trail operator communicate to the [Surface Transportation Board] their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)" of the Trails Act. . . .  We concluded [in Caldwell] that "[t]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way."  Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU.

Barclay, 443 F.3d at 1374 (quoting Caldwell, 391 F.3d at 1233) (emphasis in original) (citation omitted).

In another sense -- the dominant consideration in these types of taking cases -- the taking occurs when the government, pursuant to the Trails Act, creates a new easement for a recreational use over land that had been encumbered by an easement limited to railroad purposes. See Preseault v. United States, 100 F.3d 1525, 1550 (Fed. Cir. 1996) ("Preseault II") (describing the conversion of a railroad easement to a recreational trail as "a new easement for [a] new use, constituting a physical taking of the right of exclusive possession that belonged to the [owners of the servient estates]"). The statutory imposition of this recreational easement, which otherwise had not been granted, is a taking. The Trails Act also subjects the property to another burden -- railbanking -- or the potential reactivation of rail service along the corridor if necessary. This remote speculative possibility does not, however, mean that the original railroad-use easement is resuscitated or reinstated. See Toews, 376 F.3d at 1381 ("Whether there ever will be . . . other railroad service over these paved routes . . . is a matter of speculation about the distant future, based on uncertain economic and social change, and a change in government policy by managers not yet known or perhaps even born. Such speculation does not provide a basis for denying protection to existing property rights under the Constitution.").

**The Court's Liability Decision**

In its liability decision this Court applied the test articulated by the Federal Circuit in Preseault II -- whether a plaintiff is entitled to compensation in a rails-to-trails case depends on three determinative issues:

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

Preseault II, 100 F.3d at 1533.

The first inquiry -- whether the named landowners have a property interest in the right-of-way -- depends upon the nature of the original conveyance that established the railroad's right to operate a railroad on the property at issue. Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373-74 (Fed. Cir. 2009).

In its liability decision, the Court interpreted a 1910 deed from Adrian C. Honore to Seaboard Air Line Railway ("Seaboard"), recognizing that the parcels at issue had been conveyed unaltered down the chain of title until the NITU was issued in April, 2004. The conveyance reads, in pertinent part:

> ADRIAN C. HONORE . . . does hereby remise, release, and forever quit claim unto the SEABOARD AIR LINE RAILWAY

> . . . a right of way for railroad purposes over and across the following described parcels of land . . . .
>
> This conveyance is made upon the express condition, however that if the Seaboard Air Line Railway shall not construct upon said land and commence the operation thereon [within] one year of the date hereof of a line of railroad, or, if at any time thereafter the said Seaboard Air Line Railway shall abandon said land for railroad purposes then the above described pieces and parcels of land shall [ipso facto] revert to and again become the property of the undersigned, his heirs, administrators and assigns.

Rogers, 90 Fed. Cl. at 422 (citation omitted).  The Court read the conveyance as granting Seaboard an easement solely for rail use, and therefore found that Plaintiffs would have obtained fee simple estates in the corridor upon discontinuance of railroad use if the taking had not occurred.  Id. at 429-33.  To this effect, the Court noted that "the Honore conveyance placed an explicit limitation on the use of the property interest conveyed and contained an unequivocal stipulation that title would revert to the grantor upon discontinuance of the use of the parcel for its intended railroad purpose."  Id. at 430-31.

In addressing the second Preseault II inquiry, the Court interpreted "railroad purpose" under Florida law as excluding recreational trail use, and thus concluded that "the governmental action converting the railroad right-of-way to a public trail right-of-way imposed a new easement on the landowners and effected a Fifth Amendment taking of their property."  Id. at 432. Turning to Preseault II's third prong, whether, "even if the grants of the easements were broad enough to encompass recreational trails," the easements had terminated, this Court recognized that the "even if" circumstance was not in play.  Because the Court found that the Honore easement was not broad enough to encompass a recreational trail, the Court did not reach the third prong of the Preseault II analysis, i.e., whether Seaboard had terminated or "abandoned" its easement prior to the NITU.

Following its liability decision, the Court directed the parties to exchange appraisal reports for purposes of determining the "just compensation" due to Plaintiff landowners under the Fifth Amendment.  See Order, December 4, 2009.  At the onset of this process, both parties measured the compensation due to the landowners as the difference between the fair market value of a fee simple estate and the fair market value an estate burdened by a trail easement. Pls.' PFUF, Ex. H, Oct. 18, 2010.  The Government ultimately changed its valuation method, however, and instead argued that landowners were owed only the "incremental" difference between the fair market value of an estate burdened by a rail easement and that of an estate burdened by a trail easement.  See Def.'s PFUF at 8-11, Aug. 27, 2010.  Plaintiff contested this new formula, and the parties filed the instant cross-motions.

**Discussion**

**Summary Judgment Standard**

Summary judgment is appropriate where the evidence demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC"); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (construing Rule 56 of the Federal Rules of Civil Procedure). A genuine dispute is one that "may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A fact is material if it "might affect the outcome of the suit." Id. at 248.

The moving party bears the burden of establishing the absence of any material fact, and any doubt over factual issues will be resolved in favor of the non-moving party. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Once this burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. Liberty Lobby, 477 U.S. at 256. A court does not weigh each side's evidence when considering a motion for summary judgment, but "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). When opposing parties both move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Mingus Constructors, 812 F.2d at 1391.

**Plaintiffs Need Not Prove Common Law Abandonment Under Florida Law In Order To Prove The Nature Of Their Property Interests For Valuation Purposes**

The "just compensation" due for a taking is "reimbursement to the owner for the property interest taken. [The property owner] is entitled to be put in as good a position pecuniarily as if his property had not been taken." United States v. Va. Electric and Power Co., 365 U.S. 624, 633 (1961) (internal quotation and citation omitted). The parties agree that, in a case involving a partial taking, just compensation is the difference in the fair market value of the property before and after the taking, otherwise known as the "before and after" analysis. See United States v. Miller, 317 U.S. 369, 376 (1943).

Defendant contends that in order to arrive at the "before" value, this Court must determine whether the railroad had effected a common law abandonment of its express easement prior to the NITU. Demonstrating abandonment under Florida law is no mean feat. As this Court noted in its liability decision, an easement is abandoned under Florida law when all of the elements of equitable estoppel are satisfied. Wiggins v. Lykes Bros. Inc., 97 So. 2d 273, 276 (Fla. 1957). In Florida, the elements of the doctrine of estoppel are: (1) a representation by the party estopped to the party claiming the estoppel as to some material fact, which representation is contrary to the conditions of affairs later asserted by the estoped party; (2) a reliance upon the representation by the party claiming the estoppel; and (3) a change in the position of the party claiming the estoppel to his detriment, caused by the representation and his reliance thereon.

5

Jewett v. Leisinger, 655 So. 2d 1210, 1212 (Fla. Dist. Ct. App. 1995) (citing Florida Dep't of Transp. v. Dardashti Properties, 605 So. 2d 120, 123 (Fla. Dist. Ct. App. 1992)).

Additionally, "the servient owner must show conduct by the dominant owner which outwardly manifests an intent to no longer use the easement or conduct inconsistent with the continuance of the easement." Id. (citing Enos v. Casey Mountain Inc., 532 So. 2d 703 (Fla. Dist. Ct. App. 1988)). Mere nonuse will not destroy an easement by grant. Id. Abandonment of an easement is a question of intent, and the party asserting abandonment has the burden of proof. Dade County v. City of North Miami Beach, 69 So. 2d 780, 783 (Fla. 1954); see also Leibowitz v. City of Miami Beach, 592 So. 2d 1213, 1214 (Fla. Dist. Ct. App. 1992) (explaining that party asserting abandonment must demonstrate that there was a clear affirmative intent to abandon the easement).

Defendant argues that because Plaintiffs have not demonstrated as a matter of Florida law that the railroad "abandoned" the corridor prior to the NITU, the land was burdened with a railroad easement prior to the taking. Thus, in Defendant's view, just compensation should reflect the difference between the value of the property burdened by a rail easement and the value of the property burdened by a trail easement. Defendant's argument misunderstands the operation of the Trails Act and misconstrues the conveyance granting Plaintiffs' property interests.

Defendant's insistence that Plaintiffs prove common-law abandonment to demonstrate the "before" condition of their property is contrary to the operation of the Trails Act. Defendant injects a wholly inappropriate common law requirement for "abandonment" where the statutory and regulatory scheme of the Trails Act imposes its own construct of the term. The NITU prevented abandonment from occurring by imposing a new easement for trail use and preserving the potential reinstatement of a future railroad use by railbanking. This combined blocking of state law abandonment and imposition of a new easement constitutes the taking. As the Federal Circuit explained in Caldwell:

> The Surface Transportation Board . . . has authority to regulate the construction, operation, and abandonment of most railroad lines in the United States. A railroad seeking to abandon a railroad right-of-way within the jurisdiction of the STB must either: (1) file a standard abandonment application that meets the requirements of 49 U.S.C. § 10903; or (2) seek an exemption, under 49 U.S.C. § 10502. If the STB approves a standard abandonment application or grants an exemption and the railroad ceases operation, the STB relinquishes jurisdiction over the abandoned railroad right-of-way and state law reversionary property interests, if any, take effect.
>
> . . .
>
> The Trails Act, through a process known as "railbanking," provides an alternative to abandoning a railroad right-of-way under sections 10903 and 10502. Section 8(d) of the Trails Act allows a

6

railroad to negotiate with a state, municipality, or private group (the "trail operator") to assume financial and managerial responsibility for operating the railroad right-of-way as a recreational trail. If the railroad and the trail operator indicate willingness to negotiate a trail use agreement, the STB stays the abandonment process and issues a notice allowing the railroad right-of-way to be "railbanked." The effect of the notice, if the railroad and prospective trail operator reach an agreement, is that the STB retains jurisdiction for possible future railroad use and the abandonment of the corridor is blocked "even though the conditions for abandonment are otherwise met." Specifically, section 8(d) provides that "such interim use [for trails] shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." Thus, section 8(d) of the Trails Act prevents the operation of state laws that would otherwise come into effect upon abandonment-property laws that would "result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners."

391 F.3d 1226, 1228-29 (Fed. Cir. 2004) (citations omitted).

Because the taking was the blocking of the "abandonment" which would have occurred under the Honore deed by operation of the Trails Act, Plaintiffs need not demonstrate that a state law abandonment occurred in order to either establish a taking or to prove the nature of their property interest prior to the NITU. Here, as a result of the NITU, the Trails Act would have blocked an abandonment of the railroad easement and prevented the fee simple, unencumbered by that railroad easement, from reverting to Plaintiffs. As such, the property interest taken from Plaintiffs was a fee simple.

As the Court explained in Raulerson v. United States:

the extent of the taking depends not on plaintiffs' property interests at the time of the NITU, but rather "upon the nature of the state-created property interest that petitioners would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest." This view is consistent with well-settled Federal Circuit precedent that "[t]he taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." Because the easement would have reverted back to plaintiffs under state law, the fee simple value of plaintiffs' properties is the appropriate starting point in a damages analysis for just compensation; the appropriate measure of damages is the difference between the value of plaintiffs' land unencumbered by a railroad easement and the value of plaintiffs' land encumbered by a

>perpetual trail use easement subject to possible reactivation as a railroad.

99 Fed. Cl. 9, 12 (July 7, 2011) (citations omitted).

Imposing a requirement that Plaintiffs prove a common law abandonment would also thwart a proper construction of the Honore deed. In this case as in Preseault II, the governing deed "established state-created rights in the owners . . . to have unfettered possession upon the termination of the railroad's easements." Preseault II, 100 F.3d at 1537. Here, the Honore deed only granted the railway "a right of way for railway purposes over and across" the subject parcels. Further, the Honore deed expressly provided that if the railway "shall abandon said land for railroad purposes then the . . . pieces and parcels of land shall [ipso facto] revert to and again become the property of [Honore], his heirs, administrators and assigns." Rogers, 90 Fed. Cl. at 422. Thus, once the railroad ceased using the land for railroad purposes, Plaintiffs' fee simple estates would no longer be encumbered by the railroad-use easements.

It is uncontroverted that the railroad had ceased using the corridor for railroad purposes at least as of the time of the NITU, if not before. Specifically, in late 2003, the railroad began the regulatory process of abandoning its rail operations. On December 15, 2003, CSX, Seaboard's successor, and the Seminole Gulf Railway, L.P. ("SGLR"), lessee and operator of the right-of-way, filed a petition for exemption with the Surface Transportation Board. The petition indicated that SGLR and CSX intended to abandon an approximately 12.43 mile portion of the railway corridor between Sarasota and Venice. See Pls.' PFUF, Ex. A-3, Oct. 18, 2010. According to the petition, no rail traffic had operated on the corridor since March of 2002, and there had been no rail movements over the corridor's last three miles since at least 1993. Id. at 4 and n.3. SGLR represented that "there [was] little likelihood of there ever being a future demand for local rail service over the Subject Line" and "there [were] no prospects of future shippers [using the line]." Id. at 5-6. The petition concluded by stating that "[i]t is the intention of SGLR and [CSX] to sell the Subject Line for trail use pursuant to an existing option agreement with The Trust for Public Land" ("Trust"). Id at 7. Defendant's arguments that the railroad intended to continue its original railroad use easement and that the property should be viewed as being encumbered by a railroad use easement is inconsistent with the railroad's own petition to cease operations.

On April 2, 2004, STB issued a Decision and Notice of Interim Trail Use or Abandonment, exempting the abandonment from the prior approval requirements of 49 U.S.C. § 10903. The NITU acknowledged that the rail line "was no longer generating traffic" and explained:

>Detailed scrutiny under 49 U.S.C. 10903 is not necessary to carry out the rail transportation policy. By minimizing the administrative expense of the application process, an exemption will reduce regulatory barriers to exit [49 U.S.C. 10101(7)]. An exemption will also foster sound economic conditions and encourage efficient management by <u>relieving SGLR of the expense of maintaining a line no longer generating traffic</u> and revenue and by allowing

>   SGLR to apply its assets more productively elsewhere on its system [49 U.S.C. 10101(5) and (9)].

Am. Compl., Ex. B at 2 (emphasis added). As such, both the contemporaneous documentation of the railroad's actions in filing the petition for abandonment and the NITU establish that the corridor was no longer being used for railroad purposes at the time of the taking. This cessation of railroad use suffices to effect reversion of Plaintiffs' fee simples under the Honore deed. Defendant's argument that Plaintiffs must show a common law abandonment by the railroad to have the fee simples revert, would impose a very different and far more onerous requirement than the clear language of the Honore conveyance itself.

Defendant's invocation of common law abandonment would require construing the Honore conveyance to import the legal requirements of Florida law on abandonment to interpret how the railroad's property interest in the easement would terminate under the deed. Imbuing the term "abandon" in the Honore deed with a technical legalistic meaning instead of looking at the deed as a whole to discover the intent of the grantor, would contravene fundamental principles of interpreting conveyances. Under Florida law, a court should "consider the language of the entire instrument in order to discover the intent of the grantor, both as to the character of estate and the property attempted to be conveyed, and to so construe the instrument as, if possible, to effectuate such intent." Reid v. Barry, 93 Fla. 849, 863 (1927); see also Thrasher v. Arida, 858 So. 2d 1173, 1175 (Fla. Dist. Ct. App. 2003).

As explained in the liability decision, the Honore deed indicates that the phrase "abandon said land for railroad purposes" meant terminating rail service along the corridor. The railroad's easement therefore ended when the corridor was no longer used for railroad purposes, not, as Defendant argues, when the railroad exhibited the requisite intent for common law abandonment of the easement. While nonuse by the railroad sufficed to extinguish the railroad's easement under the Honore deed, mere nonuse could not establish abandonment under Florida law. Jewett, 655 So. 2d at 1212.

Further, Florida courts have not applied the standard for common law abandonment in construing grants, such as the Honore deed, which contain a reverter clause. In Loveland v. CSX Transportation, Inc., 622 So. 2d 1120, 1121 (Fla. Dist. Ct. App. 1993), the deed conveying property to Seaboard provided:

>   Said property is to be used for freight and passenger station and other purposes incident to the operation of [the rail line], but is to revert to grantor . . . should said railroad be subsequently abandoned and said property no longer used for railroad purposes.

Id. at 1121 n. 1. The Loveland court interpreted the reverter clause "to mean that the property would revert if the land was not used for railroad purposes." Id. at 1122. Focusing solely on the "railroad purposes" language in the deed, the court did not look to additional requirements for showing common-law law abandonment. See Florida Power Corp. v. Lynn, 594 So. 2d 789, 791 (Fla. Dist. Ct. App. 1992) (construing "abandonment" without reference to equitable estoppel where deed granted utility "the right, privilege and easement to construct, operate and maintain

9

[a tower line] . . . until the use thereof is abandoned"); <u>Dade County v. City of North Miami Beach</u>, 69 So. 2d 780, 781 (Fla. 1954) (construing "abandonment" without reference to equitable estoppel where deed granted easement for public park but reserved "all right of reversion . . . in the event of the discontinuance of such property for park purposes and the maintenance as such").

In its misguided attempt to inject the issue of common law abandonment into this litigation, Defendant proffered two declarations to show that the railroad did not abandon the corridor under Florida law. Plaintiffs moved to strike the declarations. In these declarations, Henry Neeves, Vice President of Real Estate and Public Projects for SGLR since 2004, and Barbara League, Director of Network and Joint Facility Services for CSX since 2007, provided their perceptions of the railroad's lack of intent to abandon the corridor and described the presence of rails, ties and ballast along the corridor after the NITU. Because the issue of common law abandonment is a red herring, these declarations are not relevant. Moreover, the testimony would be of dubious value, as it lacks foundation, contains speculation and purports to offer legal conclusions regarding the railroad's property interest. The Court thus grants Plaintiffs' motion to strike the declarations of Neeves and League.

## Conclusion

By operation of federal law, the "before" condition of the property in this Trails Act taking was the unencumbered fee simples Plaintiffs would have enjoyed under the Honore deed absent the taking.

Defendant's motion for partial summary judgment is **DENIED**, and Plaintiffs' motion for partial summary judgment on the method for valuation is **GRANTED**.

The parties shall direct their appraisers to measure the just compensation owed to Plaintiffs on each parcel as the difference between the fair market value of an estate held in fee simple and the fair market value of the same estate burdened with the current Trails Act easement.

Plaintiffs' motion to strike the declarations of Henry Neeves and Barbara League is **GRANTED**.

The Court will conduct a conference call with the parties on **November 14, 2011, at 11:00 a.m. ET.**

s/Mary Ellen Coster Williams  
**MARY ELLEN COSTER WILLIAMS**  
**Judge**
