# In the United States Court of Federal Claims

No. 07-273L
No. 07-426L
No. 08-198L
No. 10-187L
No. 10-200L

(Filed: March 26, 2012)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * | | |
| STEPHEN J. ROGERS, et al., | * | Fifth Amendment Taking; Rails-to- |
|  | * | Trails; Intervention of Right; |
| Plaintiffs, | * | Permissive Intervention; Timeliness |
|  | * | of Request to Intervene; Adequacy |
| v. | * | of Protection of Claimed Interest |
|  | * | in Property; Anti-Assignment Act. |
| THE UNITED STATES, | * |  |
|  | * |  |
| Defendant. | * |  |
|  | * |  |
| * * * * * * * * * * * * * * * * * * * * * * * | | |

Mark F. (Thor) Hearne, II, Lindsay S.C. Brinton, and Meghan S. Largent, Arent Fox LLP, 112 S. Hanley Road, Suite 200, Clayton, MO 63105; Debra J. Albin-Riley, Joseph L. Cavinato, III, Arent Fox LLP, 555 West Fifth Street, 48th Floor, Los Angeles, CA, for Plaintiffs.

Ignacia S. Moreno, Carol Draper, and Lary Larson, United States Department of Justice, Environment & Natural Resources Division, Natural Resources Section, Washington, D.C. 20044, for Defendant.

Thomas P. McLish and Scott M. Heimberg, Akin Gump Strauss Hauer & Feld, LLP, 1333 New Hampshire Ave., N.W., Washington, D.C. 20036, Counsel for Movant.

---

**MEMORANDUM OPINION AND ORDER DENYING INTERVENTION**

---

**WILLIAMS,** Judge.

SDC Communities, Inc. ("SDC") has moved to intervene in this matter, arguing that it is entitled to any compensation the Court may award to one of the named Plaintiffs, JMC-Real Estate, LLC ("JMC") as a result of the Government's taking of JMC's property. Plaintiffs vigorously oppose intervention, and the Government takes no position on SDC's motion. Because the motion is untimely and because the interest SDC claims is adequately represented by JMC and counsel for Plaintiffs, the motion is denied.

## Background

**Procedural History**

In these consolidated "rails to trails" actions, Plaintiffs claim that the Government effected a taking of their property when, in 2004, it converted an inactive railroad right-of-way to a recreational trail pursuant to the National Trails System Act Amendments of 1983. On November 23, 2009, the Court resolved the issue of liability for a subset of claims, including that of JMC, in favor of Plaintiffs. See Rogers v. United States, 90 Fed. Cl. 418 (2009).

After additional proceedings regarding the proper legal standard for determining the quantum of just compensation owed to Plaintiffs, the Court, on October 31, 2011, issued an opinion clarifying the measure of just compensation, and on November 17, 2011, scheduled a valuation trial in Sarasota, Florida, to begin on March 26, 2012.[1]

On February 24, 2012,[2] roughly one month before the damages trial, and almost five years after JMC's action was filed, SDC filed a motion to intervene pursuant to Rules 24(a) and 24(b) of the United States Court of Federal Claims ("RCFC").[3] As grounds for its motion, SDC argues that it is the current owner of one of the properties at issue in this case and that it is entitled to the proceeds of any judgment relating to that property, pursuant to the sales agreement transferring the property to SDC.

---

[1] Plaintiffs claimed that they were owed the difference between the fair market value of a fee simple estate and the fair market value of the same estate burdened by a recreational trail easement, while Defendant argued that the proper measure of compensation was the difference in fair market value between an estate burdened by a rail easement and an estate burdened by a trail easement. See Rogers v. United States, 101 Fed. Cl. 287 (2011). On February 9, 2012, the Court amended the schedule to begin trial on March 28, 2012.

[2] On February 27, 2012, SDC filed, and the Court granted, a motion to amend its original motion ("Am Mot. to Intervene") and memorandum ("SDC's Br.").

[3] On May 1, 2007, Stephen and Linda Rogers and three other individuals filed suit in Rogers v. United States, No. 07-273, alleging that Defendant had effected a taking of their property. On June 27, 2007, Bird Bay Executive Golf Course, Inc. and seven additional named plaintiffs filed a second action, Bird Bay Executive Golf Course, Inc. v. United States, No. 07-426, with claims relating to the same "rails to trails" takings as the Rogers Plaintiffs. On August 21, 2007, the Rogers Plaintiffs filed a motion to certify their action as a class action pursuant to RCFC 23. On August 31, 2007, the Bird Bay Plaintiffs filed an amended complaint adding two named plaintiffs, one of which was JMC. On November 12, 2007, the Court certified Rogers as a class action, and on December 14, 2007, the Court consolidated Rogers and Bird Bay. On January 27, 2010, the Court issued an order requiring the Rogers Plaintiffs to ask class members if they objected to decertification of the class. On March 22, 2010, the Rogers Plaintiffs filed a second amended complaint, listing all class members as named parties.

**SDC's Claimed Interest in the Property**

On March 10, 2005, SDC entered into an Agreement of Purchase and Sale ("Agreement") with JMC for the sale of approximately 220 acres of real property in Sarasota, Florida, adjoining the railway right-of-way at issue in this case (the "Property"). Am. Mot. to Intervene, Ex. 1 at 23. Under the terms of the Agreement, JMC's conveyance included all of its right, title, and interest in and to "all rights, privileges, easements, hereditaments and appurtences to" the 220-acre parcel, as well as its right, title, and interest "in and to the land lying in the bed of any street, road, avenue or alley, open or proposed, public or private, in front of or adjoining the Land to the center line thereof." Id. at 1.

The Agreement also contains the following paragraph:

Condemnation.

> Seller agrees to give Purchaser written notice of any action or proceeding for condemnation of any part of the Real Property, which may result in the taking of all or a material part of the Real Property. Upon such notification, Purchaser shall have the right, to be exercised within fifteen (15) Business Days after receipt of such notice, to terminate this Agreement and receive a refund of the Earnest Money. If Purchaser does not elect to terminate this Agreement, then this Agreement shall remain in full force and effect, Purchaser shall have the right to participate in the negotiation of any condemnation awards or other compensation from taking and Seller will credit to Purchaser at Closing the amount of any monies or other compensation received by Seller to date by reason of such taking, and will assign to Purchaser the right to any condemnation awards or proceeds received after such date relating to the Real Property and Seller shall convey the portion of the Property, if any, which remains after the taking. A condemnation of a part of the Real Property having a taking value in excess of Five Million and no/100ths Dollars ($5,000,000.00) (as reasonably determined by Seller) shall be deemed "material" for the purposes of this Paragraph. In the event Purchaser fails to timely deliver written notice of termination pursuant to this Paragraph, Purchaser shall be deemed to have waived its right of termination pursuant to this Paragraph. In the event of any non-material condemnation of the Real Property prior to the Closing or if Purchaser does not timely terminate this Agreement as a result of a material condemnation, Closing shall occur as provided for in this Agreement with no adjustment to the Purchase Price, but with a credit to Purchaser in the amount of any condemnation proceeds received prior to the Closing Date which are not paid for restoration, and Seller shall assign to Purchaser Seller's right to applicable condemnation proceeds to be received thereafter, if any.

Id. at 13. This language immediately follows a paragraph detailing the consequences of any casualty loss prior to closing, and immediately precedes paragraphs detailing SDC's pre-closing termination rights and the documents necessary for closing.

3

SDC argues that the Agreement's condemnation provision entitles SDC to any compensation awarded to JMC for the Government's taking in this action, because this proceeding is covered by the Agreement as an inverse condemnation action. Inverse condemnation is a "shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." United States v. Clarke, 445 U.S. 253, 257 (1980). It is a cause of action against the government to recover the value of property taken by the government without formal exercise of the power of eminent domain. Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (citing Clarke, 445 U.S. at 257).

**SDC's Knowledge of This Litigation and Its State Court Action**

In a declaration filed in support of SDC's motion to intervene, SDC's President, Mr. Henry Rodriquez testified:

> At the time of the Agreement, SDC was unaware of any potential or threatened condemnation or similar proceedings affecting the Property. The Agreement included JMC's representation and warranty that JMC was unaware of any pending or threatened condemnation or similar proceedings affecting the Property or any part thereof. The Agreement further required JMC to notify SDC of any "action or proceeding for condemnation" of the Property, allow SDC to participate in those proceedings, and agree to assign all proceeds received from those proceedings to SDC.
>
> SDC paid JMC a base price of $13,306,050 million at the closing of the sale. The Agreement provided for an additional payment to JMC in the event that SDC secured certain zoning amendments. SDC secured the zoning amendments and accordingly paid JMC $1,181,460.00 on September 25, 2007, $4,400,000 in November 2007, and $1,071,565 on February 4, 2008 for a total of $6,653,025 or what amounted to an additional payment of approximately $30,000 an acre on top of the base price.
>
> At the time SDC made the additional payments totaling $6,653,025 to JMC, SDC was unaware that JMC had commenced this action asserting an inverse condemnation claim affecting the Property, or that JMC had breached its obligation to inform SDC of the proceeding and permit SDC to participate in the negotiation of any compensation.
>
> In fact, JMC never notified SDC that it had commenced this "Rails to Trails" inverse condemnation case involving the Property in this Court.
>
> In August 2011, I was told that some type of litigation involving nearby property was ongoing. I retained Bentley & Bruning to investigate the matter. My counsel was unable to find any court filings relating to the Property, and a title search did not reveal any interest that JMC may have. I was completely unaware of the possibility that an action relating to the Property might be pending in a Federal court in Washington, D.C.

>I do not subscribe to the Sarasota Herald-Tribune, the Venice Gondolier Sun, or the Gulf Coast Business Review.
>
>Because JMC had a contractual obligation to inform SDC if there was any condemnation action regarding the Property, I expected JMC to inform SDC if such an action was proceeding and accordingly did not make it a practice to scour court dockets and news publications to determine if JMC was breaching that obligation.
>
>In October, my counsel determined that JMC was pursuing a takings claim against the government. It was not until November, however, that we determined the basis of JMC's claim and that SDC had an interest in the proceeds of JMC's Rails to Trails inverse condemnation case. A November 18, 2011 local newspaper article regarding the litigation that I saw also clarified JMC's claim and SDC's interest.

Rodriguez Decl. ¶¶ 3-10.

On February 22, 2012, SDC commenced an action against JMC in the Circuit Court of the Twelfth Judicial Circuit for Sarasota County, Florida alleging breach of the Agreement, and seeking a declaratory judgment and a constructive trust. SDC's Br. 4. Two days later, SDC filed the instant motion to intervene in this action. SDC seeks to participate in this action to "ensure that the proceeds to which SDC is entitled are not diminished through any action or inaction of JMC." Id. at 2. SDC has not specified what actions it would take as an intervenor plaintiff, except to state:

>As an intervenor, SDC will have access to non-public information, such as depositions and expert reports, allowing SDC to ensure that JMC is properly valuing the property. SDC will also be able to object to any proposed settlement that does not adequately value the property or otherwise diminishes the proceeds that SDC will ultimately receive from JMC. SDC will also be able to monitor the Government's payment of a judgment in JMC's favor so that it can take steps to protect those proceeds from dissipation by JMC. . . .

Reply in Support of SDC's Mot. to Intervene ("SDC's Reply") 2. SDC did not seek expedited consideration of its motion to intervene.

## Discussion

SDC claims it is entitled to intervene as a matter of right. Rule 24(a) provides that:

On <u>timely</u> motion, the court must permit anyone to intervene who:

(1) is given an unconditional right to intervene by a federal statute; or

5

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

RCFC 24(a) (emphasis added).

Alternatively, SDC seeks permissive intervention. Rule 24(b)(1) provides: "[o]n timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact." RCFC 24(b)(1) (emphasis added). "In exercising its discretion [under RCFC 24(b)] the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." RCFC 24(b)(3).[4]

**Timeliness**

At the outset, the Court must address whether SDC has timely sought either intervention of right or permissive intervention. As the Supreme Court has noted:

Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be "timely." If it is untimely, intervention must be denied. Thus, the court where the action is pending must first be satisfied as to timeliness. Although the point to which the suit has progressed is one factor in the determination of timeliness, it is not solely dispositive. Timeliness is to be determined from all the circumstances. And it is to be determined by the court in the exercise of its sound discretion . . . .

NAACP v. New York, 413 U.S. 345, 365 (1973) (discussing Federal Rules of Civil Procedure 24(a) and 24(b)). The Federal Circuit has further explained that:

"[A]n intervenor's timeliness is evaluated in light of three factors:

(1) the length of time during which the would-be intervenors actually knew or reasonably should have known of their rights . . . ;

---

[4] Rule 24(c) provides that a motion to intervene "must state the grounds for the intervention and be accompanied by a pleading which sets out the claim or defense for which intervention is sought." SDC has not filed such a pleading. Two courts of appeal have noted that total failure to submit a formal pleading stating grounds for intervention may constitute sufficient reason for a court to deny the motion. See Rhode Island Fed'n of Teachers v. Norberg, 630 F.2d 850, 854 (1st Cir. 1980); Abramson v. Pennwood Inv. Corp., 392 F.2d 759, 761 (2d Cir. 1968). But see Providence Baptist Church v. City of Euclid, 425 F.3d 309, 314-15 (6th Cir. 2005) (comparing cases that take a strict approach with those that favor a more lenient approach).

(2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor[s] by denying intervention.

(3) existence of unusual circumstances militating either for or against a determination that the application is timely.

Doe v. United States, 44 F. App'x 499, 501 (Fed. Cir. 2002) (quoting Belton Indus., Inc. v. United States, 6 F.3d 756, 762 (Fed. Cir. 1993)).

**SDC Failed to Act Long After It Should Have Known of Its Rights**

SDC claims it did not learn of this litigation until October, 2011, but SDC should have been aware of these proceedings at a far earlier date. Rodriguez Decl. ¶ 10. As an initial matter, the Court is skeptical that news of this action did not reach SDC, regardless of any effort on SDC's part, given the size of this proceeding and SDC's standing in the Sarasota community. SDC is a sophisticated real estate holding company controlled by Henry Rodriguez, described by the local press as a "[p]rominent Sarasota real estate investor and developer." See Sarasota real estate investor wants more, Gulf Coast Business Review, May 27, 2011 (Pls.' Resp., Ex. E) (describing Rodriguez's plan, following receipt of $100 million in "soft commitments," to establish a real estate investment strategy that, in his words, "should provide better returns than a hedge fund"); see also Michael Braga, Henry Rodriguez buys downtown Sarasota land Marvin Kaplan once owned, Sarasota Herald-Tribune, Jan. 23, 2012 (Pls.' Resp., Ex. D). There was regional news coverage of this litigation dating from at least 2008. See, e.g., Robin Roy, Trail Taking: 400 along Legacy Trail join federal suit, The South Sarasota Observer (Pls.' Resp., Ex. A); Todd Ruger, Rail-line landowners can join suit, Sarasota Herald-Tribune (Pls.' Resp., Ex. C); Gerald Rogovin, More property owners join trail suit, Venice Gondolier Sun, Feb. 22, 2008 (Pls.' Resp., Ex. C).

The lead case on these rails-to-trails takings was brought on May 1, 2007. Plaintiffs sought to certify the case as a class action. To that end, Plaintiffs' counsel conducted meetings in the Venice Community Center in the Sarasota area in early 2008, notifying owners of their potential rights to opt in to these actions as plaintiffs. The properties at issue abut over 12 miles of the former railroad corridor, and owners of hundreds of individual properties, a commercial property, two golf courses and a Sarasota County property were eligible to become plaintiffs according to a local article in February 2008. Id. More than 290 people attended the January 2008 meetings conducted by Plaintiffs' counsel as well as 125 people in February, 2008. According to a February 2008 article, over 300 owners had become plaintiffs by late February 2008, and 200 more were potential plaintiffs, as of that time. Id. This February 2008 article expressly referenced the United States Court of Federal Claims. Id. In short, this litigation was no secret in Sarasota, and a prominent real estate investor and developer represented by counsel should have known about it.

Moreover, SDC certainly should have known of JMC's complaint beginning in August of 2011, when it admittedly investigated rumors of litigation involving local property by searching the records of unspecified "local" courts. The action in which JMC is a plaintiff, No. 07-426, was a matter of public record when initially filed on June 27, 2007, and when JMC entered the case on August 31, 2007. SDC could have readily ascertained this action by checking federal

court filings. Further, a computer inquiry or basic legal research would have revealed this Court's published opinion in November 2009, finding the United States Government liable for a taking. See Rogers v. United States, 90 Fed. Cl. 418 (2009). Even a cursory search for such litigation should have revealed that JMC had filed a complaint in this Court, which has exclusive jurisdiction over federal Fifth Amendment Taking actions. As such, SDC should have known of this litigation four years ago and sought intervention earlier.

Even accepting that SDC had no actual knowledge of this suit until October, 2011, it still waited too long to seek to enter the case. In October, 2011, SDC was aware that an initial valuation trial had already been held in Sarasota on September 9 and 10, 2010 on a large property, McCann North, owned by Hugh Culverhouse, but valuation could not be determined until an issue involving the proper methodology was resolved, so proceedings were necessarily delayed. Trial Tr., 394, Sept. 10, 2010. The need to intervene was especially pressing after mid-November 2011, when SDC was aware that the parties were actively involved in concluding discovery and preparing for another valuation trial. SDC, however, did not file its motion to intervene until February 24, 2012, and the motion was not fully briefed until March 16, 2012 -- on the eve of the March 28, 2012 trial. In sum, given the years of litigation that had already taken place and the imminent trial, SDC should have sought to intervene sooner.

**The Prejudice to Existing Parties by Allowing Intervention Outweighs the Prejudice to SDC by Denying Intervention**

In this case, "[t]he unreasonableness of intervenor-applicants' delay is underscored by the prejudice to plaintiff resulting from intervenor-applicants' delay." John R. Sand & Gravel Co. v. United States, 59 Fed. Cl. 645, 651 (2004). This litigation is nearly five years old, and it has been nearly two years since the Court determined that the Plaintiffs involved in the upcoming valuation trial are owed compensation by the Government. Granting SDC's motion could necessitate an additional round of pre-trial preparation with respect to JMC's property, a single parcel generating a significant portion of the total compensation sought by Plaintiffs at the upcoming trial. The Court will not delay this already prolonged proceeding further.

Even if the Court were to keep its current schedule but permit intervention, manageability of the litigation would become a paramount concern. SDC has not articulated how it would participate in trial and briefing, but in order to meet its stated goal of ensuring maximum valuation and recovery, counsel could seek to offer its own appraisal expert, examine and cross-examine witnesses, and argue evidentiary points without having had the benefit of participating in years of discovery and trial preparation -- prolonging the trial and adding unnecessary expense to the existing litigants. SDC also seeks to secure a place at the table so that it can "object to any proposed settlement that does not adequately value the property or otherwise diminishes the proceeds that SDC will ultimately receive from JMC." SDC's Reply 2. Given its stated motives for seeking intervention, the potential for SDC to complicate and delay the proceeding is significant.

The Court's concerns regarding prejudice and manageability are underscored by Plaintiffs' argument that the Assignment of Claims Act, 31 U.S.C. § 3727 (2006), requires dismissal of SDC's motion. Plaintiffs argue that SDC has no legally protectable interest in this proceeding because SDC's underlying claim to JMC's takings award, even if valid under Florida

law, is nonetheless barred by the Act.  Plaintiffs contend that the Act prohibits both the voluntary assignment of a compensation claim against the Government for the taking of property, in addition to contingent claims in general.

The Anti-Assignment Act is comprised of two statutes:  41 U.S.C. § 15(a) (2006) and 31 U.S.C. § 3727.  Section 15(a) of Title 41 prohibits the assignment of contracts, and § 3727 of Title 31, prohibits the assignment of claims.  See Delmarva Power & Light Co. v. United States, 542 F.3d 889, 892 (Fed. Cir. 2008).  Section 3727 of Title 31 defines an "assignment" as "a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim" or "the authorization to receive payment for any part of the claim."  31 U.S.C. § 3727(a).  Subsection 3727(b) of Title 31 provides, in relevant part, that "[a]n assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued."  31 U.S.C. § 3727(b).  The Act was intended to enable "the United States to deal exclusively with the original claimant instead of with several parties, thus obviating the necessity of having to inquire into the validity of specific transfers or assignments of the claim, minimizing subjection to successive litigation upon the same claim, and eliminating the risk of double payment or multiple liability."  Patterson v. United States, 173 Ct. Cl. 819, 823 (1965).

Here, the literal terms of the Anti-Assignment Act do not apply because SDC does not possess and has not been assigned a "claim" against the United States Government for a taking.  Rather, SDC acknowledges that, as the property owner at the time of the taking, only JMC may bring this taking claim against the Government.  Nor does SDC contend that JMC in the Agreement assigned a "claim" against the United States to SDC.  Rather, it is not a "claim" that SDC would ultimately receive under the Agreement (if it prevails in its interpretation), but the proceeds of that claim.

Although an assignment of a claim against the Government is not in play here, SDC's effort to become a party to this takings suit does implicate, to some extent, a concern the Anti-Assignment Act was intended to address.  SDC is attempting to subject the Government to litigation by another party upon the same claim by injecting itself into a lawsuit to influence the adjudication or settlement of that claim, when the original claimant has been vigorously pursuing this claim for years.  While intervention would not result in the evil of successive or multiple litigation of a single claim, which the Anti-Assignment Act was intended to prevent, granting intervention would force the Government to defend against additional arguments, be subjected to more extensive processes, including cross-examination of its experts, and engage in negotiations with an additional party on a single claim.  Thus, despite its silence, the Government would, in the Court's view, also be prejudiced by this Court's permitting intervention of another party and another team of advocates to press the very same claim the Government is already defending.  Finally, adding another party to this litigation at this late stage would thwart the Court's obligation to secure the "just, speedy, and inexpensive determination of every action and proceeding."  RCFC 1.

In sum, SDC's lack of diligence in pursuing intervention, and the concomitant prejudice to Plaintiffs and the Government, suffice as grounds for denying intervention.  However, the Court is also persuaded that dismissal is warranted because any interest possessed by SDC is adequately represented by Plaintiffs' counsel.

**Any Interest Possessed by SDC is Adequately Represented by JMC**

The Court does not adjudicate whether a claimed contractual right to a takings award -- a right disputed in state court by the parties to the contract -- is a sufficient interest to justify intervention for purposes of Rule 24(a)(2). But even assuming SDC did have an interest that satisfied Rule 24(a)(2), the Court is convinced that counsel for JMC has adequately represented SDC's interest, along with the similar interests of numerous other Plaintiffs, and will continue to do so. Plaintiffs' counsel has diligently pursued JMC's claim for nearly five years, including during the preparations for the upcoming valuation trial -- indeed, JMC's counsel recently raised its claimed measure of JMC's compensation. It is well settled that representation is adequate when the objective of the applicant is identical to that of one of the parties. See, e.g., City of Stilwell, Okla. v. Ozarks Rural Elec. Coop. Corp., 79 F.3d 1038, 1042-43 (10th Cir. 1996); see also Jones v. Prince George's Cnty., Md., 348 F.3d 1014, 1020 (D.C. Cir. 2003). Here, both JMC and SDC have the identical objective in this litigation -- maximizing the value to be determined for the exact same parcel of property.

SDC further suggests that JMC will not vigorously pursue compensation because there is unrelated litigation pending between JMC and SDC. SDC intimates that this litigation brought by Hugh Culverhouse, the son of the owner of JMC, against SDC -- what it terms a baseless suit -- illustrates the bad blood between JMC and SDC, suggesting that JMC will not adequately pursue compensation for SDC. As SDC's president testified:

> SDC is currently embroiled in litigation with the family that controls JMC. JMC is owned by Joy McCann Culverhouse. Ms. Culverhouse's son, Hugh Culverhouse, Jr., owns an entity called McCann Holdings, Ltd, which sued SDC, me and others in Florida state court in May 2011. The lawsuit focuses on the alleged breach of an agreement dated June 23, 2010 between McCann and the other defendants. Neither I nor SDC was a party to the agreement, but have been sued nonetheless on what I consider to be baseless grounds. The Case is pending and I am vigorously defending myself and SDC.

Rodriguez Decl. ¶ 16. The existence of this lawsuit does not warrant an inference that JMC will intentionally try to undervalue its claimed property interest just to harm SDC. This unrelated lawsuit does not persuade this Court that JMC itself, or its counsel, will fail to adequately represent SDC's claimed interest here.

**Conclusion**

SDC's motion to intervene in **DENIED**.

                                          s/Mary Ellen Coster Williams
                                          **MARY ELLEN COSTER WILLIAMS**
                                          **Judge**