# In the United States Court of Federal Claims

No. 07-273L
No. 08-198L
(Filed: September 25, 2012)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | Motion for Partial Summary |
| **STEPHEN J. ROGERS, et al.,** | * | Judgment; RCFC 56; Class |
| | * | Action; Fifth Amendment |
| Plaintiffs, | * | Takings; Rails-to-Trails Act, 16 |
| v. | * | U.S.C. §§ 1241-51 (2006); Florida |
| | * | Law; Fee Simple; Right-of-Way; |
| **THE UNITED STATES,** | * | Easement Under Florida Law; |
| | * | Fee Simple Determinable; |
| Defendant. | * | Prescriptive Easement; Adverse |
| | * | Possession. |
| * * * * * * * * * * * * * * * * * * * * * * | | |

Mark (Thor) Hearne, II, Lindsay Brinton, Meghan Largent, Debra Albin-Riley, and Joseph Cavinato, Arent Fox LLP, 112 S. Hanley Drive, Suite 200, Clayton, MO 63105, for Plaintiffs.

Ignacia S. Moreno and Kristine S. Tardiff, United States Department of Justice, Environment & Natural Resources Division, 53 Pleasant Street, 4th Floor, Concord, NH 03301, for Defendant.

---

**OPINION AND ORDER**

---

**WILLIAMS**, Judge.

In these consolidated "rails-to-trails" actions, Plaintiffs claim that the Government effected a taking of their properties when, pursuant to the National Trails System Act Amendments of 1983 ("Trails Act"), it converted a 12.43-mile railroad right-of-way, extending from Sarasota to Venice, Florida, into a recreational trail.[1]  This matter comes before the Court on the parties' cross-motions for partial summary judgment on liability.

In two prior opinions, this Court resolved issues of liability with respect to a majority of the named Plaintiffs.  At issue in this opinion are the claims of 55 landowners in Rogers v.

---

[1] The Court uses the term "right-of-way" to describe this strip of land for convenience and not as a legal determination of the parties' property interests or rights.

United States, No. 07-273L, and Bay Plaza Properties, LLC v. United States, No. 08-198L. These landowners seek just compensation for the Government's alleged taking of property subject to five written conveyances -- the Palmer, Blackburn, Frazer, Knight, and Phillips conveyances -- as well as property for which no written conveyance has been found to exist. For the reasons described below, the Court grants Defendant's motion for partial summary judgment with respect to the alleged taking of property subject to the Phillips, Frazer, Blackburn, and Knight conveyances. The Court grants Plaintiffs' motion for partial summary judgment with respect to claims arising from the taking of property subject to the Palmer conveyance. The Court denies the parties' cross-motions for summary judgment concerning property for which no written conveyance has been found to exist.

## Background[2]

### The Seaboard Right-of-Way

Beginning in 1910, the Seaboard Air Line Railway ("Seaboard") acquired the right to operate a railroad line between the cities of Sarasota and Venice, Florida, via a series of conveyances with multiple landowners.[3] The railroad line was used for, among other things, the operation of trains for the Ringling Brothers Circus. No railroad traffic has moved over this railroad line since March 2002.

On April 2, 2004, the Surface Transportation Board ("STB") issued a Notice of Interim Trail Use or Abandonment ("NITU"). Under the terms of the NITU, Seminole Gulf Railway and CSX -- as successors and assigns of Seaboard -- granted the Trust for Public Land ("the Trust"), a national, nonprofit, land conservation organization, an option to acquire the railway right-of-way for conversion to a trail. The Trust agreed to work with Sarasota County to convert the right-of-way into a public access recreational trail. On January 13, 2005, CSX and the Trust, in reliance upon the NITU, executed a quitclaim deed stating that the premises covered by the deed "remain subject to the jurisdiction of the STB for purposes of reactivating rail service." Pls.' Proposed Findings of Uncontroverted Fact ("PFUF"), Exs. D, L, & M (STB Docket No. AB-400 (Sub No. 3X)).

Over 100 landowners subsequently filed complaints alleging that the NITU preempted their reversionary interests in the Seaboard right-of-way.[4] Some of these landowners trace their titles to one of several grantors who, in the early twentieth century, conveyed Seaboard an

---

[2] This background is derived from the Court's November 23, 2009 and June 28, 2010 opinions, and the attachments and exhibits to the motion papers.

[3] Seaboard is the railroad company that operated rail service along the subject railway corridor in the early-to-mid-twentieth century. It is the predecessor in interest to CSX and the Seminole Gulf Railway, which, in 2003, petitioned to abandon the railway corridor. Rogers, 90 Fed. Cl. at 421.

[4] Consistent with Federal Circuit precedent, the Court uses the term "reversionary interest" to refer to "a fee simple burdened by an easement." Preseault v. United States, 100 F.3d 1525, 1533-34 (Fed. Cir. 1996) (en banc) ("Preseault II").

interest in the right-of-way. Because these parcels were conveyed to the railroad via several different instruments, the Court examines each instrument to determine what interest the railroad held in the right-of-way. Other landowners do not trace their titles to these deeds. Instead, Seaboard constructed the right-of-way across these parcels without a recorded conveyance.

The two prior opinions regarding liability for takings involving the Seaboard right-of-way addressed a single conveyance. In Rogers v. United States, 90 Fed. Cl. 418 (2009) ("Rogers"), the Court interpreted a 1910 deed from Adrian C. Honore to Seaboard ("Honore conveyance"), stating in pertinent part:

> ADRIAN C. HONORE . . . does hereby remise, release, and forever quit claim unto the SEABOARD AIR LINE RAILWAY . . . a right of way for railroad purposes over and across the following described parcels of land . . . .
> . . .
> This conveyance is made upon the express condition, however that if the Seaboard Air Line Railway shall not construct upon said land and commence the operation thereon [within] one year of the date hereof of a line of railroad, or, if at any time thereafter the said Seaboard Air Line Railway shall abandon said land for railroad purposes then the above described pieces and parcels of land shall *ipso facto* revert to and again become the property of the undersigned, his heirs, administrators and assigns.

Rogers, 90 Fed. Cl. at 422. The Court read the conveyance as granting Seaboard an easement solely for rail use, and therefore found that Plaintiffs whose land was subject to the Honore deed would have obtained fee simple estates in the corridor upon discontinuance of railroad use if the taking had not occurred. Id. at 429-33.

In the second opinion, Rogers v. United States, 93 Fed. Cl. 607 (2010) ("Bird Bay"), the Court interpreted a conveyance to Seaboard from B.L.E. Realty Corporation ("B.L.E. conveyance") as granting Seaboard a fee simple in the right-of-way, and because the abutting landowners had no property interest in the corridor, denied liability for a taking. Id. at 621. The Court therefore entered summary judgment on liability in Defendant's favor with respect to the B.L.E. conveyance. Id. at 625.

At issue in this opinion is the Government's liability with respect to two additional categories of landowners abutting the rail corridor. Both categories of landowners claim they acquired their parcels before the STB issued the NITU on April 2, 2004.

**Property Seaboard Obtained Via Deed**

Landowners in the first category possess property with rights-of-way that Seaboard acquired from one of five grantors. The parties agree that these landowners can trace their title to the same five grantors: (i) Pauline and Potter Palmer, Jr.; (ii) A.E. and Mollie Blackburn; (iii) Lula and Clement Phillips; (iv) H.M. and Bertie Frazer; and (v) Jesse and F.R. Knight. See Joint Status Reports Feb. 17, 2010, Apr. 21, 2010, and May 19, 2010. The Palmer conveyance was

executed on November 10, 1910, the Knight conveyance on September 3, 1910, and the remaining three conveyances on September 5, 1910. Deeds for four of the conveyances -- Knight, Blackburn, Phillips, and Frazer -- contain the same operative language.[5] The Palmer deed uses the same language as the Honore deed, which was the subject of Rogers. 90 Fed. Cl. at 422. These deeds are determinative because they convey the property interest in the subject corridor to Seaboard that Seaboard's successors-in-interest possessed when the STB issued the NITU.

These five grantors owned the underlying land in fee simple at the time they executed conveyances to Seaboard. Ultimately, Plaintiffs claim that 31 of the properties at issue were obtained based on chains of title that originate with these deeds.[6] The parties dispute whether the instruments conveyed an easement or a fee simple to the railroad. Additionally, Plaintiffs' claims involve 19 tracts of land that Defendant argues the railroad obtained via adverse possession. See id. Whether Plaintiffs have a present property interest in the land underlying the right-of-way depends upon the nature of the original conveyance. Preseault II, 100 F.3d at 1532-33 (citing Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 16, 20 (1990) ("Preseault I")).

**Property Seaboard Obtained By Possession**

The second category of landowners possess property with rights-of-way that Seaboard acquired "by possession." Defendant submitted three pieces of evidence to support its claim that Seaboard possessed the portions of Plaintiffs' land that are encumbered by the corridor. First, Defendant submitted a table prepared by the Interstate Commerce Commission ("ICC") in 1918, which states that Seaboard "owned or used" multiple sections of its railway corridor as they existed at that time, including a section crossing several of Plaintiffs' properties.[7] Def.'s Cross-Mot. for Partial Summ. J., Opp'n to Pls.' Mot. for Partial Summ. J., and Mem. in Supp. Thereof ("Def.'s Mot."), Ex. F. The ICC valuation table concerns "lands owned or used for purposes of a common carrier." Id. No written instruments conveying these rights-of-way to Seaboard have been located. Second, Defendant submitted a 1916 map of Seaboard's railway system. Def.'s Supp. Br., Ex. I, June 13, 2012. Finally, Defendant offered an excerpt from the 1921 edition of Poor's Manual, which provides information about the history of Seaboard, its financial operations, and its routes.[8] Def.'s Supp. Br., Ex. J, June 13, 2012. Plaintiffs did not submit any

---

[5] The precise language of the deeds is quoted below in the Discussion.

[6] Plaintiffs submitted a table indicating the conveyance to which each Plaintiff traces his or her title. See Pls.' Supp. Br., Ex. A, June 13, 2012. The table also identifies parcels where Plaintiffs allege the railroad held a prescriptive easement.

[7] The ICC was the predecessor of the Surface Transportation Board. See Barclay v. United States, 443 F.3d 1368, 1371 n.1 (Fed. Cir. 2006).

[8] Poor's Manual, written by Henry Poor -- a founder of Standard & Poor's Corporation, contains a report on the financial and operational details of railroads in the United States. Pls.' Supp. Br. 19 (citing A History of Standard & Poor's: 1860-1940 Beginnings, Standardandpoors.com, http://www.standardandpoors.com/about-sp/timeline/en/us/ (last visited Sept. 18, 2012)).

4

evidence concerning the extent or characteristics of Seaboard's use or possession of the land. With respect to property acquired absent a written conveyance, the parties dispute whether Seaboard obtained an easement by prescription or, instead, a fee simple via adverse possession.

## Discussion

### Summary Judgment Standard

Summary judgment is appropriate where the evidence demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC"); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A genuine dispute is one that "may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A fact is material if it "might affect the outcome of the suit." Id. at 248.

The moving party bears the burden of establishing the absence of any material fact, and any doubt over factual disputes will be resolved in favor of the non-moving party. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Once this burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. Liberty Lobby, 477 U.S. at 256-57. A court does not weigh each side's evidence when considering a motion for summary judgment, but "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). When opposing parties both move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Mingus Constructors, 812 F.2d at 1391. In adjudicating a motion for summary judgment, "the Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues." Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) (citation omitted). Cross-motions for summary judgment "are not an admission that no material facts remain at issue." Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997) (citing United States v. Fred A. Arnold, Inc., 573 F.2d 605, 606 (9th Cir. 1978)). "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." Id.

### Takings Claims Under the Rails to Trails Act

Congress enacted the Trails Act to preserve shrinking rail trackage by converting unused rights-of-way to recreational trails. Preseault I, 494 U.S. at 5. The operation of the Trails Act is subject to the Fifth Amendment to the United States Constitution, which provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Accordingly, when private property interests are taken by the Government pursuant to the Trails Act, the property owners are entitled to just compensation. See Preseault I, 494 U.S. at 12. Because property rights arise under state law, Florida law governs whether the landowners in this case have a compensable property interest. See Ruckelshaus v. Monsanto Co., 467 U.S. 986,

1001 (1984) (citing Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 151, 161 (1980)); Preseault I, 494 U.S. at 20-25 (O'Connor, J., concurring).

In a rails-to-trails case, a taking, if any, occurs when "state law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use." Caldwell v. United States, 391 F.3d 1226, 1228 (Fed. Cir. 2004). The Trails Act prevents a common law abandonment of the railroad right-of-way from being effected, thus precluding state law reversionary interests from vesting. Id. at 1229. Stated in traditional property law parlance, upon abandonment or termination of a railroad easement, "the burden of the easement would simply be extinguished, and the landowner's property would be held free and clear of any such burden." Toews v. United States, 376 F.3d 1371, 1376 (Fed. Cir. 2004). By preventing the abandonment and concomitant restoration of a fee simple unburdened by the easement, the Trails Act effects a taking. See Barclay v. United States, 443 F.3d 1368, 1371 (Fed. Cir. 2006). As the Federal Circuit has explained, the taking occurs when the Surface Transportation Board ("STB"), the regulatory body that oversees construction, operation, and abandonment of most railroad lines in the United States, issues a Notice of Interim Trail Use or Abandonment ("NITU"):

> Abandonment is suspended and the reversionary interest is blocked "when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)" of the Trails Act. We concluded [in Caldwell] that "[t]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way." Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU.

Barclay, 443 F.3d at 1373 (quoting Caldwell, 391 F.3d at 1233-34) (emphasis in original) (citations spacing omitted).

In another sense -- the dominant consideration in these types of taking cases -- the taking occurs when the government, pursuant to the Trails Act, creates a new easement for a recreational use over land that had been encumbered by an easement limited to railroad purposes. See Preseault II, 100 F.3d at 1550 (describing the conversion of a railroad easement to a recreational trail as "a new easement for [a] new use, constituting a physical taking of the right of exclusive possession that belonged to the [owners of the servient estates]"). The statutory imposition of this recreational easement, which otherwise had not been granted, is a taking.

Whether a plaintiff possesses a compensable property interest in a rails-to-trails case depends on three determinative issues:

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to

6

encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

Preseault II, 100 F.3d at 1533.

**Principles of Deed Construction under Florida Law**

Whether Plaintiffs possessed a property interest at the time of the NITU depends upon the nature of the original conveyance that established the railroad's right to operate a railroad on the property at issue. See Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373-74 (Fed. Cir. 2009); Toews, 376 F.3d at 1375-76.

Under Florida law, "the intention of the parties . . . governs the interpretation of a document." Thrasher v. Arida, 858 So. 2d 1173, 1175 (Fla. Dist. Ct. App. 2003). A court should "consider the language of the entire instrument in order to discover the intent of the grantor, both as to the character of [the] estate and the property attempted to be conveyed, and to so construe the instrument as, if possible, to effectuate such intent." Reid v. Berry, 112 So. 846, 852 (Fla. 1927); see also 19 Fla. Jur. 2d Deeds § 107 (2012) ("The primary consideration in the construction of a deed is the intention of the parties thereto.").

"If there is no ambiguity in the language employed then the intention of the grantor must be ascertained from that language." Saltzman v. Ahern, 306 So. 2d 537, 539 (Fla. Dist. Ct. App. 1975); see also Gendzier v. Bielecki, 97 So. 2d 604, 608 (Fla. 1957) ("The test of the meaning and intention of the parties is the content of the written document."). When interpreting a deed under Florida law, "[t]he Court's function in interpreting and enforcing a contract is to determine the parties' intent from the express text of the Contract." Fin. Healthcare Assocs., Inc. v. Pub. Health Trust, 488 F. Supp. 2d 1231, 1239 (S.D. Fla. 2007) (interpreting Florida law); see also Mason v. Roser, 588 So. 2d 622, 624 (Fla. Dist. Ct. App. 1991) ("With respect to deeds of conveyance, the general rule is that if there is no ambiguity in the language employed then the intention of the grantor must be ascertained from that language.").

**Seaboard Obtained an Easement via the Palmer Conveyance**

The Palmer deed granted Seaboard:

[A] right-of-way for railroad purposes over and across the following described parcel of land . . . A strip of land one hundred (100) feet wide, being fifty (50) feet on each side of the center line of the Seaboard Air Line Railway as located across lands owned by said grantors herein . . . .

THIS conveyance is made upon the express condition, however, that . . . if the Seaboard Air Line Railway shall not construct upon said land and commence operation thereon within one year from the date hereof, a line of railroad, or if at any time thereafter the said Seaboard Air Line Railway shall abandon said land for railroad purposes, then the above described piece and parcel of land shall ipso

7

facto revert to and again become the property of the undersigned, their heirs, administrators, and assigns.

Pls.' PFUF Ex I. In <u>Rogers</u>, this Court construed identical language in the Honore conveyance and held that Seaboard obtained an easement. 90 Fed. Cl. at 431.[9] As this Court explained:

> The Honore conveyance does not refer to the outright transfer of land; it refers to "a right of way for railroad purposes over and across the . . . parcels of land," thereby indicating that the grantor retained an interest in the land referenced in the conveyance and granted an easement to Seaboard. See <u>Trailer Ranch, Inc. v. City of Pompano Beach</u>, 500 So. 2d 503, 506 (Fla. 1986) (explaining that the words "across, over, and under" in a conveyance were indicative of an easement, not a fee simple estate); <u>Irv Enterprises, Inc. v. Atl. Island Civic Ass'n</u>, 90 So. 2d 607, 609 (Fla. 1956) (construing deed as granting an easement where deed contained restrictions on use and stipulated reversion upon discontinuance of said use).
>
> . . .
>
> Here, the words of the Honore conveyance indicate that the parties intended to create an easement. The Honore conveyance transferred a "right of way for railroad purposes <u>over and across</u> the . . . described parcels of land." Def. Mot. Ex. 7. Further, like the deed in <u>Irv Enterprises</u>, the Honore conveyance placed an explicit limitation on the use of the property interest conveyed and contained an unequivocal stipulation that title would revert to the grantor upon discontinuance of the use of the parcel for its intended railroad purpose. See <u>Irv Enters.</u>, 90 So. 2d at 609. The Honore conveyance has no language that suggests that title to described parcel was conveyed outright, i.e. that the transfer was made "in fee simple."

<u>Id.</u> at 429-31.

As such, for the reasons stated in this Court's November 23, 2009 opinion construing the identical Honore language, Seaboard obtained an easement under the Palmer deed. Moreover, as in <u>Rogers</u>, the Palmer deed limited the terms of the easement to railroad purposes -- and provided that title to the property would revert to the grantor if such use terminated. As the Federal Circuit explained, when examining a right-of-way acquired in the original conveyance, the usage of a right-of-way as a recreational trail is "clearly different" from the usage of the same parcel of land as a railroad corridor. <u>Preseault II</u>, 100 F.3d at 1542. Here, as in <u>Rogers</u>, the use of the right-of-way as a recreational trail while preserving the right-of-way for future railroad activity was not contemplated by the original parties when the Palmer deed was signed. Thus, the governmental action converting the railroad right-of-way to a public trail right-of-way imposed a new easement on the landowners and effected a Fifth Amendment taking of their property. <u>Id.</u> at

---

[9] Other than the location of the strip of railroad right-of-way, the Palmer conveyance contains language identical to that of the Honore conveyance. Pls.' PFUF ¶ 29 & Ex. I.

8

1550. The Court therefore grants Plaintiffs' motion for partial summary judgment as to claims arising from property subject to the Palmer conveyance.

## **Seaboard Obtained Fee Simple Title via the Frazer, Blackburn, and Phillips Conveyances**

The Frazer, Blackburn, and Phillips conveyances are identical except for the descriptions of the grantors, grantees, dates, consideration paid, and locations of the parcels of land. The granting provision of the Blackburn conveyance, which is substantively identical to those in the Phillips and Frazer conveyances, reads:

> THIS DEED, Made this fifth day of September 1910, between A.E. BLACKBURN AND WIFE, parties of the first part, and Seaboard Air Line Railway, party of the second part,
>
> WITNESSETH, That for and in consideration of the sum of Two Hundred Dollars ($200.00) in hand paid, the receipt whereof is hereby acknowledged, and other valuable considerations, the parties of the first part hereby grant, bargain, sell and convey unto the party of the second part, all their right, title and interest, of any nature whatsoever, in and to the following property, to wit:
>
> All those certain pieces or parcels of land, lying and being in the County of Manatee and State of Florida, and being described as follows:
>
> A strip of land one hundred (100) feet wide, being fifty (50) feet on each side of the center line of the Seaboard Air Line Railway as located across lands owned by the said parties of the first part . . . .
> . . .
>
> Said strip of land contains 3.15 acres, more or less.
>
> TOGETHER WITH all and singular the tenements, heriditaments, and appurtenances thereunto belonging or appertaining, and every right, title or interest, legal or equitable, of the said party of the first part in and to the same. . . .

Pls.' PFUF, Ex. E; see also Pls.' PFUF, Ex. F, G.[10] There is no dispute that the grantors held fee simple title to the lands conveyed to Seaboard in 1910. The Phillips signed their deed on September 5th for consideration of $100 and the Blackburns signed their deed on September 5th for consideration of $200. Because the conveyances are unambiguous, the Court must ascertain

---

[10] The Frazer conveyance omits the phrase "the parties of the first part hereby grant, bargain," from the second paragraph. Despite this omission, the Frazer deed is substantively the same as the other deeds because the property is still conveyed to Seaboard. The first paragraph of the conveyance identifies the Frazers as the parties to the first part and Seaboard as the party to the second part. The second paragraph states that "all their right, title, and interest, of any nature whatsoever" is conveyed unto "the party of the second part." From the face of the instrument, it is unambiguous that "their right, title, and interest" refers to the Frazers' right, title and interest.

the parties' intent from the face of the deeds. See Saltzman, 306 So. 2d at 539 ("there is no room for judicial construction of the language nor interpretation of the words used" when the deed's wording is clear). Based on the plain language of the conveyances, the Frazers, Blackburns, and Phillips intended to convey fee simple title in their respective parcels of land to Seaboard.

The deeds' granting clauses, which purport to convey a strip of land outright to the railroad without limitation state: "the parties of the first part hereby grant, bargain, sell and convey unto the party of the second part, all their right, title and interest, of any nature whatsoever, in and to the following property. . . ." Def.'s Mot., Ex. B, C, D (emphasis added). The language could not be clearer -- the property owners were conveying all of their interest. As this Court held in Bird Bay, this language, granting all rights, conveys a fee title. 93 Fed. Cl. at 619. The language used in these three conveyances differs substantially from the Honore conveyance at issue in Rogers. In Rogers, the Honore deed granted a "right of way for railroad purposes," and provided that if Seaboard failed to construct a railway and commence operations, the property would revert to the grantor. See Rogers, 90 Fed. Cl. at 422. The Frazer, Blackburn, and Phillips conveyances do not reference an easement or a right-of-way. Rather, the deeds describe the corridor as a "strip of land" and set forth its dimensions, and do not contain any language that limits or restricts the interests conveyed as is typical with easements.

Moreover, the Frazer, Blackburn, and Phillips conveyances do not contain a reversionary clause, as the Honore deed did. The Honore conveyance stated that if a railroad was not built and its operation was not commenced within one year from the date of the deed, or if Seaboard abandoned the land for "railroad purposes," "then the [conveyed] pieces and parcels of land [would] ipso facto revert to and again become the property of [the Honores]." Rogers, 90 Fed. Cl. at 422. Imposing an express limit on how the property can be used suggests an intent to create an easement or convey something less than a fee estate. See Irv Enters., Inc. v. Atl. Island Civic Ass'n, 90 So. 2d 607, 609 (Fla. 1956) (interpreting a deed with restrictions on use and a reversion provision as granting an easement). Here, as in Bird Bay, the lack of reversionary clauses, in conjunction with the expansive granting clauses -- granting all right, interest and title -- unambiguously indicate that the Frazer, Blackburn, and Phillips conveyances intended to grant fee simple title to Seaboard. See 93 Fed. Cl. at 612.

Plaintiffs' argument that the conveyors granted an easement to the railroad is unpersuasive. First, Plaintiffs note that the deeds convey "strip[s] of land . . . as located across lands owned by said parties of the first part . . . ." Citing Rogers, Plaintiffs argue that a conveyance of land "across" a second parcel of land shows that the grantors intended to convey an easement. However, in Rogers, this Court found that other language in the Honore conveyance -- the phrases "a right of way" and "for railroad purposes" -- as well as "over and across . . . the parcels of land," reflected the grantor's intent to convey an easement. 90 Fed. Cl. at 429-31. In Bird Bay, this Court rejected the plaintiffs' contention that the phrase "through the lands of the grantor," without more, demonstrated intent to convey an easement. 93 Fed. Cl. at 621 (emphasis added). This Court held instead that "through the lands of the grantor" merely described the location of the strip of land conveyed, and did not define, characterize, qualify, or limit the nature of the property interest conveyed. Id. at 621-22. The Blackburn, Frazer, and Phillips conveyances purport to convey a "strip of land . . . as located across lands owned by said parties of the first part . . . ." Pls.' PFUF Ex. E-G (emphasis added). The word "across," in conjunction with the words "as located," merely describes the location of the subject parcel and

10

does not qualify or limit the property interest the grantors conveyed. As in <u>Bird Bay</u>, the deeds specify the location of the land conveyed and contain no limitations on the use of the land -- such as "for railroad purpose" -- and do not characterize the conveyance as a "right of way." <u>See also</u> <u>Whispell Foreign Cars, Inc. v. United States</u>, 97 Fed. Cl. 324, 337 (2011) (<u>amended on reconsideration in non-relevant part by</u>, 100 Fed. Cl. 529 (2011)) (applying Florida law and interpreting conveyance as an estate in fee because the deed conveyed land, warranted title, and did not have any use restrictions).

Plaintiffs also argue that because many jurisdictions prohibit railroads from acquiring fee simple title in property, Seaboard could not have been granted a fee simple estate in the corridor. This Court squarely rejected this identical argument in <u>Rogers</u> and <u>Bird Bay</u>. The <u>Rogers</u> court quoted <u>Florida Power Corporation v. McNeely</u>, which acknowledged that a railroad could be granted an easement, stating: "[t]his is not to say that a railroad by arrangement or otherwise could not under any circumstances operate by virtue of an easement." 90 Fed. Cl. at 430 (quoting 125 So. 2d. 311, 317 (Fla. Dist. Ct. App. 1960)). In <u>Bird Bay</u>, this Court again held that under Florida law a railroad could acquire fee simple title to the strip of land on which it operates, stating:

> The fact that Seaboard was a railroad, which may or may not have possessed the power of eminent domain, does not, as Plaintiffs argue, inhibit its right to acquire fee simple title to lands, even when it was in receivership. Under Florida law, railroad companies may acquire land over which to construct rails and operate locomotive trains either as an estate in fee or they may acquire a right to cross over such land with an easement. In Florida, the term right-of-way, as it relates to railroads, can refer either to a "right of crossing" -- an easement -- or to "a strip of land which a railroad takes, upon which to construct its railroad" -- an estate in fee. Whether the railroad obtains a "right" or "land" depends on the intent of the parties as reflected by the deed of conveyance.

93 Fed. Cl. at 622-23 (citations omitted). As in <u>Bird Bay</u>, the intent of the parties in the Frazer, Blackburn, and Phillips conveyances is clear. The deeds conveyed a "strip of land . . . and every right, title or interest" -- not a right-of-way. Moreover, the deeds did not limit Seaboard's use of the land to railroad purposes. Railroads were permitted to obtain fee estates under Florida law in 1910, and the Frazer, Blackburn, and Phillips deeds unambiguously conveyed fee estates.

In sum, Seaboard acquired a fee simple title in the portions of the right-of-way subject to the Frazer, Blackburn, and Phillips conveyances. As the adjoining landowners never possessed a property interest in the subject corridor, no taking has occurred. Defendant's motion for partial summary judgment is granted as to the claims relating to the Frazer, Blackburn, and Phillips conveyances.

### **The Knight Deed Conveyed a Fee Simple Title to the Right-of-Way**

The Knight conveyance is identical in almost all respects to the Frazer, Blackburn, and Phillips conveyances. The Knight conveyance warrants a separate discussion, however, because it contains a hand-written notation nullifying the grant unless a railroad were built within five

11

years.  The Knight deed, including this handwritten notation, which is in bold and bracketed, reads:

> THIS DEED, Made this third day of September 1910, between JESSE KNIGHT, WIDOWER, and F.R. KNIGHT unmarried, parties of the first part, and Seaboard Air Line Railway, party of the second part.
>
> WITNESSETH, That for and in consideration of the sum of Ten Dollars ($10.00) in hand paid, the receipt whereof is hereby acknowledged, and other valuable considerations, the parties of the first part hereby grant, bargain, sell and convey unto the party of the second part, all their right, title and interest, of any nature whatsoever, in and to the following property, to wit:
>
> All those certain pieces or parcels of land, lying and being in the County of Manatee and State of Florida, and being described as follows:
>
> A strip of land one hundred (100) feet wide, being fifty (50) feet on each side of the center line of the Seaboard Air Line Railway as located across lands owned by the said parties of the first part . . . .
> …
>
> Said strip of land contains 6.3 acres, more or less.  **[Provided the said railroad is built within five years from [the] date hereof, otherwise this deed becomes null [and] void.]**
>
> TOGETHER WITH all and singular the tenements, heriditaments, and appurtenances thereunto belonging or appertaining, and every right, title or interest, legal or equitable, of the said parties of the first part in and to the same.
> . . .

Pls.' PFUF Ex. H; see also Def.'s Mot., Ex E.

Defendant interprets the deed coupled with the handwritten language as creating a fee simple subject to a condition subsequent.  Plaintiffs claim that the handwritten note's language is instead evidence that the Knights conveyed an easement.  Plaintiffs argue that the "null and void" language in the handwritten note contemplates a process akin to an extinguishment of an express easement, rather than a reversion of a fee simple.  Specifically, Plaintiffs contend:

> A condition rendering a fee estate "null and void" is inconsistent with the very nature of a fee conveyance.  And, while such a 'null and void' provision is contrary to the very nature of a conveyance, such a provision is commonly found in a grant of an easement.

Pls.' Supp. Br. 23 (Jan. 19, 2011).  From this premise, Plaintiffs argue that the Knight conveyance could not have established a fee estate, relying primarily on Dean v. MOD Properties, 528 So. 2d 432 (Fla. Dist. Ct. App. 1988).  Plaintiffs claim that in Dean, "[t]he court noted that the lack of any right of reversion eliminated the possibility that a defeasible fee simple estate was created, and instead, found, the terminating language more consistent with an

easement." Pls.' Supp. Br. 25 (Jan. 19, 2011).  However, the mere presence of "terminating language" did not drive the Dean Court's finding that the conveyance there was an easement. Rather, the Dean Court found the use of the words "reversion of reversions thereof," "inept" in the conveyance at issue because they implied conveyance of a fee simple title.  The Dean Court explained:

> The draftsman of the "road right-of-way easement" to the City of Sanford in 1974 was certainly not clear as to the legal differences and distinctions as to landed estates, easements, and licenses.  However, the implication of a conveyance of the fee simple title raised by the inept words "the reversion or reversions thereof" is, in our opinion, clearly overwhelmed by the repeated qualified phrases limiting the interest conveyed to be for the "purpose of road right-of-way" and "for public road right-of-way purposes," as well as the title of the document, and constituted the creation and granting to the City of Sanford of an easement for a right-of-way for a public road and did not convey the fee simple title, nor did it convey a conditional, qualified, or determinable fee estate subject to any right of reverter in the grantor MOD.

Thus, Dean does not stand for the proposition that mention of a right of reversion eliminates the possibility of conveyance of a defeasible fee simple estate.  Rather, Dean held that a conveyance of a "road right-of-way easement" for the "purpose of road right-of-way" and "for public road right-of-way purposes" conveyed an easement and not a fee simple.  Id. at 434.

Contrary to Plaintiffs' argument, it is well recognized that a fee estate may be limited by a proviso that the estate shall expire upon a specified occurrence.  See e.g. Restatement (First) of Property, § 44 (1936).  The Restatement defines a fee simple determinable as a conveyance "created by any limitation which, in an otherwise effective conveyance of land, (a) creates an estate in fee simple; and (b) provides that the estate shall automatically expire upon the occurrence of a stated event."  Id.  Florida courts have long recognized the property interest known as a fee simple determinable.  See Richardson v. Holman, 33 So. 2d 641, 642 (Fla. 1948) (in "a fee simple determinable . . . the words creating it limit the continuation of the estate to the time preceding the happening of the contingency").

Analyzing the language of the Knight conveyance leads to the conclusion that the deed conveyed a fee simple determinable.  Like the Frazer, Blackburn, and Phillips deeds, the original language of the Knight conveyance in its entirety indicates an intent to transfer a fee simple.  The addition of the handwritten phrase -- "Provided the said railroad is built within five years from [the] date hereof, otherwise this deed becomes null [and] void" -- does not alter the fundamental character of the property interest -- the fee conveyance.  Rather, while the notation defined an event that would terminate Seaboard's fee -- failure to build a railroad within five years -- the notation did not change the nature of the fee or somehow convert the fee estate into an easement.  As in the Blackburn, Phillips, and Frazer conveyances, the granting clause of the Knight deed conveyed "the tenements, hereditaments, and appurtenances thereunto belonging or appertaining, and every right, title or interest, legal or equitable" in the corridor -- not a right-of-way limited to certain enumerated uses.  Unlike the conveyances in Dean and Rogers, the Knight conveyance contains no references to easements, rights-of-way, or any purposes.

13

Because Seaboard built a railroad within five years of the conveyance, at the time of the NITU, CSX held the strip of land at issue in fee simple absolute, and the abutting landowners had no interest in the right-of-way. The Court therefore grants Defendant's motion for partial summary judgment with respect to the Knight conveyance.

**Property Acquired "By Possession"**

Plaintiffs claim that "for land upon which Seaboard built and operated the rail line without any conveyance from the land owner, the greatest interest Seaboard could have obtained was a prescriptive easement." Pl.'s Resp. at 3, Oct. 12, 2010. Defendant claims that Seaboard satisfied the requirements for adverse possession in effect in 1910, thus acquiring a fee simple estate, and that nothing in Florida law prohibited a railroad from obtaining title through adverse possession.

**A Railroad Can Acquire Fee Simple Title by Adverse Possession**

Seaboard built its rail corridor in 1910, but for multiple portions of the corridor, there was no written conveyance granting the right to construct and operate a railbed. According to an "ICC Valuation Table" dated June 30, 1918, multiple sections of Seaboard's railway corridor as they existed in 1918 had been "held or used" "by possession." Def.'s Cross-Mot. for Partial Summ. J, Ex. F. The Table does not indicate whether the nature of Seaboard's interest was a fee simple estate acquired by adverse possession or an easement acquired by prescription.

The Florida Supreme Court, in Downing v. Bird, 100 So. 2d 57, 64-65 (Fla. 1958) (citations omitted), elaborated on the difference between establishing title by adverse possession and acquiring an easement by prescription:

> The establishment of a public highway by prescription, or long user, is based on the presumption of a prior grant. A prescriptive right is an incorporeal hereditament in land.
>
> The establishment of title by adverse possession is based on the theory that the owner has abandoned the land to the adverse possessor. Title so acquired is a corporeal right, and it is the nature of the right acquired which marks the principal difference between a prescriptive right and title by adverse possession.
>
> The trend of modern authorities is to abandon the theory that prescriptive rights are based on the presumption of a prior grant, and to treat the acquisition thereof as being rights acquired by methods substantially similar to those by which title is acquired by adverse possession. We agree with these authorities.
>
> In either prescription or adverse possession, the right is acquired only by actual, continuous, uninterrupted use by the claimant of the lands of another, for a prescribed period. In addition the use must be adverse under claim of right and must either be with the knowledge of the owner or so open, notorious, and visible that knowledge of the use by and adverse claim of the claimant is imputed to the owner. In both rights the use or possession must be inconsistent with the owner's

use and enjoyment of his lands and must not be a permissive use, for the use must be such that the owner has a right to a legal action to stop it, such as an action for trespass or ejectment.

Further in either prescription or adverse possession, the use or possession is presumed to be in subordination to the title of the true owner, and with his permission and the burden is on the claimant to prove that the use or possession is adverse. This essential element as well as all others must be proved by clear and positive proof, and cannot be established by loose, uncertain testimony which necessitates resort to mere conjecture.

. . . .

While there are slight differences in the essentials of the two actions, they are not great. In acquiring title by adverse possession, there must of course be 'possession'. In acquiring a prescriptive right this element is use of the privilege, without actual possession. Further, to acquire title the possession must be exclusive, while with a prescriptive right the use may be in common with the owner, or the public.

Adverse possession during the period in question -- 1910 -- was governed by General Statutes of Florida § 1722 (1906), titled "Adverse possession without color of title." 1910 is the relevant year because Seaboard began building the railroad in that year, and the law in effect when an adverse possession claim begins to run governs the claim.[11] Baugher v. Boley, 58 So. 980, 982 (Fla. 1912). The pertinent Florida adverse possession statute provides:

1. To Be Land in Actual Occupation Only. -- Where it shall appear that there has been an actual continued occupation for seven years of premises under a claim of title exclusive of any other right, but not founded upon a written instrument, or a judgment or decree, the premises so actually occupied, and no other, shall be deemed to have been held adversely.

2. Definition of Occupation and Possession Required. -- For the purpose of constituting an adverse possession by a person claiming title not founded upon a written instrument, judgment or decree, land shall be deemed to have been possessed and occupied in the following cases only: 1. Where it has been protected by a substantial enclosure, or 2., where it has been usually cultivated or improved.

---

[11] There is no dispute that "work on a sixteen-mile extension of the Seaboard railroad line began in January 1910 and the project was completed in full by 1911." Def.'s Supp. Br. 6, Jan. 19, 2011; see also Pls.' Resp. 1, Oct. 12, 2010 ("The present motion requires this Court to apply this analysis to land upon which the Seaboard Air Line Railway ("Seaboard") built a railway in 1910.").

Gen. Stat. Fla. § 1722 (1906).[12]  See also Baugher v. Boley, 58 So. at 984 (upholding finding of adverse possession under General Statutes of Florida § 1722 where there was "conspicuous effort to maintain a fence" around uncultivated land for the full seven-year period).  There was no similar statute governing prescriptive easements in effect at this time.  However, at common law, 20 years of continuous and uninterrupted use established an easement by prescription. Zetrouer v. Zetrouer, 103 So. 625, 626-27 (Fla. 1925) (en banc) ("Where the common law obtains, 20 years' continuous and uninterrupted use has always created a prescriptive right as well in the public as private individuals.").

Plaintiffs argue that General Statutes of Florida § 1722 is inapposite because, in several jurisdictions, railroads may not acquire rights-of-way in fee simple through adverse possession. "[O]rdinary [railroad] right of way use creates an easement by prescription only" and not "fee title by adverse possession."  10 Thompson on Real Property, 2d Thomas Ed., § 87.17 (1998). "The principal reason advanced in support of the rule is that the nature of the user by the railroad requires no more than an easement in the right of way and does not, therefore, amount to an occupancy adverse to the claim of another to the fee."  Md. & Pa. R.R. Co. v. Mercantile-Safe Deposit & Trust Co., 166 A.2d 247, 249 (Md. 1960); see also People v. Ocean Shore R.R., 196 P.2d 570, 577 (Cal. 1948) ("usually there is no user beyond the purposes of a right of way and no notice to the owner that any greater right is claimed"); see generally Penn Cent. Corp. v. U.S. R.R. Vest Corp., 955 F.2d 1158, 1160 (7th Cir. 1992) (explaining economic benefits resulting from presumption that railroad acquires an easement instead of fee simple).

Florida law, however, does not follow the majority rule.  At least two Florida courts have upheld findings that a railroad obtained title to a right-of-way through adverse possession.  See Seaboard Air Line Ry. Co. v. Atl. Coast Line R.R. Co., 158 So. 459 (Fla. 1935) (en banc) ("Seaboard"); Tassapoulos v. Seaboard Coastline R.R. Co., 353 So. 2d 867 (Fla. Dist. Ct. App. 1977).  In Seaboard Air Line, Atlantic Coast Line brought an action to quiet title to the land where its right of way crossed that of Seaboard.  The chancellor found that Atlantic had acquired the right-of-way via adverse possession under color of title, and the Florida Supreme Court affirmed.  Seaboard, 158 So. at 461.  The Seaboard Court provided no description of the evidence for Atlantic Coast Line's "actual and notorious possession" other than to say there was a "great amount."  Id.

In Tassapoulos, the Florida Court of Appeals issued the following opinion, quoted below in its entirety:

> The record titleholders to certain land in Clay County appeal from a judgment holding that the appellee railroad obtained title by adverse possession, without color of title, to a strip along one boundary of the tract.  While the record supports the trial court's judgment concerning a small parcel actually occupied by the railroad's roadbed, the record does not support the railroad's claim to a wider strip parallel to its track, the boundary of which is marked not by a substantial enclosure but only by power poles and lines on appellants' land.  Section 95.18, Florida Statutes (1975); Downing v. Bird, 100 So. 2d 57 (Fla. 1958). The case will be remanded for entry of a conforming judgment.

---

[12] The 1906 version of § 1722 remained in effect until 1918.

16

353 So. 2d at 867.[13]  A dissenting opinion reads, in its entirety:

> In my opinion, there was competent, substantial evidence to support the trial judge's finding that appellee Seaboard acquired the disputed property by adverse possession. Kiser v. Howard, 133 So. 2d 746 (Fla. Dist. Ct. App. 1961).

Id.

Tassapoulos, like Seaboard Air Line, indicates that under Florida law, a railroad can acquire fee simple title to a right-of-way through adverse possession.  So too does the Fifth Circuit's decision in Dunscombe v. Loftin, 154 F.2d 963, 967 (5th Cir. 1946) ("Under Florida law, a railroad, having the power of eminent domain, can also acquire title by adverse possession.").  Accord Whispell Foreign Cars, Inc. v. United States, 100 Fed. Cl. 529, 543-45 (2011).  This proposition is further supported by Florida Power Corp., 125 So. 2d at 311.  In Florida Power, the court considered whether the power company had obtained an easement and contrasted the power company's use of the corridor with that of a railroad:

> By comparative analysis of physical aspects of a railroad right of way and the ordinary power line easement as these aspects lend themselves to use of lands, we perceive a difference.  By the construction of its road bed, the installation of its ties and tracks, and through its railroading operations, <u>a railroad adversely using land excludes the owner from and prevents his use of that land, and so exercises dominion over it and has possession</u>.  This is not to say that a railroad by arrangement or otherwise could not under any circumstances operate by virtue of an easement; but for the reasons stated, <u>the usual adverse situation negates mere user</u>.  On the other hand, a power line principally utilitizes a space-way and is not terrestrially located as is a railroad right of way.  Beneath the suspended power line many activities entirely consistent with use by the power company may be carried on.  These activities may be of a productive nature; ordinary observation discloses a variety of instances wherein the lands beneath power lines are utilized for purposes of the owners of the lands involved.  The nature of an easement depends upon its purpose, and the right to use the land beneath a power line for other purposes not conflicting nor interfering with the easement of the power corporation remains with the landowner.

Id. at 316-17 (emphasis added) (citing Annotation, 6 A.L.R. 2d (205)).  Thus, the Florida Power Court found that the power company had used the land in concert with the property owners -- as opposed to in exclusion of them -- because the power company and the line did not occupy the land except for occasional inspections and infrequent clearing.  Id. at 317.  The court observed that unlike a power line, the presence of an active railway could prevent a landowner from using the occupied land, and such exclusive use would indicate a fee interest by adverse possession.

---

[13] The Tassapoulos court upheld a finding of adverse possession under Florida General Statutes 95.18 (1975).  The only significant difference between that statute and Florida General Statutes § 1722 (1906), was the requirement in Florida General Statutes 95.18 that the adverse possessor begin paying property taxes within one year after taking possession of the property and continue to do so throughout the period of possession.

17

See also 2 Fla. Jur. 2d Adverse Possession § 56 (2011) (citing Dunscombe, 154 F.3d at 967). As such, Florida precedent does not foreclose the possibility of a railroad acquiring a fee interest via adverse possession.

Plaintiffs argue that the weight of Florida cases equate open and notorious seizure of rights-of-way with prescriptive easements. Even if this observation were true, this does not mean that the property interest that Seaboard acquired in 1910 "by possession" must necessarily be legally defined as a prescriptive easement. Rather, as the Florida Supreme Court recognized in Downing v. Bird, the critical difference between adverse possession and prescriptive easement is whether the railroad actually possessed the property for the requisite period, indicating adverse possession, or merely used it, giving rise to a prescriptive easement for the purpose of railroad use. 100 So. 2d at 64-65. Whether a user of land meets the requirements for adverse possession or prescriptive easement is a fact intensive inquiry. Either property right must be proved by the claimant "by clear and positive proof." Id. at 65. The cases Plaintiffs cite do not persuade the Court that the property interest Seaboard obtained in 1910 was necessarily a prescriptive easement as a matter of law. See Pls.' Supp. Br. 15-19, June 13, 2012. Plaintiffs have not identified any Florida case holding that a railroad cannot obtain fee title through adverse possession, while Dunscombe, Seaboard Air Line, and Tassapoulos indicate a railroad can obtain fee ownership through adverse possession.

### Summary Judgment Is Inappropriate

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). "[S]ummary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues." Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006); see also Blue Lake Forest Products, Inc. v. United States, 86 Fed. Cl. 366, 381-82 (2009) (denying cross-motions for summary judgment when the record did not contain clear evidence regarding the motives of decision-makers or the evidence of their decisions).

In this case, neither party has met its burden. To establish title through adverse possession, Defendant must meet the requirements of Florida General Statutes § 1722, which provides: there has been an actual continued occupation for seven years of premises under a claim of title exclusive of any other right and land shall be deemed to have been possessed and occupied in the following cases only: (1) where it has been protected by a substantial enclosure, or (2) where it has been usually cultivated or improved.

On the current record, Defendant has not offered clear and positive proof that Seaboard continually occupied the land underlying the right-of-way for seven years or that it made the requisite enclosures or improvements on the land. Defendant has submitted a 1916 map of the southeastern United States depicting Seaboard's railroad network, with an inset providing a detailed map for the routes radiating from Tampa. Def.'s Supp. Br., Ex. I, June 13, 2012. The inset map shows a route running from Tampa south to Venice -- and through Sarasota. Defendant also submitted an excerpt from Poor's Manual indicating that Seaboard operated a rail line over from Fruitvale to Venice, for a total of 16.53 miles in 1921. Def.'s Supp. Br., Ex. J, June 13, 2012 (listing the Fruitvale to Venice branch as one of the rail lines Seaboard operated as of December 31, 1921). Poor's Manual provides a list of the routes where Seaboard provided

service and the mileage of those routes. Poor's Manual does not contain any detailed maps or routes to establish whether the Fruitvale to Venice route occupied the entire corridor at issue. While these materials indicate that Seaboard owned some type of rail service network in the area in 1916 and in 1921, the materials do not provide details showing that Seaboard operated continuous, open, and notorious rail service for seven years as required under Florida law. Even, assuming arguendo, that Defendant has established that Seaboard maintained and operated a railroad in 1916, and 1921, such a showing does not meet the strict requirements necessary to prove adverse possession under Florida law. See Drawdy Inv. Co. v. Leonard, 29 So. 2d 198, 203 (Fla. 1947) (holding that barbed wire fence and natural barriers enclosing grazing land "fails entirely to show such an actual continued, open and notorious possession of the lands under a claim of right by the plaintiff"); Tassapoulos, 353 So. 2d at 867 (overturning the trial court's determination that the railroad had adversely possessed land parallel to the railbed "marked not by a substantial enclosure but only by power poles and lines on appellants' land."). Further, Defendant has not articulated the dimensions of the area on each parcel to which it claims Seaboard obtained a fee interest.

Similarly, in order to demonstrate that Seaboard acquired a prescriptive easement by possession, Plaintiffs must demonstrate by clear and positive proof that the railroad's use was adverse, open, and notorious for a 20 year period -- and must demonstrate the location and dimensions of the property. Zetrouer v. Zetrouer, 103 So. at 626-27; Downing, 100 So. 2d at 65. Here, Plaintiffs did not offer such proof. Rather, they merely attempted to rebut Defendant's claims of adverse possession by citing chains of title that show the landowners did not record any conveyances to Seaboard. Pls.' Supp. Br. 12, June 13, 2012 ("The chain of title confirms that for certain segments of the right-of-way, the railroad did not obtain any recorded interest in the land. . . . Numerous state courts have reached the prevailing conclusion that a railroad acquires only a prescriptive easement, rather than an estate in fee in circumstances such as these."). Plaintiffs' allegations are insufficient to establish a prescriptive easement.

While Plaintiffs are correct that Defendant must show that Seaboard satisfied the statutory requirements to obtain fee title via adverse possession, Plaintiffs fail to acknowledge that a party claiming a prescriptive easement must also show actual, continuous, uninterrupted, and adverse use for the requisite period. J.C. Vereen & Sons, Inc. v. Houser, 167 So. 45, 48 (Fla. 1936) (finding no prescriptive easement when the claimant could not show use of property for the full prescriptive period); Guerard v. Roper, 385 So. 2d 718, 720 (Fla. Dist. Ct. App. 1980) (while appellee showed continuous use for 20 years, court found no prescriptive easement because there was no evidence to support adversity). It is fundamental that Plaintiffs must establish their property rights because in any takings case, "only persons with a valid property interest at the time of the taking are entitled to compensation." Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001).

Neither party has set forth sufficient evidence on whether Seaboard obtained a fee simple via adverse possession or a prescriptive easement by open and notorious use. Both parties' briefs contain bare assertions of fact without any evidentiary support. See Whispell Foreign Cars, 100 Fed. Cl. at 546 (holding neither the plaintiff landowners nor the defendant set forth sufficient evidence on the issue of whether a Florida railroad met the statutory requirements to obtain title via adverse possession). On this record, the Court cannot determine whether Seaboard acquired

fee simple title via adverse possession to the property acquired "by possession" or a prescriptive easement.

## Conclusion

1. Defendant's motion for partial summary judgment is **GRANTED** on the claims relating to the portion of the railroad corridor subject to the Blackburn, Frazer, Knight, and Phillips conveyances, and Plaintiffs' motion is **DENIED**.

2. Plaintiffs' motion for partial summary judgment on the claims relating to the portion of the railroad subject to the Palmer conveyance is **GRANTED**, and Defendant's motion is **DENIED**.

3. Based on the current record, the Court **DENIES** Plaintiffs' and Defendant's cross-motions for summary judgment on the claims of the Plaintiffs whose land abuts the railroad corridor where Seaboard acquired its property interest "by possession."

On or before **October 15, 2012**, the parties shall file a joint status report and propose further proceedings to resolve the claims relating to property interests Seaboard acquired by possession.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**